UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

AKEEM HENDERSON and JENNIFER
ALEXANDER, INDIVIDUALLY AND
AS ADMINISTRATRIX OF THE
SUCCESSION OF A. H.
      (Plaintiffs)
VERSUS

WILLIS-KNIGHTON MEDICAL
CENTER d/b/a WILLIS KNIGHTON
SOUTH HOSPITAL
      (Defendant)

CIVIL ACTION NO. 5:19-CV-00163

JUDGE ELIZABETH E. FOOTE

MAGISTRATE JUDGE
MARK L. HORNSBY

**MEMORANDUM SUPPORTING PLAINTIFFS' MOTION TO DISQUALIFY
DEFENDANT'S EXPERT JACQUELINE WHITE, M.D. AND
TO STRIKE HER TESTIMONY AS UNRELIABLE**

Respectfully Submitted:

SEDRIC E. BANKS LBN 2730
S. HUTTON BANKS LBN 37377
1038 North Ninth St.
Monroe, Louisiana 71201
318-388-1655 telephone
318-816-5026 facsimile
sedbanks@aol.com
*Attorneys for Akeem Henderson and
Jennifer Alexander*

**TABLE OF CONTENTS**

TABLE OF CONTENTS  i

INDEX OF AUTHROITIES  ii

I. Introduction  1

II. Law Applicable to Plaintiffs' EMTALA claims  1

III. Factual Background  3

IV. Law Applicable to expert testimony  8

  (A) Jacqulyn White, M.D. is not qualified to render an expert opinion in this EMTALA proceeding.  9

  (B) Dr. White's opinions are not based on facts of record.  10

  (C) Dr. White's methodology cannot survive *Daubert* scrutiny.  15

V. Conclusion and Prayer for Relief  17

CERTIFICATE OF SERVICE

# INDEX OF AUTHORITIES

**FEDERAL RULES**                                                                      **PAGE**

Rule 702 of the Federal Rules of Evidence.                                               8

**STATUTES / CODAL PROVISIONS**

42 U.S.C.A. §1395dd                                                                      1, 2

**JURISPRUDENCE**

*Battle ex rel. Battle,* (5th Cir. 09/20/00) 228 F.3d 544.                               1, 2

*Marshall on Behalf of Marshall v. East Carroll Parish Hosp. Service Dist.,*
(5th Cir. 02/09/98) 134 F.3d 319.                                                        1, 2

*Smithson v. Tenet Health System Hospitals, Inc.*, U.S.D.C. 07/30/08 2008 WL 2977361    2

*Battle v. Memorial Hosp. at Gulfport,* 228 F.3d 544, 558 (5th Cir. 2000).               2

*Scott v. Hutchinson Hospital,* 959 F.Supp. 1351, 1358 (USDC D Kansas 03/04/97)          2

*Ingram v. Muskogee Regional Medical Center,* 235 F.3d 550, 551 (10th Cir. 12/18/00)     2

*Burditt v. United States Dep't of Health & Human Servs.,*
934 F.2d 1362 at 1369 (5th Cir. 1991).                                                   2

*Pettyjohn v. Mission-St. Joseph's Health System, Inc.,*
(U.S.D.C. W.D. North Carolina 11/22/00) 2000 WL 33311929.                                2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786,
125 L.Ed.2d 149 (1993).                                                                  8, 9, 16

*Carlson v. Bioremedi Therapeutic Systems, Inc.,* (USCA 5th Cir. 05/16/16)
822 F.3d 194.                                                                            8

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167,
143 L.Ed.2d 238 (1999).                                                                  8, 9

*Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567 at 581 (5th Cir. 2001).               8

*Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 243-44 (5th Cir. 2002).                    8

*Wilson v. Woods,* 163 F.3d 935 at 937 (5th Cir. 1999).                                 9

*United States v. Wen Chyu Liu, 716 F.3d 159, 167 (5th Cir. 2003).*                 9

*Lassiegne v. Taco Bell Corp.,* 202 F.Supp.2d 512, (E.D. La. 04/11/02).              10

*Previto v. Ryobi North America, Inc.,* 766 F.Supp2d. 759, (S.D.Ms. 12/16/10).       10

*Johnson v. State Farm Mutual Automobile Insurance Company,*
2012 WL 1745497 (E.D.La. 05/16/12).                                                  10

*Barnett v. Deere & Company,* 2016 WL 5118263 (S.D. Ms. 09/20/16).                   10

**TO THE HONORABLE ELIZABETH FOOTE:**

NOW COME AKEEM HENDERSON AND JENNIFER ALEXANDER, **INDIVIDUALLY AND AS ADMINISTRATRIX OF THE SUCCESSION OF HER DECEASED MINOR CHILD, PLAINTIFFS** in the above styled and numbered cause who respectfully move to disqualify Jacquelyn White, M.D. as an expert witness in this case and to strike her testimony as unreliable, as supported more particularly below.

## I.       Introduction

By these motions and objections, Plaintiffs seek an order striking and/or excluding the testimony of the individual designated by Defendant, Willis-Knighton, as an expert witness namely, Jacquelyn White, M.D. Plaintiffs have timely filed this motion in compliance with the Court's February 27, 2019 deadline for filing Motions in Limine.

## II.      Law applicable to Plaintiffs' EMTALA claims.

Congress enacted the Emergency Medical Treatment and Active Labor Act ("EMTALA") to address the growing concern of "patient dumping" by imposing a two-fold duty on participating hospitals. First, it requires hospitals to provide an appropriate medical screening examination, within the capability of the hospital's emergency department, to determine whether an emergency medical condition exists. 42 U.S.C.A. § 1395dd(b)(1)(a). If the hospital acquires knowledge of an emergency medical condition, it must then provide "for such further medical examination and such treatment as may be required to stabilize the medical condition." See 42 U.S.C.A. § 1395dd(e)(1)(A); *Battle ex rel. Battle v. Memorial Hosp. at Gulfport,* (5th Cir. 09/20/00) 228 F.3d 544 at 558 - 559 and *Marshall on Behalf of Marshall v. East Carroll Parish Hosp. Service Dist.* (5th Cir. 02/09/98) 134 F.3d 319 at 325.

EMTALA's stabilization requirements is statutorily defined as "…to provide such medical treatment of the emergency medical condition as may be necessary to assure, within a reasonable degree of medical probability, that no material deterioration of the condition is likely to result…" 42 U.S.C.A. § 1395dd; *Smithson v. Tenet Health System Hospitals, Inc.*, U.S.D.C. 07/30/08 2008 WL 2977361; citing *Battle ex rel. Battle v. Memorial Hosp. at Gulfport*, (5th Cir. 09/20/00) 228 F.3d 544 at 558 and *Marshall on Behalf of Marshall v. East Carroll Parish Hosp. Service Dist.* (5th Cir. 02/09/98) 134 F.3d 319 at 325.

While a minority of federal Circuits hold a plaintiff is *required* to show the hospital deviated from its own policy or procedure in order to recover under EMTALA, the Fifth Circuit has held a hospital's deviation from its own policy or procedure "can" support a finding of EMTALA liability. See *Battle ex rel. Battle v. Memorial Hosp. at Gulfport*, (5th Cir. 09/20/00) 228 F.3d 544, 558 compare with *Scott v. Hutchinson Hospital*, 959 F.Supp. 1351, 1358 (USDC D Kansas 03/04/97); *Ingram v. Muskogee Regional Medical Center*, 235 F.3d 550, 551 (10th Cir. 12/18/00).

The Fifth Circuit allows expert testimony to assist the trier of fact in determining whether a participating hospital had actual knowledge as to whether a patient presented with an emergency medical condition and whether the treatment provided the patient was sufficient to stabilize the patient. See *Battle ex rel. Battle v. Memorial Hosp. at Gulfport*, (5th Cir. 09/20/00) 228 F.3d 544 at 558 - 559 citing *Burditt v. United States Dep't of Health & Human Servs.*, 934 F.2d 1362 at 1369 (5th Cir. 1991) compare with *Pettyjohn v. Mission-St. Joseph's Health System, Inc.*, (U.S.D.C. W.D. North Carolina 11/22/00) 2000 WL 33311929 at p. 2.

### III.    Factual Background

A.H. was the four-year old daughter of Plaintiffs Akeem Henderson and Jennifer Alexander who was born premature at 27 weeks, diagnosed with bronchopulmonary dysplasia as a result of her premature birth, and suffered from chronic asthma requiring multiple hospital admissions prior to the night in question.

At 1:54 a.m., on February 10, 2018, A.H. presented to the Willis-Knighton South Emergency Department, and the care of David Easterling, M.D., in respiratory distress with difficulty breathing.[1] At triage, the child's emergent condition was detected.[2] The child was observed in the tripod position with a pulse rate of 156, tachycardia, a respiratory rate of 36, taychypnea, and a blood/oxygen saturation of 91% on room air as measured by a pulse oximeter.[3]

At all times pertinent, Willis-Knighton had in place a standing Oxygen Protocol which requires pediatric patients to maintain an oxygen saturation of greater than 95% on room air before oxygen may be discontinued as a matter of hospital policy.[4]

Willis-Knighton healthcare providers noted A.H. home albuterol treatment prior to arrival was ineffective.[5]  Providers administered A.H. oxygen with albuterol at 2:05 a.m.[6] This type of breathing treatment typically takes approximately five (5) to ten (10) minutes to complete.[7] Despite the breathing treatment, A.H. was still "tripodding",[8] a physical stance which may be the hallmark of children in respiratory distress where the patient leans forward to take their body

---

[1] Exhibit 1: WK Medical Records BN p. 283 – 284 / 287 – 288.
[2] Exhibit 1: WK Medical Records BN p. 287 – 288.
[3] Exhibit 1: WK Medical Records BN p. 283 - 284 / 287 – 288.
[4] .Exhibit 2: WK Oxygen Protocol attached to Dr. Richard Sobel Deposition as "Exhibit 8". See also Exhibit 4: Dr. Richard Sobel deposition excerpts p. 124, 171-173.
[5] Exhibit 1: WK Medical Records BN p. 287.
[6] Exhibit 1: WK Medical Records BN p. 284, 288.
[7] Exhibit 3: Expert Report of Dr. Richard Sobel p. 7.
[8] Exhibit 1: WK Medical Records BN p. 287.

weight off of their lungs and allow their accessory muscles to assist in breathing.[9] A.H. was moved to radiology at 2:46 a.m.[10] and another oxygen and albuterol breathing treatment was administered at 3:16 a.m.[11] At 3:23 a.m., seven (7) minutes after the second breathing treatment with oxygen began, A.H.'s vital signs were reported as a pulse rate of 145, a respiratory rate of 34, and a pulse oximetry reading of 99% (not on room air).[12] These were A.H.'s last recorded vital signs prior to her discharge.

A.H. was moved from radiology back to her ER room at 3:29 a.m.,[13] given a steroid shot at 3:44 a.m.,[14] and was discharged eight minutes later at 3:52 a.m.,[15] less than two (2) hours after A.H. initially presented to Willis-Knighton South's Emergency Department with a known medical emergency condition.

Less than three (3) hours after she was discharged, A.H. suffered respiratory arrest and was transported by EMS to Willis-Knighton Bossier where she arrived without a pulse at 7:24 a.m. A.H. suffered global hypoxic-ischemic encephalopathy, was declared brain dead, and her life support was discontinued February 16, 2018. An autopsy identified the child's cause of death as Bronchiolitis and Bronchopneumonia.[16]

Plaintiffs filed suit on February 8, 2019 under the Emergency Medical Treatment and Labor Act ("EMTALA") codified by 42 U.S.C. § 1395dd. On January 24, 2020, Willis-Knighton identified Jacquelyn White, M.D. as the hospital's expert witness. Plaintiffs deposed Dr. White on February 12, 2020 at her office in Ruston, Louisiana.

---

[9] Exhibit 4: Dr. Richard Sobel deposition  p.128, 131 - 132.
[10] Exhibit 1: WK Medical Records BN p. 288.
[11] Exhibit 1: WK Medical Records BN p. 288.
[12] Exhibit 1: WK Medical Records BN p. 284.
[13] Exhibit 1: WK Medical Records BN p. 288.
[14] Exhibit 1: WK Medical Records BN p. 288.
[15] Exhibit 1: WK Medical Records BN p. 286.
[16] Exhibit 5: Autopsy Report.

Dr. White swore she had never testified in any case involving an alleged EMTALA violation;[17] that she had read "some" EMTALA in preparing her report;[18] but she did not consider herself qualified to be an expert in cases involving EMTALA claims.[19] She inquired as to how a physician could become an EMTALA expert.[20] Tellingly, Dr. White's notes reveal that when she was retained as an "expert" in this case, she "needed the definition of EMTALA **" and later, did not know "the rest of the definition" of EMTALA's stabilization requirement,[21] which she confused in her deposition.[22]

Indeed, a review of Dr. White's credentials show she has never acted as any kind of authority involving any matter related to EMTALA.

Dr. White admitted she did not consider whether a violation of hospital policy is indicative of a violation of EMTALA;[23]  she had not reviewed any Willis-Knighton policies in rendering her opinion;[24] she had never seen and did not know Willis-Knighton's Oxygen Protocol prior to her deposition;[25] she does not know the policies or protocols of the hospitals at which she is currently employed;[26] and does not know if either of her current employers has a protocol for administering oxygen.[27] Dr. White "assumes" Willis-Knighton's Oxygen Protocol applies only to inpatients,[28] but without reviewing the protocols, she cannot explain if the protocol for administering oxygen to inpatients would be any different than the protocol for

---

[17] Exhibit 7: Dr. Jacquelyn White Deposition p. 6-7.
[18] Exhibit 7: Dr. Jacquelyn White Deposition p. 13.
[19] Exhibit 7: Dr. Jacquelyn White Deposition p. 70.
[20] Exhibit 7: Dr. Jacquelyn White Deposition p. 73.
[21] Exhibit 8: Excerpts from Dr. White's Notes attached to her deposition.
[22] Exhibit 7: Dr. Jacquelyn White Deposition p. 16.
[23] Exhibit 7: Dr. Jacquelyn White Deposition p. 27.
[24] Exhibit 7: Dr. Jacquelyn White Deposition p. 13, 27.
[25] Exhibit 7: Dr. Jacquelyn White Deposition p. 13.
[26] Exhibit 7: Dr. Jacquelyn White Deposition p. 27.
[27] Exhibit 7: Dr. Jacquelyn White Deposition p. 26.
[28] Exhibit 7: Dr. Jacquelyn White Deposition p. 29.

administering oxygen to ER patients.[29] Dr. White did not "feel comfortable" answering questions related to hospital policy in general.[30]

Dr. White admitted she had been the subject of seven (7) medical malpractice complaints during her career and that one of the lawsuits filed against her involved pneumonia in a young adult.[31] Dr. White claims A.H. would have ultimately died,[32] but admitted she did not review the autopsy or the death certificate[33] and did not know what caused the child's death. Dr. White swore she would have liked to review those documents,[34] but did not. Dr. White opined it was "unlikely" A.H. had pneumonia,[35] while the autopsy lists Bronchopneumonia as a cause of death.[36]

Dr. White testified that A.H.'s vital signs on the night in question were, for the most part, in the "higher limits of normal"[37], that she could not cite "one authority over another"[38] to support her opinion, and forgot "to bring the normal set (of vital signs supporting her opinion) with [her]."[39]

Dr. White's testimony further shows she grossly misunderstands the facts reflected in the record concerning the sequence of events at issue. For example, Dr. White fails to understanding the timing of A.H.'s second pulse oximetry reading of 99% was taken seven (7) minutes after the second oxygen breathing treatment began *and while A.H. was still in Willis-Knighton's radiology department*. Dr. White admits that if her understanding of the facts is incorrect, such would

---

[29] Exhibit 7: Dr. Jacquelyn White Deposition p. 84- 85.
[30] Exhibit 7: Dr. Jacquelyn White Deposition p. 29.
[31] Exhibit 7: Dr. Jacquelyn White Deposition p. 68.
[32] Exhibit 7: Dr. Jacquelyn White Deposition p. 44.
[33] Exhibit 7: Dr. Jacquelyn White Deposition p. 32.
[34] Exhibit 7: Dr. Jacquelyn White Deposition p. 55.
[35] Exhibit 7: Dr. Jacquelyn White Deposition p. 71.
[36] Exhibit 5: Autopsy Report.
[37] Exhibit 7: Dr. Jacquelyn White Deposition p. 21.
[38] Exhibit 7: Dr. Jacquelyn White Deposition p. 64.
[39] Exhibit 7: Dr. Jacquelyn White Deposition p. 40.

affect her opinion in this case.[40] Indeed, the Federal Rules of Evidence *require* this Court to exclude testimony which is not based in fact.

Even though Dr. White admitted there is "no way" to tell if A.H. was continuously monitored during her stay at Willis-Knighton,[41] she "has to believe" the child was continuously monitored because the emergency medicine physician discharged A.H. from the hospital.[42]

Dr. White explains the statement in her expert report that "The patient was stable at discharge"[43] was not her own medical opinion and was not based on any exam or empirical evidence, but is merely what the emergency room physician declared when he discharged the four (4) year old struggling to breathe.[44] Dr. White suggests A.H. was medically stable at discharge "*if*" the emergency medicine physician "*felt*" the child was playful, active, interacting with mom,[45] smiling, running around the room, or drinking juice,[46] but those things were not documented in the medical records.[47] Dr. White's theory as to why A.H. might have been stable at discharge cannot be tested. The basis for her opinion cannot be subject to peer review. It is known for a high rate of error, and is not generally accepted in the medical community as reliable indicia of medical stabilization for the purposes of evaluating EMTALA claims. For these reasons, Plaintiffs respectfully object to the qualification of Dr. Jacquelyn White as an expert witness and request this court exclude Dr. White's testimony as unreliable.

---

[40] Exhibit 7: Dr. Jacquelyn White Deposition p. 112.
[41] Exhibit 7: Dr. Jacquelyn White Deposition p. 24.
[42] Exhibit 7: Dr. Jacquelyn White Deposition p. 47.
[43] Exhibit 6: Expert Report of Dr. Jacquelyn White p. 1.
[44] Exhibit 7: Dr. Jacquelyn White Deposition p. 75.
[45] Exhibit 7: Dr. Jacquelyn White Deposition p. 48 – 49.
[46] Exhibit 7: Dr. Jacquelyn White Deposition p. 57 – 58.
[47] Exhibit 7: Dr. Jacquelyn White Deposition p. 58.

## IV.    Law applicable to expert testimony

Rule 702 of the Federal Rules of Evidence provides, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The gatekeeping function identified in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 149 (1993) "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony…is not only relevant but reliable." *Carlson v. Bioremedi Therapeutic Systems, Inc.,* (USCA 5th Cir. 05/16/16) 822 F.3d 194 at 199 <u>citing</u> *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) <u>quoting</u> *Daubert* 509 U.S. at 589. To trigger a *Daubert* inquiry, an expert's testimony, or its 'factual basis, data, principles, methods, or their application,' must be 'called sufficiently into question.'" *Id.* <u>citing</u> *Rodriguez v. Riddell Sports, Inc.,* 242 F.3d 567 at 581 (5th Cir. 2001) (<u>quoting</u> *Kumho,* 526 U.S. at 149, 119 S.Ct. 1167).

District courts are to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue." *Id.* <u>citing</u> *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 243-44 (5th Cir. 2002) <u>quoting</u> *Daubert,* 509 U.S. at 592-593. The overarching concern is whether or not the expert testimony is relevant and reliable. To assist the Court in this analysis, the Supreme Court delineated a five-factor, non-exclusive, flexible test consisting of the

following areas of inquiry: (1) whether the theory or technique in question can be tested, (2) whether it has been subject to peer review and publication, (3) its known potential rate of error (4) the existence and maintenance of standards controlling its operation and (5) whether the theory or technique enjoys general acceptance within the relevant scientific community. *Kumho Tire*, 119 S.Ct. at 1175 <u>citing</u> *Daubert*, 509 U.S. at 592-94, 113 S.Ct. at 2796-97.

An expert witness's testimony should be excluded if the district court "finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935 at 937 (5th Cir. 1999). The district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137 at 152, 119 S.Ct. at 1176, 143 L.Ed.2d 238 (1999).

As explained more fully below, Plaintiffs submit that the testimony of Jacquelyn White, M.D. should be stricken because Dr. White is not qualified to testify as an expert in this case, her opinion is not based on facts of record, Dr. White misunderstands the facts that *are* of record, and her methodology fails *Daubert* scrutiny.

**(A) Jacquelyn White, M.D. is not qualified to render an expert opinion in this EMTALA proceeding**.

Simply because a doctor has a medical degree does not make her qualified to opine on all medical subjects. Rather, the Court must gauge whether Dr. White's "qualifying training or experience, and resultant specialized knowledge, are sufficiently related to the issues and evidence before the trier of fact and that the witness's proposed testimony will help the trier of fact." See *United States v. Wen Chyu Liu*, 716 F.3d 159, 167 (5th Cir. 2003).

Although Dr. Jaqueline White practices emergency medicine, she swore she did not consider herself an expert in EMTALA. By Dr. White's own admission, she cannot serve as an expert in this case. See *Lassiegne v. Taco Bell Corp.,* 202 F.Supp.2d 512 at 517-518, (E.D.La. 04/11/02); *Previto v. Ryobi North America, Inc.,* 766 F.Supp2d. 759 at 765-766 (S.D.Ms. 12/16/10); *Johnson v. State Farm Mutual Automobile Insurance Company,* 2012 WL 1745497 (E.D.La. 05/16/12); *Barnett v. Deere & Company,* 2016 WL 5118263 (S.D. Ms. 09/20/16). Dr. White has never testified, or even evaluated, any EMTALA claim prior to this case. Dr. White did not review any Willis-Knighton policies in reaching her opinion in this case. Dr. White cannot articulate the underlying EMTALA principles set forth in the policies of either of the hospitals where she currently practices regarding administering oxygen.

Dr. White has never been an authority, of any kind, on the issue of EMTALA or the evaluation of any claim relating thereto.

With all due respect, Dr. White has been the subject of seven (7) malpractice complaints, one of which involved pneumonia, a cause of A.H.'s death and a pertinent fact relating to his case involving impending respiratory failure in a four (4) year old.

**(B) Dr. White's opinions are not based upon facts of record.**

    (1) Dr. White's grossly misunderstands the facts documented in A.H.'s medical records, the sequence of events giving rise to this EMTALA claim, and the physiology relating to A.H.'s second breathing treatment in relation to her pulse oximetry reading taken seven (7) minutes later.

A.H. presented with a pulse oximetry reading of 91% on room air, in breathing distress, tripodding, with tachycardia and tachypnea. These are clinical signs of impending respiratory failure. Plaintiffs submit, as supported by Dr. Richard Sobel, Willis-Knighton could not be certain, within a reasonable degree of medical probability, that A.H.'s condition would not

deteriorate without obtaining a valid pulse oximetry reading on room air prior to discharging the four (4) year-old. In fact NO exam was performed at the time of discharge.

The record shows that A.H. was transported to radiology at 2:46 a.m.[48] The order for A.H.'s second breathing treatment was administered at 3:16 a.m.[49] A breathing treatment takes at least 5-10 minutes to administer.[50] A.H.'s last documented pulse oximetry reading of 99% was taken at 3:23 a.m.[51] A.H. was moved from the radiology department back to her emergency room bed at 3:29 a.m.[52] The supplemental oxygen provided in the breathing treatment takes 20-30 minutes to "wash out" of the patient's system before her room air pulse oximetry can be accurately measured.[53]

Because A.H.'s oxygen saturation was taken seven (7) minutes after the breathing treatment was initiated, the supplemental oxygen did not have time to washout of A.H.'s system prior to the 99% pulse oximetry reading. Tellingly, the "99%" reading does not indicate such was on room air whereas A.H.'s initial 91% reading does indicate a "room air" measurement.[54]

Dr. Sobel explains,

> Q: Under - - since we're looking at that, on the nurse's notes we're looking at vital statistics at 03:23, what do those say? The pulse ox goes to 99 percent, correct, and 99 percent is good?
>
> A: No. This is the result, more likely than not, within a reasonable degree of medical certainty, if you would like to use the term, of the patient getting a neb treatment - -
>
> Q: So she - -

---

[48] Exhibit 1: WK Medical Records BN p. 288.
[49] Exhibit 1: WK Medical Records BN p. 285, 288.
[50] Exhibit 3: Expert Report of Dr. Richard Sobel p. 7. See also Exhibit 7: Dr. Jacquelyn White Deposition p. 19.
[51] Exhibit 1: WK Medical Records BN p. 287.
[52] Exhibit 1: WK Medical Records BN p. 288.
[53] Exhibit 3: Expert Report of Dr. Richard Sobel p. 7. See also Exhibit 4: Deposition of Dr. Sobel p. 172 - 173.
[54] Exhibit 1: WK Medical Records BN p. 284.

A:     with oxygen.

Q:     So the patient was treated and she got better?

A:     So - - no. So this is the pulse oximetry that is measured on high-flow O2.

Q:     Where is that documented?

A:     So it's not a room air pulse oximetry.

Q:     And where is that part documented, that she is on oxygen at this point?

A:     Well, look at the time of the nebulizer treatment. So there is an albuterol nebulizer treatment that is begun at 3:16. This is given with high-flow O2.

Q:     Is that appropriate? Is that an appropriate treatment?

A:     Yes. Yes, it's appropriate. So if you note in her previous records, they document pulse oximetry on room air, especially when she went home. There was a pulse oximetry documented on room air. That is what you need. In this particular case the first pulse oximetry was on room air, so that is prior to the neb. The neb is given with oxygen, and the second pulse oximetry, there is no documentation of being on room air. That it's taken simultaneous with an albuterol treatment which is given with oxygen - -[55]

…

Q:     In your opinion on page 7 you're noting that it takes 20-30 minutes of washout time for a valid reading of O2. What does that mean?

A:     Well, that means when you increase the FIO2, or the percentage of oxygen in the air by giving supplemental oxygen, the oxygen replaces the nitrogen in the lungs, so essentially you are going to a different planet. Planet Earth is 21 percent.

---

[55] Exhibit 4: Deposition of Dr. Richard Sobel p. 140 – 141.

If you put a child on 50 percent, it's like you are breathing an oxygen concentration of 50% in the atmosphere, so that is going to artificially increase your oxygenation, and that is reflected in the pulse oximetry. That is why you have a pulse oximetry of 99 percent in this case: Because you have supplied supplemental oxygen. It has to wash out over time, so you start breathing the regular oxygen-level air. It's 21 percent. You got to breathe that for a while.

And the 50 percent oxygen atmosphere that you have delivered to the patient, the term is "washout". It washes out and the nitrogen comes back in and replaces the oxygen. After that happens and the oxygen is washed out, then you can repeat the pulse oximetry and see if it is stable, and that is what the policy or protocol is reflecting: that you need some time for the washout of oxygen, the supplemental oxygen to wash out.[56]

Dr. White mistakenly believes the 99% pulse oximetry reading was a "room air" reading because Dr. White misunderstands the documented facts relating to when the second breathing treatment was administered, and where A.H. was being treated at the time of the 99% pulse oximetry reading was taken, to-wit:

A:      …the patient was stable with 99% saturation.[57]

…

Q:      So you think the 99% was not on room air or it was on room air.

A:      I do think it was on room air. Yes, sir. I do.

Q:      And the reason being again?

A:      Because she was - - went by stretcher off oxygen to radiology. And if she was doing well enough to go then, I do not see the need for her to be put back on it….[58]

---

[56] Exhibit 4: Deposition of Dr. Richard Sobel p. 172 – 173.
[57] Exhibit 7: Dr. Jacquelyn White Deposition p. 68.
[58] Exhibit 7: Dr. Jacquelyn White Deposition p. 39.

…

Q:     Yeah. And you are convinced that the 99% is after a washout period of time where the room air is allowed to get back into the lungs?

A:     Yes, sir. Because - - And what helps me even more so is the fact that she went to radiology at least thirty, forty-five minutes prior off oxygen. So if she was doing well then, there's nowhere in there that she needs to be placed back on the oxygen or having any trouble.[59]

Dr. White is gravely mistaken. The record shows that A.H. was transported to radiology at 2:46 a.m.[60] The order for A.H.'s second breathing treatment was administered at 3:16 a.m.[61] A.H.'s last documented pulse oximetry reading of 99% was taken at 3:23 a.m.[62] A.H. was moved from the radiology department back to her emergency room bed at 3:29 a.m.[63]

In other words, A.H. was given her second breathing treatment and oxygen *in the radiology department* and her 99% pulse oximetry reading was taken *in the radiology department,* seven (7) minutes after the breathing treatment was administered, *in the radiology department*. Given that a breathing treatment takes at least 5-10 minutes to administer (Sobel Expert Report p. 7 / White 19), and the supplemental oxygen takes 20-30 minutes to washout of a patient's system.[64] It is simply not possible for the 99% oximetry reading to be a room air reading. Dr. White's opinion is not based on fact and must be excluded. See Rule 702 of the Federal Rules of Evidence, subsection "b".

---

[59] Exhibit 7: Dr. Jacquelyn White Deposition p. 50.
[60] Exhibit 1: WK Medical Records BN p. 288.
[61] Exhibit 1: WK Medical Records BN p. 285, 288.
[62] Exhibit 1: WK Medical Records BN p. 287.
[63] Exhibit 1: WK Medical Records BN p. 288.
[64] Exhibit 3: Expert Report of Dr. Richard Sobel p. 7. See also Exhibit 4: Deposition of Dr. Sobel p. 172 – 173.

(2) Dr. White did not know the cause of death but opined A.H. could not be saved.

Dr. White admitted she had been the subject of seven (7) medical malpractice complaints during her career and that one of the lawsuits filed against her involved pneumonia in a young adult.[65] Dr. White claims A.H. would have died, even if Dr. White had been the attending physician,[66] but admitted she did not review the autopsy or the death certificate.[67] Dr. White would have liked to review those documents,[68] but, in her opinion, it was "unlikely" A.H. had pneumonia.[69] The record reflects the autopsy lists bronchopneumonia as a cause of death.[70] Dr. White's opinion that A.H. was going to die, irrespective of the attending physician, is a dubious proposition where Dr. White had not reviewed the autopsy report or the death certificate and did not know the cause of A.H.'s death. Such is particularly true where Dr. White admitted, "A lot of people would be saved if they were in the hospital than not."[71]

**(C) Dr. White's theory that the A.H. was stable at discharge is not reliable because it cannot be scientifically tested, cannot be objectively reviewed by her peers, is known for a high error rate, is not subject to any medical standard, and is not generally accepted in the medical community.**

Dr. White's theory that A.H. had been stabilized prior to her discharge is not based on facts documented in A.H.'s medical record. Instead, Dr. White's opinion is based solely on her own subjective interpretation, speculation and conjecture as to what "ought" or "might" or "could" be true.

---

[65] Exhibit 7: Dr. Jacquelyn White Deposition p. 68.
[66] Exhibit 7: Dr. Jacquelyn White Deposition p. 44.
[67] Exhibit 7: Dr. Jacquelyn White Deposition p. 32.
[68] Exhibit 7: Dr. Jacquelyn White Deposition p. 55.
[69] Exhibit 7: Dr. Jacquelyn White Deposition p. 71.
[70] Exhibit 5: Autopsy Report.
[71] Exhibit 7: Dr. Jacquelyn White Deposition p. 72.

For instance, Dr. White admitted there is "no way" to tell if A.H. was continuously monitored during her stay at Willis-Knighton[72] but, because the emergency medicine physician discharged A.H., Dr. White "has to believe" A.H. was continuously monitored.[73]

Dr. White explains that the statement in her expert report that "The patient was stable at discharge"[74] was not her own medical opinion, was not based on any exam or empirical evidence, but is merely what the emergency room physician declared when he discharged the four (4) year old struggling to breathe.[75]

Dr. White suggests A.H. was medically stable at discharge "if" the emergency medicine physician "felt" the child was playful, active, interacting with mom,[76] smiling, running around the room, or drinking juice,[77] but those things were not documented in the medical records.[78]

Dr. White's theory as to why A.H. was stable at discharge is not based on objective fact or empirical evidence. Her opinion is based on conjecture and rumor. The opinion that A.H. was stable because the emergency room physician said she was stable cannot be scientifically tested. Dr. White's peers cannot review objective evidence to confirm or refute her position. Self-serving, out of court statements offered for the truth of the matter asserted is known for a high rate of error. A medical finding that Willis-Knighton was certain, within a reasonable degree of medical probability, that A.H.'s condition was not likely to deteriorate based on 'because the discharging physician said so' is not generally accepted in the medical community.

---

[72] Exhibit 7: Dr. Jacquelyn White Deposition p. 24.
[73] Exhibit 7: Dr. Jacquelyn White Deposition p. 47.
[74] Exhibit 6: Expert Report of Dr. White p. 1.
[75] Exhibit 7: Dr. Jacquelyn White Deposition p. 75.
[76] Exhibit 7: Dr. Jacquelyn White Deposition p. 48 – 49.
[77] Exhibit 7: Dr. Jacquelyn White Deposition p. 57 – 58.
[78] Exhibit 7: Dr. Jacquelyn White Deposition p. 58.

Dr. White's testimony is unreliable and fails to survive *Daubert* scrutiny. See *Daubert*, *supra* 509 U.S. at 593-597.

## CONCLUSION

Dr. White is not qualified to be an expert in this case. Her testimony is unreliable, is not based on objective facts, but on speculation. Her methodology utilized to arrive at her opinion is not reliable and her testimony is inadmissible and should be disallowed entirely. After due proceedings had, Plaintiffs PRAY this Court GRANT the instant Motion in Limine disqualifying Jacquelyn White, M.D. as an expert witness and striking her testimony. Plaintiffs further pray all orders and decrees necessary and proper under the premises and for full, general and equitable relief.

Respectfully Submitted:

SEDRIC E. BANKS LBN 2730
S. HUTTON BANKS LBN 37377
1038 North Ninth St.
Monroe, Louisiana 71201
318-388-1655 telephone
318-816-5026 facsimile
sebanks@aol.com
*Attorneys for Akeem Henderson and*
*Jennifer Alexander*

## CERTIFICATE OF SERVICE

The foregoing has been provided to opposing counsel electronically via the CM/ECF/PACER system on this 27th day of February, 2020.

S. HUTTON BANKS

Page 17 of 17