

**EXHIBIT 7**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

AKEEM HENDERSON and JENNIFER
ALEXANDER, INDIVIDUALLY AND
AS ADMINISTRATRIX OF THE
SUCCESSION OF A.H.

                     CIVIL ACTION NO. 5:19-CV-00163

VERSUS                  JUDGE ELIZABETH E. FOOTE

                     MAGISTRATE JUDGE MARK L. HORNSBY

WILLIS-KNIGHTON MEDICAL
CENTER d/b/a WILLIS KNIGHTON
SOUTH HOSPITAL

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF

JACQUELYN WHITE, M.D.

February 12, 2020

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Taken at:

Health Hut
310 West Mississippi Avenue
Ruston, Louisiana

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Reported by:   Janet McBride
                Certified Court Reporter
                Certificate No. 27006

Page 1

```
1                    S T I P U L A T I O N S

2               It is stipulated and agreed among counsel that the

3       deposition of JACQUELYN WHITE, M.D., is taken by

4       plaintiffs, AKEEM HENDERSON AND JENNIFER ALEXANDER,

5       INDIVIDUALLY AND AS ADMINISTRATRIX OF THE SUCCESSION OF

6       A.H., pursuant to Notice, and may be used for all purposes

7       permitted by the Federal Code of Civil Procedure.  All

8       objections except as to the form of the question and

9       responsiveness of the answer are reserved until such time

10      as the deposition is offered and introduced into evidence.

11      The deponent elected to read and sign her deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JACQUELYN WHITE
2/12/2020

1      A.   Yes, sir.

2      Q.   And when was that?

3      A.   About a month ago.

4      Q.   And I'm not looking for exact dates.  I'm just

5   trying to piece together some information.  Okay.  And what

6   were you asked to do?

7      A.   To review a case for him.

8      Q.   And what were you looking for in your review?

9      A.   To see if there was an EMTALA violation, to evaluate

10   a case to see if there was an EMTALA violation.

11      Q.   I understand you testified in a couple of different

12   cases in court.

13      A.   I have.  Yes, sir.

14      Q.   Did either one of these cases involve EMTALA?

15      A.   No, sir.

16      Q.   Out of curiosity, what were those cases about?

17      A.   One was about a lady that had a stroke and was sent

18   home initially and then came back with her symptoms, and

19   then was over that.  Another one was about a patient that

20   had a heart attack or came in with chest pain, shortness of

21   breath, was discharged.  And then the third--  I think I've

22   had two or three.  And then the other one was chest pain,

23   he came in and had a heart attack, but it was the timing of

24   the cardiologist involved and going to the cath lab.

25      Q.   And who were you retained by, the plaintiff or the

Page 6

1 defendant in those cases?

2 A. The defendant in all of them.  Yes, sir.

3 Q. Have you ever testified for a plaintiff?

4 A. I've not testified for one.  No, sir.

5 Q. How do you get contacted or connected, I guess is a

6 better word, with the legal world?  Do you advertise or--

7 A. No, sir.  I do not advertise.  Those previous ones

8 were from--  There was a nurse in Jonesboro that did a lot

9 of medical reviews, and my name was given to her so I've

10 looked at several charts for her.  And then those two cases

11 that came from Florida were from a colleague of hers that

12 needed an emergency medicine physician to review.  The one

13 in Opelousas, I was on the medical review panel and so I

14 was not asked, but told that I needed to come and do a

15 deposition on why we--why we--how we chose our disposition

16 of that case.

17 Q. You mentioned a medical review panels, and I think I

18 read that in your report that you had done several.

19 A. Yes, sir.

20 Q. And I'm not looking for exact numbers, but when you

21 say several, what are we talking about?

22 A. I'd probably say at least twelve to fourteen.

23 Q. Did any of those involve EMTALA?

24 A. They did not.

25 Q. Again, out of curiosity, did any of those cases

JACQUELYN WHITE
2/12/2020

```
 1     There are several vital signs you look at, as well as your
 2     examination, as well as your history of present illness.
 3     It all plays a part.  Yes, sir.
 4        Q.   So we're dealing with examination, vital signs and
 5     what else is in the components that--
 6        A.   History.
 7        Q.   History.  Okay.  I noticed that in your report, that
 8     you did not mention that you had reviewed the death
 9     certificate.  Did you--
10        A.   I didn't.  I do not remember seeing the death
11     certificate.  No, sir.
12        Q.   Did you review the autopsy?
13        A.   I did not.  No, sir.
14        Q.   Did you review the protocol for the hospital as far
15     as administering oxygen?
16        A.   No, sir.
17        Q.   Did you review the interpretative guidelines for
18     EMTALA?
19        A.   I read over some EMTALA.  I'm not sure if I read the
20     complete EMTALA, but I did look at some things about
21     EMTALA.
22        Q.   Tell me what you recall about reading the EMTALA
23     that you--
24        A.   May I look at my notes while I'm telling you that?
25        Q.   Yes.  You may.  Please do.
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1     A.   Okay.

2     Q.   I've been practicing law for forty-four years and I

3     never have figured that out.

4     A.   Okay.  I will tell you from an emergency medicine

5     physician,--

6     Q.   Please.

7     A.   --if they're stable enough to be discharged, or do I

8     feel the patient needs to be admitted.  That's a primary

9     concern on anyone that's having any kind of emergency

10    medical condition is can they continue treatment at home or

11    do they need to continue treatment in the hospital.  Have

12    you resolved it?  Have you improved it?  A patient doesn't

13    have to be back to baseline.  Are they improved well enough

14    that they can continue the treatment at home?  That's one

15    of our first things that we think of when we have someone

16    with an emergency medical condition.

17    Q.   What is the baseline for this particular child?

18    A.   A base-- Well, I--I don't know the baseline of a--

19    of this particular child.  Was the child improved or did

20    the--did the provider feel like the patient was stable

21    enough to be discharged.  It is-- According to the EMTALA

22    definition of within reasonable medical probability, and I

23    feel that this patient was, after reviewing the chart in

24    completeness.

25    Q.   All right.  If we're going to tell the jury here's

JACQUELYN WHITE
2/12/2020

```
 1        Q.   Okay.  Let's go to the respiratory rate on initial
 2     taking of the vital signs.  Is that average or normal or
 3     high average or--
 4        A.   I will say the normal for a four-year-old is around
 5     twenty-two to thirty-four.  So it is barely elevated.  Yes,
 6     sir.
 7        Q.   Okay.
 8        A.   She was slightly tachypneic.  It's a very common
 9     thing with asthma exacerbations.  Yes, sir.
10        Q.   Tachypneic is what?
11        A.   Breathing a little fast.
12        Q.   And do you know why she was breathing fast?  I mean,
13     the physiology of that.
14        A.   Because she was--she was wheezing which is
15     congestion in the lungs which is having trouble getting the
16     oxygen in there because of the inflammation.  So it causes
17     them to breathe a little faster.
18        Q.   Now, the medication, Albuterol.  Is that right?
19        A.   Albuterol.  Yes, sir.
20        Q.   Albuterol.  Okay.  Thank you.  You say that can
21     increase the--
22        A.   It can--
23        Q.   --heartbeat.
24        A.   --slightly.  Yes, sir.
25        Q.   So you really, it's fair to say that upon entry in
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
1    percent?
2       A.   In a child that's having trouble breathing, it tells
3    me that they're in need of some treatments as well as some
4    supplemental oxygen.  So that patient was probably--and I
5    think it shows in the record--put on some supplemental
6    oxygen as well as given the DuoNeb treatment.
7       Q.   Okay.  How would you measure the ninety-one percent?
8       A.   You measure it--you put a--it's a pulse ox that you
9    put on their finger and it's--  Most of the time, it stays
10   on the patient the entire ER visit or until they feel
11   pretty sure that they don't need it anymore.  But most of
12   the time, it's on the entire visit.
13      Q.   How would you know that you don't need it anymore?
14      A.   The child's running around the room, pulling it off.
15   They're playful.  They're active.  And they've been at
16   ninety-nine, they've been at ninety-five, they've been at
17   whatever, you feel comfortable enough taking it off.  It's
18   part of the whole picture.
19      Q.   So would it be fair to say that you believe that the
20   oxygen level was monitored the entire time she was in the
21   emergency room?
22      A.   That's how most patients are.  There's no way to
23   tell from this record.  You'd have to go to their facility
24   and see.  Most facilities now have the monitor in the rooms
25   where it's continuous.
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    at their policies and protocols recently.  About when to

2    administer it?  How to administer it?

3        Q.    Well, for instance, Glenwood Hospital--  How often

4    do you work there?

5        A.    I work several shifts a month there.

6        Q.    You're not familiar with any policy that relates to

7    the level of oxygen in a patient's body?

8        A.    A policy related to the oxygen in their body?

9        Q.    Oxygen level in the blood.  You don't know--

10       A.    I don't--I don't think you're--  You mean of when to

11   give them the oxygen, of when we have to--

12       Q.    Yeah.

13       A.    --put a patient on it?

14       Q.    Let's go with that.

15       A.    I don't--I don't know of their--of when it--of a

16   certain level.  Because every--every patient's going to be

17   deemed different of when they need the oxygen.  It's

18   probably at the discretion of the provider.  But I haven't

19   looked at their policies.  No, sir.

20       Q.    Are you aware in your review of the EMTALA laws

21   whether or not violation of hospital policy is prima facie

22   evidence?

23       A.    I did not see anything about--  No, sir.  I'm not.

24       Q.    You hadn't looked at that.  Did you consider that?

25       A.    No, sir.

JACQUELYN WHITE
2/12/2020

1      Q.    And is it fair to say you have no clue what the

2   policy was of Willis-Knighton South as far as administering

3   oxygen--

4      A.    No, sir.  I do not know their policy.  Right.

5      Q.    Okay.  What other hospital did you say you worked

6   at?

7      A.    Here in Ruston at Northern Louisiana Medical Center.

8      Q.    Are you familiar with the protocol of that facility

9   as far as administering oxygen?

10     A.    No, sir.

11     Q.    How about in med school when you were going through,

12   do you recall any protocols that were suggested by the

13   instructors as far as administering oxygen?

14     A.    No, sir.

15     Q.    Would it be fair to say that in your opinions any

16   type of protocol or hospital policy has been excluded?

17             **MR. ROBISON:**  Object to the form.

18             **MR. BANKS:**  Yeah.  That's a bad question.  Let

19             me strike that and see if I can ask that a

20             little better.

21     Q.    Okay.  In rendering your opinions in this case, is

22   it fair to say and to tell the jury in this case that you

23   gave no concern as to the policy of Willis-Knighton

24   hospital as far as the protocol for administering oxygen?

25     A.    That is fair to say.

JACQUELYN WHITE
2/12/2020

1      A.   This protocol is for inpatients.  In the ER, it's

2  different.  And if they do have a protocol, I would think

3  it would be different than this protocol.

4      Q.   Okay.  Well, but you are an emergency room physician

5  and you're not familiar with any protocol in the places

6  where you work.

7      A.   I have not read those protocols, if that's what

8  you're asking.  So I don't feel comfortable answering

9  particular questions about them.

10      Q.   Right.

11      A.   I know we have protocols.

12      Q.   Okay.  I'll represent to you that the "White 1" that

13  you're holding there is the protocol for Willis-Knighton

14  South.  And if I'm understanding correctly, what you're

15  telling me is that's the admission--that's for hospital

16  patients--

17      A.   I would assume that this is for the hospital

18  patient.  I wouldn't--  This says that you're to reassess

19  the patient daily on 7:00 to 3:00 shift.  So that would not

20  be pertaining to the ER and that's the first number one in

21  the protocol.  So that's why I'm assuming this is

22  inpatient--

23      Q.   Right.

24      A.   --protocol.

25           **MR. ROBISON:**  I just want to object to the

Page 29

JACQUELYN WHITE
2/12/2020

1      A.   But I would say probably in the seventies.

2      Q.   Do you know what this child died of?

3      A.   I did not read the autopsy report.  I just read that

4  ER visit and then that hospitalization.  Yes, sir.

5      Q.   So you have no idea what caused the death of this

6  child?

7      A.   I do have an idea because I read the ER chart and

8  the hospitalization.

9      Q.   Okay.  What do you think this child died of?

10      A.   Of respiratory failure.

11      Q.   Suffocation?

12      A.   I would not use the word suffocation.

13      Q.   What's the difference between respiratory--

14      A.   I don't know--

15      Q.   --failure and suffocation?

16      A.   I don't have a medical answer for that.

17      Q.   Okay.

18      A.   Just because we don't use the word suffocation in--

19  in--

20      Q.   Okay.  It says in "White Number 1," that if these

21  Sa02 less than ninety-two percent on room air and/or Pa02

22  less than fifty on room air, you place the patient on

23  minimum level 02 and titrate to maintain saturation of

24  ninety-two percent or more.

25      A.   Yes, sir.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    the chart and nor does the ninety-nine percent say that it

2    was on oxygen.  Usually, if a patient's on oxygen with a

3    pulse ox, they're going to say on two liters, on one liter,

4    on bi-pap, on ventimask.

5        Q.   So you think that the ninety-nine percent was not on

6    room air or it was on room air?

7        A.   I do think it was on room air.  Yes, sir.  I do.

8        Q.   And the reason being again?

9        A.   Because she was--went by stretcher off oxygen to

10   radiology.  And if she was doing well enough to go then, I

11   do not see the need for her to put back on it.  I will say

12   that when she came back, she had a breathing treatment done

13   at 3:16, and it does not say anywhere that she had to go

14   back on her oxygen after that.

15       Q.   Okay.  And was there another set of vital signs

16   taken?

17       A.   Those were the only two that I saw.

18       Q.   Okay.  Well, let's go to the second set of vital

19   signs.

20       A.   Yes, sir.

21       Q.   Were those normal?

22       A.   Those were the--the guidelines that I saw, her

23   respiratory rate thirty-four is within the normal.  It's

24   the high normal.  Her ninety-nine percent is definitely

25   normal.  Her one forty-six could be within normal if you

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      look at different sites, and I apologize for not having a

2      set normal with me.  It's improving whether it's the upper

3      limits of normal or just above.  I'm not sure.  But the

4      most important thing to me was that it was coming down.

5      Q.   Okay.

6      A.   Yes, sir.

7      Q.   And that was at three--

8      A.   3:23.

9      Q.   3:23.

10     A.   Yes, sir.

11     Q.   Okay.  And twenty-two minutes later, she was

12     discharged home?

13     A.   Her order was written there at 4:00, I believe, is

14     when she actually left the facility, or 3:59.  The nurse

15     actually discharged her at that time.

16     Q.   You see the 3:44 entry of Decadron steroid?

17     A.   Yes, sir.

18     Q.   What is a Decadron steroid?

19     A.   A steroid is an anti-inflammatory which helps to

20     treat the inflammation in the alveoli in the lungs that's

21     causing the wheezing and the trouble breathing.  Steroids

22     are used as the second step in an asthma exacerbation, if

23     needed.  Sometimes, we give just Albuterol.  Sometimes, we

24     give Albuterol with steroids.  This patient was given a

25     shot of steroids prior to discharge as well as a

1    be nothing, which can be acute, which can be inflammation

2    which can be fluid which can be infection.  It's a very

3    non-specific.

4        Q.   Is it indicative of pneumonia?

5        A.   No, sir.

6        Q.   Doctor, can you think about that a second and tell

7    me again.

8        A.   Perihilar infiltrates are not indicative of

9    pneumonia.  No, sir.

10       Q.   All right.  It's an inflammation?

11       A.   Yes, sir.

12       Q.   Okay.  And that inflammation that was showing up in

13   the chest x-rays at 3:39 wasn't going to be treated until

14   we administered the steroids at 3:44.  Correct?

15       A.   Some of it.  Yes, sir.  And--

16       Q.   And that inflammation was going to remain in place

17   and really it's kind of an unknown until six or eight hours

18   later.  Correct?

19       A.   It's not an unknown because she'd had that before

20   and that's a very common finding for asthmatics, and she'd

21   had it before and had done well.

22       Q.   Let me ask you, Doctor, just out of curiosity.  No

23   one has a crystal ball and I'm certainly not going to hold

24   you do that, but do you think if you would have been there,

25   this child would've died?

JACQUELYN WHITE
2/12/2020

1    hospital, who receives some Albuterol and receives a

2    steroid to combat the inflammation and then, twenty-two

3    minutes later, discharged without any vital signs.  Is that

4    standard, Doctor?

5        A.   Without any vital signs documented?  I believe that

6    patient was still on a monitor as part of his--

7        Q.   Oh, you do?

8        A.   --reassessment.  I do.  Because there's no reason to

9    take him off of the monitor before you discharge them.

10       Q.   Where is that in the notes?

11       A.   I don't--  I said I believe that.

12       Q.   But it's not in the record?

13       A.   I do not see that.  No, sir.

14       Q.   You're making that up?

15       A.   I'm not making it up.  I told you I didn't see it.

16   My assessment of reading the chart was the--  The provider

17   wrote that he reassessed the patient.  He didn't say if he

18   did have vitals or didn't have vitals.  There's none

19   documented in there.  I totally agree with that.  Yes, sir.

20       Q.   Is there a rule of medicine that if it's not

21   documented, it didn't happen?

22       A.   No, sir.  That's a rule of lawyers, not of medicine.

23   I don't mean to be crude, but it--

24       Q.   That's fine.

25       A.   --really isn't and we're--and we're awful.  When an

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1      ER is busy that we don't always document like we're
 2      supposed to.
 3           Q.   I see in your report--or I'm sorry--in the medical
 4      records, I see a notation at 3:50 a.m. that the patient's
 5      condition has returned to baseline.  Do you see that?  Do
 6      you remember that?
 7           A.   The provider wrote that?
 8           Q.   Right.
 9           A.   Yes, sir.
10           Q.   What does that mean?
11           A.   To him, he feels like the child's back to their
12      usual self.  If the child was playful, if the child was
13      active, if there was no further wheezing, then, to him, it
14      was the child's baseline.
15           Q.   It doesn't mean anything about vital signs?
16           A.   It could be.
17           Q.   Okay.  What would be the relationship?
18           A.   You would have to ask--  I mean, that provider, what
19      his definition of that is, sir.
20           Q.   Well, what is your definition?  When you read that
21      in the record, what did you believe the baselines were as
22      so far as vital signs?
23           A.   That he felt the child was back to their usual
24      status.  If--if this child is known to these--to these
25      providers, as you said, and they've seen her--seen her
```

JACQUELYN WHITE
2/12/2020

```
 1     before, and we've all seen an asthmatic and we've seen a
 2     healthy child, and we've seen a child in respiratory
 3     distress, if she's back to baseline, that tells me she's
 4     interacting with mom, she's not having trouble breathing.
 5     It could've been, you know, you'll have to ask him about
 6     his baseline.  That's what it--that's what it appeared to
 7     me.
 8          Q.   Okay.  In looking at the--
 9          A.   Because, sometimes, we--  Can I just add this?
10          Q.   Oh, yeah.  Sure.
11          A.   Sometimes, we do discharge people that are not back
12     to baseline, but they're improving and they're stable
13     enough to go home.  So that holds a lot to me that he said
14     back to baseline, that it's not just--  The child had been
15     discharged prior, if you read some of those other ones.
16     There still have some slight wheezing, but much improved,
17     or could've still had tachypnea.  You don't always wait
18     till they're totally at baseline.
19          Q.   Did you notice in some of those prior visits that
20     she was hospitalized with a ninety-five percent oximeter
21     reading?
22          A.   I did not--I don't remember specifically.  I'm not
23     surprised because that's just one of several things that
24     you look at.
25          Q.   And what would be the others that you look at?
```

Page 49

JACQUELYN WHITE
2/12/2020

```
 1      A.   Her respiratory distress, how she responded.  If you
 2   look at your protocol, at the bottom of it, it says a
 3   pediatric child needs oxygen and I think it says pediatric
 4   is to have an 02 maintained at ninety-five or greater.  So
 5   that's kind of borderline if they're at ninety-five.  The
 6   good thing is our child was at ninety-nine when she went
 7   home.
 8      Q.   Yeah.  And you are convinced that that ninety-nine
 9   percent is after a washout period of time where the room
10   air is allowed to get back into the lungs?
11      A.   Yes, sir.  Because--  And what helps me even more so
12   is the fact that she went to radiology at least thirty,
13   forty-five minutes prior off the oxygen.  So if she was
14   doing well then, there's nowhere in there that states that
15   she needed to be placed back on the oxygen or having any
16   trouble.
17      Q.   Okay.  Coming back to what we've talked about here
18   before, in those prior visits in the emergency room that
19   you reviewed, did you see any mention of a protocol in
20   there?
21      A.   Did I mention a protocol?  No, sir.
22      Q.   Do you see any mention of protocol in those--
23      A.   No, sir.
24      Q.   --prior visits?
25      A.   No, sir.
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1      A.    Yeah.   Okay.   Yes, sir.
 2      Q.    I'm talking about between the discharge from Willis-
 3   Knighton South and the time when the patient, the four-
 4   year-old patient, is transported by ambulance to Willis-
 5   Knighton Bossier.   What happened to the child's body?   What
 6   was going on inside?
 7      A.    I would really--   Before I answer that, would like
 8   to read the death certificate to see what the coroner
 9   actually said it was.   I mean--
10              MR. HUTTON BANKS:   Autopsy or death
11              certificate?
12              WITNESS:   The autopsy report.
13      A.    I mean, to just give you off the cuff, if I can help
14   explain it to the jury.   I don't think--   I don't feel like
15   the patient was inappropriately discharged.   I think it's
16   an awful, awful sad case.   I think--   Asthma--   I've seen
17   several people die from it.   It's a very unfortunate--   It
18   is a--   It's very sad but it--
19      Q.    Is it painful, Doctor?
20      A.    It's not--   Is it painful to have trouble breathing?
21   I think it's uncomfortable.   Have I had asthma?   I do not
22   have asthma.
23      Q.    Would you tell the jury that this child did not
24   suffer in between the discharge--
25      A.    I would not tell the jury that.
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    very--in much distress.  Even if you're not hearing it,

2    they're not sitting here like you and I.  They're going to

3    be very uncomfortable.

4        Q.   Did you notice that the family, as noted in the

5    records, observed respiratory failure.

6        A.   I don't understand what you're saying.  They

7    observed it when?

8        Q.   When they called the ambulance?

9        A.   I did not see the run sheet of the call.  I'm

10   reading the ER chart and I don't--I don't know what they

11   said when they called.  Do you have the run sheet of when

12   the patient was picked up by the ambulance?

13       Q.   I don't know if we have that, Doctor.  I'm not sure.

14       A.   Okay.  Well, I will say that on the ER note that the

15   doctor wrote that CPR was not being done by the bystander,

16   so I'm assuming that the patient did not code in front of

17   the parents or they didn't recognize it and that the

18   ambulance guys recognized or it occurred in front of the

19   ambulance guys.

20       Q.   Okay.  You think also, Doctor, coming back to what

21   we talked about early--  Well, before we leave that.  Do

22   you think a four-year-old can explain to a doctor that "I'm

23   feeling better, Doctor.  I'm okay."

24       A.   They can say, they can show it, they can act it.  I

25   think you can say, "Do you feel better?" and they can smile

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
1    or say yes or run around the room, which shows you they're
2    feeling better.  Drinking their juice.  They're feeling
3    better.  Yes, I do.
4        Q.   Okay.  Did you see where this patient was running
5    around the room?
6        A.   I didn't see it documented.  No, sir.
7        Q.   Did you see where she was drinking juice?
8        A.   No sir.
9        Q.   Did you see any of those things that you're talking
10   about that indicated to you that the patient's fine?
11       A.   No.  But I saw the note of the reassessment that the
12   nurse said that the patient was feeling better.  So you'd
13   have to ask the nurse what she was observing that made her
14   say that.  But that's how I reassess.
15       Q.   I understand.
16       A.   Yes, sir.
17       Q.   I want to cover just a couple of quick questions and
18   answers, if you will, Doctor, just to kind of cover some
19   ground here.  Tell me whether you agree or don't agree,
20   please?
21       A.   Yes, sir.
22       Q.   Vital sign assessment is essential in determining a
23   patient's health status?
24       A.   Where are you reading this from?  Is this from a
25   medical book?
```

Page 58

JACQUELYN WHITE
2/12/2020

1     Q.   If we wanted to open it up in front of the jury and

2   read from it and we wanted to tell the jury that this

3   source, this medical source that Dr. White, as the bible,

4   it would tell us how not to discharge an unstable patient.

5   What text would you go to?

6     A.   I wouldn't be able to give you a name of that.  I

7   use very--  We all use different texts as well as our

8   clinical judgment on saying this.

9     Q.   Okay.  Which text or medical authority would you

10   rely on to tell you when to not discharge an unstable

11   patient?

12     A.   I don't have one over the other that I would give

13   you.

14     Q.   Well, let's do it this way.  Give me two or three of

15   them that you really consider authorities insofar as

16   discharging an unstable patient.

17           **MR. ROBISON:**  Wait, what do you mean by

18                 discharging an unstable patient.

19     A.   You mean appropriate treatment of the emergency

20   medical care?

21     Q.   No.  I'm talking about.  This is how we go about--

22     A.   Appropriate discharging?

23     Q.   This is how we go about making sure that we do not

24   discharge a patient in an unstable condition.  This is it.

25   This is the page we ought to read.  What authority do you

JACQUELYN WHITE
2/12/2020

1    Q.   That you didn't get?

2    A.   The one I didn't get was the run sheet.

3    Q.   And what was the importance--

4    A.   The ambulance.  To know what was going on at the

5    house, to know what symptoms--what she presented as when

6    they got there, to know what they did or attempted to do

7    enroute.  It sometimes will help with the--  When a--when a

8    patient comes in in arrest, the chart is not always

9    complete because they're worried about trying to save the

10   child's life.  So, sometimes, the run sheet can give you a

11   better history or story.  So I just wanted that for

12   completeness.

13   Q.   Okay.  Why did you not think that the 02 protocol

14   was not sufficiently important to review with respect to

15   your opinion of whether the hospital violated EMTALA in

16   this case?

17   A.   Because when the patient was discharged, the patient

18   was stable with ninety-nine percent saturation.  So there

19   was not a question in my mind that they followed the

20   protocol or not.  They treated the patient who had an

21   emergency medical condition and the patient was stabilized.

22   So I didn't think to ask for the 02 policy.

23   Q.   Okay.  Have you ever been sued in a civil lawsuit

24   alleging medical malpractice?

25   A.   Yes, sir.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1    the lawsuit was there and then one here where I was served
 2    papers.
 3         Q.   In those lawsuits, who were the plaintiff?
 4         A.   The one in Arkansas was a twenty-two or twenty-four-
 5    year-old female that had pneumonia.
 6         Q.   And what county?
 7         A.   Faulkner County.
 8         Q.   Faulkner.
 9         A.   Conway, Arkansas.  Yes, sir.
10         Q.   And it was an actual lawsuit?
11         A.   Yes, sir.
12         Q.   And then, here, in Louisiana, what parish was the
13    suit served?
14         A.   Here in Lincoln.
15         Q.   Lincoln?
16         A.   Yes, sir.
17         Q.   Do you consider yourself an expert in EMTALA?
18         A.   No, sir.
19         Q.   Have you ever testified as an expert in an EMTALA
20    case, if I haven't already asked you that?  I apologize.
21         A.   No, sir.  You asked, but I haven't.  No, sir.
22         Q.   Okay.  Would you be surprised if this child's death
23    was caused by pneumonia and hypoxic brain injury?
24         A.   Would I be surprised?  I do believe the patient did
25    have hypoxic brain injury that was on the--that
```

Page 70

JACQUELYN WHITE
2/12/2020

1    hospitalization.  I don't remember if it said pneumonia as

2    one of the diagnoses.

3        Q.    Would it surprise you that this child had pneumonia?

4        A.    Would it surprise me?

5        Q.    If it turns out that she did?

6        A.    It would be unlikely.  It wouldn't surprise me.  No,

7    sir.

8        Q.    But it would be unlikely?

9        A.    I would think so.  Yes, sir.

10       Q.    And why would you tell the jury that pneumonia would

11    be unlikely in this case?

12       A.    Because she was on an antibiotic at the time.  It

13    was started two days prior and she had a chest x-ray done

14    that did not show an obvious pneumonia.  It had perihilar

15    infiltrates which is common with asthma.

16       Q.    I'm going to leave this alone, but I just want to

17    make sure I understand.

18       A.    Yes, sir.

19       Q.    You're saying her death was inevitable?

20       A.    I'm saying her death was unfortunate.

21       Q.    And inevitable?

22            **MR. ROBISON:**  Object to form.

23       A.    I really don't want to say it was inevitable.  It

24    was unfortunate.  I don't want to use the word inevitable.

25       Q.    Hypothetically, Doc, if this child would have been

Page 71

JACQUELYN WHITE
2/12/2020

```
 1    hospitalized and hooked up to the monitors, vital signs
 2    that we've talked about, would there be a greater than
 3    average chance that this child could've been saved?
 4        A.   Could they have been?  Yes.  A lot of people would
 5    be saved if they were in the hospital than not.  The
 6    question goes back to were they inappropriately discharged.
 7        Q.   Right.
 8        A.   And I don't think they were--it was inappropriate.
 9    If the child was in the hospital, would they have found
10    that--that's kind of putting that on the parents and I
11    really don't want to say that, for the parents' sake, to
12    tell them if you'd got the patient back sooner or if you
13    would've stayed with us, that's a hard prediction to make.
14        Q.   If they would have stayed with you?  What does that
15    mean?
16        A.   Been admitted to the hospital.  Stayed--stayed at
17    the hospital.  Believe it or not, sometimes--  I'm going to
18    add this.  Admissions are easier than discharges.  And so I
19    don't you would risk doing that.
20        Q.   Have you read Dr. Richard Sobel's report in this
21    case?
22        A.   No, sir.  I have not.
23        Q.   Have you read his deposition?
24        A.   No, sir.  I have not.
25        Q.   Is there any reason why you would not want to read
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1     those documents?

2         A.   I don't think I needed his deposition to form my

3     opinion and I didn't want to be biased on it.  I felt like

4     I had enough evidence right here.

5         Q.   Okay.

6         A.   Is he a--  Would you like me to read--  Is he an

7     asthmatic specialist?

8         Q.   No.  No.

9         A.   A pediatric specialist?

10        Q.   He's an EMTALA expert.

11        A.   Okay.  How do you become an expert in EMTALA?

12        Q.   I think the court probably has the final say on

13    that.

14        A.   Oh.

15        Q.   The effects of Albuterol last four to six hours.  Is

16    that correct?

17        A.   The long-term, yes, sir.

18        Q.   So--

19        A.   They can.  Yes, sir.

20        Q.   How long does it normally take to know whether

21    Albuterol is working or not working?

22        A.   Usually within fifteen minutes, ten to fifteen

23    minutes.  You can--you can see some improvement pretty

24    rapidly.

25        Q.   The home treatments of Albuterol that she received,

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      A.   Well, you just look and see if she has some of the

2    side effects of Albuterol.

3      Q.   Which are?

4      A.   Breathing fast, fast heartrate, anxiousness,

5    nervousness, nausea, upset stomach.  Those are the more

6    common ones.

7      Q.   Would you agree with this, Doctor, that needing to

8    use Albuterol more frequently than usual may be a sign that

9    your asthma is destabilizing and you need to seek immediate

10   medical advice?

11     A.   Yes.

12     Q.   Your statement on page 1 of your report, Doctor, you

13   mention that approximately two hours after entering the

14   emergency department, "The patient was stable for

15   discharge."  Was that based on a medical examination, that

16   statement?

17     A.   My statement was based on review of the chart.

18     Q.   Okay.  Well, when you reviewed the chart, can you

19   show the jury the medical exam that would support that

20   statement?

21     A.   No.  That's the statement that the provider wrote.

22     Q.   Oh, okay.  I may have attributed that to you.  I'm

23   sorry.

24     A.   No.  It says the doctor noted on the reassessment

25   that patient's condition had--  I'm sorry.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    you just disagree with?

2       A.   I don't disagree with it, but, once again, I think

3    this is inpatient.

4       Q.   Right.

5       A.   I don't see anything that I disagree with.  No, sir.

6       Q.   Okay.  Do you believe that there's a distinction

7    between the care given to inpatients as those that are

8    receiving treatments in the emergency department?

9       A.   Do I think there's a distinction between inpatient

10   and ER?  Yes, sir.

11      Q.   And, in particular, the standard of care involving

12   the oxygen administration.  Do you think that's different?

13   That's what I'm trying to figure out, Doc.  Let me just--

14      A.   Go ahead.  Yes, sir.

15      Q.   --rephrase this.

16      A.   Yes, sir.

17      Q.   In other words, we, at the hospital, have an

18   emergency department--

19      A.   Yes, sir.

20      Q.   --and we have admissions--

21      A.   Yes, sir.

22      Q.   --admitting patients.

23      A.   Yes, sir.

24      Q.   What I'm trying to figure out, do you administer

25   oxygen protocol differently in the emergency room than you

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
1    do in the floor of the hospital?
2      A.   I would have to see the two protocols to see if
3    their administration is different.   ER is an acute place of
4    acute distress.   Hospital inpatient can be not as acute,
5    but can still need it.   Like this is talking about recovery
6    patients--
7      Q.   Right.
8      A.   --post-op patients.
9      Q.   Right.
10     A.   So they probably have different protocols, but I
11   have not seen them so I can't tell you what they are.
12     Q.   Okay.   Now, Doc, I don't know that you saw all of
13   the records from the Willis-Knighton Bossier.   Do you
14   recall those?
15     A.   Of the ER visit?
16     Q.   Yeah.
17     A.   Now, how would I--  I'm not real sure if I'd know if
18   I didn't see all of them.
19     Q.   And that's what I want to talk about here just a
20   second.
21     A.   Okay.   Okay.
22     Q.   Before we do that--
23     A.   Yes, sir.
24     Q.   --do you know what a SANE nurse is?
25     A.   Yes, sir.
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      Q.    --the initial ER visit until they pulled the plug on
2    the child.  Do you feel like your testimony is consistent
3    with the timeline of facts in that time period?
4      A.    Yes, sir.
5      Q.    Okay.  And would you agree with me that if you have
6    some of your facts wrong, that it would give its sway to
7    some of the opinion that you have?  In other words, there
8    would be something less than desired about the opinion,
9    it's not exactly accurately, if we're not dealing with the
10   same facts?
11     A.    If my facts were wrong?
12     Q.    Right.
13             MR. ROBISON:  Object to the form.
14     A.    I guess if anybody's facts were wrong, that my
15   opinion would be different.  Yes, sir.
16             MR. BANKS:  I think that's all we have, Doctor.
17             WITNESS:  Okay.
18             MR. BANKS:  You have the right to read this and
19             sign it or you can waive that right, whichever
20             you prefer.
21             WITNESS:  I'd like to read it, if that's okay.
22             MR. BANKS:  Sure.
23   (OFF RECORD)
24             MR. BANKS:  Doctor, what I'd like for you to do
25             is would you make a copy--

Page 112