JACQUELYN WHITE
2/12/2020

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

COPY

AKEEM HENDERSON and JENNIFER
ALEXANDER, INDIVIDUALLY AND
AS ADMINISTRATRIX OF THE
SUCCESSION OF A.H.

                             CIVIL ACTION NO. 5:19-CV-00163

VERSUS                     JUDGE ELIZABETH E. FOOTE

                          MAGISTRATE JUDGE MARK L. HORNSBY

WILLIS-KNIGHTON MEDICAL
CENTER d/b/a WILLIS KNIGHTON
SOUTH HOSPITAL

\* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF

JACQUELYN WHITE, M.D.

February 12, 2020

\* \* \* \* \* \* \* \* \* \* \* \* \*

Taken at:

Health Hut
310 West Mississippi Avenue
Ruston, Louisiana

\* \* \* \* \* \* \* \* \* \* \* \* \*

Reported by:   Janet McBride
                Certified Court Reporter
                Certificate No. 27006



Page 1

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

13504 /38.

JACQUELYN WHITE
2/12/2020

APPEARANCES


FOR AKEEM HENDERSON AND JENNIFER
ALEXANDER, INDIVIDUALLY AND AS
ADMINISTRATRIX OF THE SUCCESSION OF A.H.:

> LAW OFFICES OF SEDRIC E. BANKS
> AND S. HUTTON BANKS
> 1038 North Ninth Street
> Monroe, Louisiana 71201
> appearing herein by and through
> Mr. Sedric E. Banks and
> Mr. S. Hutton Banks


FOR WILLIS-KNIGHTON MEDICAL CENTER
d/b/a WILLIS KNIGHTON SOUTH HOSPITAL:

> WATSON, BLANCHE, WILSON & POSNER
> 505 North Boulevard
> Baton Rouge, Louisiana 70802
> appearing herein by and through
> Mr. Robert W. Robison, Jr.

And

> PUGH, PUGH & PUGH
> 333 Texas Street, Suite 2100
> Shreveport, Louisiana 71101-5302
> appearing herein by and through
> Mr. Lamar P. Pugh

Page 2

JACQUELYN WHITE
2/12/2020

```
 1    There are several vital signs you look at, as well as your
 2    examination, as well as your history of present illness.
 3    It all plays a part.  Yes, sir.
 4        Q.   So we're dealing with examination, vital signs and
 5    what else is in the components that--
 6        A.   History.
 7        Q.   History.  Okay.  I noticed that in your report, that
 8    you did not mention that you had reviewed the death
 9    certificate.  Did you--
10        A.   I didn't.  I do not remember seeing the death
11    certificate.  No, sir.
12        Q.   Did you review the autopsy?
13        A.   I did not.  No, sir.
14        Q.   Did you review the protocol for the hospital as far
15    as administering oxygen?
16        A.   No, sir.
17        Q.   Did you review the interpretative guidelines for
18    EMTALA?
19        A.   I read over some EMTALA.  I'm not sure if I read the
20    complete EMTALA, but I did look at some things about
21    EMTALA.
22        Q.   Tell me what you recall about reading the EMTALA
23    that you--
24        A.   May I look at my notes while I'm telling you that?
25        Q.   Yes.  You may.  Please do.
```

Page 13

JACQUELYN WHITE
2/12/2020

1  A.   Okay.  EMTALA, to me, was--is something that we look
2  at that was written--and I mean, I've practiced medicine
3  for twenty-five years, and it's kind of known as the anti-
4  dumping law.  EMTALA is to protect a person that they can
5  get treatment regardless of ability to pay and that we're
6  going to see them regardless of ability to pay and we're
7  not going to stop and wait on treatment until we get any
8  payment.  And we're not going to transfer a patient because
9  of inability to pay.  So I reviewed EMTALA to make sure
10 that I was--that is what I'm--  We do EMTALA training,
11 continuing education, with both our companies that we work
12 for, as well as the hospitals that we work for.  And so
13 it's--I just looked over the anti-dumping law and the
14 different components of it because I know that was a huge
15 thing--part of this case.
16 Q.   And tell me, if you will, how you saw EMTALA
17 correlating to this case.
18 A.   Yes, sir.  To be honest, I did not see a lot of
19 correlation because I think of EMTALA from a clinical point
20 as a patient being transferred, an inappropriate transfer.
21 Not an inappropriate discharge to home.  So to be honest,
22 it was--it was different for me from the clinical side
23 because a transfer doesn't--in a--in a clinical mind, it
24 doesn't mean transfer to the house.  It means transfer to
25 another facility.

JACQUELYN WHITE
2/12/2020

1  the lawsuit was there and then one here where I was served
2  papers.
3      Q.  In those lawsuits, who were the plaintiff?
4      A.  The one in Arkansas was a twenty-two or twenty-four-
5  year-old female that had pneumonia.
6      Q.  And what county?
7      A.  Faulkner County.
8      Q.  Faulkner.
9      A.  Conway, Arkansas.  Yes, sir.
10     Q.  And it was an actual lawsuit?
11     A.  Yes, sir.
12     Q.  And then, here, in Louisiana, what parish was the
13  suit served?
14     A.  Here in Lincoln.
15     Q.  Lincoln?
16     A.  Yes, sir.
17     Q.  Do you consider yourself an expert in EMTALA?
18     A.  No, sir.
19     Q.  Have you ever testified as an expert in an EMTALA
20  case, if I haven't already asked you that?  I apologize.
21     A.  No, sir.  You asked, but I haven't.  No, sir.
22     Q.  Okay.  Would you be surprised if this child's death
23  was caused by pneumonia and hypoxic brain injury?
24     A.  Would I be surprised?  I do believe the patient did
25  have hypoxic brain injury that was on the--that

Page 70

JACQUELYN WHITE
2/12/2020

```
1      A.   Well, you just look and see if she has some of the
2   side effects of Albuterol.
3      Q.   Which are?
4      A.   Breathing fast, fast heartrate, anxiousness,
5   nervousness, nausea, upset stomach.  Those are the more
6   common ones.
7      Q.   Would you agree with this, Doctor, that needing to
8   use Albuterol more frequently than usual may be a sign that
9   your asthma is destabilizing and you need to seek immediate
10  medical advice?
11     A.   Yes.
12     Q.   Your statement on page 1 of your report, Doctor, you
13  mention that approximately two hours after entering the
14  emergency department, "The patient was stable for
15  discharge."  Was that based on a medical examination, that
16  statement?
17     A.   My statement was based on review of the chart.
18     Q.   Okay.  Well, when you reviewed the chart, can you
19  show the jury the medical exam that would support that
20  statement?
21     A.   No.  That's the statement that the provider wrote.
22     Q.   Oh, okay.  I may have attributed that to you.  I'm
23  sorry.
24     A.   No.  It says the doctor noted on the reassessment
25  that patient's condition had--  I'm sorry.
```

1    MR. BANKS: I've labeled it "White 2."
2    (Witness peruses document.)
3    A.  Okay.
4    Q.  That is your report?
5    A.  Yes, sir.
6    Q.  Okay.
7    MR. BANKS: I'd like to attach that to the
8    deposition along with "White 1."
9    Q.  And I want to give you a document that is now--
10   MR. BANKS: --labeled "White 3."
11   A.  Yes, sir.
12   Q.  And it's another protocol and I just want to let you
13   review that for a minute, take your time and go ahead--
14   You might want to show it to counsel first. I'm sorry.
15   A.  I'm sorry.
16   Q.  And I'll represent to you, Doctor, in all fairness
17   to counsel and yourself, that document was produced in
18   another lawsuit, not this lawsuit. It was produced in
19   another lawsuit involving Willis-Knighton. And I just
20   wanted to ask you some questions about that--
21   A.  Yes, sir.
22   Q.  --after you've had time to look at it.
23   (Witness peruses document)
24   A.  Okay.
25   Q.  Okay. Do you see anything on there, Doctor, that