UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| AKEEM HENDERSON and JENNIFER ALEXANDER, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE SUCCESSION OF A. H. (Plaintiffs) <br> VERSUS <br> WILLIS-KNIGHTON MEDICAL CENTER d/b/a WILLIS KNIGHTON SOUTH HOSPITAL (Defendant) | CIVIL ACTION NO. 5:19-CV-00163 <br><br> JUDGE ELIZABETH E. FOOTE <br><br> MAGISTRATE JUDGE MARK L. HORNSBY |

## MEMORANDUM OF LAW OPPOSING DEFENDANT, WILLIS-KNIGHTON'S, MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted:

SEDRIC E. BANKS LBN 2730
S. HUTTON BANKS LBN 37377
1038 North Ninth St.
Monroe, Louisiana 71201
318-388-1655 telephone
318-816-5026 facsimile
sedbanks@aol.com
*Attorneys for Akeem Henderson and Jennifer Alexander*

**TABLE OF CONTENTS**

TABLE OF CONTENTS                                                                    i

INDEX OF AUTHROITIES                                                               ii

I.      Introduction                                                                        1

II.     Statement of Facts                                                              2

III.    Summary Judgment Standard                                          11

IV.     Discussion                                                                         11

        (A) Willis-Knighton has Failed to Satisfy its Evidentiary Burden        12

        (B) Willis-Knighton is Liable to Plaintiffs for Violating EMTALA        13

V.      Conclusion                                                                         24

CERTIFICATE OF SERVICE                                                        24

# INDEX OF AUTHORITIES

**FEDERAL RULES**                                                    **PAGE**

Federal Rule of Civil Procedure 56                                    10

Federal Rule of Evidence 404                                          6

**STATUTES / CODAL PROVISIONS**

42 U.S.C.A. §1395dd                                              13, 14, 15

**JURISPRUDENCE**

*Battle ex. rel. Batlle v. Memorial Hosp. at Gulfport,* 228 F.3d 544
(5th Cir. 2000).                                        12, 13, 14 15, 17, 18, 21

*Burditt v. United States Dep't of Health & Human Servs.,*
934 F.2d 1362 at 1369 (5th Cir. 1991).                          13, 14, 15

*Caristo v. Clark Reg'l Med. Ctr., Inc.,* 2009 U.S. Dist.
LEXIS 75732 (E.D. Ky. Aug. 24, 2009).                                 12

*Celotex Corp. v. Catrett,* 447 U.S. 317, 322 106 S.Ct. 2548, 2552 (1986).      11

*Cervantes v. Tenet Hospital Limited,* (W.D. Tex. 03/26/19) 372 F.Supp.3d 486.      13

*Contogouris v. Pacific West Resources, LLC,* (5th Cir. 12/17/13) 551 Fed. Appx. 727.      6

*Cruz-Vazquez v. Mennonite Gen. Hosp.* 613 F.3d 54 (1 Cir. 2010).      12

*Ingram v. Muskogee Regional Medical Center,* 235 F.3d 550 (10th Cir. 12/18/00).      16

*Liles v. TH Healthcare, Ltd.,* (E.D. Tex. 05/05/14) 2014 WL 1813312.      12, 15

*Marshall on Behalf of Marshall v. East Carroll Parish Hosp. Service Dist.,*
(5th Cir. 02/09/98) 134 F.3d 319.                              14, 15, 17, 18, 21

*Matsushita v. Electric Industrial Company, Ltd. v. Zenith Radio Corporation,*
475 U.S. 574, 587-88, 106 S.Ct. 1348 (1986).                          11

*Pettyjohn v. Mission-St. Joseph's Health System, Inc.,*
(W.D. N.C. 11/22/00) 2000 WL 33311929.                                15

*Power v. Arlington Hospital Ass.,* 42 F.3d 851 (4th Cir. 1994).      13

*Romine v. St. Joseph Health Sys.,* 2013 U.S. App. LEXIS 21926 (6th Cir. 2013).          12

*Smithson v. Tenet Health System Hospitals, Inc.,*
(E.D. La. 07/30/08) 2008 WL 2977361.          15, 18, 21


*Scott v. Hutchinson Hospital*, 959 F.Supp. 1351 (D. Kan. 03/04/97).          16

*U.S. v. Beechum,* 582 F.2d 898 (5th Cir. 1978).          6

*U.S. v. Stephens,* (5th Cir. 06/10/09) 571F.3d 401.          6

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | |
|---|---|
| **AKEEM HENDERSON and JENNIFER ALEXANDER, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE SUCCESSION OF A. H.** | **CIVIL ACTION NO. 5:19-CV-00163** |
| | |
| **VERSUS** | **JUDGE ELIZABETH E. FOOTE** |
| | |
| **WILLIS-KNIGHTON MEDICAL CENTER d/b/a WILLIS KNIGHTON SOUTH HOSPITAL** | **MAGISTRATE JUDGE MARK L. HORNSBY** |

## PLAINTIFFS' MEMORANDUM OF LAW OPPOSING WILLIS-KNIGHTON'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiffs Akeem Henderson and Jennifer Alexander are the natural parents of A.H.  In their petition filed February 8, 2019, plaintiffs allege Willis-Knighton Medical Center d/b/a Willis-Knighton South Hospital (Willis-Knighton) violated the Emergency Medical Treatment and Labor Act ("EMTALA"), on February 10, 2018 when the hospital acquired actual knowledge A.H. presented with an emergency medical condition and failed to stabilize the child prior to discharging her. Approximately three (3) hours after she was discharged, A.H. suffered respiratory and cardiac arrest from which she never recovered. Defendant timely Answered the Complaint denying all material allegations, and has now moved for summary judgment. Although Willis-Knighton retained Jacquelyn White, M.D. as its expert witness, no expert testimony is cited in support of Defendant's dispositive motion.

## STATEMENT OF FACTS

A.H. was a four-year old autistic African-American female with a history of bronchopulmonary dysplasia ("BPD") related to premature birth. She had been diagnosed with asthma at two (2) years old and, because of these conditions, routinely visited Willis-Knighton's Emergency Department when her prescribed bronchodilator treatments administered at home failed to provide relief. A.H. had no private health insurance and was a Medicaid beneficiary.

Prior to February 10, 2018, A.H. visited Willis-Knighton Emergency Departments on thirty-two (32) occasions due to her chronic pulmonary issues.[1] Seven (7) of those visits resulted in either her admission to the hospital, or transfer to a different hospital that could provide a higher level of care.[2] Prior to the night in question, and without exception, Willis-Knighton admitted A.H. to the hospital each and every time she presented with an oxygen saturation level below 95% on room air (abbreviated in the medical records as "R/A").[3] Said another way, prior to February 10, 2018, Willis-Knighton never discharged A.H., when her room air oxygen saturation level was below 95% on presentation. Not once.[4]

Willis-Knighton had in effect several pertinent policies and protocols, including a standing Oxygen Protocol relating to pediatric patients exhibiting clinical signs of hypoxemia.

---

[1] Exhibit 1: Willis-Knighton South Medical Records BN p. 780 through 1758.
[2] Exhibit 1: Willis-Knighton South Medical Records BN p. 1539 – 1643 for her November 2, 2015 hospital admission; BN 1510-1525 for her December 31, 2015 transfer to a facility with a higher level of care; BN 1373 – 1509 for her March 10, 2016 hospital admission; BN 1253 – 1358 for her May 1, 2016 hospital admission; BN 1068 – 1178 for her November 4, 2016 hospital admission; BN 948 – 1013 for her July 14, 2017 hospital admission; and BN 837 – 947 for her August 28, 2017 hospital admission.

Plaintiffs' expert, Richard Sobel, M.D. noted discrepancies in the medical records Willis-Knighton provided plaintiffs versus the medical records upon which he was questioned during his deposition. (Exhibit 12: Dr. Sobel Depo p. 143-145) Plaintiffs cannot explain how the defendant's arrived at (37) emergency room visits claimed as "undisputed" in Item No. 10 of Defendant's Statement of Material Facts. Plaintiffs' object to any discrepancies in the records, particularly for the purposes of litigating Defendant's Motion for Summary Judgment.
[3] Blood/oxygen saturation or "oxygen saturation" or sometimes "02 Sat" refers to the percentage of oxygen-saturated hemoglobin relative to total hemoglobin in the blood and is typically measured by a pulse oximeter.
[4] Exhibit 1: Willis-Knighton South Medical Records BN p. 780 through 1758.

The Oxygen Protocol is referenced and applied in A.H.'s medical records[5] and was produced in this lawsuit in response to plaintiffs' written discovery requests.[6] According to the protocol, clinical signs of hypoxemia include tachycardia, tachypnea, and oxygen saturation of less than 95% on room air in pediatric patients. If a pediatric patient exhibits an oxygen saturation level of less than 95% on room, oxygen is administered per the protocol. Once oxygen is administered the protocol then requires Willis-Knighton providers to "place patient on room air and observe saturation" and discontinue oxygen only "if the patient is able to maintain an oxygen saturation of 92% [95% for pediatric patients] or greater on room air with no clinical signs or symptoms of hypoxemia."[7] Willis-Knighton's expert, Jacquelyn White, M.D., admitted she had not reviewed Willis-Knighton's Oxygen Protocol in forming her opinion and that she is not familiar with policies of any of the hospitals where she works.

For whatever reason, Willis-Knighton has declined to cite the testimony of its own expert, Jacquelyn White, M.D., in support of its dispositive motion. The only evidence offered by Willis-Knighton in support of its motion for summary judgment is an affidavit of David Easterling, M.D., the physician who discharged A.H. on the night in question and an "agent" of Willis-Knighton for EMTALA purposes. Dr. Easterling does not mention the Oxygen Protocol and does not comment on any of A.H.'s prior visits the Emergency Department and/or corresponding admissions to the hospital when her blood/oxygen saturation was below 95% on presentation.[8]

Further, Willis-Knighton's Emergency Department Plan of Care policy requires its personnel to continually reassess patients based on their triage classification. Emergent patients

---

[5] Exhibit 1: Willis-Knighton South Medical Records BN 1069 – 1073.
[6] Exhibit 2: Willis-Knighton Discovery Responses and attached Oxygen Protocol *in globo*.
[7] Exhibit 2:  Willis-Knighton Discovery Responses and attached Oxygen Protocol *in globo*.
[8] See Exhibit "A" of Willis-Knighton's Motion for Summary Judgment – Affidavit of David Easterling, M.D.

"should be reassessed often (reassessments should include documentation of vital signs) until the patient is stabilized"[9] and "all abnormal vital signs will be reassessed and documented prior to discharge."[10]

Within the six (6) months prior to her final visit to Willis-Knighton ED on February 10, 2018, A.H. had been admitted twice to the hospital in connection with chronic respiratory issues. For example, on July 15, 2017, A.H. presented to the Willis-Knighton ED with complaints of breathing difficulty, an oxygen saturation of 91% on room air, a pulse of 174 and respiratory rate of 32. Willis-Knighton documented A.H. suffered from mild respiratory distress and noted she was not using accessory muscles to assist in breathing or "tri-poding". Two (2) Albuterol breathing treatments were administered and A.H. was observed for five (5) hours. During the observation period, the hospital discovered that while some of her clinical symptoms had improved, A.H.'s room air oxygen saturation was actually backsliding and her emergency condition had not stabilized. Willis-Knighton admitted A.H. to the hospital after five (5) hours of observation under the following circumstances:[11]

| Time | Treatment / Finding | Pulse | Resp Rate | Oxygen Sat. |
|------|---------------------|-------|-----------|-------------|
| 8:35 | | 174 | 32 | 91% on R/A |
| 8:41 | Triaged as Emergent | | | |
| 9:06 | Albuterol 0.5      1 of 2 | | | |
| 9:24 | Albuterol 0.5      2 of 2 | 149 | 34 | 99% |
| 9:25 | Tachypnea breath sounds, weezing, with retractions | | | |
| 10:05 | Weezing has improved | 146 | 32 | 98% on R/A |
| 12:54 | | 135 | 30 | 95% on R/A |
| 13:23 | Symptoms have mildly improved after treatment | | | |
| 13:26 | Admitted to hospital for Observation | | | |
| 15:21 | | 130 | 30 | 96% |

---

[9] Exhibit 2: Willis-Knighton Discovery Reponses and attached hosp. emergency department policies "Section I - H".
[10] Exhibit 2: Willis-Knighton Discovery Reponses and attached hospital policies "Section I - I".
[11] Exhibit 1: Willis-Knighton South Medical Records BN 949 – 961.

A similar situation occurred on February 10, 2018, when A.H. again presented to Willis-Knighton ED at 2:05 a.m. in the "tripod" position with an oxygen saturation of 91% on room air, pulse of 156 and respiratory rate of 36. Willis-Knighton triaged A.H.'s condition as "emergent". Willis-Knighton noted that A.H. suffered from difficulty breathing, asthma exacerbation, and was tripoding. Also, noted was the fact the prescribed the bronchodilator treatments administered at home earlier, including Albuterol, provided no relief. Willis-Knighton ordered DuoNeb, Albuterol breathing treatments and concluded its emergent treatment at 3:44 a.m. with a steroid injection, discharging the four-year old at 3:52 a.m. In sum, Willis-Knighton ordered A.H. discharged from its Emergency Department less than two hours after she arrived and eight (8) minutes after the last "emergent" treatment and under the following circumstances, to-wit:[12]

| Time | Treatment / Finding | Pulse | Resp Rate | Oxygen Sat. |
|------|---------------------|-------|-----------|-------------|
| 2:04 | DueNeb 1 unit dose. | | | |
| 2:05 | Sitting in tripod position, labored breathing with retractions, wheezing, breathing treatments at home provide no relief. | 156 | 36 | 91% on R/A |
| 2:05 | 100% breathing treatment, triaged as Emergent. | | | |
| 2:11 | Respiratory effort is labored, with retractions, using tripod position, respiratory pattern is tachypnea Airway with wheezes bilaterally, sinus tachycardia. | | | |
| 2:32 | Respiratory status improved. | | | |
| 3:16 | Albuterol 2.5mg. | | | |
| 3:23 | | 145 | 34 | 99% |
| 3:44 | Decadron – Dexamethasone Sodium Phosphate 4mg. | | | |
| 3:52 | Discharge ordered by physician. | | | |
| 3:55 | Respiratory status improved. | | | |

---

[12] Exhibit 1: Willis-Knighton South Medical Records BN p. 762 - 768

After administering oxygen and Albuterol on February 10, 2018, Willis-Knighton never observed, monitored, and documented A.H.'s room air blood/oxygen saturation prior to discharging her. Instead, A.H. was given a steroid shot at 3:44 and ordered discharged at 3:52.

All experts concede A.H. was suffering an emergency medical condition on the night in question; that the child's Albuterol breathing treatments administered at home prior to her initial ED visit were ineffective, and that it takes several hours to observe the clinical effectiveness of steroids on an asthmatic patient.

A.H.'s mother, Jennifer Alexander, observed A.H. was still wheezing at the time of discharge.[13] Importantly, no medical exam was performed at the time of discharge in that no doctor had even laid eyes on A.H. during the last one and one-half hours prior to discharge.[14] Jennifer took A.H. from Willis-Knighton to the home of her grandmother i.e. Jennifer's mother. Approximately, three (3) hours later, A.H. suffered respiratory arrest.[15] 911 was called. A.H. was transported by ambulance to Willis Knighton Bossier.

At this juncture, plaintiffs are unfortunately forced to respond to Willis-Knighton's reference to a S.A.N.E. (Sexual Assault Nurse Examiner) report in its motion for summary judgment and the affidavit of David Easterling, MD.[16] Indeed, Willis-Knighton has forced the issue in the instant summary judgment proceeding. Willis-Knighton suggests the existence of a S.A.N.E. report somehow absolves it of liability for illegally "dumping" A.H. Although

---

[13] Exhibit 3: Affidavit of Jennifer Alexander Item No. 5.
[14] Exhibit 3: Affidavit of Jennifer Alexander Item No. 4.
[15] Exhibit 4: Willis-Knighton Bossier Medical Records, Nurses Notes p. 1.
[16] Defendant's brief and supporting memorandum cite the S.A.N.E. report. Defendant has also listed then-detective, Jeff Allday as a witness. Plaintiffs concede this evidence is relevant to the instant EMTALA proceeding and do not object. Specifically, plaintiffs reserve the right to present all evidence relating to this matter, or "offer proof" of crimes, wrongs and bad acts probabtive of intent, motive, opportunity, knowledge, identity, absence of mistake, and/or lack of accident relating to Willis-Knighton's violation of EMTALA. Willis-Knighton's attempted cover-up is intrinsic to its EMTALA violation, or in the alternative, is admissible under Rule 404(b). See *U.S. v. Stephens*, (5th Cir. 06/10/09) 571F.3d 401 at 410; See also *U.S. v. Beechum*, 582 F.2d 898 (5th Cir. 1978) and for civil application See *Contogouris v. Pacific West Resources, LLC*, (5th Cir. 12/17/13) 551 Fed. Appx. 727.

extremely sordid and unpleasant, plaintiffs are now forced to show the opposite of what Willis-Knighton suggests is true. Records prove trauma to the child's vagina, occurring days apart, was most likely caused by hospital personnel, and not within the three hours the child was in between ED visits. As shown more particularly below, medical records, together with the S.A.N.E. report prove Willis-Knighton's report of suspected aggravated rape is nothing more than a abhorrent attempt to silence plaintiffs and cover-up its EMTALA violation.[17]

After being ordered discharged by Willis-Knighton South at approximately 4:00 a.m. the child was taken by her mother to her grandmother's, as the mother was preparing to go to work. Less than three hours after arriving at her grandmother's, the child suffered respiratory distress. 911 was called and A.H. was transported from her grandmother's to Willis-Knighton Bossier by an Emergency Medical Services ("EMS") team. At Willis-Knighton Bossier, Nurse Jennifer Jaeger inserted a size 8 catheter into the unconscious four-year old at 7:47 a.m.[18] Nurse Jaeger did not notice any trauma to the child's vagina, and instead, reported the child tolerated the procedure well.[19]

After the catheter was inserted, Dr. James Horan, an emergency medicine physician at Willis-Knighton Bossier, telephoned PICU physician at Willis-Knighton South, Dr. Minh Tran.[20] Fifteen minutes after arriving Willis-Knighton Bossier, the child was transported back to Willis-

---

[17] As "offer of proof" and In responding to Willis-Knighton's reference to the S.A.N.E. report, plaintiffs attach Exhibit 1: WK South Medical Records; Exhibit 4: the emergency room records of Willis-Knighton Bossier which, for whatever reason, were not included in A.H.'s medical records certified by Willis-Knighton's Health Systems as the medical records of A.H.; Exhibit 5: the S.A.N.E. report; Exhibit 6: the Autopsy Report; Exhibit 7: The Autopsy Investigation; Exhibit: 8 the Bossier Fire Dept. EMS "runsheet" which Willis-Knighton's expert Jacquelyn White, M.D. requested from Willis-Knighton as referenced on pages 57 and 67 of her deposition (Exhibit 9) , but which Willis-Knighton declined to provide its expert; Exhibit 9: Excerpts from the deposition of Jacquelyn White, M.D.; Exhibit 10: Catheter age/size chart attached to Dr. White's deposition as "White 1"; and Exhibit 11: the Shreveport Police Department's incident report where, prior to the S.A.N.E. examination, Willis-Knighton reported to the SPD that A.H. had been "raped".
[18] Exhibit 4: Willis-Knighton Bossier Medical Record p. 2 of Nurse's Notes.
[19] Exhibit 4: Willis-Knighton Bossier Medical Records p. 2 of Nurse's Notes
[20] Exhibit 4: Willis-Knighton Bossier Medical Records p. 2 of Physician Documentation.

Knighton South by Bossier Fire Department's EMS team.[21] Per Dr. Horan's request, a nurse from Willis-Knighton Bossier accompanied the child in the ambulance.[22] When A.H. was placed in the ambulance for transport from Willis-Knighton Bossier to Willis-Knighton South, the EMS team performed a Genitourinary Exam which documented no abnormalities.[23] A Genitourinary Exam had also been performed by Willis-Knighton South on the child's first visit to the ER that morning which was also negative for trauma, bleeding and/or swelling.[24] So, by 8:26 a.m. on February 10, A.H. underwent two (2) separate Genitourinary Exams and both reported no abnormal findings.

When the child arrived at Willis-Knighton South at 8:46 a.m. for the second time that morning, accompanied by a nurse from Willis-Knighton Bossier, she had a size 6 catheter in place[25] i.e. different than the size 8 catheter originally inserted by Nurse Jaeger at Willis-Knighton South.

At 9:31 a.m., approximately forty-five (45) minutes after the child arrived at Willis-Knighton South, Dr. Horan, at Willis-Knighton Bossier, noted a "Special Discussion" in A.H.'s Willis-Knighton Bossier medical records suggesting that, while he had not personally witnessed such, an unidentified nurse had supposedly told him there was blood in child's vagina before the first Foley catheter was inserted by Nurse Jaeger at 7:47 a.m.[26]

Approximately ten minutes later, but before the S.A.N.E. nurse's arrival on the scene, a Willis-Knighton South official contacted the Shreveport Police Department to report suspected

---

[21] Exhibit 4: Willis-Knighton Bossier Medical Records. Exhibit 8: Bossier City Fire Dept. EMS "runsheet".
[22] Exhibit 8: Bossier City Fire Dept. EMS "runsheet" p. 3.
[23] Exhibit 8: Bossier City Fire Dept. EMS "runsheet" p. 2.
[24] Exhibit 1: Willis-Knighton South Medical Records p. 762.
[25] Exhibit 1: Willis-Knighton South Medical Records p. 756.
[26] Exhibit 4: Willis-Knighton Bossier Medical Records page 2 of Physician Documentation.  Compare with Exhibit 8: Bossier Fire Dept. Runsheet p. 3.

aggravated rape.[27] Oddly, the hospital official reporting "suspected aggravated rape", knew not only the municipal address of the incident (i.e. the grandmother's home), but also the name and physical description of the "perpetrator."[28] The matter was referred to then-detective, Jeff Allday, who Willis-Knighton has listed as a witness in this case.

After Willis-Knighton reported to the Shreveport Police Department that A.H. had been "raped", the S.A.N.E. nurse, Olivia Jones, examined the child and found she could not say the child had been sexually assaulted, much less raped.[29] Nurse Jones observed one laceration at the 6:00 o'clock position of child's vagina with two adjacent abrasions, one on either side.[30] Willis-Knighton's expert, Dr. Jacquelyn White, explained those injuries could have "absolutely" been caused by catheter insertion.[31]

Willis-Knighton South then inserted size 12 Foley catheter in the comatose child and inflated it with 5cc saline.[32] Dr. White explained size 12 is too "large" for a four-year old.[33] The size 12 catheter remained in place while hospital personnel contacted former detective Jeff Allday to re-examine the child at the hospital.[34]

On February 13, three (3) days *after* Willis-Knighton reported to the Shreveport Police Department that the four-year old was raped by a family member, Willis-Knighton documented a "Large area of swelling noted to [A.H.'s] public mound region and labia."[35] Dr. White testified that visual evidence of trauma to a four-year old's vagina would become apparent anywhere

---

[27] Exhibit 11: Shreveport Police Department Incident Report.
[28] Exhibit 11: Shreveport Police Department Incident Report p. 1.
[29] Exhibit 5: S.A.N.E. Report p. 8.
[30] Exhibit 5: S.A.N.E. Report p. 6.
[31] Exhibit 9: Deposition of Jacquelyn White, M.D. p. 108.
[32] Exhibit 1: Willis-Knighton South Medical Records BN p. 366, 508
[33] Exhibit 9: Deposition of Jacquelyn White, M.D. p. 104. Compare with Exhibit 10: which is a catheter size/age chart attached as "White 4" to Dr. White's deposition.
[34] Exhibit 1: Willis-Knighton South Medical Records BN p. 751, 368
[35] Exhibit 1: Willis-Knighton South Medical Records BN p. 752.

from a few minutes to a few hours after the trauma occurred.[36]   A.H. had never left the care of Willis-Knighton during the three (3) days preceding the trauma to her public mound. That "new" trauma was not reported to the Shreveport Police Department. No S.A.N.E. nurse was asked to examine A.H. in connection with her pubic mound swelling.

On February 14, Willis-Knighton discontinued the size 12 Foley catheter inflated with 5 cc in favor of a size 10 Foley catheter inflated with 3 cc, a forty percent (40%) reduction.[37]

Willis-Knighton again contacted former detective Allday on February 15 to re-examine the comatose child at the hospital.[38]

A.H. was declared brain dead consistent with global hypoxic-ischemic encephalopathy[39] and remained on life support. On February 16, her parents decided to discontinue life support and donate their child's organs.

An autopsy was performed February 19, 2018, which revealed not one, but two lacerations: a small laceration at the 12:00 o'clock position of the hymen and a "tiny tear" to A.H.'s posterior fourchette.[40] The Autopsy Investigation's Case Narrative specifically references "catheter insertion" in finding the cause of A.H. death to be natural due to bronchiolitis and pneumonia.[41] Critically, the swelling to A.H.'s pubic mound noted on February 13 and the laceration at the 12:00 o'clock position of the hymen noted in the Autopsy Report were ***not observed*** by the S.A.N.E. nurse who examined A.H. on February 10. Those injuries occurred

---

[36] Exhibit 9: Deposition of Jacquelyn White, M.D. p. 109.
[37] Exhibit 1: Willis-Knighton South Medical Records BN p. 520.

A.H.'s medical records relating the S.A.N.E. report, varying catheter sizes and public mound swelling were not produced to the family in response to their initial request for records pre-lawsuit. Plaintiffs became aware of those records after Dr. Sobel's deposition where Dr. Sobel observed the records upon which he was being questioned were different than the records plaintiffs had provided him.
[38] Exhibit 1: Willis-Knighton South Medical Records BN p. 751.
[39] Willis-Knighton South Medical Records BN p. 173, 458.
[40] Exhibit 6: Autopsy Report p. 1, 2.
[41] Exhibit 7: Autopsy Investigation p. 8; Exhibit 6: Autopsy Report p. 1.

**after** February 10, while the hospital had complete control and custody over the four-year old and while Willis-Knighton repeatedly contacted former detective Allday to re-examine A.H.

Law enforcement declined any charges in connection with the hospital's reported "rape".

## SUMMARY JUDGMENT STANDARD

The moving party is entitled to a judgment as a matter of law when there is no genuine dispute as to any material fact. F.R.C.P. 56(c). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 106 S.Ct. 2548, 2552 (1986). Once a movant has satisfied this burden, the burden shifts to the non-movant to set forth specific facts showing a genuine triable issue. F.R.C.P. 56(e). In determining whether the non-moving party has sustained the burden, the Court must view all facts and inferences most favorable to the non-moving party to the extent that those inferences are reasonable. *Matsushita v. Electric Industrial Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587-88, 106 S.Ct. 1348 (1986).

## DISCUSSION

Willis-Knighton's Motion for Summary Judgment should be denied because it has failed to offer any expert testimony in support of its motion. Moreover, plaintiffs show Willis-Knighton acquired actual knowledge A.H. suffered an emergency medical condition and failed to stabilize A.H. prior to discharging her. Plaintiffs can also demonstrate A.H. received disparate treatment on February 10 in comparison to her prior visits to the same hospital, and that Willis-Knighton failed to follow its own Oxygen Protocol for pediatric patients presenting with clinical signs of hypoxemia.

### (A) WILLIS-KNIGHTON HAS FAILED TO SATISFY ITS EVIDENTIARY BURDEN AS MOVANT FOR SUMMARY JUDGMENT.

Expert testimony is generally required to sufficiently support and/or oppose motions for summary judgment involving allegations of an EMTALA violation, except in "extreme" cases when the issues involved are not complex and within the general knowledge and experience of laymen. See *Battle v. Memorial Hosp.*, 228 F.3d 544 at 559 (5th Cir. 2000); *Caristo v. Clark Reg'l Med. Ctr., Inc.*, 2009 U.S. Dist. LEXIS 75732 at *19 (E.D. Ky. Aug. 24, 2009); *Cruz-Vazquez v. Mennonite Gen. Hosp.* 613 F.3d 54 at 56 (1 Cir. 2010); *Romine v. St. Joseph Health Sys.*, 2013 U.S. App. LEXIS 21926 at *9-10 (6th Cir. 2013). See also *Liles v. TH Healthcare, Ltd.*, (E.D. Tex. 05/05/14) 2014 WL 1813312 at *3-4 holding pulmonary illness and injury is not within the common knowledge and experience of laymen, and expert testimony was required to support and/or oppose summary judgment in the context of a federal EMTALA claim. (*Id.*)

Willis-Knighton retained Jacquelyn White, MD as its expert witness in this matter. For whatever reason, Willis-Knighton has declined to offer the testimony of its expert in support of its motion, and instead, attaches an affidavit of David Easterling, M.D., the ED physician who initially discharged A.H. in unstable condition, six minutes after a steroid shot which experts agree takes hours to know whether such was effective. Willis-Knighton does not suggest Dr. Easterling is an expert in brief and Dr. Easterling has not offered any expert report in connection with this matter. The fact that Willis-Knighton's motion for summary judgment is not supported by expert testimony precludes summary judgment in favor of Willis-Knighton, because the movant has failed to meet its initial burden to sufficiently support its motion for summary judgment as a matter of law.

### (B) WILLIS-KNIGHTON IS LIABLE TO PLAINTIFFS FOR VIOLATING EMTALA

In further opposition to the instant motion for summary judgment, Plaintiffs show Congress enacted the Emergency Medical Treatment and Active Labor Act ("EMTALA") to address the growing concern of "patient dumping" by imposing a two-fold duty on participating hospitals. First, it requires hospitals to provide an appropriate medical screening examination, within the capability of the hospital's emergency department in order to determine whether an emergency medical condition exists. 42 U.S.C.A. § 1395dd(b)(1)(a). Second, it obligates hospitals to provide such further medical examination and treatment as may be required to stabilize the emergency medical condition. 42 U.S.C.A. § 1395dd(b)(1)(a). Although a defendant's conduct may sometimes qualify as both malpractice and a violation of EMTALA, the causes of action remain distinct. See *Cervantes v. Tenet Hospital Limited,* (W.D. Tex. 03/26/19) 372 F.Supp.3d 486 at 494 citing *Power v. Arlington Hospital Ass.,* 42 F.3d 851 st 859 (4th Cir. 1994).

The duty to stabilize does not arise until the hospital has actual knowledge the patient has an emergency medical condition defined by statute as:

> A medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in:
>
> (i)   placing the health of the individual in serious jeopardy,
> (ii)  serious impairment to bodily function,
> (iii) serious dysfunction of any bodily organ.

The Court has requested the parties specifically address whether a doctor's knowledge of a patient's stability is evaluated subjectively or objectively for the purposes of EMTALA.[42]

---

[42] See Record Doc. 46.

Plaintiffs respond by pointing out the Fifth Circuit permits expert testimony to assist the trier of fact in determining whether a participating hospital had actual knowledge as to whether a patient presented with an emergency medical condition. See *Battle ex rel. Battle v. Memorial Hosp. at Gulfport,* (5th Cir. 09/20/00) 228 F.3d 544 at 559, where the Fifth Circuit, found the plaintiffs' expert's testimony that a "seizure disorder" is an "emergency medical condition" was sufficient evidence from which a jury could conclude that the hospital had actual knowledge of an emergency medical condition. *Battle* at 559, <u>citing</u> *Burditt v. United States Dep't of Health & Human Servs.,* 934 F.2d 1362 at 1369 (5th Cir. 1991).

Plaintiffs are uncertain as to the importance of the objective or subjective distinction in this case, where plaintiffs' expert, Dr. Richard Sobel, agrees with defendant's expert, Dr. Jacqueline White, in objectively opining that the hospital had "actual knowledge" A.H. presented with an emergency medical condition[43] and Dr. Easterling, the physician who discharged A.H., subjectively acknowledged A.H. presented with an emergency medical condition. See Item No. 5 of Easterling affidavit opining "…I do believe an emergency medical condition existed."[44]

Using either standard, once the hospital has actual knowledge of an emergency medical condition, EMTALA requires the hospital to provide "for such further medical examination and such treatment as may be required to stabilize the medical condition." See 42 U.S.C.A. § 1395dd(e)(1)(A); *Battle ex rel. Battle,* (5th Cir. 09/20/00) 228 F.3d 544 at 558-559 and *Marshall on Behalf of Marshall v. E. Carroll Par. Hosp. Ser. Dist.* (5th Cir. 02/09/98) 134 F.3d 319 at 325.

EMTALA's stabilization requirements is statutorily defined as an obligation "…to provide such medical treatment of the emergency medical condition as may be necessary to

---

[43] Exhibit 9: Deposition of Jacquelyn White, M.D. p. 15; Exhibit 12: Deposition of Richard Sobel, M.D.; M.P.H. p. 114, 115, 121, 122, 183.
[44] See Item No. 5 of Exhibit "A" to Defendant's Motion for Summary Judgment: Dr. Easterling's affidavit.

assure, within a reasonable degree of medical probability, that no material deterioration of the condition is likely to result…" 42 U.S.C.A. § 1395dd; *Smithson v. Tenet Health System Hospitals, Inc.*, U.S.D.C. 07/30/08 2008 WL 2977361; <u>citing</u> *Battle ex rel. Battle*, (5th Cir. 09/20/00) 228 F.3d 544 at 558-559 and *Marshall on Behalf of Marshall v. East Carroll Parish Hosp. Service Dist.* (5th Cir. 02/09/98) 134 F.3d 319 at 325.

The Fifth Circuit ***requires*** expert testimony to assist the trier of fact in determining whether the treatment provided the patient was sufficient to stabilize the patient. See *Battle ex rel. Battle v. Memorial Hosp. at Gulfport*, (5th Cir. 09/20/00) 228 F.3d 544 at 559, where the Fifth Circuit, <u>citing</u> *Burditt v. United States Dep't of Health & Human Servs.*, 934 F.2d 1362 at 1369 (5th Cir. 1991), <u>compare</u> <u>with</u> *Pettyjohn v. Mission-St. Joseph's Health System, Inc.*, (W.D. N. C. 11/22/00) 2000 WL 33311929 at p. 2. See also, *Liles v. TH Healthcare, Ltd.*, (E.D. Tex. 05/05/14) 2014 WL 1813312 recognizing:

> The Fifth Circuit has defined "to stabilize" as "treatment that medical ***experts*** agree would prevent the threatening and severe consequence of the patient's emergency medical condition while in transit." *Battle v. Memorial Hosp.*, 228 F.3d 544, 559 (5th Cir. 2000) (internal quotations omitted) (emphasis added). The Fifth Circuit's language suggests that expert testimony is required to prove a violation of EMTALA. This approach is consistent with the fact that "emergency medical condition," "stabilizing treatment" and other terms defined in the statute, 42 U.S.C. § 1395dd, are not "matter[s] of common knowledge … within the experience of the layman." (*Liles, supra* - emphasis maintained from original)

Although the Fifth Circuit has recognized a hospital's substantive failure to follow its own screening procedures or policies is probative of disparate treatment, and therefore a violation of EMTALA, *Smithson v. Tenet Health Sys. Hosp., Inc.*, (E.D. La. 06/30/08) 2008 WL 2977361 and *Guzman v. Memorial Hermann Hosp. System*, (5th Cir. 2011) 409 Fed. Appx. 769,

the Fifth Circuit has yet to extend such analysis to affirmatively require a plaintiff prove a hospital failed to follow its own policy or procedures relating to stabilization in order to recover under EMTALA, e.g., *Ingram v. Muskogee Regional Medical Center,* (10th Cir. 2000) 235 F.3d 550 at 552 and *Scott v. Hutchinson Hosp.,* (D. Kan. 03/04/97) 959 F.Supp. 1351 at 1357.

Should this Court impose such a requirement in this case, plaintiffs show Willis-Knighton failed to follow its own policies and protocols relating to stabilizing pediatric patients with clinical signs of hypoxemia. Willis-Knighton's Oxygen Protocol requires the hospital administer oxygen to pediatric patients presenting with clinical signs of hypoxemia, defined by Willis-Knighton as an oxygen saturation of less than 95% in pediatric patients and less than 92% in adult patients which can include patients with tachycardia and tachypnea.[45] According to the protocol, Willis-Knighton providers can discontinue oxygen only when the pediatric patient is able to *maintain* an oxygen saturation of 95% or greater on *room air*.

During her short life and prior to the night in question, A.H. presented to Willis-Knighton ED a total of thirty-two (32) times in connection with her pulmonary issues. Each and every time, A.H. presented with blood-oxygen saturation of less than 95% on room air, a total of seven (7) occasions, she was admitted to the hospital, without exception. The treatment provided to A.H. by Willis-Knighton on these prior admissions was in perfect accord with the hospital's Oxygen Protocol, which is referenced, and *applied*, in A.H.'s medical records for her November 4, 2016 visit to the Emergency Department and admission to the hospital.[46] Although Willis-Knighton has suggested the protocol applies only to inpatients, the protocol itself does not state

---

[45] Exhibit 2: Willis-Knighton's Discovery Responses and Oxygen Protocol. See Exhibit 13: Willis-Knighton Oxygen Protocol attached to Dr. Sobel's Deposition as "Sobel 8".
[46] Exhibit 1: Willis-Knighton South medical records BN 1069 – 1073.

as much. Moreover, A.H.'s medical records reference the "protocol" in connection with "keep [her] oxygen saturation greater than 95%" as she was "weaned to room air".[47]

In fact, A.H. had been admitted to Willis-Knighton South as recently as August 28, 2017, and July 15, 2017, when she presented with vital signs remarkably similar to the night in question and with a blood/oxygen room air saturation of 91%, the *exact* same blood/oxygen room air saturation she presented with on the night in question.

On February 10, 2018, A.H. presented to the Willis-Knighton South Emergency Department at 2:05 a.m. as a four (4) year old with a history of bronchopulmonary dysplasia due to premature birth, chronic asthma, multiple prior admissions, who was "tri-poding" with a 91% oxygen saturation on room air, a pulse of 156, respiratory rate of 36, and who exhibited tachypnea and tachycardia with difficulty breathing.

> The tripod position is a physical stance which may be the hallmark of children experiencing respiratory distress. In the tripod position, the child sits on the gurney leaning forward and supporting the upper body with hands on the knees or on the surface. The tripod position is thought to optimize the mechanics of respiration by taking advantage of the accessory muscles on the neck and upper chest to get more air into the lungs. Emergency physicians immediately recognize that a child adopting the tripod position is a likely indication of severe respiratory distress and impending respiratory failure.[48]

All experts agree Willis-Knighton acquired actual knowledge A.H. was suffering from an emergency medical condition,[49] which triggers EMTALA's stabilization requirement for the hospital "...to provide such medical treatment of the emergency medical condition as may be necessary to assure, within a reasonable degree of medical probability, that no material

---

[47] Exhibit 1: Willis-Knighton South medical records BN 1069 – 1073.
[48] Exhibit 14: Sobel Expert Report p. 6, attached to Dr. Sobel's Deposition as "Sobel 2".
[49] Exhibit 9: Deposition of Jacquelyn White, M.D. p. 15; Exhibit 14: Expert Report of Richard Sobel, M.D., M.P.H.; Exhibit 12: Deposition of Richard Sobel, M.D.; M.P.H. p. 114, 115, 121, 122, 183. See also Item No. 5 of Dr. Easterling's Affidavit attached to Defendant's Motion for Summary Judgment as Exhibit "A".

deterioration of the condition is likely to result…" 42 U.S.C.A. § 1395dd; *Smithson v. Tenet Health System Hospitals, Inc.*, U.S.D.C. 07/30/08 2008 WL 2977361; citing *Battle ex rel. Battle*, (5th Cir. 09/20/00) 228 F.3d 544 at 558 and *Marshall on Behalf of Marshall v. East Carroll Parish Hosp. Service Dist.* (5th Cir. 02/09/98) 134 F.3d 319 at 325.

Willis-Knighton acknowledged the Albuterol breathing treatments administered at home prior to A.H.'s visit to the emergency department were ineffective, but immediately administered another Albuterol breathing upon the child's arrival. As a bronchodilator, Albuterol is a rescue medicine designed to treat the symptoms of an asthma attack by dilating the air passages.[50] **Albuterol is not designed to treat the inflammation causing the attack.**[51] In the emergency room context, Albuterol is administered with high flow oxygen and typically takes between five (5) and ten (10) minutes to complete.[52]

Even after the Albuterol breathing treatment at 2:05 a.m., A.H. was still "tripoding" at 2:11 a.m., and possibly again at 2:22 a.m.[53]

After declaring her status "improved" at 2:32 a.m.,[54] without any corresponding vital signs or oximetry reading, Willis-Knighton ordered *another* Albuterol breathing treatment with oxygen at 3:16 a.m.[55]

At 3:23 a.m., either during the second breathing treatment or immediately thereafter, Willis-Knighton documented A.H.'s vital signs indicating a faster than normal pulse of 145 and

---

[50] Exhibit 9: Deposition of Jacquelyn White, M.D. p. 22.
[51] Exhibit 9: Deposition of Jacquelyn White, M.D. p. 41 – 42.
[52] Exhibit 9: Deposition of Jacquelyn White, M.D. p. 19; Exhibit 12: Deposition of Richard Sobel, M.D. p. 170.
[53] Exhibit 1: Willis-Knighton South Medical Records BN p. 768. See "correction" at 2:22. Compare with Item No.13 of Exhibit "A" to Defendant's Motion for Summary Judgment which references a different correction, and does not explain this correction or why such was documented at 2:22 a.m.
[54] Exhibit 1: Willis-Knighton South Medical Record BN p. 764.
[55] Exhibit 1: Willis-Knighton South Medical Record BN p. 764.

faster than normal respiratory rate of 34, and a pulse oximetry reading of 99%.[56] These were the last vital signs documented by Willis-Knighton prior to discharging A.H. at 3:52 a.m.

A.H.'s 99% oximetry reading was not a measure of her room air blood/oxygen saturation, because the measure was taken during or shortly after administering high flow oxygen with accompanying bronchodilator. A valid room air saturation requires 20-30 minutes after the high flow oxygen to "wash out" and dissipate from the bloodstream. Plaintiffs' expert, Richard Sobel, M.D., M.P.H. explains,

> Q:    Under - - since we're looking at that, on the nurse's notes we're looking at vital statistics at 03:23, what do those say? The pulse ox goes to 99 percent, correct, and 99 percent is good?
>
> A:    No. This is the result, more likely than not, within a reasonable degree of medical certainty, if you would like to use the term, of the patient getting a neb treatment - -
>
> Q:    So she - -
>
> A:    with oxygen.
>
> Q:    So the patient was treated and she got better?
>
> A:    So - - no. So this is the pulse oximetry that is measured on high-flow O2.
>
> Q:    Where is that documented?
>
> A:    So it's not a room air pulse oximetry.
>
> Q:    And where is that part documented, that she is on oxygen at this point?
>
> A:    Well, look at the time of the nebulizer treatment. So there is an Albuterol nebulizer treatment that is begun at 3:16. This is given with high-flow O2.

---

[56] Compare Exhibit 15: Authority cited by Richard Sobel, M.D., M.P.H. as reference of normal vital signs in pediatric patients attached to Dr. Sobel's deposition as "Sobel 5" with Exhibit 1: Willis-Knighton South Medical Records BN p. 763, 766.

Q:      Is that appropriate? Is that an appropriate treatment?

A:      Yes. Yes, it's appropriate. So if you note in her previous records, they document pulse oximetry on room air, especially when she went home. There was a pulse oximetry documented on room air. That is what you need. In this particular case the first pulse oximetry was on room air, so that is prior to the neb. The neb is given with oxygen, and the second pulse oximetry, there is no documentation of being on room air. That it's taken simultaneous with an Albuterol treatment which is given with oxygen - -[57]

…

Q:      In your opinion on page 7 you're noting that it takes 20-30 minutes of washout time for a valid reading of O2. What does that mean?

A:      Well, that means when you increase the FIO2, or the percentage of oxygen in the air by giving supplemental oxygen, the oxygen replaces the nitrogen in the lungs, so essentially you are going to a different planet. Planet Earth is 21 percent.

        If you put a child on 50 percent, it's like you are breathing an oxygen concentration of 50% in the atmosphere, so that is going to artificially increase your oxygenation, and that is reflected in the pulse oximetry. That is why you have a pulse oximetry of 99 percent in this case: Because you have supplied supplemental oxygen. It has to wash out over time, so you start breathing the regular oxygen-level air. It's 21 percent. You got to breathe that for a while.

        And the 50 percent oxygen atmosphere that you have delivered to the patient, the term is "washout". It washes out and the nitrogen comes back in and replaces the oxygen. After that happens and the oxygen is washed out, then you can repeat the pulse oximetry and see if it is stable, and that is what the policy or protocol is reflecting: that you need some time for the washout of oxygen, the supplemental oxygen to wash out.[58]

---

[57] Exhibit 12: Deposition of Dr. Richard Sobel p. 140 – 141.
[58] Exhibit 12: Deposition of Dr. Richard Sobel p. 172 – 173.

Willis-Knighton gave A.H. a steroid shot at 3:44 a.m. to treat the inflammation causing her asthma attack and discharged the four-year old eight (8) minutes later at 3:52 a.m. without a physical examination of the patient at the time of discharge.[59] All experts agree it can take several hours before clinical effectiveness of steroids on an asthmatic patient may be observed.

A.H. was discharged from the emergency department before Willis-Knighton could determine whether the steroids had effectively controlled the child's inflammation, without a physical examination at discharge, and without any room air oxygen saturation measurement and, much less, without A.H. demonstrating any ability to *maintain* an oxygen saturation of at least 95% on room air, as Willis-Knighton protocol requires. Notably, the child was still wheezing at the time of discharge.[60] These facts are critical because "stabilization", for the purposes of EMTALA, requires Willis-Knighton "...to provide such medical treatment of the emergency medical condition as may be necessary to assure, within a reasonable degree of medical probability, that no material deterioration of the condition is likely to result..." 42 U.S.C.A. § 1395dd; *Smithson v. Tenet Heal. Sys. Hosp., Inc.*, (E.D. La. 7/30/08_ 2008 WL 2977361; citing *Battle ex rel. Battle*, (5th Cir. 09/20/00) 228 F.3d 544 at 558 and *Marshall on Behalf of Marshall v. E. Carroll Parish Hosp. Serv. Dist.* (5th Cir. 02/09/98) 134 F.3d 319 at 325.

Dr. Sobel explains in great detail Willis-Knighton failed to stabilize A.H. prior to discharging her; that the hospital violated its Oxygen Protocol; and the treatment A.H. received February 10 was disparate in comparison to the hospital's prior treatment of A.H.[61] Plaintiffs'

---

[59] See Exhibit1: Willis-Knighton South Medical Records BN p. 762 -768. See Also Exhibit 3: Affidavit of Jennifer Alexander Item No. 4.
[60] Exhibit 3: Affidavit of Jennifer Alexander Item No. 5.
[61] Exhibit 14: Expert Report of Richard Sobel, M.D., M.P.H *in toto*.

offer Dr. Sobel's expert report *in globo* in opposition,[62] together with the following deposition

excerpts, to wit:

A:      …the hypoxia, the rapid respiratory rate, the rapid heart rate, the need for another neb, the need for steroids, which I think was pretty obvious right from the beginning. So it is conspicuously obvious that this is a child that can re-exacerbate during the night and requires inpatient observation.[63]

A:      what I'm saying is that a patient arrives in the emergency department at 1:54 and is documented as tripoding respiratory distress at 2:05. This is really an indisputable emergency medical condition with potentially dire consequences. In this case, the consequence was death.[64]

A:      The nurse documents the patient's condition on arrival as tripoding, in respiratory distress; these are obvious signs of impending respiratory failure. The emergency physician documents nursing notes review and acknowledges the patient's abnormal vital signs and pulse-oximetry. The discharge of this patient with such presentation is obviously reckless with less than two hours treatment in the emergency department without stable vital signs and room-air pulse-oximetry.[65]

A:      this is status asthmaticus by definition. For you to presume that it's completely resolved and that there is no risk of material deterioration in less than two hours is difficult to fathom and very disparate because you're just not going to send home children coming in, in respiratory distress, particularly ones with this kind of history: Autism, previous admissions, home nebs, bronchopulmonary dysplasia. To get a safe discharge after this presentation? I would have to say it's impossible."[66]

A:      Well, [A.H.'s ER visit and hospital admission on July 15, 2017] is an example of the child being admitted under similar circumstances, but I think in less dire condition than she had when she presented on February 10, 2018. So her pulse oximetry was 91 percent, and as per Dr. Tran's discharge summary the patient was, quote, 'tachypneic with respirations in the 30s and oxygen saturation of 91 percent. She improved clinically and remained on room air, and here' - - think it should be her - - 'respiratory distress resolved.' So, in this particular case, in February, her condition was similar, but worse, so her respirations were even higher. Her pulse oximetry was the same. She was in obvious respiratory distress. She was discharged. This is where you have actual knowledge of an emergency medical condition that within a reasonable medical probability was not stabilized and the discharge of the patient.[67]

---

[62] Exhibit 14: Expert Report of Richard Sobel, M.D., M.P.H *in toto*.
[63] Exhibit 12: Deposition of Richard Sobel, M.D., M.P.H. p. 184.
[64] Exhibit 12: Deposition of Richard Sobel, M.D., M.P.H. p. 183.
[65] Exhibit 14: Expert Report of Richard Sobel, M.D., M.P.H. p. 9 Item No. 5.
[66] Exhibit 12: Deposition of Richard Sobel, M.D., M.P.H. p. 170.
[67] Exhibit 12: Deposition of Richard Sobel, M.D., M.P.H. p. 121-122.

A:      It does not - - what is missing is a physical exam. Not by the doctor, not by the nurse, not by a respiratory therapist. There is just some conclusions here: Improved, returned to baseline. You've got to listen to the lungs. You've got to examine the child. You've got to recognize the abnormal vital signs which are persistent at 3:23 a.m.[68]

A:      ...So what you don't have is a verification of a - - of a room air oxygen that is greater than 95 percent. So there is no way you can determine that this child is not going to deteriorate. Tachycardic, breathing too fast, and you don't have a properly obtain pulse oximetry, and you don't have anybody that is reporting a lung exam."[69]

A:      ...You can't see if there is actually a response to the steroids because it essentially takes hours for steroids to kick in for the most part, and you are just giving a shot going out the door. There is no way that you could predict that there would not be material deterioration of the patient's condition. More likely than not, there will be.[70]

A:      ...So you can't determine within a reasonable medical probability that there won't be any material deterioration unless you do an exam, unless you wait for the steroids to work, unless you wait for the tachycardia to resolve; the tachypnea, the rapid respirations to resolve; the pulse oximetry to return to normal on room air.[71]

A:      This is a case of status asthmaticus. There was no way the staff of Willis-Knighton, to include the nurses, if there is a respiratory therapist - -I don't know - - or the doctor can determine that this condition of status asthmaticus has resolved without a longer period of observation and a physical exam of the patient.[72]

Willis-Knighton deviated from both its Oxygen Protocol and its prior emergency treatment of A.H. in order to discharge the four-year old, without a physical examination, without a valid room air oxygen saturation measurement, without requiring her to demonstrate that she could maintain a documented room air oxygen saturation of at least 95%, and approximately eight (8) minutes after administering steroids with practically no observation period. In doing so, Willis-Knighton failed to provide the treatment necessary to ensure, within a reasonable degree of medical probability, that no material deterioration of A.H.'s condition was

---

[68] Exhibit 12: Deposition of Richard Sobel, M.D., M.P.H. p. 166.
[69] Exhibit 12: Deposition of Richard Sobel, M.D., M.P.H. p. 173.
[70] Exhibit 12: Deposition of Richard Sobel, M.D., M.P.H p. 170.
[71] Exhibit 12: Deposition of Richard Sobel, M.D., M.P.H. p. 178.
[72] Exhibit 12: Deposition of Richard Sobel, M.D., M.P.H. p. 178.

likely to occur, and in fact, in this case did occur, as A.H. suffered respiratory arrest three hours after she was discharged.

## CONCLUSION

On February 10, 2018, A.H. presented to Willis-Knighton's Emergency Department in respiratory distress and with clinical signs of hypoxemia, an emergency medical condition of which Willis-Knighton had actual knowledge. Willis-Knighton failed to stabilize the child's emergency medical condition, as defined by EMTALA, and provided disparate treatment to A.H. in violation of EMTALA. Defendant's motion should be denied.

Respectfully Submitted:

SEDRIC E. BANKS LBN 2730
S. HUTTON BANKS LBN 37377
1038 North Ninth St.
Monroe, Louisiana 71201
318-388-1655 telephone
318-816-5026 facsimile
sebanks@aol.com
*Attorneys for Akeem Henderson and Jennifer Alexander*

## CERTIFICATE OF SERVICE

I hereby certify on this 7th day of May, 2020, a copy of the above and foregoing was served on all counsel of record via the CM/ECF/PACER system.

S. HUTTON BANKS

Page 24 of 24