```
 1                UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF LOUISIANA
 2                    SHREVEPORT DIVISION

 3

 4    AKEEM HENDERSON, et al.,

 5               Plaintiffs,              CASE NUMBER

 6         vs.                            5:19-CV-00163

 7    WILLIS-KNIGHTON MEDICAL CENTER
      d/b/a Willis-Knighton South
 8    Hospital,

 9               Defendant.

10    _____

11

12                     DEPOSITION OF

13               RICHARD M. SOBEL, M.D.

14

15                  November 26, 2019

16                      10:02 a.m.

17

18

19

20              105 Tivoli Gardens Road

21          Peachtree City, Georgia 30269

22    Thomas R. Brezina, CRR, RMR, CCR-B-2035

23

24

25
```

```
 1      A       Not any longer.  I would have in the
 2  past.
 3      Q       Looking at the bottom of your report on
 4  page 4 where you reference stabilization, and that
 5  is strictly from the interpretive guidelines;
 6  correct?
 7      A       I think so.  I might have cleared up
 8  some of the verbiage if it wasn't entirely clear.
 9      Q       Well --
10      A       I don't see a -- no quotes, per se, but
11  I'm sure it mirrors it if it's not an exact
12  verbiage.
13      Q       What is your understanding of the term,
14  quote, within reasonable medical probability?
15      A       Well, more likely than not.  So if it's
16  more likely than not that a patient would have an
17  unstabilized emergency medical condition, you simply
18  could not discharge them.
19      Q       So reasonable medical probability is
20  what?
21      A       Reasonable medical probability usually
22  refers to a 51 percent chance in terms of medical
23  standards, but in EMTALA I think it's actually a bit
24  different.  So if you have an unstabilized emergency
25  medical condition that you acknowledge and are aware
```



```
 1   of, you have actual knowledge of, then the EMTALA
 2   standard would be to continue stabilization and not
 3   discharge a patient.  But the verification process I
 4   think is what is referred to here.
 5              So this would be the verification
 6   process by a physician, by a hospital, by the staff,
 7   by consultants that an emergency medical condition
 8   is adequately stabilized.  That did not occur in
 9   this case.
10       Q      No.  You said by the staff and
11   consultants?  What about the emergency room
12   physician?
13       A      Yeah.
14       Q      Before we go there, are there any
15   changes or revisions that you feel need to be made
16   to your report?
17       A      Well, I think the numbering needs to be
18   cleared up.
19       Q      By the numbering you just mean the
20   paragraph numbering where it was two fives?
21       A      Yes.  I think there may be two sixes as
22   well.  I don't know what happened from page 8 to
23   page 9.  It looks like everything went out of sync
24   there.  So, eight.  Looks like the next one should
25   be six, seven, eight, nine, ten, 11 I guess it would
```



```
 1    she was frequently treated with Rocephin, a
 2    third-generation cephalosporin.  Sometimes she was
 3    released; sometimes she was admitted.
 4         Q        And the cephalosporin and Rocephin
 5    would be an antibiotic for an infection?
 6         A        Yes.
 7         Q        Corticosteroid is what?  What does that
 8    do?
 9         A        It's a steroidal anti-inflammatory
10    medicine, so it helps clear the air -- the small
11    airways in the lungs of debris and inflammation.
12         Q        And you saw where this particular child
13    had been admitted for problems with her respiratory
14    disease twice within the six months prior to this
15    February 10th, 2018, visit?
16         A        Apparently.  That is what I have
17    written, yes.
18         Q        In the next paragraph you mentioned
19    Dr. Tran, T-R-A-N, who is a pediatric hospitalist.
20    Why did you reference that in this report?
21         A        Well, this is an example of the child
22    being admitted under similar circumstances, but I
23    think in a less dire condition than she had when she
24    presented on February 18th -- February 10th of 2018.
25                  So her pulse oximetry was 91 percent,
```



1  and as per Dr. Tran's discharge summary the patient
2  was, quote, tachypneic with respirations in the 30s
3  and oxygen saturation of 91 percent. She improved
4  clinically and remained on room air, and here -- I
5  think it should be "her" -- respiratory distress
6  involved (sic).
7      So in this particular case in February
8  her condition was similar but worse, so her
9  respirations were even higher. Her pulse oximetry
10 was the same. She was in obvious respiratory
11 distress. She was discharged. This is where you
12 have actual knowledge of an emergency medical
13 condition that within reasonable medical probability
14 was not stabilized and the discharge of the patient.
15     Q    So in this July of 2017 admission
16 referenced in that paragraph, was that the only
17 problem that the child had at that time?
18     A    I don't know about that.
19     Q    So she could have -- she was
20 hospitalized with other co-morbidities besides just
21 the --
22     A    Well, I would not be surprised if she
23 had a respiratory infection. She actually had a
24 pneumonia when she arrived on February 10th. I
25 can't say I specifically recall. I put it in

Akeem Henderson, et al. vs Willis-Knighton Medical Center
Richard M. Sobel, M.D.

November 26, 2019

Page 128

1    Q    And how do you define respiratory
2    distress in this situation?
3    A    Well, I think I defined it pretty well.
4    This is a classic description of it.  In the next
5    paragraph on page 6, "Ailiyah presented in a, quote,
6    tripod, unquote, position with frank respiratory
7    distress.  Per Susan Rainer, RN, at 2:05 a.m. she
8    was, quote, distressed; quote, uncomfortable; and,
9    quote, anxious."
10            And then I went on to explain what --
11   the clinical implications of the tripod position.
12   It's the physical stance which may be the hallmark
13   of children experiencing respiratory distress.  It
14   would be very typical, so this would be an obvious
15   case of respiratory distress.
16   Q    And the tripod position was noted by
17   the nurse, is that correct, in her 2:05 note?
18   A    I believe it was at 2:05.
19   Q    And we might go ahead and attach a copy
20   of the record.
21           MR. ROBISON:  Sedric, are you there?
22           MR. SEDRIC BANKS:  Yes, please.
23           MR. PUGH:  These are the ones that I
24       e-mailed to you.
25   BY MR. ROBISON:


Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

1  Q      Yes. It's pages -- it says at the top
2  right-hand corner, "Page 761 of 1,758," and that
3  would be Defendant's Exhibit 7, I believe.
4  A      I don't have the Bates stamp, but --
5  Q      I'm going to hand you a copy so that
6  you can -- thank you.
7           (Exhibit Number 7 was marked for
8       identification.)
9           MR. SEDRIC BANKS: While we're doing
10      housekeeping, is there an objection to
11      attaching the protocol that we were
12      mentioning earlier on -- the respiratory
13      protocol that was furnished in another case?
14          MR. ROBISON: Yes. I think we attached
15      it as Exhibit 6, that chart.
16          MR. SEDRIC BANKS: That is the
17      Willis-Knighton? I'm going to talk about the
18      Willis-Knighton document that was produced in
19      another case that you-all talked about also.
20      Is that protocol attached, or is it just
21      the --
22          MR. PUGH: The flow chart.
23          MR. ROBISON: Yes. The flow chart is
24      attached as Exhibit 6. We're not agreeing
25      that it's applicable, but we attached it.

1  should be hooked up to the monitor with continuous
2  pulse oximetry.  Should have continuous
3  plethysmography, respiratory rate, the heart rate.
4  Should be on supplemental O2.
5            This is a child that's got to be wired
6  for sound, and IV is -- needs to be started.
7  Intravenous steroids, magnesium, continuous
8  bronchodilator therapy.  The die is cast when this
9  child arrives at the hospital.  This is a child that
10 needs to be admitted.
11       Q     Under -- since we're looking at that,
12 on the nurse's notes we're looking at vital
13 statistics at 0323, what do those say?  The pulse ox
14 goes to 99 percent, correct, and 99 percent is good?
15       A     No.  This is the result, more likely
16 than not, within reasonable medical certainty, if
17 you would like to use the term, of the patient
18 getting a neb treatment --
19       Q     So she --
20       A     -- with oxygen.
21       Q     So the patient was treated and got
22 better?
23       A     So -- no.  So this is the pulse
24 oximetry that is measured on high-flow O2.
25       Q     Where is that documented?

1    A    So it's not a room air pulse oximetry.

2    Q    And where is that part documented, that she is on oxygen at that point?

4    A    Well, look at time of the nebulizer treatment. So there is an albuterol nebulizer treatment that is begun at 3:16. That is given with high-flow O2.

8    Q    Is that appropriate? Is that an appropriate treatment?

10    A    Yes. Yes, it's appropriate. So if you note in the previous records, they document pulse oximetry on room air, especially when she went home. There was a pulse oximetry documented on room air. That's what you need. In this particular case the first pulse oximetry was on room air, so that is prior to the neb. The neb is given with oxygen, and the second pulse oximetry, there is no documentation of being on room air. That it's taken simultaneous with an albuterol treatment, which is given with oxygen, so --

21    Q    Before we get there, since we're looking at administered medication, which would be in the nurse's notes continued -- I think you're looking at that now?

25    A    On 767.

1  In other words, there is no auscultation of the
2  lungs.  There is no comment as to whether or not the
3  child is using accessory muscles or whether there
4  are retractions.  So there is no comment by the
5  staff, nursing staff, or the respiratory therapist.
6  That note was by the RN.
7       Q       If you look on --
8       A       There is no comment that she actually
9  listened to the lungs.
10      Q       If you look up above that, at 0211, it
11  says, "Child being held by parent" under ED course.
12      A       Yes.  That is definitely different than
13  fully mobile and ambulatory.
14      Q       And you'd -- no problem with the
15  four-year-old being held by the parent; right?
16              MR. SEDRIC BANKS:  Counsel, let me
17         interrupt you just for a second because it
18         looks like we're on multiple tracks here.  Is
19         there an explanation of why we're dealing
20         with two different sets of medical records?
21              MR. PUGH:  I don't know what you gave
22         him.  I pulled the chart from the hospital,
23         and that's what this is.  We didn't provide
24         you with --
25              MR. SEDRIC BANKS:  Well, we got it from

Akeem Henderson, et al. vs Willis-Knighton Medical Center
Richard M. Sobel, M.D.
November 26, 2019

Page 144

```
 1    the hospital, and I see the -- just for
 2    distinguishing purposes, our medical records
 3    were printed March the 6th, 2018, and the
 4    records that you are showing Dr. Sobel were
 5    printed February the 11th, 2018, and I'm
 6    wondering, well, what possible explanation is
 7    it?  We're dealing with two different sets of
 8    medical records.
 9            MR. ROBISON:  And he's actually looking
10    at the set that you gave him and the set that
11    we have, and they actually look pretty
12    similar.
13            MR. SEDRIC BANKS:  Yeah, I understand.
14            MR. ROBISON:  We'll have to figure that
15    out.  There were a few changes.  Not changes,
16    but -- I don't know the answer.
17            MR. SEDRIC BANKS:  Well, I think there
18    is something we need to deal with, and I
19    certainly feel for the doctor trying to
20    answer questions from two different sets of
21    medical records, one he's seen before and
22    expressed an opinion on, and now he's
23    presented with a different set of medical
24    records, which purports to be the same, and
25    we all know they are not the same.
```


Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

1  BY MR. ROBISON:

2       Q       Dr. Sobel, for the record, are the two
3  pages that you are looking at, practically
4  identical?

5       A       Well, so far I've seen a few
6  differences, one being the correction at the end,
7  and then it looks like most of the differences that
8  I have seen otherwise are minor and not --
9  nonsignificant, but the correction at the end is
10 fairly significant.

11      Q       Now, what are you referencing, the
12 correction at the end?  The crossout?

13      A       Yes.  268.

14      Q       We will get to that in a minute, then.
15 I want to go back to that administered medication
16 section on page 767.

17              MR. PUGH:  Yes.

18 BY MR. ROBISON:

19      Q       Did you see where the patient was given
20 the DuoNeb at 2:04; correct?

21      A       Yes.

22      Q       And then at 2:13 is noted as being seen
23 by the attending physician?

24      A       Yes.

25      Q       And there is an influenza culture, so

Akeem Henderson, et al. vs Willis-Knighton Medical Center
Richard M. Sobel, M.D.                                November 26, 2019

Page 156

```
 1   at 2:11 for the last time, and then there is a
 2   treatment, and then this note has 2:33.  So the
 3   treatment worked; right?  Unless you're just
 4   negating --
 5        A     No.  Well, you know, the correction is
 6   very interesting because it lists tripodding at
 7   2:22.  The time of physician exam is 2:13.  These
 8   are the computer clock times when you actually
 9   physically document, so this is not a time of the
10   exam necessarily.  I think these are computer top --
11   clock times when the doctor did the documentation,
12   so there appear to be a number of discrepancies that
13   are really difficult to understand.
14        Q     So perhaps the correction is from 2:11
15   to 0222; is that right?  They retimed it.
16              (Discussion ensued off the record
17         between Mr. Pugh and Mr. Robison.)
18              THE WITNESS:  I don't know.
19   BY MR. ROBISON:
20        Q     Well, we do have, however, is that
21   according to the physician, at 2:30 -- 0233 the
22   patient was negative for dyspnea on exertion, so is
23   it --
24        A     No.
25        Q     -- possible that she got better after
```

Akeem Henderson, et al. vs Willis-Knighton Medical Center
Richard M. Sobel, M.D.                                November 26, 2019

Page 166

```
 1              That is not accurate.
 2       Q      So at that point in the doctor's
 3   opinion the patient is now stabilized, according to
 4   what we just read?
 5       A      Well, he doesn't use the term
 6   "stabilized."  He states, "Return to baseline."
 7       Q      And what is baseline?
 8       A      Well, as you said, with BPD the
 9   baseline could be not that great.  Baseline goes
10   from being home O2 dependent and having nebs every
11   few hours to just mild disease which is associated
12   with asthma.
13       Q      And baseline --
14       A      It does not -- what is missing is a
15   physical exam.  That is why there is no possibility
16   they could have determined that this patient would
17   not materially deteriorate.  There is no physical
18   exam.  Not by the doctor, not by the nurse, not by a
19   respiratory therapist.  There is just some
20   conclusions here:  Improved; return to baseline.
21   You've got to listen to the lungs.  You've got to
22   examine the child.  You've got to recognize the
23   abnormal vital signs which are persistent at 3:23.
24       Q      Are you assuming that the doctor did
25   not examine the child?
```

Akeem Henderson, et al. vs Willis-Knighton Medical Center  
Richard M. Sobel, M.D.                                       November 26, 2019

Page 170

```
 1    because you have a child that came in, in near
 2    respiratory failure, failing home meds.
 3              And then you have not given steroids or
 4    magnesia, which is another arm of treatment for
 5    this, right from the beginning.  You can't see if
 6    there is actually a response to steroids because it
 7    takes essentially hours for steroids to kick in for
 8    the most part, and you are just giving a shot going
 9    out the door.  There is no way that you could
10    predict that there would not be material
11    deterioration of the patient's condition.  More
12    likely than not, there will be.
13         Q        And what fact are you basing that on?
14         A        The presentation of the child.
15         Q        Even though it improved, you're still
16    assuming that it's going to get worse?
17         A        Oh, sure.  This is status asthmaticus
18    by definition.  For you to -- for you to presume
19    that it's completely resolved and that there is no
20    risk of material deterioration in less than two
21    hours is difficult to fathom and very disparate
22    because you're just not going to send home children
23    coming in, in respiratory distress, particularly one
24    with this kind of history:  Autism, previous
25    admissions, home nebs, bronchopulmonary dysplasia.
```


Elizabeth Gallo  
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule  
404.389.1155

Akeem Henderson, et al. vs Willis-Knighton Medical Center
Richard M. Sobel, M.D.                                November 26, 2019

Page 172

1  that it takes 20 to 30 minutes of washout time for a
2  valid reading of O2.  What does that mean?
3       A      Well, that means when you increase the
4  FIO2 or the percentage of oxygen in the air by
5  giving supplemental oxygen, the oxygen replaces the
6  nitrogen in the lungs, so essentially you're going
7  to a different planet.  Planet Earth is 21 percent.
8              If you put a child on 50 percent, it's
9  like you're breathing an oxygen concentration of
10 50 percent in the atmosphere, so that is going to
11 artificially increase your oxygenation, and that is
12 reflected in the pulse oximetry.  That is why you
13 have a pulse oximetry of 99 percent in this case:
14 Because you've supplied supplemental oxygen.  It has
15 to wash out over time, so you start breathing the
16 regular oxygen-level air.  It's 21 percent.  You got
17 to breathe that for a while.
18             And the 50 percent oxygen atmosphere
19 that you have delivered to the patient, the term is
20 washout.  It washes out, and the nitrogen comes back
21 in and replaces the oxygen.  After that happens and
22 the supplemental oxygen is washed out, then you can
23 repeat the pulse oximetry and see if it's stable,
24 and that is what the policy or the protocol is
25 reflecting:  That you need some time for the washout


Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Akeem Henderson, et al. vs Willis-Knighton Medical Center
Richard M. Sobel, M.D.                                           November 26, 2019

Page 173

1   of oxygen, the supplemental oxygen to wash out.
2        Q       Does it always -- are those times
3   preset for a child that is four years old with
4   compromised lungs from birth?  The 20 to 30-minute
5   time?
6        A       Just gave a rule of thumb.  You can
7   tell how fast it's deteriorating.  You could maybe
8   make the call in just a few minutes if it starts
9   precipitously dropping.  So what you don't have is
10  verification of a -- of a room air oxygen that is
11  greater than 95 percent.  So there is no way you can
12  determine that this child is not going to materially
13  deteriorate.  Tachycardic, breathing too fast, and
14  you don't have a properly obtained pulse oximetry,
15  and you don't have anybody that is reporting a lung
16  exam.
17       Q       Does albuterol have the effect of
18  increasing a patient's heart rate?
19       A       It can.
20       Q       It can, or it does?  That is one of the
21  listed --
22       A       It can.  It can.  It can actually go
23  down, so it depends.  If you are effective in
24  treating the bronchospasm and the child is out of
25  the tripod position and not using any accessory

Page 178

1      A    That's a four-year-old, the patient.
2  So the -- you can't really rely on a four-year-old
3  to tell you their asthma attack is resolved.  That's
4  what I am saying.  The condition has returned to
5  baseline, again, we don't know what the baseline is,
6  and Dr. Easterling didn't know what the baseline
7  was.  I don't see how he could.
8          This is a patient with some degree of
9  chronic lung.  He doesn't know what the pulmonary
10 function tests show or -- I think he may have seen
11 the patient once before, but as far as returning to
12 the baseline, we don't know what the baseline is.
13 The problem is, again, there is no exam.
14         So you can't determine within a
15 reasonable medical probability that there won't be
16 any material deterioration unless you do an exam,
17 unless you wait for the steroids to work, unless we
18 wait for the tachycardia to resolve; the tachypnea,
19 the rapid respirations to resolve; the pulse
20 oximetry to return to normal on room air.
21         This is a case of status asthmaticus.
22 There was no way that the staff of Willis-Knighton,
23 to include the nurses, if there is a respiratory
24 therapist -- I don't know -- or the doctor can
25 determine that this condition of status asthmaticus

```
 1    2:05.  That is really an indisputable emergency
 2    medical condition with potentially dire
 3    consequences.  In this case the consequence was
 4    death.  So everyone in the emergency department,
 5    according to these records, had actual knowledge
 6    that the child presented in a dire condition.
 7              The nurses documented.  The doctors --
 8    confirms it in his note.  The doctor says he
 9    reviewed the -- the nurse's documentation and
10    confirmed it, so that is what I mean by actual
11    knowledge.  The doctor may have been at the bedside
12    at 2:13 when the child was still tripodding.
13              It's entirely likely, so everybody
14    should be aware that this kind of presentation can
15    be associated with death, and the child can't be
16    discharged in less than two hours.
17         Q    For purposes of EMTALA is there a
18    requirement for the length of time that a hospital
19    must keep a patient?
20         A    It depends on their condition.  So
21    EMTALA is essentially over for the most part after a
22    child -- well, after a patient is admitted with few
23    exceptions.  Few exceptions.  If the medical
24    screening and stabilization is continuing, there may
25    be unusual cases where EMTALA remains in force, but
```



Case 5:19-cv-00163-EEF-MLH   Document 49-15   Filed 05/07/20   Page 20 of 20 PageID #: 1471
Akeem Henderson, et al. vs Willis-Knighton Medical Center
Richard M. Sobel, M.D.                                                November 26, 2019
Page 184

```
 1   by and large, after the patient is admitted or
 2   properly transferred, your obligations under EMTALA
 3   have concluded.
 4        Q     Under Number 7, even the administration
 5   of injectable steroids, discharge without reasonable
 6   period of observation, that is where you're saying
 7   that there should have been more than 15 minutes of
 8   observation after the Decadron?
 9        A     Should.  Not only for an adverse
10   reaction, but to see if it's working.
11        Q     What in these records indicates to you
12   that this unstabilized patient had an obvious risk
13   of nearterm respiratory failure?
14        A     Number 1 would be the initial
15   presentation.  We went over that.  The physical
16   exam, the hypoxia, the rapid respiratory rate, the
17   rapid heart rate, the persistence of the rapid
18   respiratory rate, rapid heart rate, the need for
19   another neb.  The need for steroids, which I think
20   was pretty obvious right from the beginning.
21              So it's conspicuously obvious that this
22   is a child that can reexacerbate during the night
23   and requires inpatient observation.  The mother is
24   told direct from the beginning that the nebs at home
25   didn't work and she came into the emergency
```