UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION


AKEEM HENDERSON and JENNIFER
ALEXANDER, INDIVIDUALLY AND
AS ADMINISTRATRIX OF THE
SUCCESSION OF A.H.

                       CIVIL ACTION NO. 5:19-CV-00163

VERSUS                 JUDGE ELIZABETH E. FOOTE

                       MAGISTRATE JUDGE MARK L. HORNSBY

WILLIS-KNIGHTON MEDICAL
CENTER d/b/a WILLIS KNIGHTON
SOUTH HOSPITAL


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF

JACQUELYN WHITE, M.D.

February 12, 2020

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Taken at:

Health Hut
310 West Mississippi Avenue
Ruston, Louisiana

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Reported by:   Janet McBride
                  Certified Court Reporter
                  Certificate No. 27006

EXHIBIT
Daubert
2

JACQUELYN WHITE
2/12/2020

APPEARANCES


FOR AKEEM HENDERSON AND JENNIFER
ALEXANDER, INDIVIDUALLY AND AS
ADMINISTRATRIX OF THE SUCCESSION OF A.H.:


    LAW OFFICES OF SEDRIC E. BANKS
    AND S. HUTTON BANKS
    1038 North Ninth Street
    Monroe, Louisiana 71201
    appearing herein by and through
    Mr. Sedric E. Banks and
    Mr. S. Hutton Banks


FOR WILLIS-KNIGHTON MEDICAL CENTER
d/b/a WILLIS KNIGHTON SOUTH HOSPITAL:


    WATSON, BLANCHE, WILSON & POSNER
    505 North Boulevard
    Baton Rouge, Louisiana 70802
    appearing herein by and through
    Mr. Robert W. Robison, Jr.

    And

    PUGH, PUGH & PUGH
    333 Texas Street, Suite 2100
    Shreveport, Louisiana 71101-5302
    appearing herein by and through
    Mr. Lamar P. Pugh

JACQUELYN WHITE
2/12/2020

I N D E X

**EXAMINATION:**

                                                        Page

    MR. BANKS  . . . . . . . . . . . . .      5

    MR. ROBISON. . . . . . . . . . . .      None

    MR. PUGH . . . . . . . . . . . . .      None


**EXHIBITS:**

    White 1 - O2 Protocol    . . . . . .      28

    White 2 - Report         . . . . . .      83

    White 3 - O2 Protocol    . . . . . .      83

    White 4 - Foley Catheter info. . . . .      91

    White 5 (in globo)- Notes. . . . . .      113

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1                    S T I P U L A T I O N S

2              It is stipulated and agreed among counsel that the

3    deposition of JACQUELYN WHITE, M.D., is taken by

4    plaintiffs, AKEEM HENDERSON AND JENNIFER ALEXANDER,

5    INDIVIDUALLY AND AS ADMINISTRATRIX OF THE SUCCESSION OF

6    A.H., pursuant to Notice, and may be used for all purposes

7    permitted by the Federal Code of Civil Procedure.  All

8    objections except as to the form of the question and

9    responsiveness of the answer are reserved until such time

10   as the deposition is offered and introduced into evidence.

11   The deponent elected to read and sign her deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

JACQUELYN WHITE
2/12/2020

```
 1                          * * * * * * *
 2       JACQUELYN WHITE, M.D., after having been first duly sworn,
 3                         testified as follows:
 4                          * * * * * * *
 5              MR. BANKS:  Dr. White, may name is Sedric
 6              Banks.  We just met here before the deposition.
 7              I represent the plaintiffs in this case.  This
 8              is my son, Hutton Banks, who is co-counsel with
 9              me in this case.
10                      EXAMINATION BY MR. BANKS
11       Q.   Will you state your name for the record, please?
12       A.   Jacquelyn Kibodeaux White.
13       Q.   And, Dr. White, I understand you are an emergency
14   medicine physician?
15       A.   Yes, sir.
16       Q.   And when did you become licensed as a physician?
17       A.   I finished my residency in 1995 and have practiced
18   emergency medicine since then.
19       Q.   And where do you practice?
20       A.   I practice at Northern Louisiana Medical Center, ER,
21   here in Ruston as well as Glenwood in West Monroe.
22       Q.   And you were retained in this case by whom?
23       A.   Mr. Bob Robison.
24       Q.   And that was the initial contact was coming from Mr.
25   Robison?
```

Page 5

JACQUELYN WHITE
2/12/2020

```
 1        A.   Yes, sir.

 2        Q.   And when was that?

 3        A.   About a month ago.

 4        Q.   And I'm not looking for exact dates.  I'm just

 5   trying to piece together some information.  Okay.  And what

 6   were you asked to do?

 7        A.   To review a case for him.

 8        Q.   And what were you looking for in your review?

 9        A.   To see if there was an EMTALA violation, to evaluate

10   a case to see if there was an EMTALA violation.

11        Q.   I understand you testified in a couple of different

12   cases in court.

13        A.   I have.  Yes, sir.

14        Q.   Did either one of these cases involve EMTALA?

15        A.   No, sir.

16        Q.   Out of curiosity, what were those cases about?

17        A.   One was about a lady that had a stroke and was sent

18   home initially and then came back with her symptoms, and

19   then was over that.  Another one was about a patient that

20   had a heart attack or came in with chest pain, shortness of

21   breath, was discharged.  And then the third--  I think I've

22   had two or three.  And then the other one was chest pain,

23   he came in and had a heart attack, but it was the timing of

24   the cardiologist involved and going to the cath lab.

25        Q.   And who were you retained by, the plaintiff or the
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    defendant in those cases?

2        A.   The defendant in all of them.  Yes, sir.

3        Q.   Have you ever testified for a plaintiff?

4        A.   I've not testified for one.  No, sir.

5        Q.   How do you get contacted or connected, I guess is a

6    better word, with the legal world?  Do you advertise or--

7        A.   No, sir.  I do not advertise.  Those previous ones

8    were from--  There was a nurse in Jonesboro that did a lot

9    of medical reviews, and my name was given to her so I've

10   looked at several charts for her.  And then those two cases

11   that came from Florida were from a colleague of hers that

12   needed an emergency medicine physician to review.  The one

13   in Opelousas, I was on the medical review panel and so I

14   was not asked, but told that I needed to come and do a

15   deposition on why we--why we--how we chose our disposition

16   of that case.

17       Q.   You mentioned a medical review panels, and I think I

18   read that in your report that you had done several.

19       A.   Yes, sir.

20       Q.   And I'm not looking for exact numbers, but when you

21   say several, what are we talking about?

22       A.   I'd probably say at least twelve to fourteen.

23       Q.   Did any of those involve EMTALA?

24       A.   They did not.

25       Q.   Again, out of curiosity, did any of those cases

JACQUELYN WHITE
2/12/2020

```
 1      where you appeared or participated on the medical review
 2      panel, did any of those cases result in a positive finding
 3      for medical negligence?
 4          A.   Yes, sir.
 5          Q.   Okay.  You say in this case that you reviewed some
 6      hospital records.
 7          A.   Yes, sir.
 8          Q.   All right.  And if I've got it right, your report
 9      says that there were two sets of--  Well, actually, let me
10      just get to the report.  I'm looking at your report dated
11      January the 24th of 2020.  And it says that, a, b, c, d
12      lists the information that you reviewed.  And if I have it
13      right, you reviewed the Willis-Knighton South emergency
14      room record.
15          A.   Yes, sir.
16          Q.   For February the 10th.
17          A.   Yes, sir.
18          Q.   And you reviewed the Willis-Knighton Bossier
19      emergency room records for February the 10th.  And then you
20      reviewed the copy of the complaint filed by the plaintiffs.
21      Do you remember reading the plaintiff complaint?
22          A.   Yes, sir.  I haven't read it recently but I did read
23      it initially.
24          Q.   Anything jump out at you as being inaccurate or
25      untrue in that complaint?
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

 1       A.   Not that I can recall.

 2       Q.   And then I see the subpart D there that you reviewed

 3   a copy of a complete Willis-Knighton South record on A.H.

 4   What did you think the complete Willis-Knighton South

 5   record was?

 6       A.   Well, I asked for if she--if they had any previous

 7   ER records so that I could look at them.  I don't know if

 8   it was complete.  I'm not sure where the child was born,

 9   but those records that I received were from her ER visits

10   from about six months old, if I'm correct, up until the

11   time of this ER visit.

12       Q.   And we've just, for the record and for clarity, you

13   understood and, today understand that initials A.H. relates

14   to a four-year-old, a female child?

15       A.   Yes, sir.

16       Q.   Okay.

17   (OFF RECORD COMMENTS)

18       Q.   About how long after you received--  Well, I guess

19   maybe that's--I'm getting ahead of myself.  How did you get

20   these records?

21       A.   Email.

22       Q.   And the email was from Mr. Robison?

23       A.   Yes, sir.

24       Q.   How long after you got the email and got the

25   records, was it before you wrote your January 24th report?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      A.   I can tell you that I started looking at them on the

2   11th or 12th and probably wrote--this is my--the initial

3   report maybe was written on the 22nd, 23rd, so within that

4   time frame.

5      Q.   Okay.  And you say initial report, what did you do

6   with the initial report?

7      A.   Well, I didn't--  I still have it.  It wasn't in the

8   way that it needed to be legal.  Probably this--the initial

9   report was my part from the--from letter D on, just my

10   saying, and so I--those things were--I needed to put--I

11   didn't put in the provided documents.

12     Q.   Do you have a copy of your initial report?

13     A.   I do not have it on me, but I'm sure on our email.

14     Q.   Okay.

15     A.   But I can get it for you, if you'd like.

16     Q.   We'll pass that for right now and maybe come back to

17   later.

18     A.   Yes, sir.  Okay.

19     Q.   I think you answered the question and I probably

20   lost the answer, but what did you think the complete

21   Willis-Knighton South record was?

22     A.   Her ER visits as well as--

23     Q.   Past visits?

24     A.   Past visits.  Yes, sir.

25     Q.   What significance--  I'm sorry.  I didn't mean to

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1    interrupt.  What significance, if any, did you place on the

 2    past visits?

 3        A.    When it was said in the plaintiff file that the

 4    hospital knew the patient, because she had been there

 5    before, I felt that I needed to look at those as well, if I

 6    could give an accurate account of this ER visit.  And if

 7    it's accessible there, it's accessible to both the nurse

 8    and the provider.  So it's a matter of looking at her past

 9    ER visits to see is there a pattern, had this happened, was

10    there something lost or missing.  It gives a more complete

11    picture of a patient to see the past visits, and it's very

12    common to look at that when you're assessing a patient.

13        Q.    Just generally, what did you find in those past

14    medical records?

15        A.    That she had very frequent ER visits.

16        Q.    And was it for a recurring problem or was it for

17    multiple problems?

18        A.    It was for recurring problems, mostly related to

19    respiratory, cold, cough, fever.  They were all related to

20    that.  In fact, except one was a rash, and even on that

21    one, the child I think had an ear infection.  So a lot of

22    it was related to respiratory.

23        Q.    Would it be fair to say that other than the rash,

24    they were all related to respiratory?

25        A.    Yes, sir.
```

Page 11

JACQUELYN WHITE
2/12/2020

1    Q.   Did you understand that this particular child, this
2    four-year-old child, was a premature baby?
3    A.   Yes, sir.
4    Q.   Is there any complications that you associate with a
5    premature baby?
6    A.   I did not in this record.  Other than showing that
7    she had prematurity, there was nothing that I found that
8    she had any continual--but I didn't see her records prior
9    to six months old, but I did not see any of that.  She is a
10   child with asthma, is what I found from that.
11   Q.   And did you find that asthma was really the cause of
12   her past emergency room visits?
13   A.   Of a lot of her visits, yes, sir.
14   Q.   Did you notice where she was hospitalized for
15   asthma?
16   A.   Yes, sir.
17   Q.   Did you notice the vital signs when she was
18   hospitalized?
19   A.   I looked at all the records and I looked at some of
20   the vital signs.  Yes, sir.
21   Q.   What significance, if any, does the vital sign play
22   in examining a patient?
23   A.   Vital signs are part of the picture when evaluating
24   the patient, just as--  You have a picture of multiple
25   things that you assess.  Vital signs are part of that.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
1    There are several vital signs you look at, as well as your
2    examination, as well as your history of present illness.
3    It all plays a part.  Yes, sir.
4        Q.   So we're dealing with examination, vital signs and
5    what else is in the components that--
6        A.   History.
7        Q.   History.  Okay.  I noticed that in your report, that
8    you did not mention that you had reviewed the death
9    certificate.  Did you--
10       A.   I didn't.  I do not remember seeing the death
11   certificate.  No, sir.
12       Q.   Did you review the autopsy?
13       A.   I did not.  No, sir.
14       Q.   Did you review the protocol for the hospital as far
15   as administering oxygen?
16       A.   No, sir.
17       Q.   Did you review the interpretative guidelines for
18   EMTALA?
19       A.   I read over some EMTALA.  I'm not sure if I read the
20   complete EMTALA, but I did look at some things about
21   EMTALA.
22       Q.   Tell me what you recall about reading the EMTALA
23   that you--
24       A.   May I look at my notes while I'm telling you that?
25       Q.   Yes.  You may.  Please do.
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1       A.   Okay.  EMTALA, to me, was--is something that we look

2    at that was written--and I mean, I've practiced medicine

3    for twenty-five years, and it's kind of known as the anti-

4    dumping law.  EMTALA is to protect a person that they can

5    get treatment regardless of ability to pay and that we're

6    going to see them regardless of ability to pay and we're

7    not going to stop and wait on treatment until we get any

8    payment.  And we're not going to transfer a patient because

9    of inability to pay.  So I reviewed EMTALA to make sure

10   that I was--that is what I'm--  We do EMTALA training,

11   continuing education, with both our companies that we work

12   for, as well as the hospitals that we work for.  And so

13   it's--I just looked over the anti-dumping law and the

14   different components of it because I know that was a huge

15   thing--part of this case.

16      Q.   And tell me, if you will, how you saw EMTALA

17   correlating to this case.

18      A.   Yes, sir.  To be honest, I did not see a lot of

19   correlation because I think of EMTALA from a clinical point

20   as a patient being transferred, an inappropriate transfer.

21   Not an inappropriate discharge to home.  So to be honest,

22   it was--it was different for me from the clinical side

23   because a transfer doesn't--in a--in a clinical mind, it

24   doesn't mean transfer to the house.  It means transfer to

25   another facility.

Page 14

JACQUELYN WHITE
2/12/2020

1      Q.   Well, tell me how or if at all the discharge figured
2    into what you looked at.
3      A.   So when I evaluated this case, I evaluated was the
4    patient appropriate--were they given a medical screening
5    exam, did they have an emergency medical condition, were
6    they given an exam, were they given appropriate treatment,
7    and were they inappropriately or appropriately discharged.
8    And so that's how I looked at the chart.
9      Q.   And did you find that there was an emergency medical
10   condition?
11     A.   There was an emergency medical condition.  Yes, sir.
12     Q.   And what was that condition?
13     A.   Respiratory distress, an asthma exacerbation.
14     Q.   Would it be fair to say that the primary focus and
15   goal of an emergency room physician treating such a patient
16   with respiratory distress, would that main focus be on
17   keeping that respiratory distress from becoming respiratory
18   failure?
19     A.   I wouldn't say that's--  The primary goal is to
20   treat the patient and to stabilize them.
21     Q.   To stabilize them.
22     A.   Yes, sir.
23     Q.   How would you know if a patient is stable?
24     A.   Well, what's your definition of stable?
25     Q.   That's what I don't know.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      A.    Okay.

2      Q.    I've been practicing law for forty-four years and I

3   never have figured that out.

4      A.    Okay.  I will tell you from an emergency medicine

5   physician,--

6      Q.    Please.

7      A.    --if they're stable enough to be discharged, or do I

8   feel the patient needs to be admitted.  That's a primary

9   concern on anyone that's having any kind of emergency

10  medical condition is can they continue treatment at home or

11  do they need to continue treatment in the hospital.  Have

12  you resolved it?  Have you improved it?  A patient doesn't

13  have to be back to baseline.  Are they improved well enough

14  that they can continue the treatment at home?  That's one

15  of our first things that we think of when we have someone

16  with an emergency medical condition.

17     Q.    What is the baseline for this particular child?

18     A.    A base--  Well, I--I don't know the baseline of a--

19  of this particular child.  Was the child improved or did

20  the--did the provider feel like the patient was stable

21  enough to be discharged.  It is--  According to the EMTALA

22  definition of within reasonable medical probability, and I

23  feel that this patient was, after reviewing the chart in

24  completeness.

25     Q.    All right.  If we're going to tell the jury here's

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      the list that we want to go down, the list with each item

2      to determine whether or not this particular child was or

3      was not stable, what's on that list?

4          A.   So how I looked at it to see--  There's--there's

5      several things.

6          Q.   Okay.

7          A.   From the treatment that the child was given, the

8      treatment that the child needed to improve, the nursing

9      assessment, the provider assessment, the re-assessments,

10     and how the patient did during the ER visit and did you

11     feel comfortable that the patient was in an environment

12     that they could continue upon discharge, a safe

13     environment, an appropriate environment.

14         Q.   Okay.  I understand you looked at all of those

15     things that you mentioned, but tell me where the vital

16     signs come in.

17         A.   Okay.  This patient, on this record, had two

18     different sets of vital signs, if I'm correct.  You look at

19     the vital signs initially, they're part of the complete

20     picture, as I said earlier, and then you look at the trend.

21     She had another set of vital signs approximately an hour

22     and twenty minutes later.  And then the patient was

23     discharged approximately forty-five minutes after that.

24     Vital signs are part of the picture.  And each vital sign

25     represents something.  I don't think that you can hang your

JACQUELYN WHITE
2/12/2020

1      hat on one vital sign or the other, but I think it's part

2      of the picture of the reassessment of the patient.

3          Q.   Would you say that that's the most important part?

4          A.   I wouldn't say it's the most important part.

5          Q.   What would you think the most important part is?

6          A.   I think it's a combinat--  I think the doctor

7      reassessing a patient is the most important part.

8          Q.   The trends that you mentioned, what kind of trends

9      are you referring to?

10         A.   Are the vital signs improving or are they worsening?

11     Are they changing?  Are they the same?  That's the trend

12     that I'm talking about.  Yes, sir.

13         Q.   Okay.  Now, you understood that this particular

14     child with a history of asthma and breathing difficulties

15     woke up about 12:00 midnight wheezing and coughing on

16     February the 10th?

17         A.   Yes, sir.

18         Q.   Did you understand that the child was taken to the

19     emergency room at 1:50--I'm sorry, 2:04 in the morning?

20         A.   Yes, sir.  They presented at 1:54.  Yes, sir.

21         Q.   Okay.  Now, if I'm right, there was some breathing

22     treatments administered immediately upon arrival.  Did you

23     see that or did you understand that?

24         A.   Yes, sir.

25         Q.   Okay.  Do you know whether or not the breathing

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1    treatments were administered before the vital signs or
 2    after the vital signs?
 3        A.   Well, it looks like--  Going by the chart, the
 4    breathing treatment is documented as starting
 5    administration at 2:04.  A breathing treatment takes
 6    approximately ten to fifteen minutes, sometimes twenty
 7    minutes, to be given.  So it says at 2:04, the first set of
 8    vital signs are put in at 2:05.  But it looks like they
 9    signed in at 1:54.  So within ten to fifteen minutes.  Now,
10    you have the nursing--the nursing vital signs that are done
11    at 2:05.  So it looks like they were kind of in a
12    combination together.
13        Q.   Do you feel like there was a sense of urgency in the
14    emergency room that night?
15        A.   Yes, sir.
16        Q.   And what was the emergency?
17        A.   The emergency was that the child was wheezing and
18    having some difficulty breathing.
19        Q.   Okay.  The vital signs that were taken upon the
20    initial--the initial vital signs, were they normal or
21    abnormal?
22        A.   The breathing was slightly increased.  The
23    respiratory rate, the heart rate could be perceived as
24    normal.  There's variable normals in a four-year-old child.
25    The pulse ox was a little low and the temperature was at
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
1      99.3.
2      Q.   Okay.  Let's go over the pulse first.
3      A.   Yes, sir.
4      Q.   What was the pulse rate?
5      A.   One fifty-six.
6      Q.   Is that above average?
7      A.   It is at the higher limits of normal.  It can be
8   average.  I think if you look at different pediatric,
9   they'll give you ranges of heart rates.
10     Q.   And what did you think the range was for a four-
11  year-old?
12     A.   That's probably a little bit high.  It can be
13  average.  When a child--when anyone arrives to the ER, you
14  can be anxious and nervous, but that is a little high.  She
15  also received an Albuterol treatment at home before she
16  came, and Albuterol can also raise your heart rate a little
17  bit.  So she did receive one treatment after they woke up,
18  according to the record.
19     Q.   Okay.  Did you understand that that one treatment
20  that she received at home sometime just shortly after
21  midnight wasn't working?
22     A.   Yes, sir.
23     Q.   And you understand it wasn't working so, therefore,
24  they brought this child to the emergency room?
25     A.   Yes, sir.
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      Q.   Okay.  Let's go to the respiratory rate on initial
2   taking of the vital signs.  Is that average or normal or
3   high average or--
4      A.   I will say the normal for a four-year-old is around
5   twenty-two to thirty-four.  So it is barely elevated.  Yes,
6   sir.
7      Q.   Okay.
8      A.   She was slightly tachypneic.  It's a very common
9   thing with asthma exacerbations.  Yes, sir.
10      Q.   Tachypneic is what?
11      A.   Breathing a little fast.
12      Q.   And do you know why she was breathing fast?  I mean,
13   the physiology of that.
14      A.   Because she was--she was wheezing which is
15   congestion in the lungs which is having trouble getting the
16   oxygen in there because of the inflammation.  So it causes
17   them to breathe a little faster.
18      Q.   Now, the medication, Albuterol.  Is that right?
19      A.   Albuterol.  Yes, sir.
20      Q.   Albuterol.  Okay.  Thank you.  You say that can
21   increase the--
22      A.   It can--
23      Q.   --heartbeat.
24      A.   --slightly.  Yes, sir.
25      Q.   So you really, it's fair to say that upon entry in

Page 21

JACQUELYN WHITE
2/12/2020

1    the emergency room, the physicians really didn't know what
2    was causing the high respiratory rate.  Is that right?
3        A.   I wouldn't say that they didn't know because I think
4    the parent presented as an asthma exacerbation.  And when a
5    nurse does the initial part of the vital signs is listening
6    to the lungs.  So I think they knew or had a good idea of
7    where it was coming from being the fact that they gave them
8    a treatment within ten to fifteen minutes.
9        Q.   Is it fair to say that the Albuterol relaxes the
10   airways but it has no affect at all upon the inflammation?
11       A.   Yes, sir.  That is fair to say.  It's a muscle--it's
12   a relaxant--it's an anti-inflammatory--kind of a little bit
13   of both, but it does relax the airways to open them up.
14       Q.   Right.
15       A.   Asthma causes inflammation and swelling of the lower
16   airways and so Albuterol helps to open that up.  Yes, sir.
17       Q.   Okay.  With the initial treatment, did it involve
18   treating the inflammation?
19       A.   The initial treatment did the inflammation mostly.
20   That is how you treat it initially.  The child had a DuoNeb
21   which is a combination of Albuterol and ipratropium, which
22   both, in different ways, relax smooth muscle in the lungs
23   and then the second treatment was just Albuterol by itself.
24       Q.   Okay.  I think--
25       A.   Yes, sir.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1        Q.    --you're ahead of me here, but I'm still staying
 2     with this initial assessment of vital signs.
 3        A.    Yes, sir.
 4        Q.    Okay.
 5        A.    And the initial treatment was a DuoNeb.
 6        Q.    At what time was that?
 7        A.    At 2:04.
 8        Q.    2:04.  Okay.
 9        A.    Yes, sir.
10        Q.    That's the DuoNeb that you referred to.
11        A.    Uh-huh (yes).
12        Q.    So is it fair to say that looking back at the
13     picture as it's developing, the Albuterol was not working
14     at home.  She gets to the hospital some two hours later
15     after waking up, and additional medication is given.
16        A.    Yes, sir.
17        Q.    Now, let's go back to that vital signs again, the
18     initial entry of vital signs.  Temperature was elevated or
19     normal?
20        A.    That was normal.
21        Q.    Okay.  And let's go to the pulse oximeter.  What
22     does that say?
23        A.    Ninety-one percent.
24        Q.    Okay.  Tell me about the ninety-one percent.  How
25     does an emergency room physician view that ninety-one
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    percent?

2        A.   In a child that's having trouble breathing, it tells

3    me that they're in need of some treatments as well as some

4    supplemental oxygen.  So that patient was probably--and I

5    think it shows in the record--put on some supplemental

6    oxygen as well as given the DuoNeb treatment.

7        Q.   Okay.  How would you measure the ninety-one percent?

8        A.   You measure it--you put a--it's a pulse ox that you

9    put on their finger and it's--  Most of the time, it stays

10   on the patient the entire ER visit or until they feel

11   pretty sure that they don't need it anymore.  But most of

12   the time, it's on the entire visit.

13       Q.   How would you know that you don't need it anymore?

14       A.   The child's running around the room, pulling it off.

15   They're playful.  They're active.  And they've been at

16   ninety-nine, they've been at ninety-five, they've been at

17   whatever, you feel comfortable enough taking it off.  It's

18   part of the whole picture.

19       Q.   So would it be fair to say that you believe that the

20   oxygen level was monitored the entire time she was in the

21   emergency room?

22       A.   That's how most patients are.  There's no way to

23   tell from this record.  You'd have to go to their facility

24   and see.  Most facilities now have the monitor in the rooms

25   where it's continuous.

Page 24

JACQUELYN WHITE
2/12/2020

1      Q.   Okay.  So the child comes in with breathing problems

2    and you measure the oxygen level.  Is it important to get a

3    baseline before you start treating the child?

4      A.   No, sir.

5      Q.   You don't need a baseline?

6      A.   If a child's in distress, you can look at them and

7    start the treatment.  You don't hold up the treatment to

8    get a baseline.  But putting them on the monitor at the

9    same time, you're kind of doing it all at the same time.

10   So I feel like that was put on at the same time the

11   treatment was ordered, the medicine was given, and the

12   nurse was putting in the vital signs.

13     Q.   Ninety-one percent, is that average?

14     A.   No, sir.

15     Q.   What is the average for a four-year-old child?

16     A.   Average for a four-year-old child is probably

17   ninety-six to a hundred.

18     Q.   So would it be fair to say that these vital signs

19   upon entry were not normal?

20     A.   That one was low.  Yes, sir.  And the respiratory

21   rate was slightly high.  Yes.

22     Q.   The hospitals that you work in--

23     A.   Yes, sir.

24     Q.   --do they have protocols about administering oxygen?

25     A.   I'm sure they do.  I'm not sure.  I haven't looked

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      at their policies and protocols recently.  About when to
2      administer it?  How to administer it?
3          Q.   Well, for instance, Glenwood Hospital--  How often
4      do you work there?
5          A.   I work several shifts a month there.
6          Q.   You're not familiar with any policy that relates to
7      the level of oxygen in a patient's body?
8          A.   A policy related to the oxygen in their body?
9          Q.   Oxygen level in the blood.  You don't know--
10         A.   I don't--I don't think you're--  You mean of when to
11     give them the oxygen, of when we have to--
12         Q.   Yeah.
13         A.   --put a patient on it?
14         Q.   Let's go with that.
15         A.   I don't--I don't know of their--of when it--of a
16     certain level.  Because every--every patient's going to be
17     deemed different of when they need the oxygen.  It's
18     probably at the discretion of the provider.  But I haven't
19     looked at their policies.  No, sir.
20         Q.   Are you aware in your review of the EMTALA laws
21     whether or not violation of hospital policy is prima facie
22     evidence?
23         A.   I did not see anything about--  No, sir.  I'm not.
24         Q.   You hadn't looked at that.  Did you consider that?
25         A.   No, sir.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      Q.    And is it fair to say you have no clue what the

2   policy was of Willis-Knighton South as far as administering

3   oxygen--

4      A.    No, sir.  I do not know their policy.  Right.

5      Q.    Okay.  What other hospital did you say you worked

6   at?

7      A.    Here in Ruston at Northern Louisiana Medical Center.

8      Q.    Are you familiar with the protocol of that facility

9   as far as administering oxygen?

10     A.    No, sir.

11     Q.    How about in med school when you were going through,

12  do you recall any protocols that were suggested by the

13  instructors as far as administering oxygen?

14     A.    No, sir.

15     Q.    Would it be fair to say that in your opinions any

16  type of protocol or hospital policy has been excluded?

17              **MR. ROBISON:**  Object to the form.

18              **MR. BANKS:**  Yeah.  That's a bad question.  Let

19              me strike that and see if I can ask that a

20              little better.

21     Q.    Okay.  In rendering your opinions in this case, is

22  it fair to say and to tell the jury in this case that you

23  gave no concern as to the policy of Willis-Knighton

24  hospital as far as the protocol for administering oxygen?

25     A.    That is fair to say.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1      Q.   Now, I want to show you what--
 2              MR. BANKS:  --I will mark as "White 1."
 3      Q.   Have you ever seen that document before?
 4      A.   No, sir. I haven't.
 5      Q.   Take your time and review it, and I want to ask you
 6   some questions about it.
 7      A.   (Witness peruses document.)
 8              MR. ROBISON:  Sedric, do we know whose protocol
 9              it is?
10              MR. BANKS:  I thought that was the Willis-
11              Knighton one that y'all produced to us.
12              MR. HUTTON BANKS:  It's Sobel 6, I think.
13              MR. BANKS:  Sobel 6.
14              MR. HUTTON BANKS:  Or 8.
15      A.   Okay.
16      Q.   Okay.  Generally speaking, your opinion excludes any
17   information that's on the policy that you're holding there,
18   "White 1"?
19      A.   My opinion doesn't exclude this, but I did not use
20   this protocol in coming up with my opinion, if that makes
21   sense.
22      Q.   Yeah.
23      A.   Yes, sir.
24      Q.   Now, reading that protocol, do you think it has any
25   effect on your opinion?
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1        A.    This protocol is for inpatients.  In the ER, it's

2    different.  And if they do have a protocol, I would think

3    it would be different than this protocol.

4        Q.    Okay.  Well, but you are an emergency room physician

5    and you're not familiar with any protocol in the places

6    where you work.

7        A.    I have not read those protocols, if that's what

8    you're asking.  So I don't feel comfortable answering

9    particular questions about them.

10       Q.    Right.

11       A.    I know we have protocols.

12       Q.    Okay.  I'll represent to you that the "White 1" that

13   you're holding there is the protocol for Willis-Knighton

14   South.  And if I'm understanding correctly, what you're

15   telling me is that's the admission--that's for hospital

16   patients--

17       A.    I would assume that this is for the hospital

18   patient.  I wouldn't--  This says that you're to reassess

19   the patient daily on 7:00 to 3:00 shift.  So that would not

20   be pertaining to the ER and that's the first number one in

21   the protocol.  So that's why I'm assuming this is

22   inpatient--

23       Q.    Right.

24       A.    --protocol.

25            **MR. ROBISON:**  I just want to object to the

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1                    characterization of--I'm not sure where we got
 2                    it.  I don't know that that's the protocol for
 3                    Willis-Knighton.
 4           MR. BANKS:  Okay.
 5           MR. ROBISON:  And I'm not saying it's not.  I
 6           just--
 7           MR. BANKS:  I understand.
 8      Q.   Do you think the--  Well, first of all, you said to
 9   reassess every day?
10      A.   This one is a reassess daily on a 7:00 to 3:00
11   shift.  That's why I'm thinking this is an inpatient
12   protocol.
13      Q.   Gotcha.
14      A.   Yes, sir.
15      Q.   Would it be important to reassess the oxygen level
16   in an emergency room patient?
17      A.   Yes, sir.
18      Q.   How often would you want to do that to an asthmatic
19   child that's suffering?
20      A.   They're on a continual monitor, most of the time.
21   If they're--if they're urgent enough to need oxygen, almost
22   always are they going to be on a continual monitor.
23      Q.   Now, is it important that before you do your initial
24   assessment, that the number that you start with on the
25   oxygen level is on room air?
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      A.   If it's possible to obtain it, but if someone is in

2   distress, you're not going to wait just to get that number

3   to have something to go by.

4      Q.   Okay.  I mean, the child's suffocating and you're

5   going to try to save her.  Right?

6      A.   Theoretically, if a child is suffocating, yes.

7   You're going to start treatments right then.

8      Q.   Was this child suffocating?

9      A.   Was this child suffocating?  I did not get a picture

10   of suffocating from this chart, no, sir.

11      Q.   Tell the jury, if you will, what, in your mind, is

12   suffocating.

13      A.   You came up with the word suffocating.  Not me.

14   Right?  What is suffocating?  Someone who is unable to get

15   any oxygen or air and they're near trouble with respiratory

16   failure.  I think of--  We don't use the word suffocating a

17   lot in medical terms.  So I'm kind of guessing off of a

18   layman's definition of suffocating.

19      Q.   Right.  From medical terms, where would that oxygen

20   level have to drop before you would commonly refer to this

21   child as suffocating?

22      A.   Suffocating, in the seventies probably, and I'm

23   totally guessing because there's no medical term of

24   suffocating related to pulse ox.

25      Q.   Right.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      A.   But I would say probably in the seventies.

2      Q.   Do you know what this child died of?

3      A.   I did not read the autopsy report.  I just read that

4  ER visit and then that hospitalization.  Yes, sir.

5      Q.   So you have no idea what caused the death of this

6  child?

7      A.   I do have an idea because I read the ER chart and

8  the hospitalization.

9      Q.   Okay.  What do you think this child died of?

10     A.   Of respiratory failure.

11     Q.   Suffocation?

12     A.   I would not use the word suffocation.

13     Q.   What's the difference between respiratory--

14     A.   I don't know--

15     Q.   --failure and suffocation?

16     A.   I don't have a medical answer for that.

17     Q.   Okay.

18     A.   Just because we don't use the word suffocation in--

19  in--

20     Q.   Okay.  It says in "White Number 1," that if these

21  SaO2 less than ninety-two percent on room air and/or PaO2

22  less than fifty on room air, you place the patient on

23  minimum level O2 and titrate to maintain saturation of

24  ninety-two percent or more.

25     A.   Yes, sir.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    Q.   What does that mean in layman's terms?

2    A.   Well, she was at ninety-one.  And so they're saying

3    if someone presents and their oxygen is around ninety-two,

4    you want to put them on oxygen enough to bring up their

5    oxygen level above ninety-two.  So she was kind of

6    borderline according to those orders of needing oxygen.

7    And you put them on it until they come above--you put

8    minimal--just enough oxygen until you could bring their

9    saturation above that point.  The fifty that you just read

10   is if you do a blood gas on them.  When someone's severely

11   close to respiratory failure, you're doing a blood gas on

12   it because you want it even more--more accurate than a

13   pulse ox.  You want to know more about it.  You'll do an

14   arterial blood stick, and that's where that fifty comes

15   from.  She did not have that done.  So they're going by the

16   pulse ox.

17   Q.   Okay.  Reading on a little further here, I'm

18   skipping and I'm going to--

19   A.   Sure.

20   Q.   --give you the document back--

21   A.   Yes, sir.

22   Q.   --in case I'm missing something that you want to

23   talk about.

24   A.   Yes, sir.

25   Q.   But under the guidelines in the last little

Page 33

JACQUELYN WHITE
2/12/2020

```
1     paragraph there, let me let you read that and I'll mark it
2     for you.
3          A.   Yes, sir.
4          Q.   Would you read that particular highlighted section
5     in "White Number 1"?
6          A.   Yes, sir.  "Patients on a ventilator will have 02
7     weaned per protocol to maintain an 02 saturation of ninety-
8     two percent or greater or a Pa02 of sixty or more.
9     Patients will have the 02 protocol continue upon extubation
10    and titrated to nasal cannula at minimum level."
11         Q.   Is it fair to say that whether the patient is in the
12    emergency room or admitted to the hospital, that the goal
13    and the object is, from the physician's standpoint, is to
14    maintain an oxygen level?
15         A.   Yes, sir.  This protocol that you're highlighting is
16    a patient on a ventilator.  She's not--
17         Q.   Right.
18         A.   --not on a breathing machine.  She was already down
19    to this titrate--she's on a nasal cannula at minimal is
20    where she started.  So, yes, you titrate them as needed,
21    but she didn't need this protocol wouldn't--wouldn't be to
22    her, this part, because she was never needed to be on a
23    ventilator.
24         Q.   How would you know when a patient needs to be on a
25    ventilator?
```

Page 34

JACQUELYN WHITE
2/12/2020

1      A.    When their 02 sat remains low despite breathing
2    treatments despite supplemental oxygen starting with the
3    nasal cannula, then to a ventimask, then to a non-
4    rebreather, and they're continuing to have respiratory
5    distress that's worsening instead of improving.  And then
6    you would do a blood gas if you truly thought they were
7    near respiratory failure to see what the oxygenation--the
8    Pa02 is in the blood.
9      Q.    Have you ever heard the term washout?
10     A.    Yes, sir.
11     Q.    Tell me what that means to you.
12     A.    For asthma patients?
13     Q.    Please.
14     A.    When you're breathing so fast or your breathing is
15   not effective enough that you're not able to exchange the
16   oxygen in your--in your lungs.  It's not something I use
17   very often, to be honest, washout.
18     Q.    Okay.  Have you ever heard the term washout used
19   with respect to maintaining an oxygen level in a patient?
20     A.    No, sir.
21     Q.    Okay.  Well, let me ask you this.  If you have a
22   patient who has a breathing problem and you think the first
23   thing we're going to do, before we take any vital signs or
24   anything else, we're going to give some oxygen to this
25   patient who's struggling to breathe.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1     A.    Okay.

2     Q.    Okay.  Would you want to know how that oxygen

3     treatment faired?  In other words, whether they improved or

4     whether they cannot maintain the oxygen that's given to

5     them?

6     A.    Absolutely.

7     Q.    How would you do that?

8     A.    At the same time you're placing the patient on the

9     oxygen, you're doing the patient's vital signs and,

10    nowadays, the machines are at the bedside.  So at the same

11    time when someone's getting the oxygen equipment, the pulse

12    ox has been placed on their finger.  There's also pulse

13    oxes at triage when they're being brought in at the--at the

14    door.

15    Q.    Yes, ma'am.  And would it be fair to say that as

16    long as that oxygen is going into that four-year-old child,

17    those oxygen levels are going to be inflated?

18    A.    If she's improving--if she's responding to it, yes.

19    And that's your goal.  Yes, sir.

20    Q.    Okay.  And would the goal also be to maintain that

21    level of oxygen that's desired?

22    A.    Absolutely.

23    Q.    Okay.  All right.  Now, in this situation, let's

24    assume that the patient, this four-year-old, is getting

25    oxygen--

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    A.   Yes, sir.

2    Q.   --and she comes in at ninety-one percent on room air

3    and the doctors decide that she needs some oxygen--

4    A.   Yes, sir.

5    Q.   --and they give her some oxygen.

6    A.   Uh-huh (yes).

7    Q.   And you're testing her the whole time.

8    A.   Uh-huh (yes).

9    Q.   Would you want, just out of curiosity, take the

10   oximeter off?

11   A.   Absolutely.

12   Q.   And then test her?

13   A.   You keep it on while you take the oxygen off of her,

14   yes, sir.

15   Q.   Okay.  And how long would you wait before you figure

16   out whether she's maintaining a level or she's not

17   maintaining a--

18   A.   There's not a magic number, but it takes maybe a few

19   minutes, but you like to know that it's going to stay there

20   somewhere between fifteen and thirty minutes.  That was

21   actually done on this patient.

22   Q.   Okay.  Show me in the medical records where it was

23   done.

24   A.   Okay.  If you'll notice at--  The patient was taken

25   to radiology--let me see where I have that written down.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
1    After the first treatment, I think the patient was taken to
2    radiology between treatments and the--and it's noted in the
3    chart--I don't think I have it in front of me, but the
4    patient was taken off the oxygen and went to--and went to
5    radiology.  If that patient--if the saturation would not
6    have remained elevated, they would've not taken the patient
7    to radiology off the oxygen.  So that tells me that that
8    breathing treatment worked, it helped--started to improve
9    her, and that she was more stable enough that she could at
10   least go to x-ray and get an x-ray.  An x-ray can take
11   anywhere from ten to fifteen, twenty, thirty minutes to
12   have done.  So the fact that she was able to do that off of
13   oxygen tells me that she was improving.
14       Q.  Okay.  Would you want to then follow that up?
15       A.  Absolutely.  And that--the--if you look at her
16   reassessment of her vitals, her oxygen at that time is
17   ninety-nine percent.  And that's at 3:23 which is forty-
18   five minutes before she got discharged, it was at ninety-
19   nine percent.
20       Q.  And do you know whether or not the ninety-nine
21   percent--how long--let me stay with the ninety-nine percent
22   result.  Do you know if she was still on oxygen at that
23   time?
24       A.  Well, she was taken off of it to go to radiology at
25   2:46 and it does not say that she was placed back on it on
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1      the chart and nor does the ninety-nine percent say that it
 2      was on oxygen.  Usually, if a patient's on oxygen with a
 3      pulse ox, they're going to say on two liters, on one liter,
 4      on bi-pap, on ventimask.
 5      Q.   So you think that the ninety-nine percent was not on
 6      room air or it was on room air?
 7      A.   I do think it was on room air.  Yes, sir.  I do.
 8      Q.   And the reason being again?
 9      A.   Because she was--went by stretcher off oxygen to
10      radiology.  And if she was doing well enough to go then, I
11      do not see the need for her to put back on it.  I will say
12      that when she came back, she had a breathing treatment done
13      at 3:16, and it does not say anywhere that she had to go
14      back on her oxygen after that.
15      Q.   Okay.  And was there another set of vital signs
16      taken?
17      A.   Those were the only two that I saw.
18      Q.   Okay.  Well, let's go to the second set of vital
19      signs.
20      A.   Yes, sir.
21      Q.   Were those normal?
22      A.   Those were the--the guidelines that I saw, her
23      respiratory rate thirty-four is within the normal.  It's
24      the high normal.  Her ninety-nine percent is definitely
25      normal.  Her one forty-six could be within normal if you
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    look at different sites, and I apologize for not having a

2    set normal with me.  It's improving whether it's the upper

3    limits of normal or just above.  I'm not sure.  But the

4    most important thing to me was that it was coming down.

5        Q.    Okay.

6        A.    Yes, sir.

7        Q.    And that was at three--

8        A.    3:23.

9        Q.    3:23.

10       A.    Yes, sir.

11       Q.    Okay.  And twenty-two minutes later, she was

12   discharged home?

13       A.    Her order was written there at 4:00, I believe, is

14   when she actually left the facility, or 3:59.  The nurse

15   actually discharged her at that time.

16       Q.    You see the 3:44 entry of Decadron steroid?

17       A.    Yes, sir.

18       Q.    What is a Decadron steroid?

19       A.    A steroid is an anti-inflammatory which helps to

20   treat the inflammation in the alveoli in the lungs that's

21   causing the wheezing and the trouble breathing.  Steroids

22   are used as the second step in an asthma exacerbation, if

23   needed.  Sometimes, we give just Albuterol.  Sometimes, we

24   give Albuterol with steroids.  This patient was given a

25   shot of steroids prior to discharge as well as a

Page 40

JACQUELYN WHITE
2/12/2020

1    prescription of some oral steroids.

2       Q.    And would it be fair to say that the Decadron was

3    administered mainly for inflation?

4       A.    For inflammation?  Yes, sir.

5       Q.    How long does it take for that steroid to take

6    effect?

7       A.    It can be six to eight hours.  It's long-term.  It's

8    not an acute treatment.

9       Q.    Okay.  Tell me why you would not want to wait six to

10   eight hours to find out if the inflammation is going to be

11   controlled by the steroid before you discharge the child.

12      A.    Because he felt the child was stable enough to be

13   discharged home to do nebulizer treatments at home.  It is

14   documented that the patient has a nebulizer machine at

15   home.

16      Q.    That's the Albuterol?

17      A.    Yes, sir.  Yes, sir.

18      Q.    I thought we talked earlier, maybe I missed it but

19   to make sure that we're on the same page here.  I thought

20   we talked about Albuterol not treating inflammation, just

21   simply opening the airways.

22      A.    It does.  And that's how you treat--treat asthma.

23   That's considered a rescue medicine as well as some type--

24   Some people put them on a low-dose of a maintenance.  Her

25   maintenance medicine is Dulera that she was doing twice a

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    day which was a combination steroid inhaler and a long-

2    acting Albuterol.

3        Q.   Tell us, if you will, how the inflammation effects

4    the breathing.

5        A.   It only effects the breathing if the inflammation's

6    preventing--it's causing congestion and prevention of

7    oxygen exchange.  So sometimes they may have a little bit

8    of wheezing.  They may have no wheezing.  They may have a

9    little bit of tachynpea or breathing a little fast.  But

10   that is the primary treatment of asthma.

11       Q.   So the Albuterol is going to open the airway.  The

12   steroid Decadron is going to treat the inflammation--

13       A.   Uh-huh (yes).

14       Q.   --but we really haven't determined whether this

15   steroid is going to work or not to reduce that inflammation

16   until six or eight hours after it's administered.  Is that

17   right?

18       A.   The steroid kicks in six or eight hours later.  Yes,

19   sir.

20       Q.   What happens if the steroid doesn't work?

21       A.   Well, they're given--they have Albuterol medicine at

22   home.  Sometimes mild asthmatics are not even given

23   steroids.  They're given an Albuterol treatment or two and

24   given their medication.

25       Q.   Doctor, would you agree with me that the Albuterol

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    treatments at home didn't work and that's why she was at

2    the hospital?

3        A.   I will agree with you that her first treatment that

4    they attempted to give her did not work.  Yes, sir.

5        Q.   And the only inflammation treatment that she got was

6    at 3:44 in the morning, twenty-two minutes before

7    discharge?

8        A.   Yes, sir.  Well, and her Dulera, assuming she's

9    taking it as she's supposed to.

10       Q.   I'm sorry?

11       A.   Her Dulera which is her home medication.

12       Q.   Okay.

13       A.   Yes, sir.  She's on that so she should have a small

14   dose on board if she's taking her Dulera.

15       Q.   Did you notice there were some x-rays done at 3:39

16   in the morning?

17       A.   Yes, sir.

18       Q.   Before the steroids were administered?

19       A.   Yes, sir.

20       Q.   Did you notice anything unusual about those x-rays?

21       A.   No, sir.

22       Q.   Okay.  Do you know what infiltrates are?

23       A.   Yes, sir.

24       Q.   Tell me what they are, please.

25       A.   Well, this child had perihilar infiltrates which can

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    be nothing, which can be acute, which can be inflammation

2    which can be fluid which can be infection.  It's a very

3    non-specific.

4        Q.   Is it indicative of pneumonia?

5        A.   No, sir.

6        Q.   Doctor, can you think about that a second and tell

7    me again.

8        A.   Perihilar infiltrates are not indicative of

9    pneumonia.  No, sir.

10       Q.   All right.  It's an inflammation?

11       A.   Yes, sir.

12       Q.   Okay.  And that inflammation that was showing up in

13   the chest x-rays at 3:39 wasn't going to be treated until

14   we administered the steroids at 3:44.  Correct?

15       A.   Some of it.  Yes, sir.  And--

16       Q.   And that inflammation was going to remain in place

17   and really it's kind of an unknown until six or eight hours

18   later.  Correct?

19       A.   It's not an unknown because she'd had that before

20   and that's a very common finding for asthmatics, and she'd

21   had it before and had done well.

22       Q.   Let me ask you, Doctor, just out of curiosity.  No

23   one has a crystal ball and I'm certainly not going to hold

24   you do that, but do you think if you would have been there,

25   this child would've died?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      A.   Yes, sir.  Unfortunately.  Because I feel I would've
2    discharged her as well.
3      Q.   I see.  And you would've discharged her based on
4    what?  The vital signs?  Or--
5      A.   The reassessment, the complete reassessment.
6      Q.   Reassessment.
7      A.   Yes, sir.
8      Q.   Who did the reassessment?
9      A.   The provider and the nurse.
10      Q.   Okay.  Which nurse?
11      A.   I did--  You'll have to look in the chart to see.
12    But the provider is the one who decides if the patient is
13    going to be discharged or not.
14      Q.   That's the doctor?
15      A.   Yes, sir.
16      Q.   Okay.  And--
17      A.   Or it can be a mid-level provider.  In this case, it
18    was a doctor.  Yes, sir.
19      Q.   Have you ever discharged a patient without an exam?
20      A.   Have I ever discharged a patient without an exam?
21    Yes, sir.
22      Q.   You did that?
23      A.   Yes, sir.
24      Q.   Have you ever discharged a patient without knowing
25    what the vital signs were?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1        A.    Without knowing what the repeat vital signs were?  I
 2    haven't all--  Yes, sir.  I've seen an initial set.  Do I
 3    always require a second set?  No, sir.
 4        Q.    How do you know what the vital signs are if you
 5    don't take the vital signs?
 6                    MR. ROBISON:  Are we talking about on an
 7                    initial set or an in--
 8                    MR. BANKS:  No.  I'm sorry.  That's a poor
 9                    question.  Let me strike it and start over.
10                    WITNESS:  Okay.
11        Q.    Do you agree with me, Doctor, that it's standard
12    medicine not to discharge a patient without taking the
13    vital signs?
14        A.    That is not standard medicine.
15        Q.    Not from the emergency room.  You--you would--
16        A.    You can't make a--  It depends on the diagnosis and
17    what the patient has.  If you need a reset--a reset of--
18    another set of vital signs.
19        Q.    Let's take this patient--
20        A.    Yes, sir.
21        Q.    --who was struggling to breathe--
22        A.    Okay.
23        Q.    --who has a history of asthma--
24        A.    Yes, sir.
25        Q.    --whose home treatments didn't work, who is at the
```

Page 46

JACQUELYN WHITE
2/12/2020

1    hospital, who receives some Albuterol and receives a
2    steroid to combat the inflammation and then, twenty-two
3    minutes later, discharged without any vital signs.  Is that
4    standard, Doctor?
5        A.   Without any vital signs documented?  I believe that
6    patient was still on a monitor as part of his--
7        Q.   Oh, you do?
8        A.   --reassessment.  I do.  Because there's no reason to
9    take him off of the monitor before you discharge them.
10       Q.   Where is that in the notes?
11       A.   I don't--  I said I believe that.
12       Q.   But it's not in the record?
13       A.   I do not see that.  No, sir.
14       Q.   You're making that up?
15       A.   I'm not making it up.  I told you I didn't see it.
16   My assessment of reading the chart was the--  The provider
17   wrote that he reassessed the patient.  He didn't say if he
18   did have vitals or didn't have vitals.  There's none
19   documented in there.  I totally agree with that.  Yes, sir.
20       Q.   Is there a rule of medicine that if it's not
21   documented, it didn't happen?
22       A.   No, sir.  That's a rule of lawyers, not of medicine.
23   I don't mean to be crude, but it--
24       Q.   That's fine.
25       A.   --really isn't and we're--and we're awful.  When an

Page 47

JACQUELYN WHITE
2/12/2020

```
1      ER is busy that we don't always document like we're
2      supposed to.
3         Q.   I see in your report--or I'm sorry--in the medical
4      records, I see a notation at 3:50 a.m. that the patient's
5      condition has returned to baseline.  Do you see that?  Do
6      you remember that?
7         A.   The provider wrote that?
8         Q.   Right.
9         A.   Yes, sir.
10        Q.   What does that mean?
11        A.   To him, he feels like the child's back to their
12     usual self.  If the child was playful, if the child was
13     active, if there was no further wheezing, then, to him, it
14     was the child's baseline.
15        Q.   It doesn't mean anything about vital signs?
16        A.   It could be.
17        Q.   Okay.  What would be the relationship?
18        A.   You would have to ask--  I mean, that provider, what
19     his definition of that is, sir.
20        Q.   Well, what is your definition?  When you read that
21     in the record, what did you believe the baselines were as
22     so far as vital signs?
23        A.   That he felt the child was back to their usual
24     status.  If--if this child is known to these--to these
25     providers, as you said, and they've seen her--seen her
```

Page 48

JACQUELYN WHITE
2/12/2020

1    before, and we've all seen an asthmatic and we've seen a
2    healthy child, and we've seen a child in respiratory
3    distress, if she's back to baseline, that tells me she's
4    interacting with mom, she's not having trouble breathing.
5    It could've been, you know, you'll have to ask him about
6    his baseline.  That's what it--that's what it appeared to
7    me.
8        Q.   Okay.  In looking at the--
9        A.   Because, sometimes, we--  Can I just add this?
10       Q.   Oh, yeah.  Sure.
11       A.   Sometimes, we do discharge people that are not back
12   to baseline, but they're improving and they're stable
13   enough to go home.  So that holds a lot to me that he said
14   back to baseline, that it's not just--  The child had been
15   discharged prior, if you read some of those other ones.
16   There still have some slight wheezing, but much improved,
17   or could've still had tachypnea.  You don't always wait
18   till they're totally at baseline.
19       Q.   Did you notice in some of those prior visits that
20   she was hospitalized with a ninety-five percent oximeter
21   reading?
22       A.   I did not--I don't remember specifically.  I'm not
23   surprised because that's just one of several things that
24   you look at.
25       Q.   And what would be the others that you look at?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      A.   Her respiratory distress, how she responded.  If you

2   look at your protocol, at the bottom of it, it says a

3   pediatric child needs oxygen and I think it says pediatric

4   is to have an 02 maintained at ninety-five or greater.  So

5   that's kind of borderline if they're at ninety-five.  The

6   good thing is our child was at ninety-nine when she went

7   home.

8      Q.   Yeah.  And you are convinced that that ninety-nine

9   percent is after a washout period of time where the room

10   air is allowed to get back into the lungs?

11      A.   Yes, sir.  Because--  And what helps me even more so

12   is the fact that she went to radiology at least thirty,

13   forty-five minutes prior off the oxygen.  So if she was

14   doing well then, there's nowhere in there that states that

15   she needed to be placed back on the oxygen or having any

16   trouble.

17      Q.   Okay.  Coming back to what we've talked about here

18   before, in those prior visits in the emergency room that

19   you reviewed, did you see any mention of a protocol in

20   there?

21      A.   Did I mention a protocol?  No, sir.

22      Q.   Do you see any mention of protocol in those--

23      A.   No, sir.

24      Q.   --prior visits?

25      A.   No, sir.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      Q.    Okay.  Did you see any mention that or concern that
2      the patient might have bacterial pneumonia that the x-rays
3      is lagging behind and not showing up?
4      A.    No, sir.  But the patient had been placed on an
5      antibiotic two days prior so if they did have a touch of
6      pneumonia, they were on a very--they were on a decent
7      antibiotic at that time.
8      Q.    So, really, what you're thinking, and make sure I've
9      got this right, you would tell the jury that this patient
10     was just bound to die, there was really nothing they could
11     do for her?
12          MR. ROBISON:   Object to the form.
13     A.    I'm going to say that this patient was discharged
14     appropriately to home.  It's a very unfortunate event what
15     happened.
16     Q.    What did happen, Doc?  What did happen?
17     A.    That's a very--  I mean, that's a good question.
18     I'm--  The patient obviously woke up several hours later
19     wheezing, in respiratory distress.  According to the chart,
20     the grandmother tried to give another breathing treatment.
21     When she did not get better, she called the ambulance.  And
22     at some time between her call and the ambulance call, I
23     believe when they arrived, and this is according to the
24     record, because I did not see the EMR--the--the ambulance
25     record of reading of how the patient was on their arrival,

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1   it was just when she got to the ER.

2       Q.   How was she when she got to the ER?

3       A.   She was--she was coding at that time.  She did not

4   have a heartbeat.  They were breathing for her.  She had to

5   be intubated.  It took two times to intubate her and that

6   they had started ACLS protocol at that time.

7       Q.   Okay.  So what would you tell the jury happened

8   between the discharge and the fact that when she returned

9   to the hospital, a different hospital, brain dead?  What

10  would you tell the jury happened?

11              MR. ROBISON:  Just object to the form.  I don't

12              know if she was brain dead at that point.

13              WITNESS:  Yeah.

14      Q.   She wasn't brain dead?

15      A.   I don't--I don't know if she was brain dead at that

16  time.  She was coding at that time.  Do people come back

17  from coding?  That doesn't--that doesn't equate with brain

18  dead right then.

19      Q.   Okay.  So what would you tell the jury happened to

20  this four-year-old after she left the emergency room until

21  she returned to a different hospital coding?

22      A.   That sometime in the next few hours she had

23  respiratory distress and the medicine either did not work

24  appropriately, for whatever reason, was not given

25  appropriately, did not work appropriately and by the time

Page 52

JACQUELYN WHITE
2/12/2020

1   the paramedics arrived, she was in respiratory failure.

2       Q.   Who would have given her the medicine that you just

3   mentioned?

4       A.   Her mother or her grandmother.  I believe the

5   grandmother was there.

6       Q.   You think the grandmother did it?  She didn't

7   administer the medicine properly?

8       A.   I don't know.  That's the grandmother's who's

9   documented in there.

10      Q.   That right.

11      A.   When people are in respiratory distress, sometimes

12  it's hard to give the Albuterol treatments.  She tried and

13  then--  She tried initially, I think, according to the

14  report, and then called the ambulance.

15      Q.   Have you ever seen that, Doctor, where Albuterol

16  just didn't work?

17      A.   I've seen where it's--  Yes.  And there's--whether

18  it was either appropriately or if someone is in distress,

19  was the machine--  You have--  You have to be compliant

20  enough to stay still to have the oxygen mask on you to get

21  the medicine in there--to get the medicine into the lungs.

22  That's why the nebulizer machine--  I've seen people come

23  in and say that theirs isn't working at home or it didn't

24  do well and we give them a treatment with a respiratory

25  therapist.  Sometimes we have to--  It does work.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    Q.   So you would tell the jury that you think grandma
2    didn't do it well?
3    A.   No.  I would not tell the jury that.
4    Q.   Okay.  So then what else?  If grandma didn't do,
5    what happened?
6    A.   I am not--  I'm going to be the first to tell you
7    that I am God and I don't know what happened but
8    unfortunately the child died several hours later.
9    Q.   Okay.  Now, explain to the jury the mechanics.
10   What's going on in the body between the time that the
11   hospital discharged her from the emergency room and the
12   time when she is brought back coded to a different
13   hospital.  What's happening mechanically in the body?
14   A.   I can explain to them about asthma and asthma
15   attacks and respiratory failure and I can explain to them
16   the medication that was given to the patient.  And I can
17   explain the child's body can compensate up to a certain
18   point and then the child coded.
19   Q.   How would you know if the child's body is coping?
20   A.   Well, unfortunately, the child, according to the
21   record, was sleeping and then woke up this way, according
22   to grandma.  I wouldn't blame any of the family at all on
23   this horrible thing.
24   Q.   No.  And maybe my question is poor but let's see if
25   I can get you focused on what I want to talk about.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    A.   Yeah.  Okay.  Yes, sir.

2    Q.   I'm talking about between the discharge from Willis-

3    Knighton South and the time when the patient, the four-

4    year-old patient, is transported by ambulance to Willis-

5    Knighton Bossier.  What happened to the child's body?  What

6    was going on inside?

7    A.   I would really--  Before I answer that, would like

8    to read the death certificate to see what the coroner

9    actually said it was.  I mean--

10                MR. HUTTON BANKS:  Autopsy or death

11                certificate?

12                WITNESS:  The autopsy report.

13   A.   I mean, to just give you off the cuff, if I can help

14   explain it to the jury.  I don't think--  I don't feel like

15   the patient was inappropriately discharged.  I think it's

16   an awful, awful sad case.  I think--  Asthma--  I've seen

17   several people die from it.  It's a very unfortunate--  It

18   is a--  It's very sad but it--

19   Q.   Is it painful, Doctor?

20   A.   It's not--  Is it painful to have trouble breathing?

21   I think it's uncomfortable.  Have I had asthma?  I do not

22   have asthma.

23   Q.   Would you tell the jury that this child did not

24   suffer in between the discharge--

25   A.   I would not tell the jury that.

Page 55

JACQUELYN WHITE
2/12/2020

1    Q.    Did she suffer physically?

2    A.    The child-- We suffer.  Anytime she had a asthma

3    attack, she was suffering from having some difficulty

4    breathing.  Is it painful?  I don't think so.  You'd have

5    to ask the asthma asthmatic that's had a couple of really

6    bad flare-ups and had to be intubated from it.  She had

7    never had a severe enough one that had to be intubated,

8    ever, since the charts from six months on.  She had never

9    had one that bad.

10   Q.    Do you think the child knew that she was in trouble?

11   A four-year-old, can they perceive the fact--

12   A.    I think breathing is a basic thing.  I think she

13   can-- If she can tell them or can't tell them, you can

14   hear wheezing, you can see distress.

15   Q.    Is there any medical condition that you're aware of

16   that you can't hear the wheezing going on but the physician

17   can determine there's something really seriously wrong

18   here?

19   A.    In an asthmatic?

20   Q.    Right.

21   A.    Yes.  You can have the asthma so severe that they're

22   not hardly having airway movement at all and not hear

23   wheezing.  And then when you give a breathing treatment, as

24   it's opening up the airway, the wheezing can get worse

25   initially and then better.  But that person is going to be

JACQUELYN WHITE
2/12/2020

1    very--in much distress.  Even if you're not hearing it,

2    they're not sitting here like you and I.  They're going to

3    be very uncomfortable.

4       Q.   Did you notice that the family, as noted in the

5    records, observed respiratory failure.

6       A.   I don't understand what you're saying.  They

7    observed it when?

8       Q.   When they called the ambulance?

9       A.   I did not see the run sheet of the call.  I'm

10   reading the ER chart and I don't--I don't know what they

11   said when they called.  Do you have the run sheet of when

12   the patient was picked up by the ambulance?

13      Q.   I don't know if we have that, Doctor.  I'm not sure.

14      A.   Okay.  Well, I will say that on the ER note that the

15   doctor wrote that CPR was not being done by the bystander,

16   so I'm assuming that the patient did not code in front of

17   the parents or they didn't recognize it and that the

18   ambulance guys recognized or it occurred in front of the

19   ambulance guys.

20      Q.   Okay.  You think also, Doctor, coming back to what

21   we talked about early--  Well, before we leave that.  Do

22   you think a four-year-old can explain to a doctor that "I'm

23   feeling better, Doctor.  I'm okay."

24      A.   They can say, they can show it, they can act it.  I

25   think you can say, "Do you feel better?" and they can smile

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    or say yes or run around the room, which shows you they're

2    feeling better.  Drinking their juice.  They're feeling

3    better.  Yes, I do.

4        Q.   Okay.  Did you see where this patient was running

5    around the room?

6        A.   I didn't see it documented.  No, sir.

7        Q.   Did you see where she was drinking juice?

8        A.   No sir.

9        Q.   Did you see any of those things that you're talking

10   about that indicated to you that the patient's fine?

11       A.   No.  But I saw the note of the reassessment that the

12   nurse said that the patient was feeling better.  So you'd

13   have to ask the nurse what she was observing that made her

14   say that.  But that's how I reassess.

15       Q.   I understand.

16       A.   Yes, sir.

17       Q.   I want to cover just a couple of quick questions and

18   answers, if you will, Doctor, just to kind of cover some

19   ground here.  Tell me whether you agree or don't agree,

20   please?

21       A.   Yes, sir.

22       Q.   Vital sign assessment is essential in determining a

23   patient's health status?

24       A.   Where are you reading this from?  Is this from a

25   medical book?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    Q.   I'm just asking you if you believe that.

2    A.   Do I believe that vital signs are essential?

3    Q.   In determining a patient's health status.

4    A.   They are a part of it.  It's not absolute but I do

5    think it's important.

6    Q.   Okay.  If you'll just tell me whether you agree or

7    don't agree.

8    A.   Okay.

9    Q.   Vital sign assessment is essential in the

10   determination of a patient's health status.

11             MR. ROBISON:  Are we talking about in an ER

12             setting or sitting here?

13   Q.   Sure.  ER setting.

14   A.   So does essential--  Can you give me your definition

15   of essential?  Is it definitive; is it absolute?  It's

16   important.  That's why--

17   Q.   Okay.  You'd tell the jury it's not essential; it's

18   something else?

19   A.   It's important.

20   Q.   Important?

21   A.   Yeah.

22   Q.   Okay.  The second thing that I want to talk to you

23   about.  An alteration in a patient's vital signs can

24   provide objective evidence of the body's response to

25   physical and physiological stress or changes in

JACQUELYN WHITE
2/12/2020

1    physiological function.

2       A.   Yes.

3       Q.   Okay.  Vital sign monitoring is a core function of

4    the registered nurse.  Agree or not agree, Doctor?

5       A.   Say it again.

6       Q.   Vital sign monitoring is a core function of the

7    registered nurse.

8       A.   Yes.

9       Q.   Monitoring of vital signs is an essential component

10   of caring for all patients in order to assess treatment,

11   effects, detect procedural complications, and identify

12   early signs of clinical deterioration.

13      A.   No.

14      Q.   You wouldn't agree with that?

15      A.   No, sir.  Because it says all.  So I don't think

16   it's necessary in all cases.

17      Q.   And how about in this case?  Would it be true in

18   this case?

19      A.   Read it again it again, please sir.

20      Q.   Sure.  Fair enough.  Monitoring of vital signs in

21   this case is an essential component in order to assess the

22   treatment effects and detect procedural complications and

23   identify early signs of clinical deterioration.

24      A.   Yes.

25      Q.   When this child arrived at the emergency room at two

Page 60

JACQUELYN WHITE
2/12/2020

1     in the morning, I think it was, on February 10th, was she

2     stabilized then?

3         A.   She came in.  Was she stable when she arrived?

4         Q.   Yeah.

5         A.   She was not.  No, sir.

6         Q.   Would you agree, Doctor, that unstable patients may

7     need continual observation and frequent monitoring of vital

8     signs until they are stabilized?

9         A.   Yes.

10        Q.   And if I'm understanding correctly, you would tell

11    the jury, in this case, that you don't really need vital

12    signs at discharge to know whether the patient was stable

13    or not stable?

14        A.   I would tell them that there were no vital signs

15    documented on this patient at discharge.

16        Q.   Fair enough.  Would agree or not agree that the key

17    risk addressed by emergency department policies is to

18    prevent a serious adverse event by detecting physiological

19    disturbances and initiating treatments in a timely and

20    effective manner?

21        A.   That's pretty wordy.  Can you repeat yourself?  I'm

22    sorry.

23        Q.   Sure.  No problem.  Anytime you want me to repeat

24    something, no problem at all, Doctor.

25        A.   Okay.  Thank you.

Page 61

JACQUELYN WHITE
2/12/2020

1     Q.   The key risk addressed by emergency department

2    policies is to prevent a serious adverse event by detecting

3    physiological disturbances and initiating treatment in a

4    timely and effective manner.

5     A.   I really don't like all that wording, but I think

6    I'd say yes.

7     Q.   Okay.  The next statement, Doctor.  The four main

8    aims of effective patient observation are, Number One,

9    monitoring of physiological variables to evaluate treatment

10    effects.  Would you agree with that as being one?

11     A.   Yes, sir.

12     Q.   Would you agree that Number Two would be to maintain

13    a thorough assessment with a 24-hour a day hospital

14    emergency room department?

15     A.   To maintain a thorough assessment--  That's the key

16    to observation.

17     Q.   Right.

18     A.   You're talking about observation within the ER

19    setting?

20     Q.   Right.

21     A.   Okay.  Because different people have different

22    observing within that ER stay versus an observation bed

23    versus doing a six or eight hour observation.  So we

24    observe most of our patients at sometime during their ER

25    visit.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      Q.   Okay.  Number Three that another aim of effective

2   patient observation is for the early detection and

3   treatment of post-procedural complications.

4      A.   Okay.

5      Q.   Do you agree with that?

6      A.   Yes.

7      Q.   Okay.  The fourth main aim of effective patient

8   observation is the early detection and treatment of a

9   deteriorating via an emergency response.

10      A.   Sure.

11      Q.   Okay.  Would you agree that vital sign assessment

12   frequency ensures that emergency department patients will

13   not be discharged in an unstable condition?

14      A.   Does it ensure?  Can I ask you a question?

15      Q.   Yeah.  Sure.

16      A.   Is this from your expert witness that you're asking

17   me if I agree with his statements?

18      Q.   No, ma'am.  I'm just--

19      A.   Or is this from a book or is this from--  Where is

20   this--

21      Q.   Well, now that you mention it, Doctor.  Let me ask

22   you this.  If we wanted to pull the "bible" so to speak,

23   the absolute medical authority that Dr. White believes in,

24   you with me?

25      A.   Uh-huh (yes).

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    Q.   If we wanted to open it up in front of the jury and

2    read from it and we wanted to tell the jury that this

3    source, this medical source that Dr. White, as the bible,

4    it would tell us how not to discharge an unstable patient.

5    What text would you go to?

6    A.   I wouldn't be able to give you a name of that.  I

7    use very--  We all use different texts as well as our

8    clinical judgment on saying this.

9    Q.   Okay.  Which text or medical authority would you

10    rely on to tell you when to not discharge an unstable

11    patient?

12    A.   I don't have one over the other that I would give

13    you.

14    Q.   Well, let's do it this way.  Give me two or three of

15    them that you really consider authorities insofar as

16    discharging an unstable patient.

17            **MR. ROBISON:**  Wait, what do you mean by

18                 discharging an unstable patient.

19    A.   You mean appropriate treatment of the emergency

20    medical care?

21    Q.   No.  I'm talking about.  This is how we go about--

22    A.   Appropriate discharging?

23    Q.   This is how we go about making sure that we do not

24    discharge a patient in an unstable condition.  This is it.

25    This is the page we ought to read.  What authority do you

Page 64

JACQUELYN WHITE
2/12/2020

1    rely on?

2       A.    You don't--  The books on emergency medicine or the

3    complete care of a patient, and they may be included in

4    that.

5       Q.    Okay.  What books are we talking about?

6       A.    Tintinalli's of Emergency Medicine is very good and

7    probably the--one of the leading authorities.  For

8    pediatrics maybe Harriet Lane on emergency treatments of

9    that.  UpToDate is a culmination of different treatments on

10   that.  Rosen's has a good book on that.  I mean, there's

11   several of them.  I don't use just one as that on whether

12   or not to discharge or admit a patient.

13      Q.    Right.

14      A.    Because I think that's the question here, right, of

15   whether the patient should have been discharged or not.  Is

16   that the EMTALA violation that we're discussing?

17      Q.    Is that what you thought it was?

18      A.    Is that what you're--  I had a hard time reaching on

19   EMTALA violation on this.

20      Q.    I think you told us that.  And your evaluation of

21   EMTALA violations, if I'm understanding correctly, did not

22   consider any hospital policy, it didn't consider any

23   interpretation of EMTALA guidelines.  Correct?

24      A.    Did I look at--  I did look at the EMTALA guidelines

25   when looking at this.  Yes, sir.

Page 65

JACQUELYN WHITE
2/12/2020

1    Q.   Any of the apply that you thought would particular--

2    A.   I did not think they applied.  No, sir, I did not.

3    Q.   Would you agree that vital signs assessment serves

4    as an early warning of a change in a patient's condition?

5    A.   It can.  Yes, sir.

6    Q.   Have you ever read anything about what can happen

7    when your vital signs aren't stable at discharge time?

8    A.   Have I ever read anything about that?  Not in

9    particular.

10   Q.   Would any of those medical texts that you've

11   mentioned here this afternoon, would any of those address

12   what can happen when your vital signs aren't stable at

13   discharge time?

14           MR. ROBISON:  Are we talking about in this case

15           or--

16   Q.   No.  Just in the medical text.

17   A.   That's a very simplistic that doesn't say that in

18   the book about patients stabilizing.  If I can add, do we

19   always wait until vital signs are stable before we

20   discharge patients?  No.  If we did our hospitals would be

21   more overcrowded than they are.

22   Q.   Do you know of any dangers of releasing a patient

23   with an unstable vital sign?

24   A.   What is your definition of unstable?

25   Q.   Not normal.

Page 66

JACQUELYN WHITE
2/12/2020

```
 1        A.    Okay.  Abnormal doesn't have to mean unstable.  So
 2     you can have an abnormal vital sign, which is out of the
 3     norm of what is--  It's like a bell curve.  It can be out
 4     of the abnormal, but not necessarily mean the patient is
 5     unstable.
 6        Q.    What would you tell the jury an unstable vital sign
 7     is?
 8        A.    I would say that abnormal and unstable are
 9     different, and do I think she had any unstable?  No.  Do I
10     think it could've been abnormal on certain perimeters?  It
11     could be--  Which if you look at different books, such as
12     if you want to look at Harriet Lane or a different
13     pediatric book, they can have different norms for a four-
14     year-old.
15        Q.    Okay.  Did you ask for any documents in this case
16     that you didn't get?
17        A.    I asked for all the old ER records and the run
18     sheet, and I didn't get the run sheet.  I think--
19              WITNESS TO MR. ROBISON:  Did I ask for that?  I
20              didn't ask for it?
21              MR. ROBISON:  You asked for it.
22        A.    I did ask for it.  I asked for the run sheet when
23     they did go pick up the patient, and I didn't get that.
24     And the old ER records.  Those were the two I asked for.
25     Yes, sir.
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1     Q.   That you didn't get?

2     A.   The one I didn't get was the run sheet.

3     Q.   And what was the importance--

4     A.   The ambulance.  To know what was going on at the

5     house, to know what symptoms--what she presented as when

6     they got there, to know what they did or attempted to do

7     enroute.  It sometimes will help with the--  When a--when a

8     patient comes in in arrest, the chart is not always

9     complete because they're worried about trying to save the

10    child's life.  So, sometimes, the run sheet can give you a

11    better history or story.  So I just wanted that for

12    completeness.

13    Q.   Okay.  Why did you not think that the O2 protocol

14    was not sufficiently important to review with respect to

15    your opinion of whether the hospital violated EMTALA in

16    this case?

17    A.   Because when the patient was discharged, the patient

18    was stable with ninety-nine percent saturation.  So there

19    was not a question in my mind that they followed the

20    protocol or not.  They treated the patient who had an

21    emergency medical condition and the patient was stabilized.

22    So I didn't think to ask for the O2 policy.

23    Q.   Okay.  Have you ever been sued in a civil lawsuit

24    alleging medical malpractice?

25    A.   Yes, sir.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      Q.    How many times, Doctor?

2      A.    I believe that's six times.

3      Q.    And how did those cases come out?

4      A.    They were all dropped.

5      Q.    And have you ever been subject to a medical

6   negligence complaint?

7      A.    Those were the--  Am I saying it right?  Those were

8   the complaint--  I've had six complaints.

9      Q.    So--

10     A.    I had--  Well, those were six.  I had one in

11   addition to that that was a letter to the board as a

12   complaint.  It was never a suit.  And I had to write a

13   letter explaining it, and then that was dropped.  So that

14   would be the only thing besides that.

15     Q.    And so just so we're clear.

16     A.    Yes, sir.

17     Q.    I'm saying complaints or lawsuits.  Are you

18   considering a complaint a lawsuit?

19     A.    Yes, sir.

20     Q.    Have you ever actually had a lawsuit filed, where

21   the sheriff comes out and serves a petition and you got to

22   go to court?

23     A.    Yes, sir.  I think two of them may have been to

24   that--   Three were in Arkansas where I first started

25   practicing and I believe three were here.  One--official

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    the lawsuit was there and then one here where I was served

2    papers.

3        Q.   In those lawsuits, who were the plaintiff?

4        A.   The one in Arkansas was a twenty-two or twenty-four-

5    year-old female that had pneumonia.

6        Q.   And what county?

7        A.   Faulkner County.

8        Q.   Faulkner.

9        A.   Conway, Arkansas.  Yes, sir.

10       Q.   And it was an actual lawsuit?

11       A.   Yes, sir.

12       Q.   And then, here, in Louisiana, what parish was the

13   suit served?

14       A.   Here in Lincoln.

15       Q.   Lincoln?

16       A.   Yes, sir.

17       Q.   Do you consider yourself an expert in EMTALA?

18       A.   No, sir.

19       Q.   Have you ever testified as an expert in an EMTALA

20   case, if I haven't already asked you that?  I apologize.

21       A.   No, sir.  You asked, but I haven't.  No, sir.

22       Q.   Okay.  Would you be surprised if this child's death

23   was caused by pneumonia and hypoxic brain injury?

24       A.   Would I be surprised?  I do believe the patient did

25   have hypoxic brain injury that was on the--that

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    hospitalization.  I don't remember if it said pneumonia as

2    one of the diagnoses.

3        Q.   Would it surprise you that this child had pneumonia?

4        A.   Would it surprise me?

5        Q.   If it turns out that she did?

6        A.   It would be unlikely.  It wouldn't surprise me.  No,

7    sir.

8        Q.   But it would be unlikely?

9        A.   I would think so.  Yes, sir.

10       Q.   And why would you tell the jury that pneumonia would

11   be unlikely in this case?

12       A.   Because she was on an antibiotic at the time.  It

13   was started two days prior and she had a chest x-ray done

14   that did not show an obvious pneumonia.  It had perihilar

15   infiltrates which is common with asthma.

16       Q.   I'm going to leave this alone, but I just want to

17   make sure I understand.

18       A.   Yes, sir.

19       Q.   You're saying her death was inevitable?

20       A.   I'm saying her death was unfortunate.

21       Q.   And inevitable?

22            MR. ROBISON:  Object to form.

23       A.   I really don't want to say it was inevitable.  It

24   was unfortunate.  I don't want to use the word inevitable.

25       Q.   Hypothetically, Doc, if this child would have been

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    hospitalized and hooked up to the monitors, vital signs

2    that we've talked about, would there be a greater than

3    average chance that this child could've been saved?

4        A.   Could they have been?  Yes.  A lot of people would

5    be saved if they were in the hospital than not.  The

6    question goes back to were they inappropriately discharged.

7        Q.   Right.

8        A.   And I don't think they were--it was inappropriate.

9    If the child was in the hospital, would they have found

10   that--that's kind of putting that on the parents and I

11   really don't want to say that, for the parents' sake, to

12   tell them if you'd got the patient back sooner or if you

13   would've stayed with us, that's a hard prediction to make.

14       Q.   If they would have stayed with you?  What does that

15   mean?

16       A.   Been admitted to the hospital.  Stayed--stayed at

17   the hospital.  Believe it or not, sometimes--  I'm going to

18   add this.  Admissions are easier than discharges.  And so I

19   don't you would risk doing that.

20       Q.   Have you read Dr. Richard Sobel's report in this

21   case?

22       A.   No, sir.  I have not.

23       Q.   Have you read his deposition?

24       A.   No, sir.  I have not.

25       Q.   Is there any reason why you would not want to read

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    those documents?

2    A.   I don't think I needed his deposition to form my

3    opinion and I didn't want to be biased on it.  I felt like

4    I had enough evidence right here.

5    Q.   Okay.

6    A.   Is he a--  Would you like me to read--  Is he an

7    asthmatic specialist?

8    Q.   No.  No.

9    A.   A pediatric specialist?

10   Q.   He's an EMTALA expert.

11   A.   Okay.  How do you become an expert in EMTALA?

12   Q.   I think the court probably has the final say on

13   that.

14   A.   Oh.

15   Q.   The effects of Albuterol last four to six hours.  Is

16   that correct?

17   A.   The long-term, yes, sir.

18   Q.   So--

19   A.   They can.  Yes, sir.

20   Q.   How long does it normally take to know whether

21   Albuterol is working or not working?

22   A.   Usually within fifteen minutes, ten to fifteen

23   minutes.  You can--you can see some improvement pretty

24   rapidly.

25   Q.   The home treatments of Albuterol that she received,

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    this child received at home--

2       A.   Yes, sir.

3       Q.   --were those any different than the Albuterol that

4    was administered in the hospital?

5       A.   As far as I know, no, sir.  I believe it was just

6    straight Albuterol that she had at home.  The Dulera was

7    different.  But she had Albuterol at home, according to the

8    record, yes, sir.

9       Q.   And this is my--

10      A.   Uh-huh (yes).

11      Q.   --my crass way of putting it.

12      A.   Yes, sir.

13      Q.   But there's no industrial strength Albuterol.  I

14   mean, Albuterol is Albuterol.

15      A.   They are different--  There are different strengths.

16   Yes.  There are.  There are different strengths.

17      Q.   Is the hospital grade different than the home use

18   grade?

19      A.   It just depends on what her prescription was as far

20   as to know if she had the same medication as we had at

21   home.

22      Q.   Can you over-medicate with Albuterol?

23      A.   Sure.

24      Q.   And if you do over-medicate, how would you know

25   that?

Page 74

JACQUELYN WHITE
2/12/2020

1    A.   Well, you just look and see if she has some of the
2    side effects of Albuterol.
3    Q.   Which are?
4    A.   Breathing fast, fast heartrate, anxiousness,
5    nervousness, nausea, upset stomach.  Those are the more
6    common ones.
7    Q.   Would you agree with this, Doctor, that needing to
8    use Albuterol more frequently than usual may be a sign that
9    your asthma is destabilizing and you need to seek immediate
10   medical advice?
11   A.   Yes.
12   Q.   Your statement on page 1 of your report, Doctor, you
13   mention that approximately two hours after entering the
14   emergency department, "The patient was stable for
15   discharge."  Was that based on a medical examination, that
16   statement?
17   A.   My statement was based on review of the chart.
18   Q.   Okay.  Well, when you reviewed the chart, can you
19   show the jury the medical exam that would support that
20   statement?
21   A.   No.  That's the statement that the provider wrote.
22   Q.   Oh, okay.  I may have attributed that to you.  I'm
23   sorry.
24   A.   No.  It says the doctor noted on the reassessment
25   that patient's condition had--  I'm sorry.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1      Q.   Okay.  I think I--
 2      A.   Yeah.  That's why I had it--
 3      Q.   --confused that and--
 4      A.   --in parentheses.
 5      Q.   --I apologize to you.
 6      A.   No.  That's okay.
 7      Q.   But we want to take his statement that--
 8      A.   Yes, sir.
 9      Q.   --the doctor wrote here in the notes,--
10      A.   Yes, sir.
11      Q.   --and we want to show the jury on a big board the
12   medical exam that supports that.  Where is that?  The
13   medical exam?
14      A.   It's not in the chart.
15      Q.   Okay.  Would you agree that once the medical
16   emergency is over with, the physician determines that we no
17   longer have an emergency medical condition, that you would
18   stop the treatment?
19      A.   No, sir.
20      Q.   Okay.  Would you agree that compared to an adult,
21   the small size of a child's airway, it makes the child more
22   susceptible to obstruction by the tongue?
23      A.   It can.  Yes.
24      Q.   Would you agree that room air contains twenty-one
25   percent oxygen?
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    A.   Yes, sir.

2    Q.   Would you agree that children are belly breathers

3    because they rely heavily on their diaphragms?

4    A.   Younger children can be.  Yes, sir.

5    Q.   And four-year-old, that qualifies as a younger child

6    in your mind?

7    A.   I don't--they're not--I don't know what age they

8    stop using their diaphragm as much, but they're not

9    necessarily at four, belly breathers.

10   Q.   Would you agree that when a child experiences low

11   cardiac output state, the child relies mostly on an

12   increase in heartrate?

13   A.   Relies on that for what?

14   Q.   To live.  For--

15   A.   Not just an increase in heartrate.

16   Q.   To survive.  I'm sorry?

17   A.   That's kind of too generic to say it relies on the--

18   Q.   You would not agree with that?

19   A.   I would say that's too vague and it's not exactly an

20   appropriate medical statement.  Can I just add this--

21   Q.   Yeah.  Sure.

22   A.   I'm not--  Are you--  Is that from his expert

23   witness about the low cardiac output?

24   Q.   No.  I was just--

25   A.   Or is that just a medical term?  I'm not sure--

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      Q.   It was just a question that I had.

2      A.   Low cardiac output, I'm not sure if that's relating

3   to the asthma.  That's kind of a--that's why I don't feel

4   comfortable saying that.  That's--

5      Q.   Would asthma cause a low cardiac--

6      A.   That's more of a cardiac--  Not necessarily.  That's

7   why I'm not real sure about that.

8      Q.   Okay.  Fair enough.  I'll have to get the exact term

9   you used, we were talking about not intervals of taking

10  vital signs, but I think your term was trends.

11     A.   A trend.  Yes, sir.

12     Q.   You're saying that there's no trends here because

13  the child was monitored the entire time?

14     A.   I did not say there was no trends.  I said there was

15  a--  You can look at these two and look at a trend, that

16  the child seems to be improving as opposed to worsening.

17     Q.   And you would think that the second set of vital

18  signs are normal?

19     A.   I didn't say they were normal.  I said they were

20  improved.

21     Q.   Did we ever have--

22     A.   From the first set.

23     Q.   I'm sorry.  I didn't mean to--

24     A.   Go ahead.

25     Q.   In your entire review of the chart, Doc, did you

Page 78

JACQUELYN WHITE
2/12/2020

1   ever see a set of vital signs that you thought were

2   perfectly normal?

3       A.   No, sir.

4       Q.   Collectively, would that trend--or those sets of

5   vital signs that you have available--would they be

6   important, if not critical, as to whether the child is

7   stable or not stable?

8       A.   They can be important.  Yes, sir.

9       Q.   Were they important in this case?

10      A.   This set?  Yes, sir.

11      Q.   A stable heartrate over what period of time

12  determines whether a child is stable or not as far as his

13  heartrate?

14      A.   The heartrate by itself doesn't determine if the

15  child's stable or unstable.  You can have an abnormal

16  heartrate and still be stable as the child.  This child's

17  heartrate is going--it has to be part of the picture

18  because it's had several doses of Albuterol.  So is the

19  heartrate a little bit elevated from the Albuterol or

20  because the child is angry because you're holding a mask in

21  front of them, or is it because they're having trouble

22  breathing?  So that's why the assessment is important.

23      Q.   You just don't know.  Do you, Doctor?

24      A.   You just don't know from a--from a heartrate.

25  Right.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1     Q.   And the same question, it will be the same situation

2 involving blood pressure and pulse rate and oxygen

3 readings?

4     A.   Not necessarily oxygen readings.

5     Q.   What's different about the oxygen readings?

6     A.   That's on a--on a finger, unless it's not--unless

7 it's not on there accurately, or they've had a blood

8 pressure cuff that's stopping the flow, that should be--

9 that should be accurate.

10     Q.   Let me ask you.  Without knowing the vital signs at

11 the time of discharge, how could you know with reasonable

12 medical certainty that the child's condition would not

13 deteriorate?

14     A.   That the child would not deteriorate?  I can tell

15 you with reasonable medical certainty that the child was

16 stable for discharge and that it's unlikely is what the--I

17 believe is what the definition.  Is that what you're

18 asking, the definition of EMTALA is what they're--

19     Q.   No.  Let me go back and ask my question again.

20     A.   Okay.  Yes, sir.

21     Q.   And let you--

22     A.   Yes, sir.  Yes, sir.  Okay.

23     Q.   Without knowing the vital signs at discharge, how

24 could any doctor know with reasonable medical certainty

25 that this child's condition would not deteriorate?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    A.   Even with the set of vital signs, how do I know with
2    reasonable certainty?  I do not think the vital signs will
3    give me reason--a difference in that, if that's what you're
4    asking.
5    Q.   No.  I'm not sure we're communicating.
6    A.   Yeah.  I don't necessarily understand.  I'm sorry.
7    Q.   No.  No.  No.  No problem.  And maybe I'm just not
8    asking the question in the right way.  But we agree that
9    there were no vital signs taken at discharge.  Right?
10   A.   There were no vital signs documented.  Yes, sir.
11   Q.   Now, my question is without vital signs at the time
12   of discharge--
13   A.   Without vital signs documented--
14   Q.   --at the time of discharge--
15   A.   --at the time of discharge.  Yes, sir.
16   Q.   --how would any doctor know with reasonable medical
17   certainty that this child's condition will not deteriorate?
18   A.   Because he did a reassessment on the child.
19   Q.   Without vital signs?
20   A.   Without them documented.  You'd have to ask him.  If
21   the child was still on a monitor, he can look at the
22   monitor.  Unfortunately, the nurse has to put the vital
23   signs into this electronic medical record.  The machine
24   doesn't automatically do it.  So just the fact that they're
25   not in here tells us they're not documented.  But when he

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1   did his reassessment, was the patient on a monitor?  I

2   cannot say.

3       Q.   And the term washout that we talked about before--

4       A.   Yes.

5       Q.   --that's just totally unfamiliar to you?

6       A.   It's not totally unfamiliar.  We just don't use that

7   as a medical term a lot, as washout.

8       Q.   What do you take it to mean?  What do you believe it

9   means, washout, in this kind of text that we're dealing

10   with here?

11       A.   Well, I don't even really like to give you a

12   medical--  I don't believe washout--  You're wanting to--

13   From your definition of washout was that the patient was

14   off the oxygen long enough, that the patient did well.  I

15   don't think this--  The patient was off the oxygen long

16   enough to show that she was maintaining her O2 saturation.

17   I don't know really--  I mean, I know you--  I don't know

18   why you want to go back to the word washout.

19           **MR. BANKS:**  Can we take a short break?

20           **WITNESS:**  Sure.  Yes, sir.

21   (OFF RECORD.)

22       Q.   Doctor, I'd like to give you a copy of what I think

23   is your report--

24       A.   Yes, sir.

25       Q.   --and let you look at that.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1           **MR. BANKS:**  I've labeled it "White 2."

2        (Witness peruses document.)

3        A.   Okay.

4        Q.   That is your report?

5        A.   Yes, sir.

6        Q.   Okay.

7               **MR. BANKS:**  I'd like to attach that to the

8               deposition along with "White 1."

9        Q.   And I want to give you a document that is now--

10              **MR. BANKS:**  --labeled "White 3."

11       A.   Yes, sir.

12       Q.   And it's another protocol and I just want to let you

13     review that for a minute, take your time and go ahead--

14     You might want to show it to counsel first.  I'm sorry.

15       A.   I'm sorry.

16       Q.   And I'll represent to you, Doctor, in all fairness

17     to counsel and yourself, that document was produced in

18     another lawsuit, not this lawsuit.  It was produced in

19     another lawsuit involving Willis-Knighton.  And I just

20     wanted to ask you some questions about that--

21       A.   Yes, sir.

22       Q.   --after you've had time to look at it.

23     (Witness peruses document)

24       A.   Okay.

25       Q.   Okay.  Do you see anything on there, Doctor, that

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    you just disagree with?

2       A.   I don't disagree with it, but, once again, I think

3    this is inpatient.

4       Q.   Right.

5       A.   I don't see anything that I disagree with.  No, sir.

6       Q.   Okay.  Do you believe that there's a distinction

7    between the care given to inpatients as those that are

8    receiving treatments in the emergency department?

9       A.   Do I think there's a distinction between inpatient

10   and ER?  Yes, sir.

11      Q.   And, in particular, the standard of care involving

12   the oxygen administration.  Do you think that's different?

13   That's what I'm trying to figure out, Doc.  Let me just--

14      A.   Go ahead.  Yes, sir.

15      Q.   --rephrase this.

16      A.   Yes, sir.

17      Q.   In other words, we, at the hospital, have an

18   emergency department--

19      A.   Yes, sir.

20      Q.   --and we have admissions--

21      A.   Yes, sir.

22      Q.   --admitting patients.

23      A.   Yes, sir.

24      Q.   What I'm trying to figure out, do you administer

25   oxygen protocol differently in the emergency room than you

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    do in the floor of the hospital?

2       A.   I would have to see the two protocols to see if

3    their administration is different.  ER is an acute place of

4    acute distress.  Hospital inpatient can be not as acute,

5    but can still need it.  Like this is talking about recovery

6    patients--

7       Q.   Right.

8       A.   --post-op patients.

9       Q.   Right.

10      A.   So they probably have different protocols, but I

11   have not seen them so I can't tell you what they are.

12      Q.   Okay.  Now, Doc, I don't know that you saw all of

13   the records from the Willis-Knighton Bossier.  Do you

14   recall those?

15      A.   Of the ER visit?

16      Q.   Yeah.

17      A.   Now, how would I--  I'm not real sure if I'd know if

18   I didn't see all of them.

19      Q.   And that's what I want to talk about here just a

20   second.

21      A.   Okay.  Okay.

22      Q.   Before we do that--

23      A.   Yes, sir.

24      Q.   --do you know what a SANE nurse is?

25      A.   Yes, sir.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    Q.   S-A-N-E?

2    A.   Yes, sir.

3    Q.   What is a SANE nurse?

4    A.   In my mind, a SANE nurse is a nurse that comes out

5    and does sexual assaults, physical assaults.  Any child

6    that is in--has any question of physical trauma, they call

7    a SANE nurse to do an exam on the patient, mainly, for--not

8    that another nurse can't do the exam, but it's for

9    medical/legal purposes.

10   Q.   Would there be a report from the SANE nurse?

11   A.   If they had a SANE exam, there should be.  Yes, sir.

12   Q.   And would that be in the medical files?

13   A.   That, I do not know.

14   Q.   Medical records.  Do you ever call a SANE nurse?

15   A.   Yes, sir.

16   Q.   And did you make a report or did the SANE nurse make

17   the report?

18   A.   Report to whom?  We do a medical report when a

19   patient comes to the ER and the SANE does their report.

20   Now, do they do a separate report for the police?  I do not

21   know.  Was SANE called on this patient?

22   Q.   Well, I was going to ask you about that.

23   A.   Okay.

24   Q.   Do you know anything about that, whether or not a

25   SANE nurse was called on this patient?

Page 86

JACQUELYN WHITE
2/12/2020

1    A.   I did not see that.  Were they?

2    Q.   I'll represent to you, Doctor, that on February the

3  10th--

4    A.   Okay.

5    Q.   --at 2:33 in the morning--

6    A.   Okay.

7    Q.   --that a GU exam--

8    A.   Okay.

9    Q.   --and tell the jury what we mean by GU exam.

10   A.   Genital urinary exam.

11   Q.   And I'll represent to you, Doctor, that that exam

12  had a negative finding for bleeding, swelling or discharge.

13   A.   Okay.

14   Q.   Would that indicate to you that there's any type of

15  abuse going on with this child?

16   A.   That would indicate that there's no physical signs

17  in her GU exam which is just a--you can look and say those

18  things that you just said so that when they were doing

19  the--  I don't know if that was during the coding of the

20  patient or the evaluation when that was written.

21   Q.   At the--

22   A.   Is that on the physical exam when the patient came

23  back coding?

24   Q.   This is on February the 10th at 2:33 in the morning.

25   A.   That's on this ER visit, not when the patient came

Page 87

JACQUELYN WHITE
2/12/2020

1      back.  Is that right?

2          Q.    Correct.

3          A.    Okay.  Okay.  Yes, sir.  So-- Right.  There's no

4      physical findings.

5          Q.    Yes, ma'am.

6          A.    Yes, sir.

7          Q.    Okay.  I'll represent to you then at 3:52, the

8      patient was discharged from Willis-Knighton South and taken

9      to her grandmother.

10         A.    Okay.

11         Q.    I'll represent to you at 6:51, according to the

12     medical records--

13         A.    Okay.

14         Q.    --the family members witnessed respiratory arrest.

15         A.    Okay.

16         Q.    I'll represent to you that at 7:24, the patient

17     arrives at Willis-Knighton Bossier with no pulse.

18         A.    Okay.

19         Q.    I'll represent to you at 7:45, Dr. Horan who is the

20     physician in the emergency room at Willis-Knighton Bossier

21     who is receiving this patient that's coding--

22         A.    Yes, sir.

23         Q.    Okay.  You with me?

24         A.    Yes, sir.

25         Q.    Dr. Horan.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1      A.   Okay.

 2      Q.   At 7:45, Dr. Horan calls Dr. Tran who was the--

 3      A.   Admitting--

 4      Q.   --emergency room physician who discharged the

 5   patient.

 6      A.   Dr. Tran was not the emergency room doctor that

 7   discharged the patient.

 8      Q.   Yeah.  I think you're right.  Dr. Tran worked on the

 9   patient.

10      A.   He's the PICU doctor.  Dr. Tran is an inpatient

11   doctor.  So I don't think Dr. Tran saw that patient that

12   morning.

13      Q.   Really?

14      A.   Dr. Easterling was the ER doctor that morning--

15      Q.   Uh-huh (yes).

16      A.   --and Dr. Tran is a hospitalist or a PICU doctor, if

17   I'm correct.  I think there's a lady Dr. Tran and a male

18   Dr. Tran.

19      Q.   Do you know either one of those doctors?

20      A.   I know the names.  I've met the man Dr. Tran one

21   time when he was working in the PICU.

22      Q.   Dr. Tran works in the PICU where?

23      A.   They're both at South.  Dr. Tran.

24      Q.   Okay.

25      A.   The patient was seen at South on the first visit
```

Page 89

JACQUELYN WHITE
2/12/2020

1    and, then presented to Bossier on the visit with the

2    coding.  Is that right?  Okay.

3        Q.    What instance did you have to meet with Dr. Tran?

4        A.    Approximately two, three years ago, I was at a

5    soccer game, watching my son play soccer in Bossier, and

6    one of the soccer players coded on the field and his

7    parents were not there.  And so I went with him to Willis-

8    Knighton Bossier and then I rode with him to Willis-

9    Knighton South where the PICU was until the parents

10   arrived, and I met him there for fifteen, twenty minutes

11   till the parents got there and then I left.

12       Q.    That's the same doctor we're talking about?

13       A.    I don't know if this is--because I don't remember

14   seeing Dr. Tran on that second visit.  That's the only Dr.

15   Tran I know.  I do know that--I believe in some of these--

16   one or two of these admissions, there's a female Dr. Tran

17   that took care of him or it may have been him.  I don't

18   know.

19       Q.    Okay.

20       A.    But I don't believe there's an ER doctor named Dr.

21   Tran.

22       Q.    Okay.  Thank you, Doctor.

23       A.    Yes, sir.  Yes, sir.

24       Q.    Let me ask you.  Have you ever inserted a catheter

25   in a four-year-old child?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    A.   Yes, sir.

2    Q.   What size of a French foley catheter did you use?

3    A.   Oh, don't get my lying.  Whatever the nurse handed

4    me.  I mean, I couldn't tell you the appropriate size for a

5    child without looking.

6    Q.   Would you take a look at what I'm going to mark--

7    A.   Yes, sir.

8    Q.   --just one second for--  And I need to let your

9    lawyers look at this just a second first.

10   A.   Yes, sir.

11        MR. BANKS: I think we're at "Number 4."

12   Q.   Okay.  Doctor, could you take a minute and review

13   that and tell me whether or not, generally, you agree with

14   that?  And I'll represent to you that it's a typical weight

15   and tube size for foley catheters broken down from six

16   months of age down to twelve months and respective size for

17   the--or twelve years, I'm sorry--six months to twelve years

18   and it's respective size foley catheters for those age

19   groups that's on the document there.

20   (Witness peruses document.)

21   A.   Okay.

22   Q.   Do you see anything that's out of line that--  Would

23   you agree with those?

24   A.   Not offhand.  Yes, sir.

25   Q.   You would agree with that?

Page 91

JACQUELYN WHITE
2/12/2020

1      A.    I would agree with them.

2      Q.    Okay.  So if we have a child that's four years old,

3    what size catheter would be using?

4      A.    It says between eight and ten.

5      Q.    Now, if I understand right, and I don't profess to

6    know anything about catheters, but if I understand right,

7    there's a bulb at the end.

8      A.    Yes, sir.

9      Q.    And you have to inflate that bulb.

10     A.    Yes, sir.

11     Q.    And what size would you inflate for a four-year-old?

12     A.    Well, the different foley site--the different foleys

13   have on the--have on the instrument or whatever, the

14   package, how much to inflate the bulb.  But it's not

15   inflated until it's into the bladder.  And anywhere from

16   five mils to ten mils to thirty, twenty mils and then to--I

17   mean, I don't know.  I'm just giving you a hypothetical.

18   But it's on--it's on the catheter bag.  So the--  And,

19   usually, sometimes in the catheter bag, the--there'll

20   already be a syringe of ten ccs of saline to put in the

21   bulb.  Not always, but, oftentimes, that's even in there to

22   make it easier on the--on the nurse or whoever's putting in

23   the catheter.

24     Q.    And it would be fair to say that there's a one-to-

25   one ratio between a milliliter and what's the other one?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1           **MR. HUTTON BANKS:**   CC.

2      Q.   CC.

3      A.   Yes.  Yes.

4      Q.   There's a one-to-one ratio.

5      A.   Yes, sir.

6      Q.   Okay.  I'll represent to you that the child arrives

7    with no pulse at 7:24 at Bossier hospital, Willis-Knighton

8    Bossier and, at 7:45, Dr. Horan calls Dr. Tran and unable

9    to reach him or her, whichever.

10     A.   Yes, sir.

11     Q.   I'll represent to you that at 7:47, a nurse,

12   Stephanie Yeager, puts in--I'm not sure the word puts in--

13   puts in--

14     A.   Right.

15     Q.   --is the right word but--

16     A.   Or in--

17     Q.   Insert?

18     A.   Right.  Inserts.  Yes.

19     Q.   Inserts a--

20     A.   I understand.

21     Q.   --a French eight foley catheter.

22     A.   Yes, sir.

23     Q.   That's inflated to five ccs.

24     A.   Yes, sir.

25     Q.   And I'll represent to you that there's no assistance

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1    required for that.
 2        A.   She wrote on there no assistance?  It's very hard to
 3    put in a catheter on a four-year-old without assistance.
 4        Q.   Without assistance.  And I may be wrong on that.
 5        A.   But if this--  Well, let me--let me go back.
 6        Q.   Sure.
 7        A.   An active four-year-old, it's very hard to put one
 8    in.  If this patient was obtunded or unresponsive, then it
 9    was very easy to put one in on her own so--
10        Q.   Now, the notation, "Patient tolerated well," what
11    would that mean to you?
12        A.   It means she was--she didn't fight against you, she
13    didn't have any--she wasn't traumatized.  She just,
14    unfortunately, I hate to be blunt, she just laid--she laid
15    there and--  It--it was without complications a lot of
16    times is that would be.
17        Q.   Okay.  Have we got to the brain dead part yet?  Is
18    she brain dead at this point?
19        A.   Well, I--I--you--  They haven't done an evaluation
20    for brain death at that time.
21        Q.   So we don't really know?
22        A.   Right.  Yes, sir.
23        Q.   But she's not moving?
24        A.   Yes, sir.  I would assume she didn't.
25        Q.   Okay.
```

Page 94

JACQUELYN WHITE
2/12/2020

1    A.   If she laid there for a foley, yeah.

2    Q.   If there were evidence of blood at the time that

3    foley eight catheter was inserted, would that be something

4    that the nurse would note or the doctor, whoever is putting

5    it in?

6    A.   I would think the nurse put it in and you would

7    think she'd notice.  Yes, sir.  It's very--  You know, I'm

8    sure you've seen on TV--  I mean, codes are very crazy.

9    And so are you looking for evidence of trauma?  Of course

10   not.  You're just trying to insert a foley.  But would it

11   be obvious right there on a four-year-old?  It should be.

12   Q.   Okay.  Now, three minutes after Nurse Yeager inserts

13   the foley eight catheter, three minutes later, Dr. Horan

14   does talk to Dr. Tran.

15   A.   Yes, sir.

16   Q.   They do connect.

17   A.   Okay.

18   Q.   Okay.  Thirteen minutes later, at 8:03--

19   A.   Yes, sir.

20   Q.   --Dr. Poole completes an order for a foley catheter.

21   A.   Okay.

22   Q.   Does that make any sense to you?

23   A.   Sure.  It does.

24   Q.   What does that mean?

25   A.   I mean, the order was put in three minutes later.

Page 95

JACQUELYN WHITE
2/12/2020

1    When there's a code and there's a lot going on, verbal

2    orders are given, but they're not documented, and so it can

3    be put in a computer after the actual order was carried

4    out, and that often happens in codes.  We do our best to

5    try not to do a procedure or any--take any order unless an

6    emergent situation so that documentation will not look like

7    that, but that does happen unfortunately in codes.  And in

8    extreme circumstances.

9        Q.    Okay.  So let me recap just a little bit.

10       A.    Yes, sir.

11       Q.    The catheter goes in, a French eight at 7:47.

12       A.    Okay.

13       Q.    Three minutes later, Dr. Horan talks to Dr. Tran

14   and, at 8:43--

15       A.    Okay.

16       Q.    --there's a transfer that's ordered to Willis-

17   Knighton South.

18       A.    Yes, sir.

19       Q.    Do you remember seeing that?

20       A.    Yes, sir.  I mean, I didn't hone in on that follow-

21   up part.  I'll be honest.  But, yes, sir.

22       Q.    Okay.  Now, at 9:31--

23       A.    Okay.

24       Q.    --Dr. Horan notes a special discussion.  Do you know

25   what special discussions are in terms of medical records?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      A.   No, sir.

2      Q.   Okay.  And I don't either.

3      A.   Yeah.

4      Q.   That's the reason I'm asking.

5      A.   No, sir.

6      Q.   It just says special discussion.

7      A.   Okay.

8      Q.   I couldn't figure out what that was.

9      A.   Who was he having the special discussion with?

10     Q.   That's a good question.

11     A.   Okay.

12     Q.   I think it was Dr. Tran, but I don't know that.

13     A.   Okay.  Yes, sir.

14     Q.   I don't want to represent that because I don't know.

15     A.   Sure.  Yes, sir.

16     Q.   Okay.  The special discussion is "the nursing staff

17   noted small amount of blood before placing the foley.  The

18   blood apparently noted in the vaginal area."

19     A.   Okay.

20     Q.   Do you know any reason why that blood would not have

21   been noticed before 9:30 when the catheter was put in at

22   7:47?

23     A.   You would have to ask that nurse and why she didn't

24   document it or she told someone and they said make sure and

25   document it.  I really don't know, sir.

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      Q.    Now, at 9:50--

2      A.    Yes, sir.

3      Q.    --the child arrives at Willis-Knighton South--

4      A.    Okay.

5      Q.    --via ambulance.

6      A.    Yes, sir.

7      Q.    And Tran is at the bedside.

8      A.    Okay.

9      Q.    And the notes say that there's a size six French

10     foley catheter in place on arrival.

11     A.    Okay.

12     Q.    Do you know how we got from the eight size at 7:47

13     to the six size at 9:50?

14     A.    I do not.

15     Q.    Does that seem a little strange to you?

16     A.    No.  It's a lack of--it's documentation error.

17     There's--they clicked a button above or below, if I had to

18     guess.  Or a nurse looked at it and it looked like a six

19     and she didn't--you have to get on it and look down to see

20     the actual six or eight.  They're both small.  They're very

21     small.  So if I had to see--if I had to guess, she just

22     guessed on what it--she--size she thought it was.

23     Q.    I gotcha.  Now, if I'm understanding the series of

24     events here correctly, I would assume and that's an

25     assumption--

Page 98

JACQUELYN WHITE
2/12/2020

1      A.    Yes, sir.

2      Q.    --I'll admit that to you.  But I would assume that

3    when Dr. Horan talked to Dr. Tran at 7:50, they talked

4    about why did you send me this brain-dead patient.  Why do

5    I have this brain-dead patient?  You, Dr. Tran, she came

6    from your hospital, not my hospital.

7      A.    Because Bossier does not admit pediatrics.  So they

8    had to transfer to South where they take care of

9    pediatrics.

10     Q.    Okay.

11     A.    Yes, sir.

12     Q.    Well, at 9:50--

13     A.    Okay.

14     Q.    --it's noted--the doctor notes--

15     A.    Okay.

16     Q.    --that there's skin tears to the vagina.

17     A.    Okay.

18     Q.    Do you know of any reason why that those skin tears

19   would not have been evidenced at 2:33 in the morning when

20   the GU exam was completed?

21     A.    When the GU exam from the other ER visit?

22     Q.    Yes.  Right.

23     A.    If I had to guess, a GU exam was not done.  When

24   someone's in respiratory distress, I don't think they--or

25   it was done by a scrub.  You'll have to ask them.  But was

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    a GU exam done?  You'll have to ask them.  If it's

2    documented, sometimes, it's a cursory, and it's looking--

3    To look into the vagina of a child, you have to spread

4    their legs and look.  Can you look without spreading them?

5    You can look but you're not going to get a very adequate

6    exam.  Do I look at a GU exam on a child with asthma

7    exacerbation?  I do not.

8        Q.    What is ROS?

9        A.    Review of systems?

10       Q.    Thank you.

11       A.    I'm sorry.

12       Q.    Thank you.  If an ROS is documented at 2:33 in the

13   morning, there was a GU exam, would that lead you to

14   believe that there was, in fact, a GU exam?

15       A.    The review of systems is verbally.  You're asking

16   them the review of systems.  Only on the physical exam

17   under GU would you note that they visually looked at it.

18   But under review of systems, you're just asking do you have

19   any bleeding, do you have any tear, do you have any

20   contusions, and they're just saying.  Does that make sense?

21   The review is just asking--is asking the patient have you

22   been short of breath, have you had chest pain, has the baby

23   had belly pain, had they been nausea or vomiting.

24       Q.    How would we know at 2:30 in the morning that it was

25   negative for bleeding, the exam was negative for bleeding

JACQUELYN WHITE
2/12/2020

1    or swelling unless there was an actual exam done?

2    A.    Right.

3    Q.    So would you agree with me that if it's noted as an

4    exam, GU exam, with no bleeding and no swelling, that that,

5    in fact, was done, that exam was done?

6    A.    You have to assume it was done.  Yes, sir.

7    Q.    Okay.  My question to you is if we did this exam at

8    2:33 in the morning--

9    A.    Yes, sir.

10   Q.    --and at 9:50, this child is noted to have skin

11   tears to the vagina, could you explain that?

12   A.    No.  And that's probably why they got a SANE nurse

13   to look at it.  You have to be super, super--have a very

14   low threshold so that you don't miss any children.  It's a

15   mandatory obligation that you have to call them.  So even

16   if you don't necessarily think there's something, if it's

17   documented, or there's any concern by any staff, they will

18   be notified.  So were they flamboyant?  I mean, I'm saying

19   about trying to see was this child molested, injured in any

20   way.  Even when we think it's not, and it's documented or

21   questioned or wondered, we're going to report it just for

22   the sake of the safety.

23   Q.    And, in fact, that's what happened.  The house

24   supervisor, I'll represent to you, at 9:50, called the

25   Shreveport Police Department and the Child Protective

JACQUELYN WHITE
2/12/2020

1    Service.  So would you assume that if those calls were made
2    by the SANE nurse to the Shreveport Police and the Child
3    Protective Service, that at least the person who made the
4    call, the house supervisor in this case, very much
5    suspected that there was abuse going on?
6        A.    She didn't necessarily suspect, but if there's any
7    signs or symptoms or any story, you're mandated to--to
8    call.
9        Q.    Now, you would agree with me that the only place
10   this child has been since 2:33 and 9:50 is two places.
11   She's been at the Willis-Knighton South hospital in this
12   interval.  Right?
13       A.    Yes, sir.
14       Q.    And she's been to grandma's.
15       A.    Yes, sir.
16       Q.    Okay.  So if we're talking about abuse, either
17   grandma knows something about it, or the hospital knows
18   something about it.  Right?
19       A.    Uh-huh (yes).  Yes, sir.
20       Q.    Now, at 10:00, ten minutes later--
21       A.    Yes, sir.
22       Q.    --after they call the police--
23       A.    Yes, sir.
24       Q.    --ten minutes later, it's noted that there's a
25   twelve sized French foley catheter.  Could you explain

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1     that?

2          A.   No, sir.

3          Q.   Could you explain at 10:00, how one would note that

4     there are tears to the vagina wall that looked fresh, two

5     to three tears that are noted, when, in fact, the GU exam

6     at 2:33 was negative for bleeding and swelling?  Could you

7     explain that?

8          A.   The only explanation is that someone brought it to

9     the attention of the provider and he looked down there and

10    then documented it.  In a code, that's the last thing he's

11    worried about, but when a nurse sees that, when they're

12    putting in a foley, they're obligated to tell.

13         Q.   And that's kind of what I want to talk to you about.

14    It's a code situation.  Right?

15         A.   Yes, sir.

16         Q.   And Dr. Tran realizes that this patient that was

17    formerly at Willis-Knighton South--

18         A.   Yes, sir.

19         Q.   --went to grandma's and then went to the ambulance,

20    coded back to Willis-Knighton--

21         A.   Bossier.

22         Q.   --Bossier and, now, he's--Dr. Tran is back on site

23    there as the attending physician, pediatric physician?

24         A.   He's the--he's a PICU attending.  The pediatric

25    intensive care at Willis-Knighton South.

Page 103

JACQUELYN WHITE
2/12/2020

```
1        Q.   Okay.  Do you know what the very first thing he sees
2    at 10:00 on this patient that's coded?
3        A.   Is what?
4        Q.   Tears to the vagina wall that looked fresh.
5        A.   The first thing he documented?
6        Q.   One of the first.
7        A.   I didn't see the--I haven't seen that chart.
8        Q.   Okay.  Is a size twelve French catheter too large
9    for a four-year-old female?
10       A.   It is large for the--according to this, yes, sir.
11       Q.   Well, if the family committed the abuse, it had to
12   happen after the child was discharged from Willis-Knighton
13   South and taken to grandma's house.  Would you agree with
14   that?
15       A.   Then or they didn't do a good physical initially and
16   it was done sometime during the night prior to the other
17   visit.  I mean, it could've happened at any time.  You have
18   a normal thing, but you're going to have to ask the
19   provider when he wrote it, how well did you look--  I mean,
20   he's--he's not going to spread her labia and look down
21   there on a child with asthma.
22       Q.   Unless he wants to have that particularly noted in
23   the medical records.  Right?
24       A.   It's not particularly noted.  It just says GU,
25   normal, no edema--  You can see no bleeding without
```

Page 104

JACQUELYN WHITE
2/12/2020

1    touching and spreading the child's legs, if I'm--

2        Q.   So you're thinking--

3        A.   --to be crude.

4        Q.   --back at 2:30 in the morning when the GU exam was

5    done, that they just really missed it.  Is that what--

6        A.   I won't say they missed it.  But I don't think they

7    did a very thorough look of it, but you would have to ask

8    them.

9        Q.   Okay.  Do you see anything particularly disturbing

10   about this situation where Horan, who receives a coded

11   patient, he did not see the blood, he did not call CPS, he

12   did not call the Shreveport Police Department, he didn't

13   call the SANE nurse?  But Horan takes it upon himself, he

14   says that the nurses noted blood before the catheter was

15   placed.

16       A.   Yes, sir.

17       Q.   Does that make any sense to you?

18       A.   Yes.  It does.

19       Q.   Explain what you're thinking.

20       A.   It's not--it's not the--  The protocol has either

21   the charge nurse or the house supervisor that notifies the

22   police.  The doctor, that's not part of their protocol for

23   doing that.  If the patient would've come in with possible

24   sexual abuse and that would be what the doctor was focusing

25   on--  This is a--this is a four-year-old child that is in

JACQUELYN WHITE
2/12/2020

1    respiratory arrest, possibly dead at this time.  That is

2    the last thing the ER doctor's focusing on.

3        Q.    That's the--

4        A.    The only reason the doctor looked at it was because

5    the nurse, when putting in the catheter, noticed this.  So

6    he's mandated to document this.

7        Q.    Here's my situation.

8        A.    Yes, sir.

9        Q.    Here's what I'm really struggling with.

10       A.    Okay.

11       Q.    Where's the notation from the nurse that there's

12   blood before the catheter?

13       A.    Well, I don't know.  You'll have to ask them.

14       Q.    Did you see any such in your review?

15       A.    I did not review that in detail.  No, sir.

16       Q.    Okay.  If I represent to you and, hypothetically, I

17   am representing to you, a situation where there's no blood

18   that's ever noted in any medical record before the catheter

19   is inserted, could you explain with that situation and

20   given what I've represented to you--

21       A.    Can I explain it?  If it's--if it's a foley catheter

22   insertion and it's already printed and you hit a button and

23   it goes out and says no complications, nothing, and then

24   she mentions it and says I did see some blood, and the

25   nurse says, did you document it, that's important, we need

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    to know, even though it's a code, she's going to go back in

2    the chart and document that.  So why would she document it

3    against herself is because she's noting it.  I mean, I

4    don't know if it's the same nurse or a different nurse.

5    That, unfortunately, happens with these electronic medical

6    records.  And this is kind of something that's coming after

7    a code.  They're not worried--  Unfortunately, they're not

8    thinking that this chart's going to a lawyer and that we

9    need to make sure nothing doesn't--

10       Q.   Do you know who was reported for abuse?

11       A.   Do I know who?  No, sir.  I didn't--I didn't see any

12    of that.

13       Q.   Do you know who was investigated for abuse?

14       A.   They investigate the parents and the grandparents or

15    whoever lives with them.  They do a pretty thorough

16    investigation.

17       Q.   Okay.  So if the GU exam that's noted in the

18    records--

19       A.   Uh-huh (yes).

20       Q.   --was done correctly--

21       A.   Right.

22       Q.   --noting that there is negative bleeding and

23    negative swelling--

24       A.   So really--  Did a SANE nurse come and do an

25    evaluation on this child?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    Q.   I don't know.
2    A.   Okay.  I mean, really, all this negates anything if
3    you have a SANE evaluation.  And I guess in the inpatient
4    side of that chart, it may say whether they decided to
5    pursue it or did not or I don't know.  But whether there's
6    inconsistencies there, if a SANE has an evaluation, that's
7    going to tell you if they think there's any trauma or could
8    it have been from the foley catheter insertion from the--
9    the craziness in the ER of putting it in?  That skin's very
10   friable.  It could've easily, you know, could it have
11   happened?  Absolutely.
12   Q.   On February the 12th--
13   A.   Yes, sir.
14   Q.   --two days later--
15   A.   Yes, sir.
16   Q.   --the size twelve French catheter is in place.
17   Again, I'll ask you the same question that we've talked
18   about.  Do you know how we go from the eight size to the
19   six size to the twelve size?
20   A.   No, sir.
21   Q.   On February the 13th, I think we're talking about a
22   brain-dead child at this point.  Are we, Doc?
23   A.   I did not review that chart.
24   Q.   Okay.
25   A.   I'm sorry.

Page 108

JACQUELYN WHITE
2/12/2020

1      Q.    No.  No problem.  On February the 13th, at 5:50

2    p.m., it's noted a large area of swelling is noted to the

3    pubic mound region in the labia, more so the pubic mound.

4      A.    Okay.

5      Q.    How long would it take for that swelling to appear?

6      A.    From trauma?

7      Q.    Right.

8      A.    From abuse?

9      Q.    Right.

10      A.    From a couple of minutes to a couple of hours.  Was

11    there bruising with it?  Was there just swelling?  I think

12    without a SANE exam or a SANE thing, I don't think it's

13    really worrisome about any of this.  If the child's been on

14    fluids and all that, they could be having swelling

15    anywhere.  Because the swelling from the trauma of putting

16    a catheter in very rapidly, is it from sexual abuse?

17      Q.    Well, it's very concerning to me, Doc, that swelling

18    would happen in a couple of hours.

19      A.    Uh-huh (yes).

20      Q.    Do I have that right?

21      A.    That it can happen in a couple of hours?  Sure.

22      Q.    I mean, well, do it this way.  More likely than not,

23    how long is it going to take for that swelling to appear on

24    the pubic mound?

25      A.    It can be within a couple of minutes to a couple of

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    hours.

2       Q.   Okay.  We're on February--

3       A.   But we're a couple of days out.  Right?

4       Q.   Right.  Could you explain that?

5       A.   No.  I can't.

6       Q.   On February the 14th there's a notation at 4:12 in

7    the morning, that we're going to remove the twelve size

8    foley catheter and we're going to substitute a ten size

9    foley catheter and we're going to reduce the bulb from five

10   milliliters to three milliliters.  And if I'm figuring

11   right, that's about a forty percent reduction.

12      A.   Okay.

13      Q.   Tell me what's going on in the medical community

14   when they're doing this.

15      A.   Well, you'd really have to ask them.  But let me

16   just tell you my thought, but I don't feel like--  Okay.

17   So when there's blood, if the blood's from urine, like you

18   say you have hematuria, hematuria--any small amount of

19   blood can cause clots and then you can't urinate.  So you

20   do typically put a large--larger foley in a patient to keep

21   the flow of it.  And so with the larger foley so it's--

22   The whole reason of putting the bulb is inside the bladder,

23   it's keeping it from pulled out.  So if he put a smaller

24   foley, then it's not unlikely that the bulb is smaller.

25   But the bulb is inside the--inside the bladder.  So it's a

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1    forty percent, but it's--we're talking two ccs, you know

2    what I'm saying?  It's--it's not that much difference.  But

3    it's just keeping the--the catheter from being pulled out

4    of the child.  That's just to hold it in place.  So I don't

5    know why they changed it to a twelve, but that's--my guess

6    would be because maybe they saw blood and they weren't sure

7    if the blood was from the--from the bladder or not.  I

8    don't know.

9        Q.   Do you attach any significance or find it in the

10   least bit odd that it's Dr. Tran who's noticing the

11   problems here with the abuse?

12       A.   No.  Dr. Tran is a PICU doctor.  Once that--  Their

13   whole thing is the entire patient.  Not only--and they--and

14   they are liable and they're mandated, and it is just

15   pounded into us that if there's any question, it has to be

16   reported, especially in pediatrics, especially.  So,

17   probably, unfortunately, they--I won't say they're experts

18   at it, but they see it more so than the average physician.

19       Q.   Okay.  Doctor, the testimony that you've given here

20   this afternoon, do you feel like that's supported by a

21   timeline?

22       A.   To a--  Supported by the timeline of the child's

23   life or the timeline--

24       Q.   Facts.  Facts within the initial--

25       A.   The ER visit?

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      Q.   --the initial ER visit until they pulled the plug on
2    the child.  Do you feel like your testimony is consistent
3    with the timeline of facts in that time period?
4      A.   Yes, sir.
5      Q.   Okay.  And would you agree with me that if you have
6    some of your facts wrong, that it would give its sway to
7    some of the opinion that you have?  In other words, there
8    would be something less than desired about the opinion,
9    it's not exactly accurately, if we're not dealing with the
10   same facts?
11     A.   If my facts were wrong?
12     Q.   Right.
13           MR. ROBISON:  Object to the form.
14     A.   I guess if anybody's facts were wrong, that my
15   opinion would be different.  Yes, sir.
16           MR. BANKS:  I think that's all we have, Doctor.
17           WITNESS:  Okay.
18           MR. BANKS:  You have the right to read this and
19                  sign it or you can waive that right, whichever
20                  you prefer.
21           WITNESS:  I'd like to read it, if that's okay.
22           MR. BANKS:  Sure.
23   (OFF RECORD)
24           MR. BANKS:  Doctor, what I'd like for you to do
25                  is would you make a copy--

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

```
 1              WITNESS:  Of any of these?
 2              MR. BANKS:  --of your notes here.
 3              WITNESS:  Absolutely.
 4              MR. BANKS:  And attach that to your deposition
 5              collectively as " White 5."
 6              WITNESS:  Absolutely, yes, sir.
 7              MR. BANKS:  And, then, Doctor, one more thing I
 8              need.
 9              WITNESS:  Yes, sir.
10              MR. BANKS:  In addition to your notes from--
11              WITNESS:  Well, I don't even know which one's
12              the first one.  I'm sorry.  If I'd have known,
13              I would've done it neater.  You can put it
14              right here, if you want.
15              MR. BANKS:  Okay.  Let's call that "White 5."
16              I'm sorry.  Thank you.
17              WITNESS:  So you want me to make copies of all
18              these?  Like, these are the ER visits, anything
19              that I wrote?
20              MR. HUTTON BANKS:  In globo?
21              MR. BANKS:  In globo.  Right.  Everything in
22              your file?
23              WITNESS:  Yes, sir.
24              MR. BANKS:  And the last thing what I need--
25              WITNESS:  Yes, sir.
```

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)

JACQUELYN WHITE
2/12/2020

1      **MR. BANKS:**  --is that initial opinion that you

2      wrote.

3      **WITNESS:**  Yes, sir.

4      **MR. BANKS:**  The very first one.  Let's do that

5      as--  Well, we can do it as in globo and, put

6      it in "5."  Just have one exhibit.

7      **WITNESS:**  Yes, sir.

8      **MR. BANKS:**  All right?

9      **WITNESS:**  Okay.

10     **MR. BANKS:**  And that's all I've got.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                   (DEPOSITION CONCULDED)

Janet McBride Court Reporting
1503 Goodwin Road, Suite 201, Ruston, LA 71270 (318-255-6300)