```
 1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF LOUISIANA
 2                      SHREVEPORT DIVISION

 3

 4   AKEEM HENDERSON and JENNIFER     :
     ALEXANDER, INDIVIDUALLY AND      :
 5   AS ADMINISTRATRIX OF THE         :     Civil Action
     SUCCESSION OF A.H.               :     No. 5:19-cv-00163
 6                                    :
     VS.                              :
 7                                    :
     WILLIS-KNIGHTON MEDICAL          :
 8   CENTER d/b/a WILLIS-KNIGHTON     :
     SOUTH HOSPITAL                   :
 9   .................................:................................

10

11

12

13

14               HEARING ON MOTIONS [26] AND [27]
                 OFFICIAL TRANSCRIPT OF PROCEEDINGS
15             BEFORE THE HONORABLE ELIZABETH E. FOOTE
                   UNITED STATES DISTRICT JUDGE
16                    SHREVEPORT, LOUISIANA
                         27 MAY 2020
17

18

19

20

21
     Reported by:  Barbara A. Simpson, RPR, CRR
22                 Federal Official Court Reporter
                   300 Fannin Street, Room 4209
23                 Shreveport, Louisiana  71101
                   Phone:  (318) 226-8003
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
25   PRODUCED BY COMPUTER.
```

```
 1                     A P P E A R A N C E S

 2   FOR THE PLAINTIFFS (VIA ZOOM TELECONFERENCE):

 3        MR. SEDRIC E. BANKS
          MR. S. HUTTON BANKS
 4        1038 North Ninth Street
          Monroe, Louisiana 71201
 5

 6   FOR THE DEFENDANT (VIA ZOOM TELECONFERENCE):

 7        MR. LAMAR P. PUGH
          MR. ROBERT G. PUGH, III
 8        Pugh, Pugh & Pugh, L.L.P.
          333 Texas Street, Suite 2100
 9        Shreveport, Louisiana  71101

10        MR. ROBERT W. ROBISON, JR.
          MS. SHELBY L. GIDDINGS
11        Watson, Blanche, Wilson & Posner, LLP
          505 North Boulevard
12        Baton Rouge, Louisiana  70821

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        27 MAY 2020

 2      (Court called to order, all participants present via Zoom)

 3            THE COURT:  All right.  It's 9:00 a.m.  Let's give

 4   everyone a minute to get situated.

 5         And we have someone calling in.  Ms. Keifer, do you know

 6   who that is?

 7            MR. PUGH:  Judge, this is Lamar Pugh.  We were trying

 8   to get an easier way, and it was not successful, trying to use

 9   a speakerphone in the middle of the room.  So we'll just have

10   to have one of us at a time.  Sorry.

11            THE COURT:  Okay.  That is -- all right.  So the

12   Court will therefore call the case of Civil Action 19-163.

13   This is Henderson versus Willis-Knighton Medical Center.

14         Would Counsel for the Plaintiff please make their

15   appearance on the record.

16            MR. HUTTON BANKS:  Yes, ma'am.  Hutton Banks for the

17   Plaintiffs.

18            MR. SEDRIC BANKS:  Sedric Banks for the Plaintiffs.

19            THE COURT:  Good morning, Mr. Banks.

20         And for the Defendants, who do we have?

21            MR. PUGH:  Judge, you have Lamar Pugh, as well as

22   Gahagan Pugh and Robert Robison.

23            THE COURT:  Mr. Robison, we can only see your ear.

24         There you are.

25         Very good.  All right.  And, Mr. Robison, I see, likewise,
```

1   that you have another box, and I presume that this is

2   Dr. White.  Is that correct?

3           MR. ROBISON:  Yes, Your Honor.  It's Dr. White.

4           THE COURT:  Very good.

5       And who is Ms. Giddings?

6           MR. ROBISON:  Ms. Giddings is another lawyer with our

7   firm, Your Honor.

8           MS. GIDDINGS:  Good morning, Judge.

9           THE COURT:  Good morning.

10      All right.  We are making a record of this matter.  We

11  have a court reporter who will be with us today.

12      We have two *Daubert* motions in this matter.  The first one

13  involved is the Plaintiff's motion to strike the Defendant's

14  expert witness.

15      The Court would begin by telling all of you-all that I

16  have read all of your briefs in detail and I have read those

17  exhibits which the Court admitted into evidence.  And you

18  should have received also the minutes from our meeting

19  yesterday that detailed those admissions and our discussion

20  yesterday.

21      The Court would start at the outset by saying that it is

22  the proponent of testimony who always has the burden to prove

23  that it is admissible.  However, when we get to a *Daubert*

24  hearing, what we find is that if we ask the proponent to prove

25  why that testimony meets the *Daubert* standard, they are at a

loss to know what are the attacks on the *Daubert* standard that are being made on that witness.  So the Court will definitely impose the burden of proof in this matter on the proponent of the testimony.

So in this case, when we take up the first motion, which is Document Number 26, the Plaintiff's motion, we know it is the Defendant, the proponent of Dr. White's testimony, who will have the burden of proof.  However, in order for the Defendant to be able to defend or address the issues that are raised in the motion, I will go ahead and allow the Plaintiffs to begin with their argument.

And I would say quickly:  Mr. Banks, to save you a little trouble, that the Court has summarized the arguments that you have made as follows -- and the Court invites contradiction and your elucidation on those issues.  First, that Dr. White is unqualified to testify as an expert in an EMTALA case.  The argument is made that Dr. White testifies that she is not an expert in EMTALA, that she did not review the policy pertaining to the 02 protocol, and that she could not articulate the underlying EMTALA principles set forth in the policies of either of the hospitals where she practices regarding administering oxygen.

They go on to note that she has malpractice claims against her.

Secondly, the argument of the Plaintiffs against Dr. White

1    is that her opinions are not based upon facts in the record.

2    They argue that Dr. White misinterprets the medical records

3    surrounding the second breathing treatment administered to the

4    child in question in this case when she arrives at the

5    conclusion that the child had a 99 pulse oximeter reading

6    before her discharge.  And that she did not review the autopsy

7    report or death certificate.

8         And lastly, they argue that Dr. White's theory that the

9    child was, quote, stable, closed quote, at discharge is not

10   reliable because in some of the tautology, she concludes

11   that because the Doctor -- this is according to the

12   Plaintiffs -- that because the treating physician said she was

13   stable, she must have been stable.

14        So with that said, then, Mr. Banks, the Court would allow

15   you to go forward with that argument and to address any issues

16   that you believe the Court has not fully appreciated.

17             MR. HUTTON BANKS:  Thank you, Judge.  Hutton Banks

18   for the Plaintiffs.

19        Good morning, Dr. White.

20        Dr. White, are you a licensed physician in this state?

21             THE COURT:  Oh, wait.  Do you want to call Dr. White,

22   then?  Is that what you're doing?

23             MR. HUTTON BANKS:  Yes, ma'am.

24             THE COURT:  Okay.  So then, what we need to do, then,

25   is swear Dr. White just as we would as if we were in a

1    courtroom.

2         So, Dr. White, Ms. Keifer is our clerk and she will go

3    ahead and swear you.  If you will raise your right hand.

4              (The witness was sworn by the Deputy Clerk)

5                        (Audio feedback)

6              MR. HUTTON BANKS:  I was going to give him a chance

7    to fix the feedback, Your Honor.

8              THE COURT:  Well, Mr. Lamar Pugh, we can't see you

9    any longer.

10        The problem is you-all have too many people in one room.

11   And, you know, you can silence the mics.  That might help.

12   Okay.

13        The Court would note for the record that we do not have

14   Mr. Lamar Pugh participating by video.  Does Mr. Lamar Pugh

15   wish -- oh, gentlemen.

16             MR. PUGH:  I don't need to participate by video.  I

17   can sit and watch.

18             THE COURT:  Okay.  So, Mr. Lamar Pugh, we understand

19   that he is not participating by video, and he has said he is in

20   the same room, if I understand it.

21        We have Mr. Gahagan Pugh, Mr. Robison, Dr. White, and

22   Mr. Lamar Pugh all in the same room.  Is that correct?

23             MR. PUGH:  Yes, Your Honor.

24             THE COURT:  And maybe Ms. Giddings as well?

25             MR. ROBISON:  No, Your Honor.  Ms. Giddings is in her

```
 1   office in Baton Rouge.

 2              THE REPORTER:  I'm sorry; who is speaking?

 3              THE COURT:  I believe that was Mr. Robison.

 4              THE REPORTER:  Thank you.

 5              THE COURT:  Now, Mr. Robison, we do not see you.

 6       We have Mr. Gahagan Pugh and Mr. Lamar Pugh in one box.

 7       And there is Mr. Robison.  Okay.

 8              MR. ROBISON:  I am back.

 9              THE COURT:  Ms. Keifer, did we successfully swear in

10   Dr. White?

11              THE CLERK:  Yes, ma'am.

12              THE COURT:  All right.  Let's proceed, then.

13       Dr. White, you are now under oath.  The Court understands

14   that you are being tendered by the Defendant as an expert in

15   the area of emergency medicine.

16       So, Mr. Banks, you may now proceed.

17              MR. HUTTON BANKS:  Thank you, Judge.

18                        CROSS-EXAMINATION

19   BY MR. HUTTON BANKS:

20   Q    Dr. White, are you a licensed physician in this state?

21   A    Yes.

22   Q    Do you have a specialty?

23   A    Yes, sir.

24   Q    And that is?

25   A    Emergency medicine.
```

1    Q      And where do you practice?

2    A      I practice in Ruston, Louisiana, and in West Monroe,

3    Louisiana.

4    Q      Very good.  Have you ever --

5           THE COURT:  Mr. Banks, the Court has read the

6    submissions, which included Dr. White's C.V.

7           MR. HUTTON BANKS:  Yes, ma'am.  Thank you.

8    BY MR. HUTTON BANKS:

9    Q      Have you ever worked in any Willis-Knighton emergency

10   department?

11   A      I have not.

12   Q      Have you ever applied to work with any physician group and

13   nursing department of any Willis-Knighton campus?

14   A      I have not.  I have worked for Schumacher, who I believe

15   now has the contract at the Willis-Knighton ERs, but I've never

16   had any affiliation with Willis-Knighton facilities as far as

17   working there.

18   Q      Thank you, Dr. White.

19   A      Uh-huh.

20   Q      Dr. White, in your practice as an emergency room

21   physician, do you find that O2 protocol is important in

22   emergency care?

23   A      There are O2 protocols for the hospitals, but for the --

24   and the providers follow their guideline -- they follow their

25   guidance of their residency programs and their training.  So I

1   follow the guidelines of my training in emergency medicine.

2   The O2 protocol that was given me to look at was from an

3   inpatient.  I've never seen the ER protocol there, so I'm not

4   sure which one you're referring to.

5   Q    Yes, ma'am.  Dr. White, we're definitely going to get into

6   that --

7   A    Okay.  Sure.

8   Q    Do you find O2 protocols important for your practice?

9   A    For my practice?  I don't have a -- I don't find O2

10  protocols.  My guidance is on my training in emergency medicine

11  as far as oxygen and when a patient needs it and when a patient

12  doesn't need it.

13  Q    Yes, ma'am.  And so for Dr. White, O2 protocols and

14  policies are not important, correct?

15  A    Policies are very important in emergency rooms and in

16  hospitals.  Policies are guidelines, and as well as guidelines

17  for my practice and for my training.  And so that is what I go

18  by with, when I'm evaluating a patient and treating a patient.

19  Q    You apply the oxygen protocols?

20  A    I do not apply the oxygen protocol, and I'm not sure which

21  one that you're talking about, because I've not seen the one

22  that you're talking.  The one that you showed me was one that

23  was for hospital inpatient side and it was a staffing protocol

24  for the staff.

25  Q    We're going to get there; just bear with me, ma'am.

1          But I'm asking:  Are the oxygen protocols important to you
2     in your practice?
3     A     There are protocols followed.  There are protocol -- an
4     oxygen protocol.  It's a hard question that I'm not sure if I'm
5     understanding because I don't -- we don't look at protocols --
6     I mean, I shouldn't say that.  An oxygen protocol.  In my
7     training, I learned when to use oxygen, the need of oxygen.
8     Oxygen is a medication given.  Every medicine, they have
9     guidelines.  Do I know a protocol as far I know the treatment
10    guideline for when to give a medication?  So is there a
11    protocol for every medication?  I'm not sure what you're
12    asking.
13    Q     Yes, ma'am.  I'll try to clear it up, Dr. White.
14          It's a simple yes or no.
15    A     Okay.
16    Q     And then you can explain however you want to explain.  But
17    are oxygen protocols important to you in your practice?
18          MR. ROBISON:  Your Honor, I object to that.  Dr.
19    White will need to be able to explain her answer, not answer
20    yes or no.
21          THE COURT:  He indicated that she could in fact
22    explain.
23          And I think we'll try to get you to answer this, Dr.
24    White.
25          And then, Mr. Banks, though, the Court appreciates your

1   point at this point in the conversation.

2        Dr. White, could you please answer the question?

3            THE WITNESS:  Okay.  Say the question again, sir, I'm

4   sorry.

5   BY MR. HUTTON BANKS:

6   Q    Sure, no problem, Dr. White.  In your practice, are oxygen

7   protocols important to you?

8   A    Yes.

9   Q    Thank you.  Why?

10           THE COURT:  Mr. Banks, I'm sorry to interrupt you.

11       It would be helpful to the Court if you would enunciate if

12   there were other points that, in other categories that you were

13   trying to address here other than the ones that the Court has

14   summarized.  That might assist the Court in being able to

15   follow the testimony that you're evoking.

16           MR. HUTTON BANKS:  Yes, ma'am.  I've kind of got an

17   outline laid out.  I think it will become very clear later.

18           THE COURT:  Okay.  Well, the Court does get the point

19   that you have made in your briefing with regard to the oxygen

20   protocol.

21           MR. HUTTON BANKS:  Thank you, Judge.

22   BY MR. HUTTON BANKS:

23   Q    Dr. White, why is it important to you?

24   A    Treatments of any medication are important to me.

25       Why is -- that's why it's important to me.  Oxygen is a

1   medication that patients may need, so it's important that I

2   know when a patient needs the medication.

3   Q    Yes, ma'am.

4        Do the hospitals in which you practice, do they have

5   oxygen protocols for treating respiratory distress?

6   A    Hospitals have protocols for inpatient as well as ER

7   protocols.

8   Q    Do you know the O2 protocols where you work?

9   A    I have seen them in the past; I have not seen anything

10  recently.

11  Q    You're not familiar with them, are you?

12  A    I am not.

13  Q    Dr. White, have you been sued for medical malpractice?

14  A    I have been sued, yes.

15  Q    And can you tell the Court how many times?

16  A    Twice.

17  Q    Okay.  The five other complaints that we were talking

18  about in your deposition --

19  A    Right.  Those were complaints filed against me, but I'm

20  not sure of the legal terms.  But I think two went into actual

21  lawsuits.

22  Q    Thank you very much, Doctor.

23  A    Yes, sir.

24  Q    And can you tell me when that was?

25  A    Yeah.  One was in Arkansas.  So it's been over 20 years.

1    And one was, I believe in 2013 to 2014, was Mr. Travis.  It has

2    been six or seven years ago.

3    Q    Yes, ma'am.  And any other complaints?

4    A    They have all been prior -- I believe the last one that

5    went into the lawsuit, that was the last one that's been filed

6    against me.

7    Q    Yes, ma'am.  And are any of those in Louisiana?

8    A    Yes, sir.

9    Q    Okay.  Can you remember some of the claims?

10   A    Can I remember some of the claims?  Yes.

11   Q    Could you tell us the claims?

12         MR. ROBISON:  Your Honor, we're going to have to

13   object to asking patient information and giving the names of

14   those complaints.  Those were not lawsuits, so it's not

15   necessarily public information.

16         MR. HUTTON BANKS:  I understand your objection.

17   BY MR. HUTTON BANKS:

18   Q    If you'd just leave the patient's name out and tell us

19   what they were complaining about.

20   A    Okay.  And the most recent one was six or seven years ago.

21   So these are even prior to that, so forgive me if I don't have

22   the -- one was a girl that, a young girl that had lower

23   abdominal pain and I consulted the surgeon and he took her

24   appendix out and it ended up not being appendicitis and they

25   filed a claim that I inappropriately consulted a surgeon.

1       The actual claim that was in Arkansas was a young lady

2   that had pneumonia and subsequently died a week and a half

3   later from strep-resistent pneumonia.

4       The one lawsuit here in Louisiana was a patient that I saw

5   as a trauma patient.  And we took care of him in Ruston.  And

6   he was initially admitted to our ICU, but while still in the ER

7   awaiting a bed, he worsened in our ER, so I transferred him to

8   LSU Trauma Center.  And the family stated that I failed to

9   transfer him in a timely manner.

10      One was a patient in Arkansas that had abdominal pain and

11  frank pain and I saw him once in several visits that he had

12  been there, and he died several months later of a bleeding

13  ulcer.

14      One was a lady here in Louisiana that had back pain

15  several weeks after having a child, and then several months

16  later was diagnosed with gallstone pancreatitis, and was

17  reported that I missed that on her ER visits.

18      That is all that I can think of off the top of my head.

19  Q    Thank you, Dr. White.

20  A    Sure.

21  Q    Have you testified in court in the expertise of emergency

22  medicine?

23  A    Yes, I have.

24  Q    And how often?

25  A    Testifying in court.  I've done several depositions and

```
 1   then I did one court down in Opelousas several years ago, I
 2   believe in 2016 or 2017, as an expert witness for a case.  I
 3   was on the medical review panel and so they had me come testify
 4   as to why we chose a particular complaint on a patient.  And so
 5   I was deposed as an expert witness for that.
 6   Q    Thank you, Dr. White.
 7   A    Uh-huh.
 8   Q    Is that all?
 9   A    There was two cases since -- well, they were depositions,
10   not actually in court.  The only one I actually went to court
11   was the one in Opelousas.
12   Q    Thank you.  So you just appeared in court as an expert one
13   time?
14   A    Yes, sir.
15   Q    And that involved malpractice?
16   A    Yes, sir.
17   Q    You've been qualified as an expert one time in
18   malpractice; is that correct?
19   A    Yes, sir.
20              THE COURT:  May I ask for a clarification, Dr. White?
21   Your qualification as an expert was -- I think Mr. Banks is
22   using a shorthand term of "malpractice."  Was it in emergency
23   room medicine?  What was you field in which you were tendered
24   as an expert?
25              THE WITNESS:  In emergency medicine, yes, ma'am.
```

1          THE COURT:  And that was one time?

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  Thank you.  And what court was that in,

4  Dr. White?

5          THE WITNESS:  I just know it was in Opelousas, and

6  I'm not sure what -- I'm not sure what court; I'm sorry.

7          THE COURT:  Okay.

8      Please continue.

9  BY MR. HUTTON BANKS:

10 Q    Dr. White, have you ever testified on behalf of a

11 Plaintiff?

12 A    Yes.

13 Q    In what case was that?

14 A    That was a couple of years before that, for a case out of

15 Florida that I reviewed for a nurse who did some cases.  She's

16 out of Jonesboro.  And I've reviewed a couple of cases for her.

17     And I think I did another case for her that was for a

18 Plaintiff.  She would just get me to review cases and look at

19 them and give her my opinion on them.

20         THE COURT:  Dr. White, I'm going to -- I didn't think

21 that's what you said in your deposition.  I thought in your

22 deposition you said you had only reviewed for the defense?  Is

23 that not correct?

24         THE WITNESS:  No, ma'am.  Not just for the defense,

25 no, ma'am.

```
1              THE COURT:  Okay.  Please continue.

2              MR. HUTTON BANKS:  Thank you, Judge.

3   BY MR. HUTTON BANKS:

4   Q    So you might have a conflict in the testimony about

5   whether we've testified for plaintiffs ever.  It might be.  Is

6   that right, Dr. White?

7   A    Say that again; I'm sorry.

8   Q    We might have some conflicting facts about whether you've

9   testified for a plaintiff ever; is that true?  It might

10  conflict with your prior testimony?

11  A    I've review -- I've testified one time, if that's what you

12  are asking, in court.

13  Q    Okay.  All right.  Dr. White, are you a scientist?

14  A    No, sir.  Did I study science?  Yes, sir.  Do I consider

15  myself a scientist?  I consider myself a physician.

16  Q    I understand.  That was -- I was going to work up to that.

17  But you do not consider yourself a scientist?

18  A    No, sir.

19  Q    Thank you.

20  A    Yes, sir.

21  Q    Dr. White, in rendering your opinion as a physician, do

22  you rely on subjective opinion or objective facts?

23  A    Objective facts.

24  Q    Thank you.

25       Dr. White, what were you asked to do in this matter?
```

```
 1   A     I was asked to review a case.

 2   Q     That's all they asked you to do?

 3   A     Yes, sir.

 4   Q     Were you asked to opine as to whether A.H. would have more

 5   likely than not have survived had she been admitted on her

 6   first visit to Willis-Knighton on February 10, 2018?

 7   A     I believe I was asked that in the deposition, but I was

 8   not asked that initially when I was asked to review the chart.

 9         It was first presented to me as:  Was this -- to review to

10   see if it was an EMTALA violation.

11   Q     Okay.

12         MR. HUTTON BANKS:  I'd like to, Your Honor, I'd like

13   introduce as Plaintiff 1 Dr. White's expert report, Daubert 1.

14   Any objection?

15         THE COURT:  All right.  Let's see.  That report, the

16   Court has previously admitted, I think, Mr. Banks, yesterday.

17         MR. HUTTON BANKS:  Yes, ma'am.

18         THE COURT:  If that is the report dated January 24th

19   of 2020, which the Court received Document 26-8.  Is that

20   correct, Mr. Banks?

21         MR. HUTTON BANKS:  Right.

22         THE COURT:  So that's previously been admitted.  The

23   Court has it in front of it.

24         MR. HUTTON BANKS:  Thank you, Your Honor.

25   BY MR. HUTTON BANKS:
```

```
 1    Q    Dr. White, what did you rely upon to prepare your report?

 2    A    I reviewed the patient's ER visits.  And I also looked at,

 3    I looked at the Willis-Knighton ER record.  I also looked at

 4    when the patient came back to the Willis-Knighton Bossier ER

 5    record.  And then a complaint filed by the Plaintiffs.

 6         And then upon asking, I looked at some Willis-Knighton

 7    records, her other ER visits.

 8    Q    Okay.  Dr. White, why did you think the Bossier ER records

 9    were important to this case?

10    A    Well, I didn't ask for those; those were given to me.  Why

11    are those important?  That was her other -- I believe that was

12    this last visit when the patient came in, coding.  Is that

13    right?

14    Q    Dr. White, you did not ask for the Bossier ER records?

15    A    It was on, it was on here.  The one that I asked for in

16    addition.  Yes, I was given that record.

17    Q    You didn't ask for it?

18         MR. ROBISON:  I'm just going to object to the

19    relevancy of that question.

20    A    I received it.  I don't remember if I asked for it or not,

21    but I believe it was given to me initially with the

22    Willis-Knighton South record.

23    Q    Thank you, Dr. White.

24    A    -- review it.

25    Q    Dr. White, you said you reviewed a copy of the complete
```

```
 1   Willis-Knighton South record?
 2   A    Yes, sir.
 3   Q    And I believe you just mentioned all of her prior ER
 4   visits?
 5   A    Yes, sir.
 6   Q    And why is that important to you in this case?
 7   A    The reason I wanted to look at those is that if somehow --
 8   it was noted on the Plaintiff's complaint that the ER should
 9   have known the patient or knew the patient from previous
10   visits, so I was trying to get a picture of why they should
11   have known that patient and if they would have known from the
12   previous visits.  I just wanted to look at the previous visits.
13   Q    Right; yes, ma'am.
14        Dr. White, is that appropriate to look at the prior
15   visits?
16   A    Absolutely.
17   Q    Thank you.
18        Dr. White, did you review any records or documents from
19   any EMS or ambulance runs?
20   A    I did ask for the ambulance run for a visit and I don't
21   believe I ever saw it.
22   Q    Dr. White, why would you want to look at the EMS run
23   sheets?
24   A    To gather information, to try to paint a complete picture
25   and see what happened.  Sometimes they will give a picture of
```

1   how the patient presented, what was going on, and better

2   history than once the patient got to the ER.  The EMS staff

3   sometime have a more accurate story sometimes, or have

4   something to add to it.  I was trying to get as complete a

5   picture as possible.

6   Q    Dr. White, do you know why you received documents you

7   didn't ask for and did not receive documents you did ask for?

8   A    I don't know why.

9        MR. HUTTON BANKS:  So if I understand, Your Honor,

10  Your Honor has already admitted the deposition into evidence.

11  Is that correct?

12       THE COURT:  The excerpts from the deposition that the

13  Court was provided with; that is correct.

14       MR. HUTTON BANKS:  Yes, ma'am.  I'd like to go ahead

15  and offer the entire deposition of Dr. White in the record.

16       THE COURT:  All right; do I have that?

17       MR. HUTTON BANKS:  That would be Exhibit 2, *Daubert*

18  2.

19       THE COURT:  The question, sir, is:  Does the Court

20  have that entire deposition in my hands?  Did you send that?

21       It is not attached to the filings in the record.  And then

22  you provided me last Friday with certain documents that the

23  Court has downloaded.  And I have those.  I'm going to -- did

24  that include the entire deposition?

25       MR. HUTTON BANKS:  Yes, ma'am.  The ones that I

1    provided you a hard copy and digital copy, *Daubert* 2 would be

2    the entire deposition.

3              THE COURT:  And which number was that on the

4    attachments that you sent in?

5              MR. HUTTON BANKS:  That would be *Daubert* 2.  Number

6    2, Your Honor.

7              THE COURT:  Ah, very good.  All right.  Thank you

8    very much.

9              MR. HUTTON BANKS:  No problem.  Are there any

10   objections?

11             MR. ROBISON:  No objection, Your Honor.

12             THE COURT:  It is admitted.

13             MR. HUTTON BANKS:  Thank you.

14   BY MR. HUTTON BANKS:

15   Q    Dr. White, did you tell us in your deposition that you

16   were not qualified as an EMTALA expert?

17   A    Actually, I was not -- I don't know the definition of an

18   "EMTALA expert."  It's not a medical -- it's not a medical

19   qualification.  It's not medical personnel that are EMTALA

20   experts that I know of.

21        So, no, I am very familiar with EMTALA.  We do EMTALA

22   every day, with any transfer patient, with any patient that we

23   see, to do a medical screening exam.  So any emergency room

24   medicine physician is very versed in EMTALA and is very

25   knowledgeable of EMTALA.  EMTALA is what -- every day.

1          THE COURT:  Okay.  Mr. Banks, if I could interrupt

2     you one minute --

3          MR. HUTTON BANKS:  Yes, ma'am.

4          THE COURT:  -- and ask Dr. White a couple of

5     questions that the Court had about that.

6       Dr. White, you were asked to review this to determine if

7     there was an EMTALA violation.  Is that correct?  Is that what

8     you told us earlier?

9          THE WITNESS:  Yes, ma'am.

10         THE COURT:  And how would you know there was an

11    EMTALA violation?  What would you look at in order to determine

12    that standard of EMTALA?

13         THE WITNESS:  Yes, ma'am.  EMTALA, in the medical

14    field when seeing patients, EMTALA means that we're going to

15    evaluate each patient.  Each patient is allowed an evaluation

16    to see if they have an emergency medical condition.

17      So did the patient receive an evaluation and was an

18    emergency medical condition found?  Yes, on both those.  When

19    the --

20         THE COURT:  Excuse me.  So, in this case, it's your

21    opinion that there was an emergency medical condition?

22         THE WITNESS:  Yes, ma'am.  Yes, ma'am.

23         THE COURT:  Now, my question is:  How do you know

24    what that protocol is, what that standard of care is, that is

25    imposed upon emergency room doctors under EMTALA?  How do you

1   know that?

2          THE WITNESS:  It's based on the standard of care of

3   whatever the patient presents with.  So whatever finding the

4   patient presents with is that complaint that they have:  Do

5   they have an emergency medical condition at that time?

6          THE COURT:  My question is -- I know that you later

7   opined that she was treated within the standard of care.  And

8   that's where the Court has a difficulty.  The attorneys for

9   Willis-Knighton, in other filings, make a distinction between a

10  negligent standard of care and an EMTALA standard of care.  Do

11  you make that distinction, Dr. White?

12         THE WITNESS:  No, ma'am.  A distinction as the

13  patient -- well, the distinction is whether the patient was

14  stable at discharge or stable at transfer.

15         THE COURT:  Before I let you go on to that issue, the

16  question is:  I thought you testified that EMTALA only applied

17  to transfers and did not apply to discharge.  Is that your

18  testimony?

19         THE WITNESS:  That is how it's interpreted by me and

20  by most physicians.  A transfer is considered to another

21  facility.  A discharge is when a patient is discharged to home.

22         THE COURT:  So you do not believe that EMTALA applied

23  to this patient because she was discharged?  Is that what

24  you're saying?

25         THE WITNESS:  I do not believe EMTALA was applied to

1   this patient, no, ma'am -- I do not believe it applied to this

2   patient because she was discharged home, yes, ma'am, that's

3   correct.

4       From the discharge point, every patient that comes into

5   ER, EMTALA has three points.  Every patient is entitled to an

6   evaluation, and then if they're deemed an emergency medical

7   condition, they are stabilized.  And then if they need

8   transfer, they're transferred to a higher level of care if

9   needed and they're stabilized as much as possible prior to

10  transfer.

11          THE COURT:  But it would not apply because she was

12  not transferred, she was discharged.  You're saying that there

13  can be no EMTALA violation in this case because that does not

14  apply to a patient who was discharged and not transferred to

15  another place?  Is that what you're saying?

16          THE WITNESS:  Right.  The patient was seen,

17  evaluated, treated appropriately, and discharged.  And because

18  of the discharge part, EMTALA does not apply.  No, ma'am, I do

19  not believe it does.

20          THE COURT:  All right.  How, then, do you know these

21  three points that you make of EMTALA:  That the patient was

22  seen, appropriately evaluated, and stabilized prior to

23  transfer?

24      How do you know that?  That's what I'm trying to get at.

25  Who tells you that?  Is that part of the hospital ER protocol?

1   Is that a policy that the hospital has in place?  Or is that

2   just something you're taught in med school, as you talked about

3   before?

4           THE WITNESS:  That's what we're taught in our

5   training, yes, ma'am.

6           THE COURT:  So in your training, you're taught about

7   what EMTALA means?

8           THE WITNESS:  Yes, ma'am.  Yes, ma'am.

9           THE COURT:  And what the requirements are of EMTALA

10  for an emergency room physician?

11          THE WITNESS:  Yes, ma'am.  At both of the facilities

12  where I work, we have to do yearly updates on continuing

13  education on EMTALA because it is so important and it is

14  utilized so often, that are, we are having, we have to do

15  studies yearly, if not more than that, to know the rules of

16  EMTALA.

17          THE COURT:  Thank you.

18      Please continue, Mr. Banks.

19          MR. HUTTON BANKS:  Your Honor, she does not

20  understand EMTALA.  I'm going to continue, but I just wanted to

21  point that out.

22          MR. ROBISON:  Your Honor, I object.  That is -- I

23  don't what kind of question that is --

24          THE COURT:  Mr. Robison, the Court -- you're

25  mumbling, Mr. Robison.

```
 1                    MR. ROBISON:  I object; that was not a question.

 2                    MR. HUTTON BANKS:  That was argument.

 3                    THE COURT:  It was definitely argument --

 4                    MR. HUTTON BANKS:  Yes, ma'am.

 5                    THE COURT:  But we are not -- and perhaps gratuitous

 6      at this point.

 7           But let's go, Mr. Banks.

 8                    MR. HUTTON BANKS:  Sorry.

 9      BY MR. HUTTON BANKS:

10      Q    Dr. White, did you tell us in your deposition that you

11      were not qualified as an EMTALA expert?

12      A    Yes, sir.

13      Q    Thank you.  Have you ever reviewed an EMTALA claim before

14      this case?

15      A    Yes, sir -- it was not a claim, but I have reviewed many

16      cases where EMTALA plays a part.

17      Q    And which EMTALA case did you review?

18      A    I was the medical director for Air Evac for five years?

19      Air Evac is a helicopter service, transport of critical care

20      patients.  And I was the medical director for Louisiana, as

21      well as, as you will see on my CV, for the OB -- I believe I

22      wrote that on there -- for OB transfers.  I reviewed every OB

23      patient that was transferred by helicopter for Air Evac for

24      several years.  And those -- that's where EMTALA came from, was

25      an OB patient.
```

1      That's one of the reasons it was written, when they were

2  transferred prior to stabilization.

3      So I reviewed every chart.  I talked to the staff and the

4  paramedics and the nurses that would take these patients, and

5  so we were very knowledgeable of EMTALA and made sure that

6  patient was stable and able to be transferred before they got

7  in the helicopter with an unborn child.

8              MR. HUTTON BANKS:  Thank you, Dr. White.

9              THE COURT:  Dr. White, I'm going to go back again.

10             THE WITNESS:  Yes, ma'am.

11             THE COURT:  When you said in your deposition that the

12  care met the standard of care, you were referring to the EMTALA

13  standard of care?  Is that right?

14             THE WITNESS:  No, ma'am.  I was referring to the

15  standard of care in treating a patient with asthma.

16             THE COURT:  Okay --

17             THE WITNESS:  -- patient with asthma.

18             THE COURT:  So it was more of a what constitutes

19  medical -- you know, what is the standard of care in that

20  medical community that would in fact not be negligent?  Is that

21  what you were testifying about?

22             THE WITNESS:  Yes, ma'am.  And stabilizing the

23  patient.

24             THE COURT:  But in your opinion, we shouldn't even be

25  evaluating this patient under EMTALA, because she was not

```
 1   transferred to a another facility.  Is that your opinion?

 2              THE WITNESS:  Yes, ma'am.

 3              THE COURT:  Okay.

 4        Mr. Banks?

 5   BY MR. HUTTON BANKS:

 6   Q    Dr. White, could you tell me the case that you were

 7   talking about, the specific case, when you reviewed an EMTALA

 8   claim?

 9   A    I was talking about all my OB cases that I looked at every

10   time when I would review those cases, both in realtime and in

11   hindsight after the cases.

12   Q    Yes, ma'am.

13   A    There were hundreds of OB cases.

14   Q    Thank you.  Thank you, Dr. White.  And I'm asking for one

15   case, just one, where you reviewed an EMTALA claim?

16   A    I don't have just one to tell you, no, sir.

17   Q    Can you name just one?

18   A    No, sir.

19   Q    Thank you.

20   A    Uh-huh.

21   Q    Dr. White, have you ever offered any opinion in any matter

22   involving any EMTALA issue?

23   A    Besides the several hundred OB cases, as far as reviewing

24   a case for someone?

25   Q    Dr. White, I'm asking:  Have you ever offered any opinion
```

```
 1   in any matter involving any EMTALA issue?

 2   A     Yes, sir.  Well, I can tell you that when I was the

 3   medical director and the assistant medical director in Ruston,

 4   I looked at all transfers.  And we would -- I would review them

 5   for:  Were they appropriate transfer?  Did we have the facility

 6   that we could have taken care of it?  Did it got to the

 7   appropriate facility for what it needed to be taken care?

 8         And I had a couple of cases from LSU that they would ask,

 9   over the years, as far as:  Did we have this service and why

10   were we sending it there?  So I've reviewed lots of cases as

11   far as were they appropriately treated and was EMTALA violated

12   at all.

13   Q     I appreciate your answer, Dr. White.

14         The question is:  Have you ever offered any opinion in any

15   matter involving any EMTALA claim?

16   A     In a claim?

17   Q     Yeah.  Yes, ma'am.

18   A     Those were cases.  They may not have been claims, so no,

19   sir.

20   Q     Thank you.

21   A     Uh-huh.

22   Q     Dr. White, have you ever been accepted as an expert in

23   EMTALA?

24   A     No, sir.

25   Q     Thank you.
```

1   A    Uh-huh.

2   Q    It might be the same question, but at the risk of

3   repetition:  Dr. White, have you ever been accepted as an

4   expert in any EMTALA case?

5   A    No, sir.

6   Q    Thank you, Dr. White.

7   A    Uh-huh.

8   Q    Dr. White, prior to being retained by Willis-Knighton in

9   this case, did you know the definition of "EMTALA"?

10  A    Yes, sir.

11       MR. HUTTON BANKS:  Okay.  I would like to introduce

12  Dr. White's notes, *Daubert* 3.

13       THE COURT:  The Court has reviewed those.  Is there

14  any objection to those being admitted?

15       MR. ROBISON:  No objection, Your Honor.

16       THE COURT:  All right, Mr. Banks, would you please

17  enunciate for the Court the relevance of those notes.

18    And you might question her about those notes so the Court

19  is not just guessing at the relevance of those handwritten

20  notes.

21       MR. HUTTON BANKS:  Yes, ma'am.  Your Honor, the notes

22  are relevant in that they show Dr. White's evaluation,

23  impression, state of mind in rendering her expert report and

24  what beliefs and knowledge she was operating under at the time

25  she was making these notes.

1          THE COURT:  You're arguing admissibility in terms of

2     hearsay, et cetera.

3          What the Court is asking you directly is:  What is the

4     relevance?  No one is challenging the admissibility of these

5     under a hearsay objection.  And that's what you're addressing.

6     So the Court wants you to state relevance.  Why -- what

7     information should I glean from those notes?

8          MR. HUTTON BANKS:  Yes, ma'am.  Plaintiffs would

9     contend that Dr. White's notes are relevant to her *Daubert*

10    hearing, whether she has the expertise to opine in this case,

11    whether she's qualified as an EMTALA expert, and Plaintiffs

12    also offer it for impeachment.

13         THE COURT:  But specifically, tell me what's

14    important in there.  What page do you want me to look at?

15         MR. HUTTON BANKS:  Oh, yes, ma'am.  Yes, ma'am.

16    We'll go one at a time.

17    BY MR. HUTTON BANKS:

18    Q    Page 2, Dr. White.  Can you see page 2 of *Daubert* 3?

19    A    No, sir.  I don't have anything -- I don't know what

20    you're talking about.

21         MR. HUTTON BANKS:  Okay.  Is that something y'all can

22    remedy on y'all's end?

23         MR. ROBISON:  Are you asking to look at her notes?

24         THE WITNESS:  You want me to look at my notes that

25    you have?

1           MR. HUTTON BANKS:  Yes, ma'am.

2           THE COURT:  That's correct.

3           MR. HUTTON BANKS:  *Daubert* 3, page 2.

4           THE COURT:  And for Counsel for the Defendant's

5    information, this is the set of notes that was produced by Mr.

6    Banks on Friday to give you warning as to what he was going to

7    introduce today.

8           THE WITNESS:  I have my notes here.  I don't have

9    them numbered by page, but I do have them in front of me.

10          THE COURT:  Okay.

11   BY MR. HUTTON BANKS:

12   Q    Yes, ma'am.  And if you'd -- Dr. White, if you'd look -- I

13   think on my copy, the copy I sent as well, it's page 2.  It's

14   got Rob Robison at the top, is the first thing at the top.

15   A    Okay.  Yes, sir.

16   Q    And if you skip down, kind of just under the halfway

17   point, there's a parenthetical expression.  And it looks like

18   you're asking:  What's the rest of the definition?  Is that

19   correct?  Am I reading that correct?

20   A    Yes, sir.

21   Q    Okay.  So let me back up a little bit.

22        Prior to being retained by Willis-Knighton in this case,

23   did you know the definition of EMTALA?

24   A    I did know the meaning of EMTALA.  I was looking up to see

25   the wording of it, but I did know the meaning of EMTALA.  I was

1    writing it down from the paperwork and it ended with dot, dot,

2    dot.  So I wrote down on the paper in parentheses what's the

3    rest of the definition to remind me to look it up to read the

4    complete thing, yes, sir.

5    Q    And, Dr. White, did you know the rest of the definition?

6    A    I didn't know exactly what the wording was, no, sir.

7    Q    Okay.  Thank you.

8    A    You're welcome.

9          MR. HUTTON BANKS:  Are there any objections to

10    admitting Dr. White's notes?

11          MR. ROBISON:  Your Honor, I believe they're already

12    admitted.

13          MR. HUTTON BANKS:  Okay, sorry.  Thank you.  Just

14    trying to be careful.

15          THE COURT:  No.  No.  To be clear, only part of her

16    notes were admitted yesterday.  The Court notes that there is a

17    difference between the submission of Daubert Exhibit Number 3

18    by the Plaintiff versus the notes that were attached to the

19    deposition in the filing that the Court admitted yesterday.

20    And I, frankly, meant to go over that with you-all yesterday.

21    There are more pages in Daubert 3, but I don't see any reason

22    why we should not admit those, although the Plaintiff's Counsel

23    has only shown me the relevance of that one statement:  What is

24    the rest of the definition of EMTALA?

25         If there's anything else in those documents, Mr. Banks,

1   that you want the Court to focus on, you need to tell me to

2   focus on.  It's not my job to read those notes and guess what

3   your point is.

4          MR. HUTTON BANKS:  Yes, ma'am, I understand, Your

5   Honor, and I appreciate that.

6      Dr. White -- if that's your preferred tact, Your Honor, we

7   can do that.  I've kind of got a flow here of topics I kind of

8   wanted to address in a certain order, but per your instruction,

9   Your Honor.

10  Q   Dr. White, if you could, if you'd turn to the

11  second-to-last page of Daubert 3?

12  A   What does it start at the top of the page?  I'm sorry.  I

13  don't have mine numbered.

14  Q   Sure.  It says*:  "Henderson versus Willis-Knighton South*

15  *ER visit due 1/25/20."*

16  A   Okay.  Yes, sir, I have it.

17  Q   Can you go about the halfway point and read the

18  parenthetical expression into the record?

19  A   I am not sure what -- what would you like me to read?

20  Q   The parenthetical expression midway down the page.

21  A   "Need definition of EMTALA."

22  Q   And that would not be the rest of the definition; that

23  would be the definition, wouldn't it, Dr. White?

24  A   Yes, sir.  I was trying to find in the definition how it

25  correlated with this case, why you felt it was EMTALA

1    violation.  I was trying to look at the actual wording of the

2    definition.

3    Q    Thank you, Dr. White.

4    A    You're welcome.

5    Q    I think we've been over your understanding of EMTALA, Dr.

6    White.  Is there something you'd like to add to that?

7    A    Add to the definition?

8    Q    Or your understanding of EMTALA.

9    A    No, sir.

10   Q    Okay.  Dr. White, do you understand the purpose of EMTALA?

11   What is your understanding of the purpose of EMTALA?

12   A    The purpose of EMTALA.  EMTALA was written so that

13   everyone had a right to a medical screening exam; and if an

14   emergency medical condition existed, they had the right to be

15   stabilized and treated, regardless of their ability to pay.  It

16   was initially called "the anti-dumping law" because of that.

17   Q    And can you identify any EMTALA principles you feel are at

18   issue in this case?

19   A    I cannot, no, sir.

20   Q    Thank you.

21        Are you familiar with the EMTALA requirement regarding

22   stabilization of patients in the emergency department?

23   A    Yes, sir.

24   Q    And what's your understanding of that?

25   A    That if a patient is deemed to have an emergency medical

1    condition, that they need to be stabilized and treated

2    appropriately.

3    Q    Dr. White, do you understand that EMTALA defines what it

4    means by "stabilization"?

5    A    Yes, sir.

6    Q    And what's your understanding of that definition?

7    A    Well, it says "to stabilize" means to provide medical

8    treatment of the condition as may be necessary to assure within

9    reasonable medical probability that no material deterioration

10   is likely to result.

11   Q    Okay.  And whether a patient has been stabilized per

12   EMTALA, does the nurse make that call or a physician?

13   A    The provider does.  In some places, it's not a physician.

14   In some places, it's mid level; it's the hospital policy.  But

15   most of the times in emergency room, it's the physician, yes,

16   sir.

17   Q    And you mentioned a policy?

18   A    Yes, sir.

19   Q    Is it your position that a patient can be determined to be

20   medically stabilized without being examined by a physician?

21   A    The physician can't determine if they are medical stable

22   without evaluating them.

23   Q    What is your understanding, Dr. White, of how the hospital

24   decision to admit the patient or discharge the patient affects

25   EMTALA stabilization requirement?

```
 1   A     It's not the hospital's -- you said the hospital's
 2   decision to admit or discharge.  It's the provider's medical
 3   decision.
 4   Q     Okay.  Well, how does that affect the -- how does the
 5   decision to admit or discharge affect EMTALA stabilization
 6   requirement?
 7   A     A physician is going to discharge a patient if they feel
 8   the patient is stabilized.  If a physician feels the patient
 9   isn't stable, they're going to admit them.  There's no reason
10   for the physician to take on the medical risk of discharging a
11   patient.
12         In EMTALA, once again, if they need to be transferred,
13   they'll be transferred.  If they need to be admitted,
14   regardless of ability to pay, they'll be admitted.  EMTALA is
15   to ensure that the patient is treated, regardless of ability to
16   pay, whether they're treated there or whether they need to be
17   transferred to a higher level of care.
18   Q     Thank you, Dr. White.
19   A     Yes, sir.
20   Q     Dr. White, is it fair to say that EMTALA is designed --
21   excuse me, to prevent disparate treatment?
22   A     You have to define "disparate."
23   Q     Treating one patient in an emergency room differently than
24   another patient.
25   A     It's designed to ensure that each patient gets an
```

1  evaluation by a provider regardless of ability to pay.

2  Q    Do you know -- Dr. White, do you know if EMTALA is

3  designed to ensure that -- that it's designed to prevent

4  disparate treatment?

5  A    Its design was to prevent patients from not being

6  evaluated based on ability to pay.

7  Q    But do you know whether it's designed to prevent disparate

8  treatment --

9  A    No, I do not.  No, I do not.

10 Q    Okay.  If it did, can you, if EMTALA was designed to do

11 that, can you think of how a judge or a jury could determine if

12 an individual did receive disparate treatment?

13 A    I do not believe that's how EMTALA was designed.  I do not

14 believe that's the purpose of EMTALA.

15 Q    Okay.  And I am asking you hypothetically:  If it was, do

16 you know how a judge or a jury could determine if a patient did

17 receive disparate treatment --

18         MR. ROBISON:  Your Honor, I'm going to object to the

19 use of this word, term "disparate treatment."  I think we've

20 got some misunderstanding of what he's actually asking.

21         THE COURT:  The Court appreciates that we have a

22 disconnect here.  To the extent, Dr. White, that you can answer

23 that, if you could please answer it.

24         THE WITNESS:  Yes, ma'am.

25    Can you define again, or can you use another word besides

1  "disparate"?

2           THE COURT:  The "disparate" is a legal term.  The

3  "disparate treatment" is a legal term.

4           THE WITNESS:  I am not familiar with it at all; I am

5  sorry.

6           THE COURT:  We've got -- Ms. Keifer, would you allow

7  me to have a breakout room with just the attorneys.  And the

8  easiest way to do that might be, Dr. White, to allow you to

9  go -- is to put you in the waiting room.  It's a virtual room;

10 it's a waiting room.  And you will be in that room and then

11 we'll come ask you to come back into the room.  Now, you --

12          MR. ROBISON:  We could ask her to leave the room.

13          THE COURT:  Okay.

14          THE CLERK:  Are you ready, Judge, you ready for me to

15 put her in a room?

16          THE COURT:  No.  Because they're all sitting there

17 together, Ms. Keifer, it won't work.

18          THE CLERK:  Oh.

19          THE COURT:  So she's just going to literally,

20 literally walk out of the room.

21                 (The witness exited the room.)

22          MR. ROBISON:  Okay.  She's just out the door, Your

23 Honor.

24          THE COURT:  Okay.

25     Gentlemen, the Court is under the distinct impression that

1    EMTALA applies to discharge.

2         From the Defendants, may I hear you?

3         MR. ROBISON:  Yes, Your Honor.  I believe that

4    what -- we can clarify that with some of Dr. White's testimony.

5    But it does apply if there is a patient discharged in an

6    unstable condition.

7         THE COURT:  Correct.  So the whole issue here is

8    whether or not -- and she has admitted the first requirement of

9    EMTALA is met, and that is that that child presented with an

10   emergency condition.  But do we limit her testimony, then, only

11   to whether or not this child was stabilized prior to discharge?

12   I find -- you know, I came in here today with some questions

13   about her testimony, but with a whole different impression as

14   to the way the Court would go on this issue.

15        The Court is always reminded of the Fifth Circuit's

16   holding that being the gatekeeper does not mean that you decide

17   credibility.  It does not mean whether you decide who is the

18   better expert, and that those things like, for example, the

19   malpractice suits, that those in fact are great fodder for

20   cross-examination.  What she reviewed, what she didn't review,

21   all of that is great fodder for examination but not necessarily

22   sufficient to allow the Court to exclude the testimony.

23        But I have to tell you that -- I don't know where the

24   defendants are going to offer her, but for her to so completely

25   misunderstand whether or not EMTALA -- and I think the argument

1  is here is that the stabilization issue is one that is a

2  standard of care in emergency medicine, regardless of EMTALA,

3  is what I hear her saying.

4      But I find this extremely troubling that she has said

5  this.  And she says it in her depo, and that's why I thought,

6  well -- I asked her again.  And she says it in the notes.  So I

7  really, I really have a problem with that.

8      Okay.  Well, let's bring her back in.

9      Mr. Banks, if you have points to make, make them quickly.

10          MR. HUTTON BANKS:  I will do that, Your Honor.

11          THE COURT:  Okay.  And let's bring her back in.

12          MR. ROBISON:  We're coming back in, Your Honor.

13      Your Honor, I believe Dr. White has gone to the restroom.

14          THE COURT:  We'll wait.

15          MR. HUTTON BANKS:  Your Honor, I appreciate your

16  direction and instruction to make them quickly.  I mean, I've

17  got some -- you know, I don't want to pull any punches, Your

18  Honor.

19          THE COURT:  No.  The Court is not asking you to do

20  that.

21          MR. HUTTON BANKS:  Okay.

22              (The witness re-entered the room.)

23          MR. ROBISON:  Dr. White is back, Your Honor.

24          THE COURT:  Very good.

25      Dr. White, thank you for allowing us that sidebar.

1       We may continue, then, on the record with Dr. White

2    present.

3       Mr. Banks, you may continue in your cross-examination.

4          MR. HUTTON BANKS:   Thank you, Your Honor.

5    BY MR. HUTTON BANKS:

6    Q    How could a hospital policy or protocol help the Court or

7    the jury determine if a patient received disparate treatment?

8    A    Please define for me "disparate" one more time; I'm sorry.

9    Q    Like different, not the same.

10   A    Like not the same with each patient?

11   Q    Right?

12   A    That had the same condition?

13   Q    Well, that were treated differently.

14   A    Most patients in the ER are treated differently because

15   they have such different complaints.

16   Q    Yes, ma'am.  I mean:  In reference to EMTALA, how could a

17   policy help determine that?

18   A    It sets guidelines.

19   Q    Can you think of any policies or protocols we could look

20   at in this case to determine if A.H. received disparate

21   treatment?

22   A    No, ma'am -- no, sir.

23   Q    Okay.  Dr. White, are you comfortable answering policy

24   questions, protocol questions?

25   A    For Willis-Knighton ER?  For this hospital?  No, I am not.

1    I have not seen any of their policies.  I do not feel

2    comfortable answering questions about them.  I haven't seen

3    them.

4    Q    Dr. White, I notice that in your notes, and as you've

5    mentioned today, and also in your report, that you reviewed

6    A.H.'s prior emergency visits to Willis-Knighton.  You said --

7    I believe you testified earlier today that they are important.

8    Is that correct?

9    A    Yes, sir.

10   Q    And could you tell us why it's important to review her

11   prior ER visits and admissions, as an EMTALA expert in this

12   case?

13   A    Well, as you said in the papers that they felt they should

14   have been -- the ER staff should have been familiar with the

15   patient, and if the patient presented there before or had an

16   illness where she presented commonly, then I wanted to look at

17   her past ER past visits.  If she had past ER visits, how

18   frequent were they or how recent were they.  Was she just there

19   a couple of days ago if they said they should remember her.

20        Also looking at the staff.  Even though a patient's been

21   there several times, it's different nursing staff, different

22   providers, different respiratory therapists.  It's a whole lot

23   of different staff there to remember patients.

24   Q    Yes, ma'am.  I really appreciate your answer.  Thank you.

25        And, Dr. White, if she was treated differently in prior

1    visits, could that be evidence of disparate treatment?

2    A     No, sir, I don't --

3    Q     Why not?

4    A     If she was treated differently?  She was treated for

5    whatever complaint that she came in for, whether it was for ear

6    infection, rash, breathing problems, fever.

7    Q     Okay.  And if she came in for a breathing problem in the

8    past to the emergency room, if she was treated differently than

9    when she came in with a breathing problem on February 10th, why

10   couldn't you extrapolate disparate treatment between the two

11   visits?

12   A     I really don't like using the word "disparate" because

13   I've never used that in the 25 years I've practiced medicine.

14   But asthma, there's different stages and different severity and

15   different medications that can be used.  And one time she may

16   have gotten one treatment, and one time she may have gotten

17   three treatments.  One time she may have gotten a certain

18   medicine; one time she may have gotten a chest x-ray and didn't

19   get a chest x-ray.

20        I don't think those are bad or wrong; I think it was the

21   judgment of the provider and maybe how sick she was.  She may

22   have been seen and then one visit she had just been seen prior

23   a day or two and had already had a chest x-ray.  And one visit

24   she had been on an antibiotic before.  So, one visit she had

25   had blood work done the day before, so maybe the next time she

1    didn't have the blood work.  But I don't think it was wrong

2    treatment if some of it varied in the treatment that was

3    provided to her.

4    Q    Thank you, Dr. White.

5         The oxygen protocol we talked earlier, and I think you've

6    mentioned it several times; you did not review it in connection

7    with this case, correct?

8    A    Right, yes, sir.

9    Q    Okay.  And you, I believe, testified earlier that the

10   oxygen protocol was not important to your opinion in this case;

11   correct?

12   A    Yes, sir.

13   Q    Okay.  Dr. White, if you misunderstand facts, certain

14   facts, material facts, would it negatively impact your opinion?

15   A    It can, yes, sir.

16   Q    In your opinion, does the Willis-Knighton oxygen protocol,

17   White 1 in your deposition, would it apply to A.H. on her

18   February 10th visit?

19   A    The only protocol that I saw was an inpatient protocol,

20   not an ER protocol, so it would not pertain to that visit, no,

21   sir.

22         MR. HUTTON BANKS:  Okay.  This is a good place.  I'd

23   like to call your attention and the Court's attention to

24   Daubert 5, Willis-Knighton's discovery responses with the

25   oxygen protocol.

1          MR. ROBISON:  Your Honor, I'm not sure what relevance

2     that has to Dr. White's ability to testify as an expert.

3          THE COURT:  Well, let's see what the point is going

4     to be.

5          MR. HUTTON BANKS:  Thank you, Judge.

6     BY MR. HUTTON BANKS:

7     Q    Do you have that document, Dr. White?

8     A    No, sir, I do not.

9          MR. HUTTON BANKS:  Okay.  Can we get that?

10         THE COURT:  All right.  So the Court has a question.

11         MR. HUTTON BANKS:  Yes, ma'am.

12         THE COURT:  And that is:  Please see attached, number

13    1, oxygen protocol which would apply to inpatients in the

14    hospital; and, 2, emergency department standing orders.

15         MR. HUTTON BANKS:  Yes, ma'am.

16         THE COURT:  And then it references the oxygen

17    protocol in 1-A.

18     Do I have the emergency department's standing order?

19         MR. HUTTON BANKS:  No, ma'am.  I did not provide

20    that.  I just wanted to talk about the oxygen protocols.

21         THE COURT:  Okay.  May I ask Defense Counsel:  It

22    seems to be a reasonable interpretation in reading the response

23    to the request for production that the oxygen protocol, which

24    is 1-A, is applicable to this situation, despite the fact that

25    we've heard this testimony that it's only applicable to

1     inpatients.  Can you address that with the Court?

2              MR. ROBISON:  Your Honor, Mr. Pugh wants to address

3     that, if that's appropriate.

4              MR. PUGH:  Your Honor, rather than re-ignite my

5     machine until it's my part, I believe that the differentiation

6     in this is an inpatient is it would be a patient that has been

7     admitted to the hospital to a floor bed and would not be

8     anything to do with the ER.  So that's what would happen when

9     somebody, for example, as a different nurse is coming by every

10    shift, respiratory therapist would have standing orders what

11    they come to do, that's what they asked for, our protocol.

12             THE COURT:  But is your answer not misleading?

13       All right.  The Court understands that what you're saying

14    that I have in front of me only applies to inpatient.

15             MR. PUGH:  What I believe happened, Your Honor, is

16    that -- and this came up in the deposition -- is that Mr. Banks

17    pulled a policy from another case he had at Willis-Knighton

18    regarding an inpatient and then he starts questioning

19    witnesses, now that did that -- why doesn't this apply.  This

20    applies to it in this case.  It's not a policy produced in this

21    litigation because it would not have applied in the emergency

22    room.

23             THE COURT:  Okay.  So what was produced?

24             MR. PUGH:  I'll have to look at that part --

25             THE COURT:  What is 1-A?

1          MR. PUGH:  I've got to find what 1-A is, Judge.  We

2     did not -- I don't have those documents in front of me.  I

3     didn't see that attached --

4          THE COURT:  Okay.  Then when you certainly when you

5     go on --

6          MR. PUGH:  They asked for different protocols in a

7     discovery response -- and Mr. Gahagan has gone to get those

8     responses.  When they asked for a O2 protocol --

9          THE COURT:  You gave them inpatient one?

10         MR. PUGH:  It's the inpatient.  And it only applies

11    if a person is admitted to the hospital.

12         THE COURT:  I understand the difference between

13    inpatient and emergency room physician, sir.

14       But my question to you-all is:  If he clearly asked for

15    it, and one interpretation would be that you, either you don't

16    have an emergency room procedure or these responses are

17    misleading.

18         MR. PUGH:  I am going to look through the responses,

19    Your Honor.  It's going to take me a minute.  I remember them

20    asking the protocol, so I asked for the current inpatient

21    protocol and sent that.  That is not saying that it applied to

22    the ER.  So I will go to the responses, to the discovery --

23         THE COURT:  Number 1.

24         MR. PUGH:  Now I'm looking at the actual responses.

25    The one I have, Your Honor, 1-A --

 1              MR. SEDRIC BANKS:  Your Honor, this is Sedric

 2    Banks --

 3              MR. HUTTON BANKS:  Hang on, Dad; hang on.

 4              MR. PUGH:  Emergency department standing order, O2

 5    protocol, the first page is inpatient.

 6              THE COURT:  And is that the same thing as he was

 7    questioning the witness with, that you say he --

 8              MR. PUGH:  I don't believe, from my memory, it was

 9    not, Your Honor.  Again, they pulled an older policy from

10    another case --

11              THE COURT:  Okay.  But the thing he asked you, he

12    asked you that -- he wants to know which policy was in effect

13    at the time of her discharge, which refers to the following

14    subject matters:  Clinical signs of hypoxia in a pediatric

15    patient and the reassessment of that patient prior to

16    discharge.

17        And you say:  Please see oxygen protocol attached to the

18    request for production 1-A.  And that's the inpatient one you

19    gave him.  So that's not applicable to A.H. -- what I'm saying,

20    Mr. Pugh, is that if I had gotten that, I would say, oh, yeah

21    yeah, yeah, they gave it to me because I asked for what applied

22    to A.H.  And now you're saying, oh, that's not applicable

23    because it's the inpatient one.

24              MR. PUGH:  I need to read it, Your Honor.  But if I

25    was misleading, it would not apply.  1-A would not apply to any

1    patient in the ER, including A.H.

2        I thought they were asking for -- and again, I have not

3    looked at these interrogatories in a long time.

4            THE COURT:  Perhaps you could supplement your

5    response to be more responsive?

6                   (Counsel for Defendants confer)

7            MR. PUGH:  All right.  The policy wouldn't have been

8    in effect -- I remember this now.  The policy wouldn't have

9    been in effect on the inpatient side at the time of this

10   discharge.  So I went back and pulled the O2 protocol for the

11   time in which that child was in the hospital.

12           THE COURT:  You were not dealing with inpatient, as

13   you have pointed out.

14           MR. PUGH:  But --

15           THE COURT:  The Court is going to require

16   Willis-Knighton to supplement their response to this, to

17   produce the policy procedural training materials or protocol

18   which was in effect at the time of her discharge and was

19   applicable to the emergency room for: (A), the administration

20   of oxygen; and, (B), the clinical signs of hypoxemia in a

21   pediatric patient and the reassessment of that patient prior to

22   discharge.  Because he's asking about A.H. and you give the

23   inpatient one that was in effect.

24           MR. PUGH:  And I will clarify that because it was

25   not --

1          THE COURT:  So the Court would give you 10 days from

2    today's date to produce that, those documents, if there are

3    any --

4          MR. PUGH:  I can clarify the response, Your Honor, to

5    make sure that it's not, nobody misunderstands.  There is no

6    protocol, O2 protocol in the ER that would be applicable to

7    A.H., period.

8          THE COURT:  There is no O2 protocol?

9          MR. PUGH:  No, ma'am.  Protocol would only apply on

10   inpatient side.  So the only thing we had that was even close

11   was this standing order, and that's why I produced it.  I

12   should have --

13         THE COURT:  What you need to do, sir, is clarify that

14   response within 10 days and make that admission on the record.

15         MR. PUGH:  Certainly.

16         THE COURT:  Okay.  You have 10 days.

17         MR. PUGH:  Yes, ma'am.

18         THE COURT:  Thank you.

19         MR. HUTTON BANKS:  Your Honor, may I continue?

20         THE COURT:  Yes.

21         MR. HUTTON BANKS:  Thank you.  We just heard that

22   there is no oxygen protocol for ER patients.  That's correct,

23   Mr. Pugh?

24         THE COURT:  That's what he said, and he's going to

25   clarify it for the record and you'll have it writing.

 1            MR. HUTTON BANKS:  Okay.  And we are on the record

 2    today, are we not?

 3            THE COURT:  We are on the record.

 4            MR. HUTTON BANKS:  Okay.  May I go to a shared

 5    screen?

 6            THE COURT:  Yes.

 7            MR. HUTTON BANKS:  Thank you.

 8            THE COURT:  Oh.  Ms. Keifer has to transfer the host

 9    rights back to you, Mr. Hutton.

10        So Ms. Keifer -- there you go.

11            MR. HUTTON BANKS:  Okay.  And the whole point of this

12    is not a discovery dispute yet -- that may come later -- but

13    that the expert's opinion is not based on fact.  That is a

14    reason we should exclude Dr. White's testimony, because it's

15    not based in fact.  It's a *Daubert* 702 requirement.

16                        (Document displayed)

17    BY MR. HUTTON BANKS:

18    Q    Dr. White, what am I looking at?

19    A    You know, looks like in November of 2016, the patient was

20    admitted to an observation bed overnight.

21    Q    Okay.  Is this an emergency room record?

22    A    It is written as a temporary orders.  It says "emergency

23    department temporary orders."  But it's an inpatient -- you see

24    where it's checked "observation"; those are orders that were

25    written -- and I can't see who they're by, but those are orders

1  to be carried out in the observation and the patient is

2  admitted to observation bed.

3  Q    It's an emergency department order?

4  A    Yes, sir.  They're orders written in the emergency

5  department, probably by the emergency physician:  Admitted to,

6  it says the attending Dr. Craig for an observation bed.  If you

7  see at the top where it's checked, as opposed to inpatient

8  admission, which means they're probably going to stay less than

9  two days.  And those are orders.  They're written in the ER but

10  to go on the inpatient side to be --

11  Q    These are orders that are written in the ER?

12  A    Yes, sir.  A lot of admit orders are written in the ER.

13  Q    Okay.  And if you scroll down a little bit and you're

14  looking at the meds that the emergency room physician was

15  providing, what meds did he indicate that he was providing?

16  A    Oxygen.  I can't scroll.  You're going to have to scroll

17  it for me, but I see where it's checked "oxygen."  That's the

18  inpatient side.

19  Q    The emergency room is writing the inpatient side?

20  A    Yes, sir.

21  Q    And emergency room is prescribing oxygen protocol?

22  A    For the inpatient side, yes, sir.

23  Q    So the ER doctor is prescribing the oxygen protocol in the

24  emergency room?

25  A    Not in the emergency room.  He's writing these orders to

1    be carried out wherever the patient is admitted to, whatever

2    floor or bed, under observation.

3    Q    Okay.  But they're in the emergency department, correct?

4    A    Yes, sir.  Where most patients start at and then orders

5    are written while they're still there, yes, sir.

6    Q    Yes, ma'am.  And in the emergency department, the

7    emergency room is prescribing the oxygen protocol?

8    A    No, sir.  That's not for in the ER.  He has a different

9    set of orders that are being carried out in the ER.  He has a

10   different order sheet, and it's in the commuter.

11   Q    So why does it say, why does it say "emergency department

12   temporary orders"?

13   A    Because they're temporary orders for the admission of that

14   patient and they are started, they're initiated, written in the

15   ER.

16   Q    By a ER physician?

17   A    Yes, sir.

18   Q    Okay.  Would you be interested to see what oxygen protocol

19   the ER physician is talking about?

20   A    I believe it's the protocol that he gave you.

21   Q    Okay.  But she's not an inpatient yet, is she?

22   A    She's not yet.  Those are for orders to be carried out

23   when she does become one, yes, sir.  You don't want the patient

24   going to the floor without any orders whatsoever, because there

25   may be a time lag.  So these orders are written and are brought

1    with the patient to the room so they can be carried out

2    immediately.

3    Q    Why is the ER physician dealing with the oxygen protocol?

4    A    Because he's writing her temporary orders, which is

5    very -- this is a very common practice.  That's how patients

6    are admitted through the ER often.

7    Q    And do you know the ER physician prescribing the oxygen

8    protocols?

9    A    I don't know him, no, sir.  I cannot read that.  There is

10   a physician order right there, a name.

11   Q    Well, isn't there a sticker on it?

12   A    That sticker doesn't look like the same name that's on

13   the -- that's the ER sticker when the patient came in.  It may

14   have been a different doctor writing these orders if they

15   changed shifts or whatever.  That doesn't look like

16   "Easterling."  Doesn't mean it's not, but the printed name

17   doesn't look like "Easterling."  All I can tell you is the

18   patient is turned over to Dr. Craig on patient's admission to

19   hospital.

20   Q    But there's an oxygen protocol being ordered by an

21   emergency room physician in the emergency department, correct?

22   A    To be carried out on that floor, yes, sir.

23   Q    And that appears to be the same doctor --

24   A    It doesn't look like "Easterling."  I will tell you that.

25   Q    Well, can you see "David Easterling" on the sticker there?

```
1    A    Oh, definitely; yes, sir.

2    Q    Well, I mean, are you saying that it's a fact that it's

3    not David Easterling?

4    A    I'm not saying it's a fact; I'm saying it doesn't look

5    like Dr. Easterling on the printed name.

6    Q    Or dictation number?

7    A    Uh-huh.  That looks D-E-U-H-A-N.

8    Q    If you had to guess at who's the ER physician, who would

9    you say --

10   A    I don't know any of the Willis-Knighton physicians other

11   than -- no, I can tell you the names on all these different ER

12   visits but I don't know any of them personally and I don't

13   recognize that name.

14   Q    Do you recognize the name David Easterling?

15   A    On the sticker, I do; I see that.

16   Q    Do you have any reason to think that he's not the doctor?

17   A    Just because it doesn't look like his name printed.

18             MR. HUTTON BANKS:  Your Honor, do you have any

19   questions?

20             THE COURT:  No.

21             MR. HUTTON BANKS:  Okay.

22        Do you think we will get a different oxygen protocol,

23   Mr. Pugh, than the one we have, or is that the one we're

24   dealing with?

25             THE WITNESS:  He said the ER did not have an oxygen
```

 1   protocol.

 2            MR. PUGH:  It clarifies this, as we discussed I

 3   believe in one of the depositions.

 4        In the ER -- Judge, I -- in the ER you have the ER doctor

 5   in charge of the visit and constant monitoring and people

 6   coming in and out of the room.  When they're on the floor, it

 7   is different because somebody would come by once or twice a

 8   day.  The nurses would come by more frequently and the doctors

 9   do not.  I think it's been explained that on a protocol, that's

10   to set when a patient is going to be in a hospital in an

11   inpatient status for more than one day.  They are then going to

12   rules that will, what will happen every day while they are

13   there.  And that is what the oxygen protocol addresses.

14        As I've discussed with you, Hutton, many times, that the

15   documents that you pulled from another case was an inpatient

16   case, I believe in Bossier, a different hospital system at the

17   time.  And that's where you started asking questions about, did

18   this apply to this patient.  And we explained to you it would

19   not apply because it was an inpatient policy from -- actually

20   an outdated one.  So that's why when you asked me in the

21   interrogatories for the policy for inpatient -- you didn't say

22   inpatient -- but the protocol I gave you, that one that I'm

23   going to clarify to make it very clear, that it doesn't apply

24   to this case.  However it would apply to an inpatient or a

25   patient you showed a minute ago when somebody has been admitted

1    to hospital.

2              THE COURT:  Mr. Pugh, I believe that the confusion --

3    and I don't know anything about him using something from

4    another case.  But looking at these response to the request for

5    production, he asked specifically what was applicable to A.H.

6    And so this confusion that we have about whether or not this

7    policy applies to the ER or on the inpatient is probably of the

8    Defendant's own making.  So the Court gets it.  The Court

9    understands what the doctor is saying about the temporary

10   orders.  But the defense needs to clarify their response.

11        And, Mr. Banks, you need to move on at this point.

12             MR. HUTTON BANKS:  Thank you, Your Honor.

13             MR. PUGH:  Thank you.

14   BY MR. HUTTON BANKS:

15   Q    Dr. White, do you know of any reason an O2 protocol for a

16   floor patient suffering from non-emergency respiratory distress

17   would be any less stringent or different in any way than an

18   E.D. patient suffering from emergency respiratory distress?

19   A    It would be different in that in an E.D., there is a

20   provider there 24/7, so they are able to see these patients --

21   and the patients have a much higher nursing ratio in the ER.

22        On the floor, they don't have as high of a ratio and as

23   many -- and the provider can't be there as often, not even

24   close to what they are in the ER.  So that's why the protocols

25   are for the floor, that they are checked and they are

1    monitored.  Fortunately, nowadays, most people can be on a

2    pulse oximeter and on a monitor in the room that the nurses can

3    see in a station.  And so that's why they have protocols on the

4    floor that maybe they won't have the protocol in the ER but

5    it's because the provider is there and is able to administer

6    the medicine or order it.  Oxygen is considered a medication,

7    and so the nurses have to have that protocol of when to give

8    the oxygen unless they call the doctor every time and when to

9    do it because they're not allowed to decide on their own if --

10                THE COURT:  I think the question, Dr. White, is, is:

11   In the emergency room, would the requirement for the

12   administration of oxygen be any less stringent dealing with

13   what the pulse ox shows?  In other words, the pulse ox,

14   whatever it said in that protocol, whatever the percentage was

15   for a pediatric patient at some point you were to administer

16   the oxygen, would that be any different as to --

17                THE WITNESS:  No.

18                THE COURT:  No?  It would be the same in the

19   emergency room?

20                THE WITNESS:  Yes, ma'am.  I'm sorry; I didn't

21   understand.  Yes, it would be the same.  Or it should be.

22   BY MR. HUTTON BANKS:

23   Q    The principles of the O2 protocol would apply equally, be

24   the same?

25   A    The principles, yes, sir.  Yes, sir.

```
1    Q     And if the emergency room physician is prescribing it,
2    then probably the emergency room patient should get it?
3    A     Absolutely.
4    Q     Dr. White, in reviewing A.H.'s prior emergency room visits
5    and admissions, in comparison with the night in question, did
6    you notice any patterns or trends?
7    A     Trends in her visits?
8    Q     Sure.
9    A     That the patient -- yes, sir.
10   Q     What did you notice?
11   A     The patient has a history of asthma and has frequent ER
12   visits for her asthma.
13   Q     And did you notice that every single time that she
14   presented with an O2 sat below 95 percent, she was admitted?
15   A     No, sir.
16   Q     That's right, because the night in question, that's not
17   true, is it?
18   A     No.  I'm saying I did not notice that.  It's not the
19   initial O2 sat that determines the admission; it's the O2 sat
20   after the patient has been treated and stabilized to what the
21   provider felt comfortable.  Most of her admissions, her initial
22   O2 sat was in the 80s when she was admitted.  Even if it came
23   up, it usually just came up to the low 90s and that was her
24   last one.  But I didn't look at them in detail.  I looked at
25   those 30-something visits to get an idea of the patient
```

1  presentation, how severe was she, how often did she have to be

2  admitted, how -- what treatments did she have to get before she

3  was stabilized.

4  Q    And, Dr. White, did you ever notice where she presented

5  with an O2 sat below 95 and was discharged?

6  A    I can't remember specifically.  That's not exactly what I

7  was looking for in those.  I'll be happy to go back and review

8  the 30-something cases but I don't remember specifically.  I do

9  remember on the several admissions, I believe there were six or

10  seven of them, her sat was in the 80s most of the time on the

11  initial one.

12       There were several -- I will say that she was admitted as

13  we'd call a "bounce-back patient"; she came back within one to

14  two days of her discharge and she got a little bit worse and so

15  then she was admitted.  And those visits sometimes were in the

16  high 90s, low 90s.  O2 sat is part of the presentation, but

17  it's not diagnostic of it, what her sat is, whether it

18  determines admission or not.

19  Q    Okay.  Thank you, Dr. White.

20  A    Yes, sir.

21       MR. HUTTON BANKS:  Your Honor, and for purposes of

22  the record and this hearing, I would like to introduce as

23  evidence Willis-Knighton Discovery Responses.

24       THE COURT:  I do not have the attachments to those.

25  I have that as your Daubert 5.  It does not have the

1   attachments to it.

2           MR. HUTTON BANKS:  Is that O2 protocol not attached

3   to it?

4           THE COURT:  Nothing is attached -- wait a minute; I'm

5   lying.  The O2 protocol is attached.  Yes, it is.  But not the

6   second thing, the emergency room whatever.  But, yes, the O2

7   protocol is attached.  So, yes.

8       Is there any objection from Willis-Knighton?

9           MR. ROBISON:  Your Honor, I think we would object to

10  the entirety of those responses because they're not -- they

11  have not been shown to be relevant.  As far as the O2 sat

12  protocol referenced, we have no objection.

13          THE COURT:  The Court is going to allow them, for

14  purposes of this hearing, to be admitted.

15          MR. ROBISON:  (Nods head up and down.)

16          THE COURT:  All right, Mr. Banks.

17          MR. HUTTON BANKS:  Yes, sir.  Just housekeepings.

18  I'd like to introduce the record we showed on the shared

19  screen, for the purposes of this hearing.

20          THE COURT:  And where was that in the documents that

21  you attached?

22          MR. HUTTON BANKS:  Yes, ma'am.  That is Exhibit 4,

23  Bates number 1095.  If your, if your -- Exhibit 4 is broken

24  down into segments.  It was too large to email at once, so I

25  had to break it down.  So we have 4.2, and it's the 72nd page

```
 1   on 4.2.
 2            THE COURT:  So the 72nd page out of 156 pages in 4.2?
 3            MR. HUTTON BANKS:  Correct.
 4            THE COURT:  Court's got it.
 5            MR. HUTTON BANKS:  We'd like to admit it.
 6            THE COURT:  It is admitted.
 7            MR. HUTTON BANKS:  Thank you.
 8        And I'd like to go next to Exhibit 4, Daubert 4.  It's in
 9   4.4, and it's page 125 of 4.4.  It should be, it should be
10   Bates number 1577.
11            THE COURT:  What was the page number?
12            MR. HUTTON BANKS:  In 4.4, it is page 125.
13            THE COURT:  And it has at the top 10 something and
14   there is 11/02/16.  Is that the date?
15            MR. HUTTON BANKS:  It says -- the best way to look is
16   on the side of the page, Your Honor; it's got the Bates number
17   on the side of the page.  On the right side of the page, it's
18   Bates numbered at the side 1577.
19            THE COURT:  Let's see.  1577.  Yes, I am looking at
20   that page.
21   BY MR. HUTTON BANKS:
22   Q    Dr. White, can you see it?
23   A    No, sir.
24            MR. HUTTON BANKS:  Can we look at it?
25            THE WITNESS:  They are trying to look it up.
```

1          THE COURT:  The Court has it.

2          MR. ROBISON:  May I ask a question, Your Honor?

3          THE COURT:  Sure.

4          MR. ROBISON:  I'm looking at Documents 49-2 and -3

5   and -4.  Which one would I look at to find --

6          MR. HUTTON BANKS:  Mr. Robison, it would be 4.4.

7   4.4, and it would be 125th page on 4.4.

8          MR. PUGH:  I tell you what I think happened.  I

9   didn't get one of his emails because it was too large and I bet

10  we didn't get the email.

11     If you can tell me what page of the medical record, I'll

12  go try to find it.  But I got an email that said part one.  I

13  didn't get an email that said part two.

14         THE COURT:  The Court, operating on an iPad, got that

15  and was able to download it.  It's page 1577 -- the Bates is

16  1577 of 1758.

17         MR. PUGH:  It's probably the size for our domain at

18  the office.

19         THE COURT:  And it is dated November 2nd of -- it

20  looks like '16.  Could be '15.  Yeah, it's '15.  2015.

21     Mr. Hutton, do you want to try screen sharing again?

22         MR. HUTTON BANKS:  I'll try, Your Honor.

23         THE COURT:  You did a good job last time.

24         MR. HUTTON BANKS:  I had it set up, Your Honor.  I

25  knew right where I was going.

```
 1              MR. PUGH:  That's page 1577.  Is the Bates stamp

 2   1577, page 1577 of 1758?

 3              THE COURT:  That is correct.

 4              MR. PUGH:  The doctor has it.

 5              MR. ROBISON:  We have a hard copy.

 6                    (Document displayed)

 7              THE COURT:  Okay.  Good.

 8        Oops.  There it is.

 9   BY MR. HUTTON BANKS:

10   Q    Dr. White, what am I looking at?

11   A    I'm not really sure.  Give me one second here.

12        Looks like a nursing sheet of an inpatient.  I believe

13   it's on the inpatient side, from Dr. Tran, Sharon Tran.  It

14   definitely doesn't look like an ER, any type of ER paperwork

15   that I've seen.  Okay; I'm looking.

16   Q    Okay.  And do you see the activity date, 11/3/15, oxygen

17   therapy?

18   A    Yes, sir.

19   Q    When you scroll down to under "comments" -- don't scroll

20   down.  You should be able to see it right there on the screen

21   you're looking at; it's at the bottom of the screen.  It's

22   right here, "comments."

23   A    Okay.

24   Q    Okay.  They're setting up -- is it fair to say they're

25   setting up 2 liters per minute in the ER?
```

1    A    Set up 2 liters in ER holding.  They must have a room

2    where they hold their inpatients before they go to the floor.

3         Set up 2 liters per minute in ER holding.  Wean to 1 liter

4    per minute if sat remains 100 percent.  Reassess for O2

5    protocol daily.  Sat was 92 percent on 2 liters when she first

6    came in ER.

7    Q    Is this application of the protocol, Dr. White?

8    A    That's application of the inpatient side.  Now they're

9    following the patient orders, because the patient is in a

10   holding room and the patient's been admitted.  And these are on

11   admission papers.

12   Q    Okay.  And why is it talking about the ER?

13   A    Because she's in a holding room in the ER, obviously,

14   until her room is ready, I'm assuming.

15   Q    Okay.  And when she first came into the ER, she wasn't

16   admitted, was she?

17   A    No, sir.  She was in the ER, right, as an ER patient.

18   Q    Okay.  And her sat, when she came into the ER, was

19   93 percent, right?

20   A    That's what it says, yes, sir.

21   Q    And would that trigger the protocol?

22   A    It says she was 92 percent on 2 liters when she came to

23   the ER.  So I have to guess her O -- it's safe to say her O2

24   was even lower, because when she presented to the ER, she's not

25   going to be on oxygen.

1        So they're saying when the put her on the 2 liters, her

2   sat was 93.  So if you look at that visit, that's 11/2.  I have

3   it written in my notes:  When she presented to the ER that day,

4   her saturation was 85 percent on room air.

5   Q    Right.  And, Dr. White, under the protocol, anything below

6   95 triggers the protocol, right?

7   A    I don't -- as we said, I have not looked at that inpatient

8   protocol, so I don't know if it's 95.  That -- I don't know

9   what the protocol's saying.

10       THE COURT:  Let's just ask you a medical question.

11  If it's below 95 on a pediatric patient, would you think that

12  patient, as a matter of medical treatment in the emergency

13  room, needed oxygen?

14       THE WITNESS:  Sure.  If the patient is in any type of

15  respiratory distress or wheezing or anything, 95, it would be

16  safe to say that they would put her on some blow-by oxygen or a

17  liter of oxygen.  Absolutely, that would be safe to say.  Most

18  protocols will say anywhere from 92 to 95 percent, they

19  recommend supplemental oxygen.  But it's, once again, at the

20  discretion of how the patient -- but it's safe to say the

21  patient was placed on oxygen.  And definitely at this time

22  because her sat was 85.

23  Q    So, Dr. White, the protocol was triggered in the ER?

24  A    It was triggered when the patient was admitted.

25  Q    But it says that 93 percent was when she first came in the

1   ER?

2   A    That doesn't actually mean the protocol was triggered;

3   that means the doctor ordered oxygen and the patient was on

4   oxygen.

5   Q    Okay.  Dr. White, do you see the two lines below "oxygen

6   therapy"?

7   A    Where's "oxygen therapy"?

8   Q    It's the note we're looking at.

9   A    Two lines below?

10  Q    Yeah.

11  A    Read to me where you're talking about; I'm sorry.

12  Q    Sure.  It says "protocol, yes."

13  A    Yes.  If you look -- these orders on this sheet of paper

14  are dated 11/3/15.  That patient was admitted at this time.

15  These are orders on an admitted patient.

16  Q    But the protocol is triggered, isn't it?

17  A    Yes.  The patient's admitted.

18  Q    And the note says, where the protocol was triggered, the

19  note says that she had 93 percent when she first came into the

20  ER --

21  A    On 2 liters --

22  Q    -- right?

23  A    -- it says.  Yes, sir.

24       And if you look in her ER chart, her presentation, her

25  vital signs, her O2 sat was 85 percent on room air.

```
1    Q    Yes, sir -- I mean, yes, ma'am.

2         And, Dr. White, what I'm saying is:  Anything below 95

3    would trigger the protocol, correct?

4    A    No, sir.  I don't have her protocol -- you're wanting me

5    to say anything below 95 would trigger the protocol.

6    Q    Yes, ma'am.

7    A    You're talking about the admission protocol.  You're

8    trying --

9    Q    (Indiscernible.)

10   A    -- into the ER.  I don't mean to be obstinate, but it's

11   two different things.

12        THE COURT:  Mr. Banks, you did get the admission from

13   her that what the protocol does is it provides how many times

14   per day, et cetera, the oxygen needs to be taken but that the

15   same percentages to show for a pediatric patient of when they

16   would need oxygen would be applicable to the ER.  You got that

17   admission.  I think that's all you're going to get from this.

18   I see that you're attempting to say that there was a breach in

19   the protocol and therefore a per-se violation of EMTALA.  And

20   the Court understands the importance of that to your case.  But

21   I think you've gotten as far as you're going to get with this

22   line of questioning.

23        MR. HUTTON BANKS:  Thank you, Your Honor.  For the

24   purposes of Daubert, I'm trying to illustrate that Dr. White's

25   opinion that the oxygen protocol only applies to inpatient is
```

1    not a fact.  That is not a fact.  Her expert opinion is not

2    based in fact.  That's kind of what I'm going for as well.

3    BY MR. HUTTON BANKS:

4    Q    Dr. White, does it mean by "wean"?

5    A    To turn down the amount of oxygen that the patient is

6    receiving.

7    Q    Why is that important?

8    A    Because as the patient improves, it doesn't need as much

9    oxygen.

10   Q    How do you wean?

11   A    You turn down the bottle of oxygen from two to one and a

12   half to one liter to a half liter, like you wean anything else.

13   Q    Well, how long would that take?

14   A    It depends on how fast the patient responds to the

15   medications and the breathing treatments.  Some people, it

16   takes 30 minutes, some people it takes several hours, some

17   people it takes several days.

18   Q    How would you know when you can stop weaning?

19   A    This says based on her oxygenation on the protocol.

20   Q    Thank you.

21   A    Yes, sir.

22   Q    Dr. White, how is weaning related to reassessment of the

23   patient?

24        THE COURT:  Mr. Banks, do we need to stay on this

25   page?

1           MR. HUTTON BANKS:  Oh, sorry.  I'm working on it.

2    Okay; sorry about that.

3    BY MR. HUTTON BANKS:

4    Q    Dr. White, thank you.  How does the weaning process relate

5    to reassessment of the patient?

6    A    Weaning is following the -- the weaning is they're

7    following the O2 sat.  Reassessment is the complete picture of

8    the patient.

9    Q    Dr. White, how does weaning the patient off oxygen,

10   reassessing the patient, maintaining oxygen saturation greater

11   than 95 percent on room air, how does that relate to

12   stabilization?

13   A    Okay.  So a patient, if a patient is able to maintain

14   their O2 sat without supplemental oxygen, that's important for

15   the provider to know.  That's one of the reasons a patient may

16   be admitted for an observation or a regular admission, is if

17   they need supplemental oxygen.  If it's taking them a long time

18   to wean, or if they're in distress and their O2 sat hasn't come

19   up, then they may decide to put the patient in the hospital

20   until the O2 sat can come up.  A patient may not -- may be able

21   to be weaned within 30 minutes of a treatment.  The patient may

22   just get oxygen on the treatments.

23   Q    Yes, ma'am.  And how does that relate to stabilization?

24   A    If a patient is stable off the oxygen, then they're able

25   to maintain their oxygenation without supplemental oxygen.

1   Q    So if they are put on oxygen, they are reassessed, they

2   are weaned, they are reassessed, they can maintain an oxygen

3   sat greater than 95 percent on room air --

4   A    Uh-huh.

5   Q    -- that relates to stabilization?

6   A    That's part of the stabilization, sure.  But can I have a

7   patient stable with a good oxygenation or unstable with a good

8   oxygenation?  Absolutely.  That's part of the picture of a

9   stabilized patient.

10        THE COURT:  Well, that brings me to my concern and

11   lack of understanding about your testimony, Doctor.  And that

12   is that you testified that the patient was stabilized and that

13   her medical treatment was necessary to assure, within a

14   reasonable medical probability, that no material deterioration

15   of her condition was likely to result or to occur during the

16   transfer or discharge.  So you -- that's the definition of

17   "stable."

18     How -- what principle do you apply when you said that the

19   patient was stable when she was discharged, in your opinion?

20        THE WITNESS:  Yes, ma'am.  Based on the nursing

21   documentation and based on the provider documentation, based on

22   her improvement in her vital signs, based on the fact that her

23   O2 sats, I believe was without supplemental oxygenation at the

24   end, and that the provider stated that the patient was back to

25   baseline, the patient was not described by the nurse -- so it

1    was kind of a combination of all those.

2              THE COURT:  Okay.  And my question was perhaps poorly

3    worded.

4         You're pointing to the facts that you used to make that

5    conclusion.

6         What is the standard that you were applying to determine

7    that?  How do you know what facts to look at and what level of

8    care that the patient needs to look at?  What standard of care

9    are you imposing on that?

10             THE WITNESS:  The standard of care -- and please feel

11   free to stop me if I'm not answering right.

12        The standard of care for whether the patient would be able

13   to be discharged or not.  That's one thing that an emergency

14   physician is always thinking about when someone comes in,

15   besides stabilizing them.  Are they stable enough to go --

16             THE COURT:  How do you define that?  When you give

17   your opinion that she was stable, how are you defining

18   "stable," the word "stable"?

19             THE WITNESS:  I'm defining "stable" that the patient

20   could appropriately go home and be treated at home, and with

21   the likelihood that she was not going to acutely

22   decompensate -- it's very unfortunate, but based on her

23   presentation, her prompt response to the treatment, her

24   appropriate medicines that were given, and based on the history

25   that the patient did have -- has asthma and had been multiple

1    times to the ER and did have to be admitted.

2            THE COURT:  That -- you're going back to the specific

3    facts of this case.  And while that's certainly important, it's

4    certainly another question that may be asked of you.

5         What is the standard that you look at for stability?  You

6    give the opinion that the patient was stable on discharge.  And

7    I want to know what the standard is that a physician, an

8    emergency room physician, looks at to make the determination

9    for any patient.

10           THE WITNESS:  Okay.  Can this patient continue their

11   treatments at home?  Is the patient going to a safe

12   environment?  Does the patient have the appropriate medication

13   and/or, as in her case, nebulizer or treatments that they can

14   continue at home?  Is it reasonable to think that the patient

15   is going to continue to do well at home versus being in an

16   inpatient environment?  Does the patient need things in the

17   hospital that they cannot get at home, or does the patient have

18   the appropriate facility or place that they're going to be at

19   that they can continue their care?

20           THE COURT:  Thank you.

21           MR. HUTTON BANKS:  Your Honor, I'd like to introduce

22   Daubert 6, which is White 1, as an exhibit.

23           THE COURT:  It is White 1.  You mean it's attached to

24   the deposition, or where is it?  Is it in the things you sent

25   me?

 1          MR. HUTTON BANKS:  Yes, ma'am.  It's Daubert 6 in

 2   what I sent you, and it's attached to Dr. White's deposition as

 3   White 1.

 4          THE COURT:  All right.  We're back to the oxygen

 5   protocol.  Haven't you introduced that --

 6          MR. HUTTON BANKS:  I'm sorry; I --

 7          THE COURT:  Okay.  Well, it is admitted.

 8          MR. HUTTON BANKS:  Okay, thank you.  And then 1577

 9   was the medical record we just reviewed about the ER.

10          THE COURT:  And that's 1577, which was page 125 of

11   4.4?

12          MR. HUTTON BANKS:  Precisely.

13          THE COURT:  Okay.

14          MR. HUTTON BANKS:  Precisely.

15          THE COURT:  May I elaborate?

16       How different is your definition of "stable" from -- or

17   how you judge whether or not a patient is stable for a

18   discharge from this wording?  And that is that with respect to

19   that emergency medical condition, that the treatment that was

20   provided has been necessary to assure within a reasonable

21   medical probability that no material deterioration of the

22   condition is likely to result from or occur during or after the

23   discharge?

24       How different is that criteria from what the criteria you

25   gave me for determining whether or not an ER patient is stable

```
 1   for discharge?
 2            THE WITNESS:  I think that's very similar.  I do
 3   agree with that.
 4            THE COURT:  Okay.
 5       Okay.  All right, Mr. Banks.
 6            MR. HUTTON BANKS:  Thank you.
 7   BY MR. HUTTON BANKS:
 8   Q    Dr. White, before this case, had you heard the term
 9   "washout" being used with patients in respiratory distress who
10   needed oxygen?
11   A    No, sir.  I've heard "washout," I've heard the word
12   before, 20-something years ago maybe, but it's not a term used
13   in the medical field that I'm aware of or that I've had in any
14   of my continuing education hours.
15   Q    Thank you.  Do you know what it means today?
16   A    No, sir.
17            MR. HUTTON BANKS:  I'd like to look at Daubert 8,
18   which is Dr. Sobel's deposition, page 172.
19            THE COURT:  There are 23 pages that I see.  Which
20   page on your attachment is it?
21            MR. HUTTON BANKS:  It's page 172, and I think it's
22   towards the end, ma'am.
23            THE COURT:  Okay.  Your attachment --
24            MR. HUTTON BANKS:  It's probably page 18 or 19 -- 17,
25   18, 19.
```

1          THE COURT:  Because I can search it that way.

2      All right; go ahead.

3  BY MR. HUTTON BANKS:

4  Q    Do you have it in front of you, Dr. White?

5  A    I do.

6  Q    Okay.  Dr. Sobel was asked what he meant by "20 to 30

7  minutes of washout time" in his expert report and the report

8  that he drafted, and he explains "washout."

9      Have you had a chance to read that?

10 A    No, sir, but I will.

11 Q    Please.

12 A    Okay; I've read it.

13 Q    Do you understand, Dr. White, that when you give a patient

14 supplemental oxygen, you are artificially inflating their blood

15 oxygen, normal blood oxygen levels?  You understand that,

16 correct?

17 A    You are giving supplemental oxygen in the lungs.  It's not

18 artificially inflating it in the blood.  It's in the blood

19 actually.  But it's additional oxygen to their lungs, yes, sir.

20 Q    Do you understand, Dr. White, that in order to understand

21 what the patient is capable of without being on oxygen, there

22 is a time period where the nitrogen has to replace the oxygen

23 in the lungs?

24 A    Yes, sir.

25 Q    Okay.  What do you call that?

1   A    I don't really have a term for it.  It just means you take

2   the patient off the oxygen and see how well they do without the

3   supplemental, and it gives them time on the room air.  He's

4   saying that -- he said it needs to take 20 to 30 minutes for

5   washout time for a valid O2 reading.

6   Q    Do you dispute that?

7   A    I don't know if it takes as long as 20 to 30 minutes

8   because I've taken people off oxygen and their pulse ox has

9   dropped within minutes of the oxygen.  So I don't think it

10  takes necessarily 20 to 30 minutes.

11  Q    Okay.  Dr. White, how long do you think it takes to get a

12  valid oxygen saturation?

13  A    It can vary with time, but it can be within a few minutes.

14  Some people, it may take longer, not necessarily asthmatics.  I

15  don't think it takes that long.  And you're really not worried

16  about washout time; you're worried about over, over time.  I

17  mean, if you take a person off oxygen, you can usually see

18  within a few minutes if it's going to drop or not.  Sometimes

19  you'll wait 20 minutes, 20 to 30 minutes between breathing

20  treatments on a child when their off the oxygen, because not

21  necessarily that the O2 washout of what he's describing is

22  going on, but that the inflammation is recurring and they're

23  not allowed to get as much of the oxygen from just room air, so

24  they need to get some more.

25  Q    Okay.  And if Dr. Sobel says it takes 20 or 30 minutes to

1    wash out before you get a valid O2 reading, Dr. White would

2    say:  No, no, that's not correct; it takes blank?

3         It takes blank amount of --

4    A    I don't think it takes as long as that.

5    Q    Okay.  I'm asking you:  How long do you think it takes?

6    A    As I told you, it can take within a minute or two.  You

7    can see that O2 desat when you take someone off of oxygen.

8    Q    You can get a valid room air reading in one minute?

9    A    You can get valid room air reading, if you need a number,

10   you can get a valid room air reading within two to three

11   minutes.  They have a continuous pulse ox on their finger.

12   There may be a lag time from the oxygen in the blood to the

13   oxygen in the lungs of a few minutes, two to three minutes.

14   Q    Okay.  So, Dr. White, when do you think -- do you think

15   A.H. was moved to radiology?

16   A    Yes, sir, I do.

17   Q    And when do you think A.H. was moved to radiology?

18   That's -- it's page 767.  That's Exhibit 4, 767.  That's 4.1.

19   A    Is that the ER visit?

20   Q    Yes, ma'am.

21   A    Okay.

22        MR. HUTTON BANKS:  That'll be the second page, Judge

23   Foote, the second page of 4.1, is where that visit starts.

24        THE COURT:  I see.  This is 2/10/2018.  All right.

25        While she is looking at that.  We've been going for an

1   hour and a half.  Let's go ahead, then, and take a brief break.

2       Ms. Keifer, we all can just get up and leave and come

3   back.  It's 11:01.  I would suggest that we come back at

4   11:10 and be ready to go again and that Dr. White will have the

5   answer, which is:  What is her assumption with regard to the

6   time that the child was taken to radiology?

7       And we'll go ahead and take that brief break at this time.

8   I would tell you-all that I have a 1:30 hearing as well.  It is

9   a sentencing.  I expect it to last at 2:15, till about 2:15.

10  At 2:15 I have a regular weekly call with all the judges on

11  COVID-19 and on our policies and procedures.  I may have to not

12  be on that call in order to finish this hearing today.  But, I

13  would tell you that, that we would have to recess at 1:30

14  because the jail will be online at that time for us.

15      All right.  Well let's come back then.  It's now 11:02.

16  Let's come back at 11:10.  Thank you.

17                      (Recess)

18          THE COURT:  All right.  It is now 11:11.  We lack the

19  witness and the defense counsel.

20      Here is our witness.

21      Do we have defense counsel present?

22          MR. ROBISON:  (No verbal response.)

23          THE COURT:  Oh, and our court reporter.

24      All right.  Is all counsel present?

25          MR. ROBISON:  Yes.

1          THE COURT:  And our witness, Dr. White, is back.

2      Mr. Banks, if you would refresh us as to which document we

3  are looking at.

4          MR. HUTTON BANKS:  Sure.  This would be

5  Daubert 4-767, which I think is -- let's see if I can do it

6  here.  Yeah.

7                  (Document displayed)

8          THE COURT:  And the question to the Doctor was:  What

9  is her assumption with regard to the time of -- what exactly,

10  Mr. Banks?

11          MR. HUTTON BANKS:  Yes, ma'am.  I want to know what

12  time Dr. White thinks that A.H. was moved to radiology.

13          THE COURT:  Doctor, can you answer that question?

14          THE WITNESS:  I'm sorry.  As I said, at 2:46 it's

15  noted that patient was moved to radiology.

16  BY MR. HUTTON BANKS:

17  Q    Thank you, Dr. White.  And can you tell me when the second

18  albuterol treatment was administered?

19  A    Looks like it was administered at 3:11.

20  Q    Okay.  And can you tell me when she was moved back from

21  radiology?

22  A    It just says when it was completed.  I don't see a note of

23  when she was moved back from radiology.

24  Q    If we could go back to that first page, 767.  I'm sharing

25  it.

```
 1              THE COURT:  So what's the question, sir?
 2              MR. HUTTON BANKS:  Yes, ma'am.
 3    BY MR. HUTTON BANKS:
 4    Q    Can you look at the records, Dr. White, and determine when
 5    she was moved from radiology back to her bed?
 6    A    No, sir.  No, sir.
 7    Q    Well, what happened at 3:29?
 8    A    Patient moved to 20.
 9    Q    And that'd be her -- she was moved to 20 at 2:04, right?
10    A    Yes, sir.
11    Q    And then she was moved to radiology, right?
12    A    Yes, sir.
13    Q    And then she was moved to 20 again, right?
14    A    Yes, sir.
15    Q    Okay.  So would it be fair to say that the record shows
16    she was moved from radiology back to 20 at 3:29?
17    A    Yes, sir.
18    Q    Okay.  And the second albuterol breathing treatment was
19    administered what time?  3:16?
20    A    3:11.
21    Q    I've got 3:16, but I think it was ordered at 3:11.
22    A    It was ordered at 3:11, administered at 3:16.
23    Q    Right.  So your understanding that A.H. was moved to
24    radiology on a stretcher, off of oxygen, that's incorrect,
25    isn't it?
```

1    A     No, sir.

2    Q     Was she given oxygen while she was in radiology?

3    A     You'd have to ask the radiology tech or one of the nurses

4    that was there.  That's not on the document.

5    Q     But it's in your opinion.

6    A     My opinion was that she went to radiology without oxygen,

7    yes, sir.  That's my opinion.

8              THE COURT:  Without oxygen or with oxygen?

9              THE WITNESS:  Without.

10              THE COURT:  Okay.  And why do you say that?

11              THE WITNESS:  When he asked me that, if the patient

12    was stable enough, a lot of times they'll go to radiology off

13    the oxygen rather than carrying the oxygen tank with them.

14    When a patient is still requiring oxygen and they're considered

15    maybe unstable or not stable enough to go to radiology, they

16    will have a portable x-ray done in the room to leave them on

17    the monitor and the oxygen.

18              THE COURT:  Well, you're saying that -- you're saying

19    that's the standard of care.  But do you know what happened in

20    this case?

21              THE WITNESS:  No, ma'am, I do not.  I just know that

22    she went to the radiology room, according to the chart, to

23    receive a 2D chest x-ray.

24    BY MR. HUTTON BANKS:

25    Q    Okay.  So, in your opinion, on page 2 of your opinion,

1   that after her first breathing treatment, she was also able to

2   be transported to radiology for a two view chest x-ray without

3   supplemental oxygen.  That's a statement within your opinion,

4   correct?

5   A    Yes, sir.

6   Q    Okay.  But that's not based in fact, is it?

7   A    You asked me what I thought and I told you, right.

8   Q    Okay.  That's part of our *Daubert* -- okay.  Thank you.

9        Dr. White, how long does it take to administer a breathing

10  treatment?

11  A    Approximately anywhere from 10 to 20 minutes.

12  Q    Okay.  Anywhere from 10 to 20.  And when was this

13  breathing treatment administered?

14           THE COURT:  3:16.

15  BY MR. HUTTON BANKS:

16  Q    3:16.  Okay.  So 3:16, right, Dr. White?

17  A    Yes, sir.

18  Q    And when was the 99 percent O2 reading?

19  A    At 3:23.

20  Q    While she was on high flow oxygen?

21  A    We don't know that.

22  Q    And you don't either, do you, Dr. White?

23  A    You're right, I don't; no, sir.

24  Q    Okay.  And if you look at 766, which I've got it on share

25  right here, you see the vital signs and you see where there is

1    a 91 percent on R/A.  And "R/A" stands for what?

2    A    Room air.

3    Q    Okay.  And the 99 percent, there is no room air

4    designation, is there?

5    A    Right.

6    Q    So you may be incorrect to testify that you thought the

7    99 percent was a room air reading; is that correct?

8    A    I told you that it was my thought, my assumption, because

9    it doesn't state whether it is or not.

10   Q    Okay.  But it's not -- your assumption is not based on

11   fact, is it?

12   A    It's based on not telling you which one it's on, on the

13   documentation.

14   Q    Okay.  Same on page 2 of your opinion, Doctor.  It is --

15   for everyone's benefit, I believe it's -- I believe it's

16   Daubert 1, if everybody could go to that.  Let's see here.

17   Page 2.

18       Let's see.  And, Dr. White, it's covered up by my screen.

19   I'll try to remedy that.  Okay.  And the third line down, you

20   say that stabilizing treatment included --

21           THE COURT:  Mr. Banks, we are still on the other

22   screen.

23           MR. HUTTON BANKS:  Can y'all not see that?

24           THE COURT:  Now, we can -- we can see -- there you

25   go.

```
 1                        (Document displayed)

 2              MR. HUTTON BANKS:  Okay.  Here we go; sorry, y'all.

 3    BY MR. HUTTON BANKS:

 4    Q    So three lines down, in page 2 of your opinion, you

 5    include dexamethasone as a stabilizing treatment; is that

 6    correct?

 7    A    (No verbal response)

 8              MR. HUTTON BANKS:  We may have lost Dr. White.

 9              THE COURT:  Dr. White?

10        Mr. Pugh?

11        Mr. Robison?

12              MR. ROBISON:  (No verbal response)

13              THE COURT:  Did they voluntarily take themselves out?

14              MR. HUTTON BANKS:  I don't know.

15              MR. SEDRIC BANKS:  We lost even the law clerk -- I'm

16    sorry, the lawyer in Baton Rouge.

17              MS. GIDDINGS:  I'm here.  Do you want me to call

18    somebody?

19              MR. SEDRIC BANKS:  There you are.  Didn't mean to

20    count you out.

21              MR. HUTTON BANKS:  I am trying to wrap it up, Judge.

22              THE COURT:  Well, we can't do anything right this

23    minute, can we?

24              MR. HUTTON BANKS:  I know that.

25              THE COURT:  Oh, we lost Ms. Plouf, too.
```

```
 1                THE LAW CLERK:  No, Judge; I'm here.

 2                MR. HUTTON BANKS:  There's Ms. Plouf.  Hello, Ms.

 3     Plouf.

 4                THE COURT:  Oh, good.

 5          Yes, Ms. Giddings, perhaps you had better call.

 6                MS. GIDDINGS:  I will do that.

 7                     (Brief pause in proceedings.)

 8                MS. GIDDINGS:  Your Honor, I just talked to Bob

 9     Robison.  He said the power has gone out in the building and

10     they're trying to set up the Zoom on their cellphones to see if

11     that will work.

12                THE COURT:  Hmm.

13          Is the weather bad there, Ms. Plouf, do you know?  Is the

14     weather bad in Shreveport?

15                MR. SEDRIC BANKS:  We're in Monroe and Baton Rouge,

16     Judge.  I don't think we have anybody in Shreveport.

17                THE COURT:  Yes.  Ms. Plouf is.

18                MS. PLOUF:  I'm here at my apartment, so I think --

19                MR. SEDRIC BANKS:  I believe they're in Ruston at Dr.

20     White's office, it looks like to me.

21                THE COURT:  I think they're all at the office in --

22     well, I don't know.  I thought they were all in Shreveport.

23     Ms. Plouf is in Shreveport.

24                MS. GIDDINGS:  I think they are at Mr. Pugh's office

25     in Shreveport.
```

```
 1                THE COURT:  Mr. Banks, are you bringing your doctor
 2       today?
 3                MR. SEDRIC BANKS:  No, ma'am.  We're going to stand
 4       on our submissions, Judge.
 5                MR. PUGH:  Hello.  Can y'all hear me?
 6                THE COURT:  I hear Mr. Pugh.  And --
 7                MR. PUGH:  Yes, Judge.  What's happened is the
 8       Regents Tower is experiencing power failures in different areas
 9       and you may have heard a few minutes, probably about 30 minutes
10       ago, I made a comment saying that, you know, that the
11       electricity was out in the plugs in the room.  Well, now it is
12       expanding to other areas.  The server has gone down, which
13       means the internet has gone down, and so the capability of the
14       Zoom has gone down.  And I don't know -- you know, this is on
15       the phone line, so it's working.  But I don't know how to
16       rectify the problem.  It's happening in different areas, at
17       least in our offices anyway.
18                THE COURT:  Okay.  This is possible to do on a
19       cellphone.  I've done felony pleas on a cellphone, sir.
20                MR. PUGH:  No.  This is on the office landline.
21       Okay.  That's why I didn't -- but it just doesn't -- I don't
22       have internet capabilities because of all the plugs in the
23       office are going out one by one.
24                THE COURT:  Do you have a cellphone?
25                MR. PUGH:  We do have cellphones, yes, ma'am.  We
```

1    could all --

2           THE COURT:  Why don't you hang up this phone and try

3    to call in with the cellphone.

4           MR. PUGH:  Well, we could try to do Zoom on the

5    individual cellphones.

6           THE COURT:  That's what I'm suggesting, sir.

7           MR. PUGH:  Okay.  We will have to send -- we'll just

8    share the invitation with the others, with Dr. White, and we

9    will try that now.

10           THE COURT:  Okay.

11           MR. PUGH:  Thank you.

12                  (Brief pause in proceedings)

13           THE COURT:  I see Mr. Lamar Pugh; I see Ms. White,

14    Dr. White.

15           MR. PUGH:  And, Judge, in the meantime, they are

16    flipping breakers in the building trying to bring (inaudible).

17    This is the first I've ever seen of this.

18           THE COURT:  Dr. White, there is a problem on your

19    camera.

20           THE WITNESS:  I am so sorry.  There we go; is that

21    better?

22           THE COURT:  Yes.

23       All right.  Dr. White is back.  Defense Counsel is back.

24       And we are back on the record.

25       Ms. Plouf, are you there?

1          LAW CLERK:  Yes, Judge.

2          THE COURT:  Good.  Very good.

3      All right.  Let's proceed, then.  I believe that Mr. Banks

4  was drawing the witness' attention to the page.

5          MR. HUTTON BANKS:  Yes, ma'am.  Yes, Your Honor.

6  BY MR. HUTTON BANKS:

7  Q    Dr. White, I was looking at page 2 of your expert report,

8  third line down, page 2, stabilizing treatment.

9  A    Okay; go ahead.

10  Q    Sure.  Do you see where you classify dexamethasone as a

11  stabilizing treatment?

12  A    I don't see where you're talking about, but I will agree

13  with that, yes, sir.

14  Q    Sure.  It's page 2, third line down:  "Stabilizing

15  treatment was provided."

16  A    Yes, sir, I do see it.

17  Q    And when you mean "stabilizing treatment," you're talking

18  about stabilizing an emergency medical condition, correct?

19  A    Yes, sir.

20  Q    Okay.  And what is albuterol and what does it treat?

21  A    Albuterol is a smooth muscle relaxer.  So when a patient

22  is having an asthma attack as an exacerbation, they have both

23  inflammation in lungs, in the alveoli of the lungs, as well as

24  the tightening of the airways.  And so albuterol is used to

25  relax the muscles in the lungs, in the alveoli, to relax and

1    open up so that more air can get into the lungs and they can

2    breath better.  So that's what albuterol does.  Albuterol can

3    work -- works acutely within several minutes and can last up to

4    several hours.

5         The dexamethasone is a medication which is used, is its

6    properties of the anti-inflammatory.  The swelling of the

7    airways, which is when you hear the wheezing, it's from the

8    swelling and the tightness of the airways.  The dexamethasone

9    also helps the inflammation so that the patient can breathe

10   well, and open up the airways to get adequate oxygenation.

11   Q    Thank you.  And, Dr. White, dexamethasone is a steroid,

12   correct?

13   A    Yes, sir.

14   Q    And how long does it take in steroid before a clinician

15   can observe the effects, the effectiveness of the steroid?

16   A    It can take several hours.  It can be anywhere from four

17   to six to eight hours.

18   Q    Okay.  So it could take eight hours before a clinician

19   could determine if the steroid was effective in reducing the

20   swelling?

21   A    It can -- we know that the steroid is effective.  We know

22   that the steroid works.  It's given in the ER for potential

23   symptoms in the next, in the next few hours to days.  When

24   people come to the ER for an asthma exacerbation, most of them

25   have already tried straight albuterol.

1    Some people have mild asthma attacks and we just give them

2    a breathing treatment and do not give the steroids.  We just,

3    we refill their albuterol, give them a treatment, and they're

4    doing well.  But if they need it or they've been taking the

5    treatments, that's kind of the next step for how to treat

6    asthma.

7    Q    Okay.  Thank you, Dr. White.  And if it takes -- if you

8    take the next step, it is not a normal situation, you take the

9    next step and you administer the steroid?

10   A    Yes, sir.

11   Q    And it takes as a, quote, stabilization treatment.  And it

12   takes six to eight hours for the steroid before a provider can

13   determine whether the steroid is effective.

14       Is it fair to say that A.H. was discharged, ordered

15   discharged eight minutes after the steroid was administered?

16   A    No, sir.  That's often how it is treated.  The patient

17   also has albuterol, and it's very important that you make sure

18   they have albuterol at home because the albuterol works for

19   several hours and they may need a treatment or two of albuterol

20   until the steroids kick in.

21       So we do not watch people four to six to eight hours

22   waiting for the steroids to kick in.  But we do start it in the

23   ER so that it can start working on their body.

24   Q    Yes, sir -- yes, ma'am.  And kind of just to go back, you

25   listed dexamethasone, the steroid, as a stabilization

1    treatment --

2    A    Yes, sir.

3    Q    -- on page 2.  Okay.  So if you're administering a steroid

4    to stabilize the patient, it takes six to eight hours for the

5    steroid to kick in.  You discharge her eight minutes after the

6    steroid.  How could the hospital assure, within a reasonable

7    degree of medical probability, that A.H.'s condition would not

8    materially deteriorate?

9    A    Because she had albuterol at home and was given the

10   treatments there.  She had been discharged many times on

11   steroids and the albuterol and had done well.  It is not

12   standard of care to watch an asthmatic patient six to eight

13   hours to make sure the steroids kick in.

14   Q    In this case, did A.H.'s condition materially deteriorate

15   after she was discharged?

16   A    Obviously, several hours later when she coded, yes, sir.

17   Q    Okay.  And did you see any medical record that would

18   dispute A.H.'s mother's statement that after the physician's

19   initial exam, approximately 2:30, no doctor physically examined

20   A.H. before she was ordered discharged?

21   A    Say that again?

22   Q    Sure.  Do you know of any medical record that would

23   dispute A.H.'s mother's statement that after the initial exam

24   by the physician at approximately 2:30, no doctor physically

25   examined A.H. before ordering her discharge?

1    A    Well, that goes against what the physician wrote in his

2    charts.

3    Q    And what were you pointing to?

4    A    On his re-evaluation.

5    Q    Did you see a physical exam --

6            THE COURT:  Could you point that out to us, please,

7    ma'am?

8        And, Mr. Banks, would you get rid of the report that's on

9    the screen?

10            MR. HUTTON BANKS:  Yes, ma'am.

11            THE WITNESS:  On the physician documentation --

12            THE COURT:  Yes, ma'am.

13            THE WITNESS:  -- under medical decision making at

14    3:50, it says that -- he wrote a differential diagnosis.  He

15    wrote that the data was reviewed, he wrote that he counseled

16    with the parent and the guardian, and then he wrote response to

17    treatment.

18        So that tells me that the physician interacted and

19    discussed and spoke with mom and evaluated the child.

20            THE COURT:  Mr. Banks?

21            MR. HUTTON BANKS:  Yes, ma'am.

22    BY MR. HUTTON BANKS:

23    Q    Dr. White, you're saying that those records show that

24    there was a physical exam, a second physical exam?

25    A    The physician evaluated the patient.

1    Q    Yes, ma'am.  But --

2    A    You'll have to ask the provider exactly what he did with

3    his re-evaluation.

4    Q    Dr. White, do you see any evidence, any fact that would

5    indicate a physical exam before discharge?

6    A    I see under the nurses' notes that at 3:55 on follow-up

7    response, after the albuterol, it says:  "No adverse reaction

8    and respiratory status improved.  Tolerated well."  That means

9    a respiratory evaluation was done.

10   Q    I'm sorry; I should have asked a better question.

11        Any physician's physical exam prior to discharge?

12   A    There is not a physical exam on the chart, no, sir.

13   Q    Okay.  So there's no facts to support that there was a

14   physical exam?

15   A    No, sir.

16   Q    Okay; back to Daubert 3 -- we're getting close here, guys.

17        Back to Daubert 3, page 3 of Daubert 3.  I think I can

18   bring it up.

19        Okay.  Dr. White, I'm looking at the top of page 3 where

20   it appears you have written that you need the EMS run sheet.

21   Is that correct?

22   A    Yes, sir.  Those are my notes and I wrote that.

23             MR. HUTTON BANKS:  So I'd like to call the Court's

24   attention to Daubert 7.

25             THE COURT:  The Court's looking at it.

```
 1              MR. HUTTON BANKS:  Okay.  Thank you, Your Honor.

 2                      (Document displayed)

 3  BY MR. HUTTON BANKS:

 4  Q    Dr. White, what I've put on the screen here is Daubert 7.

 5  Is that an EMS run sheet?

 6  A    Yes, sir.

 7  Q    This is what you needed?

 8  A    I would like to look at it -- yes, sir.

 9  Q    Okay.  And if I represent to you that Willis-Knighton had

10  an unrestricted HIPAA authorization to obtain any record that

11  it wanted to obtain, can you explain why you weren't provided

12  the record that you asked for?

13  A    No, sir.

14              MR. ROBISON:  I'm going to object to that.  That

15  happens to be the run sheet the Plaintiffs did not disclose to

16  us when the Court ordered them to disclose it.

17              THE COURT:  I think that's a fight that goes beyond

18  on the scope of this hearing.

19      Please continue.

20              MR. HUTTON BANKS:  Thank you, Your Honor.

21  BY MR. HUTTON BANKS:

22  Q    Dr. White, in your -- you have been tendered and accepted

23  in a single case as an expert in emergency medicine.  It was a

24  malpractice case, correct?

25  A    Yes, sir.
```

1   Q    And that would be like Mr. Robison's representation of

2   Willis-Knighton in this case, correct, as opposed to

3   Mr. Pugh's?

4            THE COURT:  I don't know if she can answer that.

5   BY MR. HUTTON BANKS:

6   Q    What I'm asking, Dr. White, is that you've never been

7   tendered as an EMTALA expert, have you?

8   A    No, sir.

9            MR. HUTTON BANKS:  Okay.  That's all I have, Your

10  Honor.

11           THE COURT:  The Court has some questions before we

12  allow examination by Defense Counsel.

13       Prior to working on this case, Dr. White, had you ever

14  heard the words that stabilization meant:  "Local treatment as

15  necessary to assure, within a reasonable medical probability,

16  that no material deterioration of the condition, emergent

17  condition, was likely to result from or occur during the

18  transfer or discharge"?  Had you ever heard those words before

19  you started working on this case?

20       I'm sorry; I can't hear you.

21           THE WITNESS:  Yes, ma'am, I have.

22           THE COURT:  Okay.  And what do you understand that to

23  be that?

24           THE WITNESS:  That the patient is to be stabilized to

25  the best of the provider's ability, and is the patient stable

1   enough for discharge or does the patient need to be admitted?

2          THE COURT:  Before, when I asked you what criteria

3   you used and what you were --

4                         (Audio feedback)

5          THE COURT:  You can't have two microphones under the

6   same room.  And we have the iPad and we have Dr. White.  All

7   right.  The --

8                    (Audio feedback continues)

9          THE COURT:  -- Defendant.  Okay.

10          MR. PUGH:  Your Honor, we (inaudible) --

11          THE COURT:  You were doing fine with the cellphone.

12   You can't have both -- I see two microphones on in the same

13   room, and you can't do that.

14          MR. PUGH:  Okay.

15          THE COURT:  And you just have to mute it; you don't

16   have to get rid of your pictures.

17       Dr. White, how different are those words from the criteria

18   you apply to determine whether or not this patient was stable?

19          THE WITNESS:  I looked to the part to see if the

20   patient had an emergency medical condition when they were

21   evaluated and what the (audio feedback, inaudible) --

22          THE REPORTER:  Excuse me; could you repeat that,

23   please.

24          THE COURT:  We can't understand you.  Would you start

25   your answer again.  There's a lot of fiddling going on with the

1    other stuff.

2        Okay, let's -- okay, Dr. White.

3        THE WITNESS:  My -- and feel free to stop me if I'm

4    not saying this right.

5        As far as EMTALA, the patient was seen.  The patient had

6    an evaluation to determine if she had an emergency medical

7    condition.  She did have an emergency medical condition.  After

8    the patient was stabilized from that emergency medical

9    condition, so she was stable for discharge.

10       THE COURT:  Okay.  You know, that's going to be one

11   of the cruxes of this case, is:  What standard or was she

12   stable?  And the objection that has been made to your testimony

13   is that you're applying -- you're not applying the right

14   standard.

15       So what the Court is attempting to figure out is what

16   standard you applied under the care you apply and whether the

17   EMTALA standard is the same thing as the medical standard for

18   discharge in a patient being stable for discharge.  And I'm

19   trying to determine all that.

20       So if you could tell me how you know.  Is this from your

21   training?  What are the standards that you apply?  And how are

22   the words that I read to you different or the same as the

23   standard that you apply?

24       THE WITNESS:  I'm going to find those words that you

25   just read.

1          THE COURT:  "That medical treatment was given --"

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  "-- as may be necessary to assure, within

4    reasonable medical probability, that no material deterioration

5    of the condition is likely to result or occur."

6          THE WITNESS:  So I believe that -- I believe

7    stabilization for EMTALA or for malpractice is the same, when

8    is the patient stable, upon discharge or upon transport to

9    another facility, regardless, the patient was stable for

10   discharge.

11        So I'm using the same standards that I learned in my

12   education, in my continuing care, in my training as far as an

13   asthmatic patient and when they need to be admitted versus when

14   they're stable enough for discharge.

15        Does that help?

16         THE COURT:  Yes.  And in this particular case, where

17   are the facts in the record that you refer to?  The 99 percent.

18         THE WITNESS:  Yes, ma'am.

19         THE COURT:  What other facts are you pointing to in

20   the record, specifically, that show that this patient was

21   stable at discharge?

22         THE WITNESS:  I feel that the doctor provided the

23   appropriate treatment with two breathing treatments and the

24   steroids.  I feel that the doctor --

25         THE COURT:  That's not the question.

1          THE WITNESS:  Okay.  Okay.

2      The evaluation, treatment, discharge.

3          MR. WHITE:  Okay.

4          THE COURT:  So stability.  What was the condition?

5  Where do we find her condition at the time of discharge in the

6  record?  We know the 99 percent is your opinion, that that was

7  on room air.  And we understand that's your opinion.  Anything

8  else?

9          THE WITNESS:  Her set of vitals, which goes with

10 that, and the assessment by the provider and the reassessment

11 by the nurse, and her improvement in her vital signs, and the

12 fact that she had the medication at home, that she was stable

13 enough to be discharged to continue care at home.

14         THE COURT:  And those are all the facts that you

15 relied on for that?

16         THE WITNESS:  Yes, ma'am.  As well as the facts of

17 what her medical condition was and reviewing her old charts

18 that they had available to them, that she responded very well

19 to treatments and in the past, had never -- had to be admitted

20 several times, never more than two days and never had to be

21 intubated.

22     So that tells me that her asthma was under relatively good

23 control and that it was under relatively -- that she responded

24 well to medication.  I did not see red flags that, hey, she has

25 to be intubated sometimes, she has to have a week or two of

```
 1    hospitalizations.  It tells me that once the medicines that he

 2    gave, that were given to her in the past, she responded well

 3    to.

 4              THE COURT:  All right.  At this time, then, we would

 5    allow defense counsel to ask any clarifying questions if they

 6    would wish to do so.

 7              MR. ROBISON:  Your Honor, would it be acceptable for

 8    me to use the same computer?

 9              THE COURT:  Yes.

10              MR. ROBISON:  All right.  Thank you.

11                           DIRECT EXAMINATION

12    BY MR. ROBISON:

13    Q    All right.  Dr. White, in your opinion, if a physician or

14    hospital discharges a patient to home in an unstable condition,

15    would that be an EMTALA violation?

16    A    That can be, yes.

17              THE COURT:  No; wait.  She said earlier, Mr. Robison,

18    that this EMTALA didn't apply to discharge.

19              THE WITNESS:  To this patient that was discharged

20    because they were stabilized.

21              THE COURT:  Dr. White, you gave the opinion that

22    EMTALA didn't apply to this situation at all because the

23    patient was discharged and not transferred, is what I heard you

24    to say.

25         Now, whether or not you are qualified to give an opinion
```

1    as to whether or not the patient was stabilized within medical

2    probability is a different thing.  But I heard you say

3    something quite different on the record.

4          MR. ROBISON:  Your Honor, we're trying to clarify at

5    this point what she meant.

6          THE COURT:  Did you talk to her in between?

7          MR. ROBISON:  I told her what you would ask, but we

8    didn't talk about what we talked about, off the record.  That

9    would have been inappropriate.

10          THE COURT:  You told her off the record?

11          MR. ROBISON:  What I was going to ask her, Your

12    Honor.

13          THE COURT:  So you discussed her testimony between

14    the time that this proceeding began and your questioning her

15    now?

16          MR. ROBISON:  I didn't -- yes, I told her that we're

17    going to be asking her questions later, because initially I had

18    told her that we were going to go first.  And so I said that

19    after this, then I'm going to get to ask you questions, Dr.

20    White, about this.  We're going to ask you about EMTALA and

21    discharge and transfer and that you may not go eat lunch with

22    your husband, unfortunately.  So that's what we were talking

23    about.

24          THE COURT:  Did you -- did you say anything more

25    specific than that, Mr. Robison?  Did you discuss with her, her

```
1  testimony that she said that EMTALA did not apply to discharge,

2  only to transfer?  Did you discuss that fact with her?

3         MR. ROBISON:  I told her that I was going to ask her

4  to clarify what she meant by that.

5         THE COURT:  All right.  That gives the Court some

6  pause, Mr. Robison.

7     Did you give her any further instructions than that on

8  what answer she should give?

9         MR. ROBISON:  I did not tell her how to answer, no,

10  Your Honor.

11         THE COURT:  Okay.  The Court asked the question

12  several times of the Doctor, to make it clear as to whether or

13  not she understood that question; and I was satisfied that it

14  was her opinion that EMTALA only applies to transfer and not to

15  discharge.  It's what she says in her deposition and it's what

16  she said here again today.

17     Doctor, I will certainly give you the chance to explain

18  that if you can, but I would allow you to go ahead and explain

19  how you have changed your opinion now that it does apply at

20  discharge, that EMTALA applies at discharge.

21         THE WITNESS:  My definition or understanding of

22  EMTALA had three parts of:  Was the patient able to be seen,

23  has a right to be seen; a patient has a right to be stabilized;

24  and if needed, a patient has a right to be transferred,

25  regardless of ability to pay.
```

1    So this patient was stabilized.  I don't feel EMTALA,

2    because the patient sent home, was an EMTALA violation.  But I

3    feel like the three parts of EMTALA, that I understand EMTALA

4    to be, were not deviated or didn't occur in this case.  So I do

5    not feel like EMTALA was violated in this case.

6            THE COURT:  Okay.  Are you going to give the opinion

7    that EMTALA was not violated?  Is that what you are here to do?

8            THE WITNESS:  Yes, ma'am.

9            THE COURT:  Oh, my gosh.  Mr. Robison, didn't you

10   object?

11           MR. ROBISON:  And if I may clarify, Your Honor.  I

12   believe what we are doing, and it would tie in with the other

13   *Daubert* motion on Dr. Sobel.  What we would be asking Dr. White

14   is:  Was this patient, in your opinion, stabilized at

15   discharge?  We do think it would be inappropriate for us to

16   ask:  Dr. White, in your opinion, was there an EMTALA

17   violation?

18       So, yes, it's our opinion that the case law shows that the

19   issue for an EMTALA violation is whether the hospital and

20   healthcare provider had actual knowledge that the patient was

21   unstable at discharge.  And that would be the violation.

22       So it is our position that, despite what Dr. White just

23   said, that does not -- that is not our intention, unless the

24   Court allows Dr. Sobel to say it, which we think would be

25   inappropriate because it's a legal conclusion.  What we ask her

1   is her medical opinion based on the facts she saw in the

2   record, was the child stable at discharge.

3        And as far as whether EMTALA violation, I think the Court

4   would have to go back to:  Did the treating physician and/or

5   hospital have actual knowledge of unstability?

6            THE COURT:  You understand, Dr. White, that the

7   Court's consternation is caused by the fact that they have

8   filed, they have filed an objection to anyone saying that it is

9   or is not EMTALA violation.

10       Now, Doctor, isn't it correct, though, that you don't

11  think that EMTALA applies to discharged patients?

12           THE WITNESS:  That is correct, yes, ma'am.

13           THE COURT:  Okay.  All right.  Please continue, then,

14  Mr. Robison.

15  BY MR. ROBISON:

16  Q    All right, Dr. White.  We've already gone over the record

17  that you reviewed.  In your opinion, based on the emergency

18  room record for this visit at issue, can you just explain to us

19  succinctly why you believe that this patient was stable at

20  discharge -- stable before discharge.

21  A    The patient was brought to the ER and was very promptly

22  triaged, evaluated by the nurse, and then evaluated by the

23  provider.  The provider promptly ordered the appropriate

24  medications and treatment for the patient.  The patient had

25  x-rays done, I believe, and then had a reassessment after the

 1    medication.  The provider felt, after an appropriate time after

 2    the medication, that the patient was stable for discharge home

 3    to continue the treatment.

 4    Q    And, Dr. White, you are basing that off of your reading of

 5    the medical records themselves, correct?

 6    A    Yes.

 7    Q    Was the patient actually treated in the emergency

 8    department?

 9    A    Yes.

10    Q    So she was not, quote, dumped because she was unable to

11    pay?

12    A    No.

13            THE COURT:  That's -- Mr. Robison, this goes both

14    ways.

15            MR. ROBISON:  I understand, Your Honor.

16    BY MR. ROBISON:

17    Q    Based on the record that you have before you, does it

18    appear -- can you tell us one more time why was the patient,

19    based on the facts that we have, stable at discharge?

20    A    Based on the trending of the patient's vital signs and the

21    reassessment by the nurse and the provider, I felt the patient

22    was stable for discharge.

23    Q    Can you find a fact that's in the record -- not an

24    accusation -- that shows this patient was unstable prior to

25    dis -- well, at discharge?

1   A     No, sir.

2   Q     Now, just for clarification, when the patient first

3   presented, she did in fact have an emergency medical condition,

4   correct?

5   A     Yes.

6   Q     And screening has already been affirmatively pled by

7   Plaintiffs that there was a good screening, or that the patient

8   was screened.  Do you agree with that?

9   A     Yes.

10  Q     And the screening found an emergency medical condition,

11  correct?

12  A     Yes.

13  Q     Okay.  In your opinion, was that emergency medical

14  condition treated in the ER?

15  A     Yes.

16  Q     And then do you see any indication in the facts we have

17  that the patient was unstable after that treatment in the ER?

18  A     No, I do not.

19  Q     Based on the facts that you have before you, based on your

20  review of the record, would you have admitted this patient as

21  an inpatient?

22  A     No, I would not.

23  Q     Why not?

24  A     Because I felt the patient could continue her treatment at

25  home and I felt safe and I didn't see the risk involved of her

1   going home versus being admitted.  The patient was able to

2   maintain her O2, or so I thought.  The patient showed that she

3   was back to normal to her usual condition, which is without

4   oxygen, and that that doctor felt comfortable letting the

5   patient go home and resume care.

6   Q    Did you believe that there was any, or a reasonable

7   possibility that this patient's condition was going to

8   deteriorate?

9   A    No, I did not.

10  Q    And you are basing that off of the facts that you have

11  reviewed from the record?

12  A    Yes.

13  Q    And the principles that you have used to review these

14  records, where did you learn these things?  What methodology

15  did you use to review the records?

16  A    I read the record and utilized my training, my medical

17  education, and my continuing education.

18  Q    And do you have continuing education every year?

19  A    Yes, sir.

20  Q    Now, what is board certification, emergency medicine board

21  certification?

22          THE COURT:  Mr. Robison, the Court is well aware

23  she's board certified.  The Court knows what that is.

24          MR. ROBISON:  All right.

25          THE COURT:  This is not a trial; we're not at trial.

1   The Court's more concerned about the standard of care, the

2   standard of care that was applied --

3            MR. ROBISON:  Okay.

4   BY MR. ROBISON:

5   Q    Dr. White, is the standard of care or the treatment

6   provided by Dr. Easterling and the hospital personnel, as

7   reflected in the record we have, does that appear to have been

8   sufficient to stabilize this patient?

9            THE COURT:  Now, Mr. Robison, Willis-Knighton walks a

10  preposterously fine line in that you object to Dr. Sobel

11  testifying as to a medical standard of care versus the EMTALA

12  standard of care.  What I hear that Dr. White said (inaudible

13  due to train horn sounding) --

14       Can you-all hear that?

15           MR. ROBISON:  Yes.

16           THE COURT:  We'll wait a second; it's a train

17  passing.

18       -- is that the EMTALA standard of care for stabilization

19  is the same as the emergency room doctor's standard of care.

20       Is that what you understand her to say, Mr. Robison?

21           MR. ROBISON:  Yes, Your Honor.  The standard of care

22  for the emergency medicine treatment is the same for the

23  treating physician, whether they are treating a patient or

24  concerned with EMTALA.

25       Our objection is because Plaintiffs have said there was no

1    medical malpractice.  So we're not saying there cannot be a

2    discussion by both experts, was this patient treated properly,

3    that that would be a negligence case.  And this is not

4    negligence.

5         So this comes down to whether there was a patient dumping,

6    not -- we could still have negligence.

7              THE COURT:  Right.  Correct, correct.  The negligence

8    could be part of the EMTALA claim.

9              MR. ROBISON:  Well, our understanding, though, the

10   Plaintiffs specifically pled:  This is not a negligence claim.

11   So we could -- we don't think we do -- have a breach of a

12   standard of care where -- we're not saying it happened -- but

13   where, say, a doctor was negligent --

14             THE COURT:  No, sir --

15             MR. ROBISON:  -- but no EMTALA.

16             THE COURT:  They can take facts -- the Plaintiff has

17   the prerogative of taking one set of facts and determining

18   which cause of action they wish to plead.  They are not

19   pleading a cause of action in medical malpractice; instead,

20   they are pleading an action under EMTALA.

21             MR. ROBISON:  Yes, Your Honor.

22             THE COURT:  Certainly, actions that -- and we have

23   heard this doctor say that whether or not a patient was stable

24   would be the same standard of care.  And certainly evidence of

25   negligence can be part of EMTALA; in other words, it can be

1  proof of the EMTALA violation.

2      But certainly they have a stronger burden of proof than

3  they might have in a medical malpractice case.  So that would

4  be --

5          MR. ROBISON:  (Nods head up and down.)

6          THE COURT:  And you're nodding, Mr. Robison.

7      So that's why there is an inconsistency in the objections

8  versus the testimony you are attempting to evoke from this

9  witness.  And that's why I asked her about the standard of

10 care, because she says the standard of care was not breached,

11 in her deposition.  And I need to know what standard of care

12 that is.

13     Anyway, do you have any other points to make, Mr. Robison?

14         MR. ROBISON:  Your Honor, I think you've probably

15 heard a lot already.  As far as -- I could go into some of what

16 Dr. White's background is, and credentialing and being on

17 committees.  Does the Court want to hear some of that

18 testimony?

19         THE COURT:  No, sir.  The Court has her Curriculum

20 Vitae.

21         MR. ROBISON:  Okay.  We could go into some of that,

22 how Dr. White -- may I ask some questions about her involvement

23 in EMTALA situations?

24         THE COURT:  I did allow Plaintiff's counsel to do

25 that, so I will allow you to do that.

 1            MR. ROBISON:  And it will be brief, Your Honor.

 2   BY MR. ROBISON:

 3   Q    Dr. White, you in the past have been a medical director of

 4   a facility?

 5   A    Yes.

 6   Q    And you've also served as an assistant medical director?

 7   A    Yes.

 8   Q    In your position as medical director, does the issue of

 9   EMTALA arise?

10   A    Yes, sir.

11   Q    And have you been involved in EMTALA policies and

12   training?

13   A    Yes, sir.

14   Q    Is EMTALA something that you deal with on a daily basis

15   when you're working in the emergency department?

16   A    Yes, sir.

17   Q    And your position as credentialing those physicians, have

18   you been involved in credentialing at hospitals?

19   A    Yes, sir.

20   Q    And what is credentialing?  Real quickly.

21   A    It's to make sure they have the adequate training and all

22   the credentials to be able to have privileges at the hospital.

23   Q    All right.  And does that duty of credentialing a

24   physician, or being credentialed yourself, involve proficiency

25   in what EMTALA means?

A     Yes, sir.

          MR. ROBISON:  And, Your Honor, for clarification, as I understand it, our primary objection on the other motion is that we do not believe it would be appropriate for someone to be, shown to the jury as, quote, an EMTALA expert because we believe that's the Court.

          THE COURT:  Yes, sir.  The Court understands that portion of it.  But, you know, your second part of your objection, it's not -- the motion is not limited to that.

     You also say that you object to his testimony whether or not A.H. was or was not stable.  You talk about that, and you talk about the standard of care.  And you say that that's irrelevant for him to say that the standard of care was breached because this is not a medical malpractice claim.  And yet here, you attempted to elicit the same type of testimony from Dr. White.  And the Court finds that part inconsistent.  And -- so, anyway.

     Are we finished, Mr. Robison?

          MR. ROBISON:  Unless Your Honor has other questions, I believe that we are.  Yes, Your Honor.

          THE COURT:  Okay.  The Court, then, is prepared to rule in this matter and would do so briefly.

     The Court would begin by reciting for the record the nature of the *Daubert* duties of the Court and the *Daubert* standard.  The Court does this for purposes of the record.  The

1    parties themselves have all recited that in the appropriate

2    cases in their briefs.

3        But basically, this case centers around the treatment of

4    four-year-old asthmatic, A.H., and what she received at

5    Willis-Knighton Medical Center South on February 10th.  We note

6    that at 1:45 a.m., she presented to the emergency room with

7    breathing problems.  She was discharged around 4:00 a.m. and

8    then just before 7:00 a.m., she suffered respiratory arrest at

9    home and was later declared brain dead.  She died on

10   February 16th when the support was discontinued.

11       The suit by A.H.'s parents is against Willis-Knighton for

12   the treatment the night of February 10th, and it alleges that

13   it violated EMTALA, the Emergency Medical Treatment & Labor

14   Act.  They assert that A.H. presented to Willis-Knighton

15   Medical Center with an emergent medical condition and that the

16   patient was not stabilized prior to discharge.

17       Plaintiffs' complaint states that they are not pursuing a

18   medical malpractice claim.

19       The experts that have been retained are, by the defense is

20   Dr. Jacquelyn White.  The Court notes that she is going to be

21   tendered as an expert in emergency medicine.  She is board

22   certified in emergency medicine and a fellow in the College of

23   Emergency Physicians.  She has over 25 years of experience in

24   emergency medicine and currently works 90 hours a month doing

25   clinical work in an ER and 60 hours a month doing

administrative duties.  The Court notes that she has served on review boards for hospitals and as an independent consultant in cases.  The Court does note she has only been qualified as an expert witness on one occasion.

We know that expert testimony is only admissible if it is both relevant and reliable.  And this was the holding of the Fifth Circuit citing the *Daubert* case, which came out in 1992. It's to be remembered that the purpose of *Daubert* was to expand the use of expert testimony in cases and not to limit that testimony but to set criteria for it.

We know under Federal Rule of Evidence 402 that relevant evidence is generally admissible and is defined under 401 as that which has any tendency to make a fact more or less probable than it would be without the evidence and which is of consequence in determining the action.

702 states that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(A), the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(B) the testimony is based on sufficient facts or data;

(C) the testimony is the product of reliable principles and methods; and

(D) the expert has reliably applied the principles and

1    methods to the facts of the case.

2          So, as we can see, the language of 702 incorporates that

3    language from the *Daubert versus Dow Chemical Case*.

4          703 talks about the different sources that an expert

5    witness can utilize to express that opinion.

6          And then 704, which we will get into in more detail,

7    provides that opinion is not objectionable because it embraces

8    an ultimate issue.  However, the Fifth Circuit commands us to

9    make the distinction between what is an ultimate issue versus

10   what is a legal conclusion.  And that is the fine line that we

11   must walk that, looking at that.  That issue does not come up

12   in Dr. White's testimony.

13         We know that the Fifth Circuit has told us that under 702

14   and *Daubert* that trial courts are assigned a gatekeeping role

15   to determine the admissibility of expert testimony.  This Court

16   must find that the evidence is both relevant and reliable

17   before it may be admitted.  To do so, the Court must evaluate

18   whether the reasoning and methodology underlying testimony is

19   valid and can be reliably applied to the facts of this case.

20         The Court in *United States versus Valencia*, the Fifth

21   Circuit case in 2010, stated that the gatekeeper functions

22   requires more than a glance at the expert's credentials.  The

23   Court must also ensure that the expert has reliably applied the

24   methods in question.

25         The following factors must be considered by the Court when

1  evaluating reliability under Daubert:  Whether the theory or

2  technique can be tested, whether the theory or technique has

3  been to peer review in publication, the known or potential rate

4  of error, the existence and maintenance of standards and

5  controls, and, five, the general acceptance of theory in

6  scientific or expert testimony.

7      We note that the *Kumho Tire* case by the Supreme Court

8  further expanded Dow and talked a little bit more about the

9  trial court's gatekeeping obligation and that it also applies

10  to testimony based, not just on scientific knowledge, but

11  technical and other specialized areas.  But we know that the

12  key, as *Kumho Tire* tells us, of testimony is reliable, and it

13  is whether or not the principles that underlie the proposed

14  submission are reliable.

15      So the focus of *Daubert* is on the principles and

16  methodology, not necessarily on the conclusions that they

17  generate.

18      As I referred to earlier, however, the Fifth Circuit

19  cautions judges in making that gatekeeper assessment that the

20  trial judge's role as gatekeeper is not intended to serve as a

21  replacement for the adversary system.  This was the holding in

22  the case of *Pipitone*, P-I-P-I-T-O-N-E.  Thus, while exercising

23  its role as gatekeeper, a trial court should take care not to

24  transfer *the Daubert* hearing into a trial on the merits.

25  Vigorous cross-examination, presentation of contrary evidence,

 1    and careful instruction on the burden of proof are the

 2    traditional and appropriate means of attacking shaky but

 3    admissible evidence.

 4         As I've stated earlier, it's not up to me to decide who

 5    has the best expert.  There, the Court would look to the

 6    different aspects of Dr. White's testimony which have been

 7    objected to.

 8         The difficulty -- excuse me.

 9         The Court notes that Dr. White, despite her testimony that

10    she was asked to determine whether or not an EMTALA violation

11    had occurred as being her goal or what she was to do at the

12    outset of this case, is woefully unable to give us any opinion

13    about what policies or procedures EMTALA has imposed upon

14    emergency rooms.  She is ignorant about what EMTALA applies to.

15    Her statements that EMTALA only applies to transfer and not

16    discharge show a total lack of understanding of EMTALA.

17         I came into this hearing today with a different

18    perspective, but despite what Dr. White has said, the Court has

19    a question in its mind whether the definition under EMTALA of a

20    patient being stable and what is the normal standard of care

21    for an emergency room doctor, whether or not those are the

22    same.

23         And I will remind Willis-Knighton that is the second part

24    of their objection when it comes to Dr. Sobel as well.  And so

25    that question is unresolved, in this Court's mind, and I need

1    further briefing on that issue:  Is it the same standard of

2    care?

3         This doctor has said that she believes it to be very

4    similar, if not the same.  And I simply do not have enough

5    knowledge to be able to rely to make that decision at this

6    time.  And I'll remind the Defendants:  It is their burden to

7    give me that knowledge.  And right now I don't have it.

8         Certainly, if this was a case involving the standard of

9    care for emergency room physician, the Court would allow the

10   doctor to testify as to that standard.  And if you can convince

11   me that the EMTALA standard for discharge is the same thing,

12   you know, for what is -- what stable means to the discharge, is

13   the same thing as it is for any emergency room physician

14   looking at any patient, whether it's for transfer or discharge

15   under EMTALA.  If you can convince me of that fact, then she'll

16   be allowed to testify in the narrow area of whether or not the

17   patient was stable at the time of discharge.  She's also

18   qualified to tell me whether or not the patient presented with

19   an emergent condition and -- but those are going to be the

20   issues that the Court sees that is not resolved for EMTALA.

21        The issue on -- we know that Dr. White, as we said, is an

22   emergency room doctor with 25 years experience and training.

23   She says she's had continuing education in EMTALA, and yet as

24   the Court has noted, her testimony is that EMTALA would not

25   even apply in this case, which is a wrong conclusion.

1    The Court does not find that any type of prior malpractice

2  claim or her failure to review certain policies which may be

3  pertinent are, in fact, fatal to her testimony and they are not

4  grounds simply to exclude her testimony.  Now, do they make

5  fertile grounds for cross-examination?  Absolutely.

6  Absolutely.  But they do not defeat her testimony or her

7  ability to testify as an expert in emergency medicine and all

8  of this is presumed upon your being able to convince me,

9  Defendants, that it's the same standard of care that's being

10  applied.

11    She's never worked for a Willis-Knighton facility.  She

12  was unfamiliar with their policies and procedures.  She,

13  despite her conclusions that EMTALA imposes certain conditions

14  on emergency rooms, she couldn't tell us what those were or

15  that she reviewed any policies or procedures of Willis-Knighton

16  that they had.

17    The issue on the oxygen protocol hopefully will be cleared

18  up by Willis-Knighton's amended response to their

19  interrogatories or the request for production.  The Court does

20  not find that, either, fatal to her testimony.

21    The second basis of the objection, beyond her

22  qualifications, is not knowing anything about EMTALA, is that

23  Dr. White's opinion is based on insufficient facts and data.

24  And of course, that's one of the requirements of Daubert, that

25  there be sufficient facts.  She makes certain assumptions.  And

124

 1   all experts make certain assumptions.  Those assumptions may be

 2   wrong, but that's not up to me to determine unless that

 3   assumption, those assumptions are so far outside of the record

 4   as to render this testimony unreliable.

 5        I will give you the example that she makes the assumption

 6   that the 99 percent oxygen saturation rate at discharge was on

 7   room air.  That may or may not be a correct assumption.  And of

 8   course, the way that you undermine an expert's conclusions is

 9   by attacking the assumptions that that expert makes.  And the

10   way you do that is on cross-examination.

11        So the Court does not find that the facts and data that

12   she has relied upon is so insufficient or outside the record

13   for the Court not to allow her those opinions as an emergency

14   room physician.  And as I said, everything -- her being allowed

15   to get on that stand -- is going to be dependent on whether or

16   not the Defendants can convince me that it's the same standard

17   of care.

18        The failure for her to review the death certificate or

19   autopsy reports, I understand those were not produced at the

20   time of her report being rendered.  I'm not sure -- I don't

21   think that renders her opinion as an emergency room physician

22   as to what happened in the emergency room unreliable.

23   Certainly, here again, it's an area for cross-examination.

24        The Court does believe that I have therefore outlined the

25   reasons for my opinion, and that is that she would be qualified

1    as an emergency room physician if you can convince me that the

2    entire -- the EMTALA definition of "stability" and criteria for

3    stability is the same one as for an emergency doctor's standard

4    of care for what is "stability upon discharge."

5         The rest of the objections would be overruled.  She is

6    certainly no expert in EMTALA.  She is certainly no expert in

7    what policies and procedures EMTALA imposes upon an emergency

8    room.  And the Court would not allow her to testify about those

9    things.

10        All right.  So is that clear, then, to the Defendants?

11   The Court would give you an additional 10 days to produce any

12   additional briefing on the subject, Defendants.  And you could

13   give the Plaintiffs, then, seven days to respond.

14        Let me give you those exact dates.  All right.  Today is

15   the 27th.  Okay.  So the Court -- and this is going to mess up

16   the Court's prior scheduling order with regard to the motion

17   for summary judgment.

18        The Court would give the Defendants until Friday, June 5,

19   and would then give the Plaintiffs to Friday, June 12th to

20   submit any type of briefing on that issue.

21        Hopefully, there are some cases out there that will tell

22   us that.

23        All right.  Let's turn, then, to the issue -- we can let

24   Dr. White go, and we can turn to the issue of Dr. Sobel.

25             MR. ROBISON:  Thank you, Your Honor.

1            THE COURT:  All right.  Do we need to take another

2     break?  We've been going at it again for about another hour and

3     a half.  Should we take just a ten-minute break and come back

4     at 12:38 and we can do that?

5            MR. ROBISON:  Yes, Your Honor.  Okay.  Thank you very

6     much.

7                        (Recess)

8            THE COURT:  All right.  Let's go back on the record.

9     Let's make sure we have everyone.  We have both Mr. Bankses.

10    We have both Mr. Pughs.  We have the top of Mr. Robison's face.

11    We have our court reporter.  Very good, Mr. Robison.

12        The Court was informed by Ms. Keifer of something very,

13    very important, and that is she only arranged for this call to

14    last four hours.  So that means that Zoom will just cut us off

15    at 1:00 without warning.  So what the Court proposes, as I told

16    you-all at the outset, I have a 1:30 sentencing, I have a 2:15

17    phone call.  So let's come back maybe -- what she'll have to do

18    is issue a new Zoom invitation to everyone.  And we'll come

19    back at 3:00.  We don't have a witness to put on at that time.

20    Perhaps there's other evidence that the defense would wish to

21    put on that the Court does not have.  The Court will entertain

22    argument at that time.  And the Court will, although it is the

23    Court's ruling that it is the Plaintiff who has the burden of

24    proof as to the admissibility of Dr. Sobel's testimony, that

25    the Court will allow the Defense to go first to state what

1  their objections and outline their objections to Dr. Sobel's

2  testimony.  The Court understands that the primary objection is

3  to the legal conclusion that there is a violation of EMTALA,

4  which would be the same thing as saying there's a violation of

5  the anti-dumping statute, Mr. Robison, or asking if the patient

6  was dumped.

7      So with that said, then, please do check your emails.  Ms.

8  Keifer will be sending out the new invitation to you.  It'll be

9  a different link to click on and we'll reconvene at 3:00 to

10 take care of this matter today and get it taken care of.  So I

11 appreciate your patience and the ability to resolve this today.

12         MR. SEDRIC BANKS:  Your Honor?

13         THE COURT:  Yes.

14         MR. SEDRIC BANKS:  If I may, I have a 3:00 10.1

15 conference.  May I take that and then join this late?  And of

16 course, I'll waive any appearance in the interim.  I'm not

17 asking you to hold things up.

18         THE COURT:  Thank you, Mr. Banks.  And can I ask you

19 how you are going to be doing that?  I'm just curious.

20         MR. SEDRIC BANKS:  On a cellphone.

21         THE COURT:  On a cellphone.  Good.  And who is it

22 with?

23         MR. SEDRIC BANKS:  It's going to be with the *Palowsky*

24 *versus Co*rk case in Monroe that's going on.  It's with

25 Mr. Pettiette there in Shreveport and Brian Crawford in Monroe

```
1    and John Guice in Monroe and Joe Ward in Covington.

2              THE COURT:  I happen to know all of those people

3    well, including Joe Ward.

4         But my question really was:  Is it Judge Hayes?  Is that

5    it?

6              MR. SEDRIC BANKS:  I'm sorry?

7              THE COURT:  Is it Judge Hayes?

8              MR. SEDRIC BANKS:  Oh, no.  It's state court, Judge.

9    It's state court.

10             THE COURT:  Oh, okay.

11             MR. SEDRIC BANKS:  Yes, ma'am.

12             THE COURT:  Okay.  So, but they're handling that by

13   phone.  The nature of my inquiry is how the Court is dealing

14   with stuff like that, so --

15             MR. SEDRIC BANKS:  I don't want to give you the wrong

16   impression.  This is just going to be a 10.1 conference among

17   counsel.  The Court will not be involved at this point.

18             THE COURT:  Oh.  Okay, all right; very good.

19             MR. SEDRIC BANKS:  I'm not asking to hold your

20   proceeding up.  Hutton can cover us until I can get back to it.

21             THE COURT:  Right.  And I was just curious as to what

22   courts are doing.  All right.

23        So we'll see everybody at 3:00 with your new number.  And

24   I appreciate your patience and your ability to get this

25   resolved today.
```

1          MR. SEDRIC BANKS:  Thank you, Judge.

2          THE COURT:  Thank you.   And we will be in recess.

3              (Recess from 12:41 p.m. until 3:09 p.m.)

4          THE COURT:  The Court is late to our 3:00, and I will

5     acknowledge that.  I will tell you-all for the record that what

6     I was doing did affect you-all, and that is having to do with

7     what the Court's scheduling of jury trials is going to be like

8     and how we're going to handle those matters.  So, while I have

9     this on the agenda for the end of our meeting today, I would go

10    ahead and address it with you very briefly to kind of give you

11    the latest update.

12         The Court just participated in part of our weekly COVID-19

13    call with the Article IIIs, the Magistrates, the Public

14    Defenders, the U.S. Attorney's Office, the Marshals, everybody

15    that you can possibly imagine.  There were 30 people on the

16    call.

17         As it pertains to you-all, it has to do with the civil

18    jury trials.  There has been in effect a prohibition against

19    civil jury trials until July 1.  That will expire, according to

20    the vote of the judges -- that is not my vote -- and it will in

21    fact expire July 1, but it will be up to the individual judge

22    to decide to hold jury trials.

23         The difficulty is that there is no protocol yet as to how

24    to hold a jury trial under the circumstances that we are

25    facing.

1          Oh, and for the record, let me -- I know, Mr. Hutton, I

2    didn't -- Mr. Banks, you said that your father said he may be

3    joining us later.  Is that right?

4          MR. HUTTON BANKS:  Yes, ma'am.

5          THE COURT:  He is not on, but everybody else is on.

6    Very good.

7          MR. HUTTON BANKS:  Yes, ma'am.

8          THE COURT:  So, the difficulty arises is that there

9    are no protocols in place.  And the Court --

10         (Audio feedback and connection interrupted)

11         MR. GAHAGAN PUGH:  Your Honor, I apologize.  Lamar's

12   computer froze but the volume wasn't on, so we missed

13   everything you just said.  But we're going to try my computer

14   now.

15      Sorry about this.  We've just had disaster after disaster

16   today.

17         THE COURT:  Did y'all get electricity back?

18         MR. GAHAGAN PUGH:  We did.  They flipped the circuit

19   breaker and now it seems to be working.  Lamar's --

20         THE COURT:  I see he's frozen.

21         MR. GAHAGAN PUGH:  He's trying to restart it now but

22   I've got you back on and we can --

23         THE COURT:  Okay.  So what the Court was addressing

24   was the practicalities of holding a jury trial.  After July 1,

25   it's going to be up to the individual Article III as to whether

1   or not to hold jury trials.

2        The difficulty is that we have no protocol for getting a

3   jury trial or conducting a jury trial under these circumstances

4   of social distancing.  And as long as the numbers are what they

5   are now, certainly Caddo was getting better but now it's not

6   looking so good.

7        The difficulty is that the whole concept of a jury trial

8   is antithetical to the idea of social distancing.  We are

9   bringing in members of the community to judge.

10        All right.  Lamar Pugh is in the waiting room, Ms. Kathy.

11   There.

12        Excuse me.  One of the other judges --

13        I know that all of this is hard on lawyers.  It's also

14   hard on judges.

15        But the protocols will not be in place until we're close

16   to July 1, if we're lucky.  We don't get to expect to get

17   guidance from the Administrative Office until the middle of

18   June.  We do not expect to get guidance until the middle of

19   June from either the Administrative Office of the courts or

20   from the Judicial Council of the United States, which is the --

21   you know, that's the Supreme Court administrative body.  So we

22   don't know how you would conduct a jury trial under these

23   circumstances.  Hopefully y'all's date is far enough out that

24   those things would not be a problem.  The Court is looking at

25   your date.  Your October 5 trial date, I will tell you is the

1    week of a criminal trial that I have.

2        There are bets on whether or not that criminal trial will

3    ever go to trial, but it is set for two weeks.  Whether or not

4    it actually goes those two weeks, I don't know.  Your trial is

5    set for three days.  I don't know who put that.  I think it's

6    highly unlikely to ever do a trial with expert witnesses and a

7    jury in three days, in my experience.  We may do it; we may do

8    it.  But anyway, you could start later in that week.  Or the

9    next week is October 13th, and that week we could make

10   available to you as well.  So worst case scenario -- well,

11   number one is the COVID issue and that we have protocols in

12   place.

13       Number two, would be if that criminal trial went over, we

14   could start either in the middle of the week or we could start

15   October 13.  If anybody -- if you would check your calendars

16   now, please, and let me know whether or not that week is

17   available.

18       And Mr. Banks left, I presume to check his calendar.

19       Mr. Lamar Pugh, Mr. Gahagan Pugh, Mr. Robison, are you-all

20   available the week of October 13th?

21           MR. LAMAR PUGH:  Yes, Your Honor.  And Mr. Robison is

22   checking his calendar right now.

23           MR. ROBISON:  Yes, Your Honor.

24           THE COURT:  All right.  Mr. Banks, are you available?

25           MR. HUTTON BANKS:  Yes, ma'am, we're available

1    October 13th.

2            THE COURT:  Very good.  So let's put them down for

3    October 13th.

4        You will have a collision with an 18-wheeler and a car,

5    which if we had to bet, would not go to trial.

6        The other issue, of course, I would bring up at this time

7    is mediation.  Certainly this is a case that is ripe for

8    mediation, especially after the Court does its *Daubert* ruling.

9    Your magistrate is Judge Hornsby.  That means that he will not

10   agree to mediate it.  And he does that for a reason.  He wants

11   to maintain his ability to be a fair magistrate.  But Judge

12   Hayes can do it for you if you ask her.  Now, there are plenty

13   of other commercial mediators.  I have no preference, whichever

14   way you-all wanted to go.  But certainly this is a case that

15   would behoove everyone to mediate.

16       Sometimes clients are reluctant to enter into the

17   mediation process.  I never order mediation as part of my

18   scheduling order because I think that, there again, the idea of

19   forcing people to mediate defeats the idea of mediation, of

20   people coming together voluntarily to reach an agreement.  But

21   sometimes people have trouble with their clients for one reason

22   of wanting to mediate.  And if that would be the situation for

23   any of you, you could contact the Court and we would be glad to

24   enter an order for mediation.

25           MR. LAMAR PUGH:  On that point, Judge, we have -- and

134

1    we briefly talked about it, I think, during our call a week or

2    two ago; but we have had one mediation with Judge Frank

3    Thaxton.

4              THE COURT:  You told me that, yeah.

5              MR. PUGH:  And so -- and currently, we made an offer

6    last week that he was communicating, I think, right about the

7    time of the holiday, to the other side.

8              THE COURT:  Oh, well, good.  I remember that now.

9    And I am sorry I went through my spiel.  And I remember --

10             MR. HUTTON BANKS:  I'm sorry, Judge.  But to be

11   clear, plaintiffs received the offer and countered, and we

12   haven't heard back.

13             THE COURT:  Oh, so we --

14             MR. LAMAR PUGH:  Okay.  We'll check with Judge

15   Thaxton.

16             THE COURT:  So you're saying once again, Mr. Banks,

17   that the ball is in their court?

18             MR. HUTTON BANKS:  Yes, ma'am.

19             THE COURT:  Okay.  Understood.

20        And you can get, then, with Judge Thaxton and see.

21        All right.  All that aside, I hope that sometime in the

22   next two months that we do have a protocol in place that we can

23   tell you.  I've walked that path that the jurors would have to

24   walk, and I just -- besides, I think it adds -- it's going to

25   add more time to the process.  It may be, for example, that we

would have to voir dire jurors in groups, which would mean that we would have to -- sometimes, you know, I'll bring in a big group and we ask everybody the questions at the same time and if people have -- you know, if number 50 has a particular issue, we really don't question 50 about his issues until we realize that we're going to need number 50, mathematically, but at least that person has heard the questions.  All that whole other group has been participating in the voir dire up to that point.

     If we have to divide people into smaller groups to bring them into the courthouse, it may be that we have to start voir dire all over again with the next group, you know, saying this is Mr. Pugh, this is who he represents, do you know Mr. Pugh, this is Mr. Banks, do you know him, and start the whole process all over again, which you can, you know, tell is going to drag this out.  But we just don't know because we're in such uncharted territory.

     None of you look happy, or maybe everybody is just tired.

     All right.  We will now turn to -- and so if you have any ideas of how somebody could conduct a jury trial with people maintaining a social distance of at least 6 feet and not being inside a space with recirculated air for hours at a time, you could let us know.

     All right.  The next issue, then, is whether or not Dr. Sobel's testimony should be limited.  The motion by the

1   defendants seeks to limit Dr. Sobel's testimony.  My

2   understanding of Willis-Knighton's position is twofold.  One is

3   that there be no testimony or evidence at trial attempting to

4   establish Dr. Sobel as an EMTALA expert; and secondly, that

5   there be no testimony that EMTALA as violated.  And then third,

6   that Dr. Sobel will not testify regarding the standard of care

7   generally applicable to A.H.'s healthcare providers on

8   February 10, 2018.  Willis-Knighton does not object to Dr.

9   Sobel testifying as an expert in emergency medicine.

10       The Court understands and has read all of the arguments in

11  this matter.  The Court would reiterate that it believes that

12  when it comes to Dr. Sobel's testimony, that it is the

13  Plaintiff who carries the burden of proof to convince the Court

14  that Dr. Sobel's testimony rises to the level of reliability

15  required by *Daubert*, *Kumho Tire*, all the subsequent cases.

16       The issue presented by, at least the first two issues that

17  Willis-Knighton has enunciated, is appreciated by the Court as

18  follows.  As we started at the outset, we know that the Federal

19  Rules of Evidence do allow, they do allow a witness to testify

20  as to the ultimate issue.  704 provides that an opinion is not

21  objectionable just because it embraces an ultimate issue.  And

22  705 states that unless the Court rules otherwise, an expert may

23  state an opinion and give the reasons for it without first

24  testifying to the underlying facts and data, but the expert may

25  be required to disclose those facts or data on

1   cross-examination.

2        So we know that's what 704 says.  However, at the same

3   time, we know that the Fifth Circuit, as well as other courts,

4   have ruled that no witness may testify as to a legal

5   conclusion.  And that was the holding in *The United States*

6   *versus Williams* of the Fifth Circuit, and also of *The United*

7   *States versus Izydore*, *I-Z-Y-D-O-R-E*, in 1999, quoting the

8   *Williams* case cited the earlier *Izydore* case.  So when you

9   look -- so that's very easy to say, isn't it?  That we may

10  allow a witness to express an opinion as to the ultimate issue

11  but not a legal conclusion.  Where it becomes more difficult is

12  for us to parse out exactly what that means in an individual

13  case.  And it may even mean different things in different types

14  of cases.

15       So with that as background, and even though the Court

16  acknowledges that Mr. Banks has the burden of proof here, the

17  Court would allow Willis-Knighton to go forward with their

18  objections, to outline their objections and put forth their

19  argument.  I'd ask that you divide it into those two parts,

20  part one and two dealing with his being qualified as an EMTALA

21  expert; and secondly, his testimony that an action is a

22  violation of EMTALA.  And then we'll deal with the third issue,

23  whether or not he can testify regarding a standard of care

24  generally applicable to A.H.'s healthcare providers on that

25  case.

1      So, then, may I hear from the Defendants with further

2   argument as to Dr. Sobel?

3           MR. PUGH:  Yes, Your Honor.  Lamar Pugh.  I'll be

4   arguing on this particular motion.

5      You know, Judge, I think today being the first hearing

6   we've had on this case, really underlines a problem not only in

7   the *Daubert* hearing but going forward in the case and that is

8   the uniqueness of this case.

9      When you look at the jurisprudence, there is a lack of

10  jurisprudence when there is an EMTALA allegation without a

11  medical malpractice allegation.  The cases are typically:  An

12  expert comes in and testifies and it's about medical

13  malpractice and EMTALA combined.  All the cases that I was able

14  to look at were a combination of those.

15     Adding to that, when you look at Dr. Sobel himself, he has

16  testified in his deposition that this is extremely unique for

17  him as well.  He has never seen a case that he's been involved

18  with, other than in the province of Puerto Rico where they do

19  not have a medical malpractice statute, where malpractice and

20  EMTALA were not combined.  And he commented in his deposition,

21  and that was some of the pages that I attached to the Friday

22  night submission to the Court.  In his discussion --

23           THE COURT:  Okay.

24           MR. PUGH:  -- this is the only case that he has where

25  these two issues are -- excuse me, the issue malpractice and

1    EMTALA are not in one case.  In fact, he thought it was very

2    unusual and he even inquired further -- and I won't go into the

3    details of what he inquired with his attorney because I don't

4    know -- but in his deposition, he said this is an unusual case

5    when there's not any medical malpractice claim.  It's unusual

6    for me to receive a case like this and I want to understand a

7    little bit further.  I have no prior experience with an

8    independent EMTALA case that didn't involve medical

9    malpractice.

10        So that kind of underlines as we're going through this

11   case, to me, the issues that we're going to be looking at,

12   because we frankly have a very narrow case -- very narrow --

13   and that is:  Was there a violation of EMTALA when it comes to

14   the stabilization?  Part of the objection to what --

15        Your Honor, if I don't go in the order you like, please

16   stop me, but.

17        Part of the concern is in his report.  He discusses

18   about -- he thinks there was a failure to perform an

19   appropriate medical screening exam.  Both the malpractice, it's

20   in Docket 1, paragraph 2, the Plaintiff states:  No

21   pre-litigation requirements or administrative filings were

22   necessary, nor any other relief is sought in this lawsuit

23   against Defendant, Willis-Knighton.  No relief is sought under

24   medical malpractice.  So that is not an issue for the expert --

25             THE COURT:  I will say again that the Plaintiff

1    has -- there are facts that are out there and those facts may

2    tend to prove a lot of different things.  Knowledge, for

3    example, because I know you argue that knowledge, they must

4    prove knowledge.  So just because the Plaintiffs say they have

5    not filed a medical malpractice, and we all know why they

6    haven't filed a medical malpractice, I guess because the limits

7    are so little.  That's just my guess.  But they have a set of

8    facts.  That set, you cannot preclude them from bringing out

9    the facts of what happened before.

10         And, Mr. Pugh, what you've done is you've moved on to

11   three, which I was inclined to get --

12              MR. LAMAR PUGH:  Sure.  I'll go back to one,

13   because --

14              THE COURT:  Let's just do one and two.  How -- what

15   are the limits that we would put on his testimony with regard

16   to EMTALA?

17         Certainly, Mr. Pugh, let me ask you this.  In an ordinary

18   medical malpractice case, don't you allow the doctor to testify

19   as to what is the local standard of care?

20              MR. LAMAR PUGH:  You would allow that when that is an

21   issue in a malpractice practice, which it is, but in an EMTALA

22   case, I would argue to the Court:  I don't believe that is the

23   issue.  I think the issue is -- I'm sorry.

24              THE COURT:  I'm not saying that that is the issue.  I

25   think that the -- I'm using that as an analogy, that someone

1    has to say that there are policies and procedures under EMTALA

2    that apply to an emergency room.

3         And are you saying he can't say that?

4         MR. PUGH:  No, Your Honor.  He can testify as an

5    emergency medical physician.  I'm not challenging that, as to

6    what he sees in the records and what he would have done.  The

7    challenge we have is him testifying about that is a violation

8    of the law or is a stabilization.  That's where our issues are,

9    is where he is trying to expand his opinion either beyond the

10   pleadings --

11        THE COURT:  Wait.  Now, wait; I'm going to stop you.

12   You said two things there.  And that is a violation of EMTALA.

13   And I am going to tentatively agree with you there.  I don't

14   think that the expert gets to say that EMTALA has been

15   violated.

16        I think you went on just then to say, Mr. Pugh, that he

17   can't testify that the patient was not properly stabilized.  Is

18   that what you were going to say?

19        MR. PUGH:  No, Your Honor.  To me, he should not be

20   able to argue that the patient was not properly medically

21   screened, which he does in his report.  But the Plaintiffs have

22   said that is not an allegation of which they're making in their

23   complaint.

24        THE COURT:  Well, you can't -- there are facts as to

25   the treatment of this plaintiff.  And this, again, goes into

1    number three that you're talking about.  And that's that he

2    can't talk about what's going on in the rest of the case.

3    Certainly one of the elements that is going to be -- that the

4    Plaintiff has to prove in EMTALA -- and, Mr. Gahagan Pugh, you

5    are looking at me so hard -- and that one of the elements that

6    he has to prove is knowledge.  That, and certainly the

7    treatment of this physician.  Every time the physician touches

8    that patient or every time there is an entry, that, those facts

9    go to knowledge.

10       I'm not saying we're going to instruct on medical

11   malpractice, because we're not going to do that.  We would

12   instruct on EMTALA.  We would say:  These are the elements that

13   EMTALA requires.  And certainly he could testify as to whether

14   or not those elements had been fulfilled.

15       And I'm arguing with you.

16           MR. PUGH:  I would agree with you, Your Honor, with

17   the exception of:  The Plaintiffs have specific -- if you want

18   me to wait, I will, on this part, but in paragraph 8, they are

19   saying that Willis-Knighton provided appropriate medical

20   screening and detected an emergency medical condition in a

21   four-year-old child.

22       So my point is:  Under *Daubert*, that is not a fact at

23   issue for the expert to give an opinion on because the

24   Plaintiffs and the Defendants agree that the individual had an

25   emergency condition when the child arrived in the emergency

1   room --

2          THE COURT:  Okay.  Now, Mr. Pugh, I'm going to go

3   back on you there.  And I'm looking at what you're saying

4   again.

5      Number one, you have refused to stipulate that there was

6   an emergent medical condition.  I heard Dr. White say that she

7   agreed there was.  But in reading the responses to the

8   discovery, you were asked to stipulate to that or to admit to

9   that, more or less, and you-all did not.

10     Do I hear that as a stipulation or admission at this time?

11         MR. LAMAR PUGH:  Upon presentation to the hospital.

12         THE COURT:  She had an emergent medical condition --

13         MR. PUGH:  No, she was given -- I can't say exactly,

14  but I can say that the doctor did a medical screening

15  examination and determined there was an emergency medical

16  condition, yes.

17         THE COURT:  Mr. Banks, do you concede that the

18  medical screening was appropriate?

19         MR. HUTTON BANKS:  Yes, ma'am.  They performed

20  appropriate medical screening and they detected emergency

21  medical condition.  Now, once they detect the emergency medical

22  condition, then the duty to stabilize is triggered.  I don't

23  see how this falls into *Daubert*.  I mean, if this is an

24  exception or a 12(b)(6) or whatever.  But as far as *Daubert*, I

25  don't see why Dr. Sobel can't state his opinion.

1            THE COURT:  Where -- so let's point me, then,

2     exactly --

3            MR. LAMAR PUGH:  Document 1, paragraph 8 is where the

4     Plaintiffs make the statement.

5            THE COURT:  Okay.  No.  In Dr. Sobel's report, Mr.

6     Pugh.

7            MR. PUGH:  Oh, yes.  I can, Your Honor.  And I'd be

8     happy to put it on the screen if you'd like.  But I can --

9            THE COURT:  No; I have it in front of me.  Just give

10    me the page.

11           MR. PUGH:  The specific on the medical screening

12    exam, the first time it is mentioned in an opinion is on page

13    7, general summary, last paragraph, the end of the first

14    sentence:  My opinion based on the information I have reviewed

15    is that Willis-Knighton South emergency did not provide

16    reasonable medical screening.  And he goes on, on the

17    stabilization.  But just the, did not provide reasonable

18    medical screening, is offering an opinion that I --

19           THE COURT:  That's contrary -- are we splitting words

20    here?  Is that contrary to the Plaintiff's position?

21        Mr. Banks, can you distinguish that?

22           MR. HUTTON BANKS:  No.  I just asked Dr. Sobel to

23    review the case and that's what his opinion is.  I don't see

24    that any factor of *Daubert* is mentioned at all.

25           THE COURT:  But what he's saying is:  You can't argue

1    something to the jury that is inconsistent with your admission.

2    So if you're saying -- and I'm not sure that what he means,

3    because we don't have him here, is initial medical screening or

4    is it continuing medical screening, because I didn't read it

5    the way you are reading it, Mr. Pugh.  I read it:  As things

6    progressed, this patient was not treated appropriately.

7            MR. PUGH:  Your Honor, under EMTALA, the first

8    obligation of the hospital is to provide a medical screening.

9    It's a term of art under EMTALA where it says they must

10   determine yes or no, is there an emergency medical condition.

11   Then you go on past that.  It's a very defined in all the case

12   law.  There are the two types of cases -- excuse me; there's

13   actually three.  But failure to medically screen, failure to

14   stabilize, failure to appropriately transfer.

15       So it is he's giving an opinion and it goes on.  That's

16   just the first reference; there are others to come.

17           THE COURT:  All right.  Mr. Pugh, I keep trying to

18   get you back to our first issue, and I'm -- because, all right,

19   we have M.A. Riddell, who entered the waiting room.  I think

20   that's Mr. Banks, the other Mr. Banks.

21           (Mr. Sedric Banks joined the hearing via Zoom)

22           THE COURT:  Okay.  So let's talk, so let's talk

23   about -- as I said, Mr. Pugh, I'm tentatively agreeing with you

24   that the man cannot say that EMTALA was violated.  I am going

25   to tentatively agree with that.

 1      Can he go as far as saying the EMTALA regulations apply to

 2   the emergency room and they impose upon the emergency room

 3   certain duties, and outline what those duties are as per page 4

 4   of his report?

 5           MR. PUGH:  Page 4 of his report, Your Honor, is a --

 6   his recitation of the EMTALA Interpretive Guidelines, which I

 7   would argue to the Court is, based on some jurisprudence, is

 8   the law.  EMTALA is very generally worded, okay, if I can just

 9   explain this point.  It's very generally worded on the details

10   of it.  So in 19 -- excuse me, 2004, CMS came out with

11   interpretive guidelines.  It's called the State Operations

12   Manual Interpretive Guidelines.  And in that, that is for

13   hospital surveyors who go in on an EMTALA complaint.  Because

14   typically EMTALA complaints are made to the government, and the

15   government comes in and does an investigation through the State

16   Department of Health.

17      This document is what explains to the state surveyors you

18   need to go in and look for.  Okay.  So that is the document

19   that even in his report he says these definitions are coming

20   from the Interpretive Guidelines on page 3.  So the bottom of

21   page 3 --

22           THE COURT:  Yes, sir, I understand that.

23      So my question to you is:  Do you object to him saying

24   that these are, this is the hospital survey, all the things

25   that you just said, and that these apply to an emergency, sir?

1      MR. PUGH:  If he's going to give the details of them,

2  to me, it's the same as giving a jury instruction as to what

3  the law is.  Now, if he can say there are interpretive

4  guidelines out there and then the Court instructs the jury as

5  to what they are --

6      THE COURT:  If he is a person that advises on what

7  the policies and procedures in a hospital should be, why can't

8  he testify as to what policies and procedures apply?

9      MR. PUGH:  I think he could testify that there are

10  interpretive guidelines out there, but I think -- I'm sorry,

11  Your Honor.

12      THE COURT:  So, then, I would just read these

13  interpretive guidelines to the jury?

14      MR. PUGH:  I think this is what EMTALA -- again,

15  EMTALA is generally worded.  It has the portions we've talked

16  about today, but it doesn't tell them:  When you go in, what do

17  you do with a pregnant woman?  It just -- what EMTALA is

18  generally, and these are like the medical screens and he is

19  combining his opinion of what the law says with what the

20  interpretive guidelines say.  I think he could say:  These are

21  the interpretive guidelines --

22      THE COURT:  He can say these are the interpretive

23  guidelines?

24      MR. PUGH:  -- but what his interpretation of what

25  they are, I think it's him explaining the law to the jury.

1      THE COURT:  Okay.  All right.  The Court finds these

2  first issues similar to -- I will analogize it.  And it is that

3  you could have an accident reconstructionist say:  The man ran

4  the red light.  You could have another person say that the,

5  state this.  But you cannot have that expert say that the

6  driver was negligent.

7      And I think that what we have here is that I don't think

8  that the witness can ultimately say EMTALA was violated,

9  despite the fact that Mr. Robison tried to get his own witness

10 to say that earlier today.  So, I don't think that you can have

11 him testify to those words.  As we said, the legal conclusion

12 versus the ultimate issue, there's a fine line between those.

13     I would ask, Mr. Banks, do you have -- the Court made the

14 same error in looking at your submissions to the Court that it

15 did in looking at the Defendant's, and that is that I assumed

16 that when you submitted Dr. Sobel's report again last Friday,

17 that I had everything already, and so I did not download that.

18     Do you have his CV?

19         MR. HUTTON BANKS:  Yes, ma'am.  It's attached as

20 Exhibit 1 to Defendant's submissions.

21     THE COURT:  Yes.  And what I'm telling you is:  I

22 didn't download Exhibit 1 because I assumed that Exhibit 1 was

23 the same thing that I already had, just trying not to download

24 everything onto my iPad.

25     So can you tell me about his experience in his CV in terms

1    of policies and -- emergency room policy and procedures.

2         MR. HUTTON BANKS:  Yes, ma'am.  It's quite extensive.

3    As Mr. Pugh indicated, he's testified all over the country and

4    if you consider Puerto Rico, then different parts of the world,

5    about EMTALA.  But, you know, Your Honor, I don't think there

6    has been any objection at all about Dr. Sobel's qualification,

7    training, experience.  I didn't see that in the *Daubert* motion

8    at all.  But at this time I would like to offer Defendant's

9    Exhibit 1 in connection with this hearing.

10        THE COURT:  Yes, sir.  And what is in Exhibit 1?  I

11   saw it; it was his report --

12        MR. HUTTON BANKS:  And his CV.

13        THE COURT:  -- and the CV?

14        MR. HUTTON BANKS:  Yes, ma'am.

15        THE COURT:  It's not that he -- what the Court is

16   looking for is -- and the Court was under the impression from

17   the report that he was an expert in policy and procedures and

18   regulations that would apply to an emergency room.

19        MR. HUTTON BANKS:  Yes, ma'am.  Absolutely.  He's

20   reviewed countless policies.  He's been an EMTALA reviewer from

21   1997 to present.  He's very familiar with the policies and

22   Willis-Knighton's oxygen protocol in this case, which he

23   offered an opinion about in his deposition.  Yes, ma'am.

24        THE COURT:  What is the -- when you say he was an

25   "EMTALA reviewer," what do you mean by that?

1          MR. HUTTON BANKS:  Ms. Keifer, may I have permission

2     to share screen?

3          Thank you, Ms. Keifer.

4                    (Document displayed)

5          MR. HUTTON BANKS:  So, Judge, you see:  EMTALA

6     reviewer, 1997 to present, on Dr. Sobel's CV?

7          THE COURT:  But -- I do see it.  My question is:

8     What does that mean that he did?

9          MR. HUTTON BANKS:  I guess he reviews EMTALA claims,

10    EMTALA policies.  What I would try to illustrate, Your Honor,

11    is that the CV entirely and Dr. Sobel's expert report was

12    explored in-depth for hours during his deposition and no one

13    has sought to disqualify Dr. Sobel in that capacity.  It's not

14    on the table.

15         THE COURT:  But, no, they don't want to qualify him

16    as an EMTALA expert, is what they're saying.

17         MR. HUTTON BANKS:  I mean disqualify him in that

18    manner.

19         THE COURT:  That is what they are seeking to do.

20         And what it is -- again, I would make the analogy to a

21    simple negligence claim.  If you say that -- and it has to do

22    with the interaction between what the Court tells the jury in

23    the jury instruction and what the witness testifies to.  The

24    witness --

25         All right.  Ms. Plouf, would you send Judge Walter a

1   message and tell him that I am in a hearing.  I thought he

2   would get the red light, but I guess not.  Thank you.

3       To go back, the Court would instruct what the elements of

4   negligence are, the breach of a statutory duty, and that that

5   might constitute negligence.  So the Court would instruct on

6   that.  Then the witness would testify that the car ran the red

7   light; and then the Court would instruct that there is a law

8   that you cannot run the red light.  And then on the negligence,

9   as to what negligence is:  It's the breach of the statutory

10  duty.  And so the witness can only go so far.

11      And I would analogize that to EMTALA.  It may well be that

12  this gentleman is qualified to say that EMTALA is a set of

13  rules and regulations as interpreted by all of these things

14  that applies to an emergency room.  And I think that just like

15  protocols that are in place in emergency rooms, experts

16  evaluate those all the time to say this is an adequate protocol

17  or this is not an adequate protocol.

18      So I think that he can testify that there are rules and

19  regulations that do apply to the emergency room and he can

20  evaluate the actions in terms of these interpretive guidelines,

21  but I don't think that's to say that, those words, that EMTALA

22  was violated.  I think he can say that EMTALA requires the

23  appropriate screening, it requires the stabilization, in this

24  case stabilization was not adequate because of the following

25  factors.  And the fact would be that that's how far he could

1    go.  And that would be the Court's opinion on those issues.

2         So that means that you could not qualify him, Mr. Banks,

3    as an expert in EMTALA.

4         The Court would suggest that you explore an alternate way

5    to qualify him.  Certainly, he's an expert in emergency

6    medicine.  I would suggest -- and you could speak with him as

7    to how he has been tendered in the past, but that --

8         MR. HUTTON BANKS:  I'm sorry, Your Honor.  I think

9    the defendant's expert -- I think that's their words.

10   Plaintiffs intended to tender Dr. Sobel as an expert in medical

11   compliance with EMTALA standards.

12        MR. PUGH:  Your Honor, that would be a medical expert

13   in compliance with the law; it would be the same thing.  And I

14   would like to go through some of his qualifications on that

15   point as well.

16        THE COURT:  Mr. Pugh, the Court has reviewed it.  And

17   I am going to finish my sentence, first of all.

18        MR. HUTTON BANKS:  Sorry.

19        THE COURT:  And my thought process, Mr. Banks, was

20   that he would be an expert in standards of ER management,

21   administrative practice, protocols and regulations, something

22   along those lines.  And therefore that he would be able to say,

23   deal with policies and procedures -- not just EMTALA -- that

24   apply to hospitals -- I mean, that apply to emergency rooms,

25   not just EMTALA.

1      So Mr. Banks, do you want to explore that with him?  Have

2  you asked him how he was in fact qualified otherwise?

3           MR. HUTTON BANKS:  Are you -- I mean, I will, Your

4  Honor.  If we tender as an expert in medical compliance with

5  EMTALA standards, we attach Exhibit 1, then the burden would

6  shift to Defendants to show he's not.  Is that correct?

7           THE COURT:  The burden in *Daubert* is always with you.

8           MR. HUTTON BANKS:  Sure.

9           THE COURT:  It is very puzzling how that works, Mr.

10  Banks.  It would seem that there is some inner burden shifting,

11  but that's not what 100 percent of the jurisprudence says.  All

12  right?  So I would agree -- I agree with your gut feeling and

13  second that feeling but have to tell you that that it is not

14  what the law says.  The law says that it is the proponent,

15  meaning you, who has to -- has the burden of proof.  That seems

16  to be belied by the fact that the Court doesn't conduct this

17  gatekeeping hearing unless there is an objection under *Daubert*.

18  What we do usually is just hear their qualifications at trial

19  and go forward at that time.

20      But the Court would -- has a problem with you saying "an

21  expert in EMTALA compliance."  I think that implies that he is

22  going to give an opinion as to whether or not EMTALA was

23  complied with, when the issue is -- it's subtle, Mr. Banks;

24  it's a step below "was EMTALA complied with."  He can say

25  "EMTALA applied."  He can say that the EMTALA Interpretive

1    Guidelines require these things.  And he can say then that

2    those things were not done because of the following facts.

3        The Court would then instruct:  EMTALA requires these

4    things and therefore.  And then the jury could make up their

5    mind as to whether or not you have carried your burden on

6    proving those facts based on his testimony.

7        It's subtle.  But you are left with how you are going to

8    qualify him.

9        All right.  So, Mr. Lamar Pugh, why do you think he cannot

10   be qualified in the area of ER management, administrative

11   practices and protocols and regulations.

12       MR. LAMAR PUGH:  Your Honor, I would look back to his

13   experience, Your Honor, and say that -- again, he's not here

14   for me to cross-examine.  The only way I can do is to go back

15   to his deposition and present quotes of where, what he has said

16   during his deposition about it.

17       THE COURT:  You've got the floor; do it now.

18       MR. LAMAR PUGH:  I think part of it is going to be so

19   blended with that EMTALA expert issue, and I can't -- the

20   questions were generated.  For example, he's only been

21   qualified as an expert in Louisiana.

22       Gahagan, can you pull up page 61, please.

23       Judge, I would purport to you that in his deposition he

24   said he's reviewed a half a dozen cases in Louisiana, he's

25   testified twice, and then later submitted he testified three

1    times.  All of the cases were medical malpractice.  He was not

2    sure if they were of EMTALA.  And he was qualified only as an

3    expert in emergency medicine, not in just policies and

4    procedures any different than the other.

5        I'm happy to show those pages if the --

6            THE COURT:  What about in other -- you know, you're

7    presenting a witness that's been qualified one time in

8    emergency medicine.

9            MR. LAMAR PUGH:  You're correct.  He has two cases

10   listed in his expert report.  The majority of them are medical

11   malpractice cases.

12       Gahagan, get page --

13           THE COURT:  Has he -- has --

14           MR. LAMAR PUGH:  I'm sorry; I think that's frozen.

15           THE COURT:  Anything else to show the Court?

16           MR. LAMAR PUGH:  Yes, Your Honor; I lost you there

17   for a minute.  I wasn't sure of the response.

18       He said he's been involved in 50 cases.  Majority of them

19   were malpractice.  Six to ten had an EMTALA complaint, but none

20   of them had an EMTALA-only complaint.  Page 60 of his

21   deposition, lines 5, 8, and 16.  I attached those and

22   provided --

23           THE COURT:  I'm afraid I don't understand the

24   significance of your saying --

25           MR. PUGH:  Judge, he didn't testify any differently

1    than the doctor this morning about what an ER doctor would say.

2    We're fine with him testifying as an emergency medical, as I

3    think she could testify as an emergency medical doctor, about

4    what --

5              THE COURT:  That remains to be seen.  I am still

6    concerned about that standard of care issue.

7         Okay.  Anything else to show me, Mr. Pugh?

8              MR. LAMAR PUGH:  Yes, certainly.

9         Gahagan, give me page 28.

10             THE COURT:  I have reviewed all these, you know.

11             MR. LAMAR PUGH:  That's just the pages I sent you,

12   Your Honor, which only about four, not the others.

13        He has testified -- when you say he's had a lot of

14   experience developing policies, most of his experience was in

15   the '80s and '90s.  I'll remind the Court that the operative

16   time period for the majority of the documents that he's

17   referencing did not occur until 2004.  So his development of

18   policies in '80s and '90s would not apply to this case because

19   the Interpretive Guidelines didn't even come out until 2004.

20        He has indicated that he reviewed cases, or on his CV

21   does, that he has done reviews for the Georgia HealthCare

22   Foundation.  In 18 years, he has reviewed 10 to 12 cases.  He

23   has reviewed no cases in the last five years.  He was not

24   representing the Department of Health & Hospitals, nor was he

25   representing CMS.  And he said the only qualification necessary

1    to do that was to be a working ER physician.  I don't think

2    that gives him specialized training for doing that when he's

3    done 10 of them in the eighteen years and has done none in the

4    last five years, and the majority of them were done before the

5    2004 Interpretive Guidelines came out.

6         So I don't see that his expertise in the area of

7    developing policies and procedures in the '80s and '90s would

8    be relevant to EMTALA after the Interpretive Guidelines in

9    2004.

10             THE COURT:  Mr. Pugh, do you contend that the related

11   standards that, and Interpretive Guidelines that he recites,

12   beginning at the bottom of page 3 and onto page 4, are

13   erroneously applied to this case, or are not correct?

14             MR. PUGH:  I think the Interpretive Guidelines would

15   be applied to this case.  His opinion of what they say, I would

16   have a difference for that.  Whether he has applied them -- you

17   know, he goes through and gives the definitions of different

18   terms that are not fully defined under EMTALA; they're defined

19   more in these Interpretive Guidelines, which is the majority of

20   what he --

21             THE COURT:  All right.  What he quotes on page 4, is

22   any of that -- I have a note:  Where does this come from?

23        Does this come directly from the Interpretive Guidelines

24   or is he making this up?

25             MR. LAMAR PUGH:  Parts of it, if you look on page 3,

1   he says according to the Interpretive Guidelines, medical part

2   and medical evaluation of EMTALA all.  I don't know that there

3   are some places he may be quoting specifically from them, like

4   in the definitions on the next page.  I mean, he -- these are

5   the same --

6          THE COURT:  One through four is exactly what your

7   witness said.

8          MR. LAMAR PUGH:  Correct.  And that is what the

9   general interpretation of the emergency room physicians are

10  about --

11         THE COURT:  And number 5.

12         MR. LAMAR PUGH:  -- what the three duties are under

13  EMTALA.  But he's saying these are all according to the

14  Interpretive Guidelines.  He's giving his opinion on what they

15  say, is how I'm reading this paragraph starting on page 3.

16         THE COURT:  I don't know if he's giving his opinion

17  as to what they say or whether this is quoting from the

18  Interpretive Guidelines.

19         MR. LAMAR PUGH:  Again, I will tell you, and I have,

20  you know, I've been through them many times over the years but

21  they are not -- the definitions -- there is a definition of

22  "hospital emergency department" in here.  There is a -- I have

23  not gone line --

24         THE COURT:  Is any of this information in 1, 2, and 3

25  on page 4, is any of that information -- I'm going to ask you

```
 1    two questions -- incorrect; or number two, not contained in the

 2    Interpretive Guidelines?

 3              MR. LAMAR PUGH:  I believe, Your Honor, when he

 4    looks -- I believe he is quoting portions from it and then he's

 5    giving opinions at the end.

 6              THE COURT:  All right.  Is it incorrect?  Is any of

 7    it incorrect?

 8              MR. LAMAR PUGH:  I don't know that I would say that

 9    they're --

10              THE COURT:  All right.  The Court is prepared to rule

11    on this first issue, and that is that he is adequately

12    qualified as an ER medical doctor and in certain standards of

13    ER management, administrative practice, protocols, and

14    regulation.

15         How you want to phrase that, Mr. Banks, is going to be

16    another issue.  And you may want to get with him and go over

17    that.

18         The Court is going to allow him to testify that EMTALA and

19    the Interpretive Guidelines, as to what they say and their

20    definitions apply in an emergency room.  The Court will then

21    allow him to give his opinion as to, based on the facts of this

22    case as to whether or not those regulations were fulfilled.

23    But he cannot cross the line and say that there was an EMTALA

24    violation.  He can say failure to stabilize.

25         Now, let's talk about the issue of the improper screening.
```

```
 1    I am not clear, and it is not clear from the -- I have to agree

 2    with you, Mr. Banks; I don't think this is a *Daubert* issue.  I

 3    think this is an issue of what you have conceded to the Court

 4    versus what your expert is saying.  And certainly, if he has an

 5    opinion that the person was not properly initially screened,

 6    then that might be inconsistent with what you are saying.  I'm

 7    not sure.

 8         And the Court did not appreciate that that was part of

 9    Willis-Knighton's argument at all prior to today from the

10    briefing that was out there.  I don't think that goes to his

11    ability to testify; I think it's more of an issue that we

12    should resolve at the pre-trial as to whether or not this is a

13    different -- whether or not this doctor is saying something

14    different than a concession that the plaintiff has made.

15         It would be the same thing as if the plaintiff had

16    stipulated that the light was red when his client went through

17    it but that he has all kinds of reasons why that was not

18    negligence.  And then his expert says:  Oh, no, the light was

19    green.  Where would that put us?  That's not a *Daubert* issue;

20    it's a stipulation issue.  And I am -- all right.  I'm going to

21    read you something.

22         When I look at the discovery, that's not an issue that was

23    brought up.  Interrogatory No. 7:  Please state whether A.H.

24    did or did not suffer an emergency medical condition as defined

25    by EMTALA at the time she was transferred from Willis-Knighton
```

1    Hospital.  Please state whether or not she had it, as defined

2    at the time she was transferred.

3        And it says:  Defendant objects to this interrogatory as

4    vague and overly broad.

5        This Court agrees it's not well worded.

6        Subject to that objection, Defendant shows that A.H. was

7    stabilized and discharged home.

8        I just -- I think that there's a lot of, in these

9    interrogatories, talking over each other.

10            MR. LAMAR PUGH:  Your Honor, if I may?

11            THE COURT:  It's not as bad -- your response, Mr.

12    Pugh, is not as bad as I thought it was.  I thought he was

13    asking:  Do you concede that there was an emergent medical

14    condition upon admission?  And --

15            MR. PUGH:  We've always said that there would be no

16    need -- maybe if I say it this way.  Your Honor, if there is no

17    emergency medical condition, there is no EMTALA, there is no

18    need to stabilize.  If the doctor makes a determination that

19    there is no emergency medical condition, EMTALA drops to the

20    floor; it does not exist.  So for me to say that the patient

21    was stabilized means it had to have had emergency medical

22    condition, or there would be no reason to stabilize under

23    EMTALA.

24            THE COURT:  I understand, Mr. Pugh.

25        All right.  So that is the Court's ruling with regards to

1    those two issues.

2         The Court reserves judgment as to the phrasing of how the

3    expert will be tendered and what we're going to do about any

4    inconsistency in what the doctor says with what points that the

5    Plaintiff may have conceded.

6         Here again, when I read his report, I didn't think he was

7    saying that initially that she was not properly screened as a

8    emergency medical condition, but that as she was gone on and

9    treated, that that was not adequate for the ultimate

10   stabilization of the patient.

11        MR. PUGH:  But under EMTALA, Your Honor, again, there

12   is, level one, if you don't get to that.  So there is only one

13   time you do a medical screening examination and that's to

14   determine if emergency medical condition exists.  After that,

15   it's becomes stabilized or not.

16        THE COURT:  I understand your position on that.  And

17   as I said, I think it's not a *Daubert* issue but an issue to be

18   decided at the pretrial and what we're going to do.  And I

19   think the plaintiff needs to give some thought to that.  But I

20   saw nothing else that talked about --

21        MR. PUGH:  Your Honor, in his opinions, if you're

22   talking about stabilization, it's numbers 1, 2, 3, 4 and 5 --

23   screening; I'm sorry.  His opinion is on page 8.  And I may

24   have been supposing what your question was and should have

25   waited.  But, on page 8, it's the last of sentence 1.  It's 2,

```
1    3 and --

2              THE COURT:  I find that different as to adequate

3    medical screening emergency stabilization.  What he's saying is

4    that he didn't look beyond.  I see it as different than what

5    you're saying, Mr. Pugh.

6              MR. LAMAR PUGH:  And he defines "medical screening

7    exam" on page 4.

8              THE COURT:  Mr. Pugh, the Court has ruled and I'm not

9    going to sit here and argue with you any more this afternoon on

10   this issue.

11             MR. LAMAR PUGH:  Thank you.

12             THE COURT:  All right.  Let's turn, then, to the next

13   issue, which is that Dr. Sobel cannot testify regarding the

14   standard of care generally applicable to A.H.'s healthcare

15   providers on February the 10th.

16         Would you address that, then, Mr. Pugh.

17             MR. PUGH:  Your Honor, it would be the argument that

18   if it is not at issue -- and the same Daubert argument I made

19   before.  And that is if it is not an issue in the case, the

20   expert's opinion would not help the trier of fact to make a

21   determination -- and again, this is the part about the medical

22   malpractice.  If he is to testify that there was medical

23   negligence in a malpractice sense, I don't believe that's

24   something that is alleged in this case.  And if it is, we got

25   to get back to Louisiana law and apply the medical review panel
```

1    and follow its action.  So that was what was meant by that

2    entire section.

3        So to the extent he's --

4        THE COURT:  The Court will go ahead and enunciate its

5    ruling on this.

6        First of all, let's go back to the testimony that EMTALA

7    was violated.  I would note, as I said before, that we have the

8    704 issue versus the issue that we cannot render conclusions of

9    law.  The Court would make the observation that other district

10   courts specifically, when looking at EMTALA, have disallowed

11   that an opinion as to whether EMTALA was violated as

12   impermissible legal conclusion.  And those cases were pointed

13   out by the defendant.  An example is the *Guzman* case *versus*

14   *Memorial Hermann Hospital* out of Texas.  But the -- and the

15   plaintiff, despite having good argument on that issue, came up

16   with no cases that would convince the Court otherwise.

17       Secondly, the testimony that A.H. was or was not stable,

18   or other defined terms, that the Court would deny that.  The

19   terms within the statute are not legal conclusion, and

20   testimony as to whether A.H. was stable at the time she was

21   discharged will aid the jury in determining if the EMTALA was

22   violated.  Other district courts, including the *Guzman* case,

23   have allowed similar testimonies.  *Guzman*, objection to an

24   expert's, quote, opinions about whether "T" had an emergency

25   medical condition and whether he was stable in the emergency

1    room on that basis, that they go to the ultimate issue is

2    unpersuasive.  So this Court is making the same distinction

3    that the *Guzman* case, which is cited by the Defendant, did in

4    fact make.

5        Again, another case on point is *D-E-L-I-B-E-R-T-I-S versus*

6    *Pottstown, P-O-T-T-S-T-O-W-N, Hospital* from the Eastern

7    District of Pennsylvania.  And the expert was "permitted to

8    testify regarding his opinion as to whether plaintiff had an

9    emergency medical condition and regarding the symptoms he

10   demonstrated."

11       Testimony about the standard of care.  I think we have --

12   here, I thought this was simply a dispute over semantics until

13   I heard Dr. White's testimony this morning.  And that's why the

14   Court was so concerned about what standard she was utilizing in

15   order to judge the stability and whether the standard of care

16   for an emergency medical physician, emergency room physician

17   would be the same as it is under EMTALA.  Does that definition

18   of stabilization mean the same thing?

19       The parties have agreed and argued to the Court that the

20   applicable standard -- and this is why I questioned her on

21   this -- is not medical negligence but instead the EMTALA

22   statute and the EMTALA language.  If that is different than

23   what the definition of "stability" is, ordinarily understood by

24   an emergency room physician, I think defendants have a problem

25   getting Dr. White qualified.  And that was it.  This doctor is

1    doing it solely under EMTALA.  And he can testify with regard

2    to her medical treatment and determine that.  He's not going to

3    testify as to negligence and that's not -- because that's not

4    the issue here.

5         The Court notes that we know that the case law says that

6    EMTALA is not intended to be a federal malpractice statute.

7    But you cannot ignore how the patient was treated in the facts

8    of the case, and we can't limit this expert to not looking at

9    the facts of the case as to how the person was treated.

10        So, no experts would be permitted to testify that

11   Willis-Knighton did or did not violate EMTALA.  No witness, Mr.

12   Robison, is going to be allowed to testify that whether or not

13   a patient was "dumped," which is a word that has specific

14   connotations with EMTALA.  Experts will be allowed to

15   testify -- or let's say Dr. Sobel will be allowed to testify --

16   whether A.H. had an emergency medical condition or was

17   stabilized before her discharge.  And experts will be permitted

18   to talk about the care that she received that night in this

19   matter.

20        I am still waiting to hear from you on the issue of Dr.

21   White.  It just seems that Willis-Knighton is walking an

22   astonishingly fine line here.  They have presented a witness

23   who doesn't seem to have an understanding of EMTALA, and yet

24   they argue that Willis-Knighton should not be subject to a

25   standard of mere malpractice or negligence but to the standard

1    of EMTALA.  So when it comes to stabilization, that's going to

2    be what the defendants have to convince me of:  That Dr. White

3    can -- that what the -- that the criteria she is using for

4    "stabilization" under the duty of an emergency room physician

5    is identical to that under EMTALA.

6         So that concludes the Court's ruling for today, and the

7    Court's review of this matter.

8         Have I forgotten any issues, Mr. Pugh?

9         MR. LAMAR PUGH:  Your Honor, you haven't forgotten an

10   issue; but I wanted to clarify one, to make sure I understood

11   correctly.  When I clarify that interrogatory answer meant

12   inpatient didn't apply to this particular case, does the Court

13   want a copy of what I am going to give them within 10 days?  I

14   don't know if the Court wanted --

15        THE COURT:  Yes, that's an interesting issue.  But I

16   think that what you indicated was that you weren't aware of any

17   oxygen protocol for the emergency room.  Is that right?

18        MR. PUGH:  No, Your Honor.  And again, I don't want

19   to bring up an issue that you've ruled on; but when I answered

20   that question, I had time to look while we were at lunch.  They

21   asked for any and all documents that were applicable at the

22   time of his discharge.  I said, response:  Please see attached

23   oxygen protocol, which would apply to inpatients.  So I made it

24   clear there, I thought, that it would apply to inpatients.  She

25   was not one.  And the ER standing orders.  So I can reclar --

168

 1   word that sentence appropriately.  But, no, I was not saying

 2   there wasn't one or not.  I tried to find any and all protocols

 3   that Willis-Knighton, the entity, had.  And I told them:  Give

 4   me anything that could respond to this, whether it applied to

 5   this particular case or not.

 6       And so, again, I just wanted to know if you wanted a copy.

 7           THE COURT:  Well, perhaps so.  Perhaps you should

 8   submit that to the Court as well, because I thought you said

 9   there was no such procedure, there was no --

10           MR. PUGH:  There was no protocol in the ER for

11   oxygen, no, ma'am.  That's why I produced the ER standing order

12   because it mentioned O2.  I tried to go to anything in the

13   hospital that would be responsive to the question they asked.

14   And I believe I appropriately responded by giving them the

15   hospital document and the ER and indicated that the hospital

16   document only applied to inpatients.

17       And also why I did this was:  They produced -- it came up

18   in the middle of the case an oxygen protocol that they said

19   applied, it was from a case years ago that Mr. Banks had.  And

20   he said this in his deposition.  And so I wanted to give the

21   protocol that was the correct one at the time of the discharge

22   to show that the one that he had was from another case, another

23   date, another hospital.

24       So I was not trying to mislead anyone; I certainly never

25   would do that, but I was trying to give anything that had

1   response to the question asked.  And I thought my -- would

2   apply to inpatients since I've had the discussion with him,

3   inpatients would not include this patient because it was in ER.

4   But I will correct it.

5        THE COURT:  There was obviously a misunderstanding

6   there, Mr. Pugh, and the Court is not attributing any improper

7   motives to you in this matter.

8        MR. PUGH:  That was also an issue.  And I would send

9   a copy to you.

10       THE COURT:  Yes, thank you.

11    Is there anything else to come up at this time?

12    Oh, Ms. Plouf, talk about the exhibits.  We had some

13   issues on the exhibits, didn't we, from this morning?

14       LAW CLERK:  Yes, Judge.  You were going to clarify,

15   first, the procedure for the admitted exhibits, individual

16   pages, and then it was Dr. White's notes.

17       THE COURT:  Ah.  Very good.  Thank you for reminding

18   me.  Okay.  There, it's two separate issues.  One is that Mr.

19   Banks had emailed Ms. Plouf and he didn't copy the rest of you.

20   But his question was as to the -- and that's why she didn't

21   respond to you, Mr. Banks.

22       MR. HUTTON BANKS:  Sorry.

23       THE COURT:  And the question was whether or not --

24   does he need to resubmit the documents that were admitted today

25   that the Court did not admit yesterday?

1    And the answer is: Absolutely yes.  It is your duty, not

2    ours, to post pages and pull the ones that were admitted today.

3    That is your obligation, Mr. Banks, and you need to have those

4    to us within 24 hours.

5         MR. HUTTON BANKS:  Yes, ma'am.

6         THE COURT:  Okay?  So that's number one.

7    Number two, when you talked about her handwritten notes,

8    it was not clear what pages of those handwritten notes you were

9    admitting.  Were you admitting the entirety of her handwritten

10   notes or not?  And we were not clear on that.  Our notes did

11   not reflect whether or not you were admitting the whole thing.

12        MR. HUTTON BANKS:  Yes, ma'am.  I'll -- if it would

13   make it easy, I would just admit them, introduce them all

14   unless there's an objection.

15        THE COURT:  Is there any objection to -- it's not a

16   whole lot of pages or I might -- is there any objection?

17        MR. LAMAR PUGH:  No objection.  I would ask the Court

18   if the Court wants me to introduce what I sent Friday night and

19   briefly referred to and showed on the screen, because I failed

20   to do that during the arguments.

21        THE COURT:  Oh, good point, Mr. Pugh.

22   Yes.  If you would go ahead, the things you did send on

23   Friday, to the extent that they were not included with what the

24   Court admitted, please do.  They would be admitted into

25   evidence.

1      The Court needs you likewise, within 24 hours, to send

2   those things to the *footemotions* file.  Ms. Plouf and I will

3   review them to make sure that they comport with our

4   recollection of what was admitted into evidence.  And then we

5   will, if we agree, we will give them to Ms. Keifer.

6      Mr. Banks, I assume you had no objection to the things

7   that Mr. Pugh sent on Friday night and which he showed today to

8   the Court?

9           MR. HUTTON BANKS:  No, Your Honor, I have no

10  objection and just ask that it be admitted entirely, his CV and

11  his report.

12          MR. LAMAR PUGH:  I was referring to --

13          THE COURT:  Yes, and the CV, right.  The CV was not

14  in previously and the Court will allow the introduction of the

15  CV.

16          MR. HUTTON BANKS:  Thank you.

17          MR. LAMAR PUGH:  And I think that was actually

18  introduced by Mr. Banks, from my --

19          MR. HUTTON BANKS:  That's correct.

20          MR. LAMAR PUGH:  So, if you will submit that.  I was

21  referring to the deposition excerpts.

22          THE COURT:  Anything further?

23          MR. SEDRIC BANKS:  Judge, this is Sedric.  Just for

24  clarity, the documents that you're asking for to be sent in 24

25  hours, do you want hard copies of those as well or just the

1  electronic?

2          THE COURT:  No, sir.  We don't do hard copies so

3  well, especially since we are all working remotely.  This Court

4  is a firm believer that working remotely is the best way for

5  all of us to be going at this time.

6          MR. HUTTON BANKS:  Judge, just one more issue; I'm

7  sorry.  The *Daubert* 7 for Dr. White was shown, discussed at

8  length, but I don't think it was formally introduced.  Is there

9  an objection to introducing Exhibit Daubert 7?

10          THE COURT:  Wait.  Let me see what it was.

11     That's just the EMS sheet?

12          MR. HUTTON BANKS:  Yes, ma'am, that's correct.

13          THE COURT:  Had you not introduced that before?

14          MR. HUTTON BANKS:  I don't think that I did.  And I

15  wanted to show in the notes where she saying that she needed

16  the run sheet, and that's what the whole conversation was

17  about.

18          THE COURT:  I'm going to tell you I have no objection

19  to it going in; I would allow it to go into evidence.  I'm not

20  sure the -- that does not affect my opinion.

21          MR. HUTTON BANKS:  Yes, ma'am.

22          LAW CLERK:  Judge, did you want to reset the Document

23  46 motion for summary judgment deadline that were dependent on

24  the outcome of the *Daubert* hearing in light of the fact that

25  you have not completely ruled on the *Daubert* hearing?  It was

```
 1   initially set for --
 2          THE COURT:  Yeah.  I think we just suspend that
 3   deadline indefinitely and see what the Court rules.
 4        Thank you, Ms. Plouf.
 5        Is there anything else?
 6          MR. LAMAR PUGH:  Not from the Defendants.
 7          THE COURT:  Well, I know it's been a very long day
 8   for us doing that, doing all this.  And the Court was busy when
 9   you weren't busy.  So the Court thanks everyone for their
10   patience on this very long day.  And other than the electricity
11   going off at the Pugh office, things went very well today.
12        So the Court thanks you.  And if there's nothing further,
13   then, we are adjourned.
14                (Court was adjourned at 4:28 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

1                         INDEX OF WITNESSES

2   WITNESS CALLED BY THE PLAINTIFF:

3      JACQUELYN WHITE, M.D.
        Cross-Examination ................................   8
4        Direct Examination ............................... 104

9                       CERTIFICATE

10

11      I, Barbara A. Simpson, RPR, CRR, Federal Official Court Reporter, do hereby certify this 26th day of June, 2020, that the foregoing is, to the best of my ability and understanding, a true and correct transcript of proceedings had in the above-entitled matter.

13

14  _____/s/ Barbara A. Simpson