UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| AKEEM HENDERSON, ET AL. | CIVIL ACTION NO. 19-163 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| WILLIS-KNIGHTON MEDICAL CENTER | MAGISTRATE JUDGE HORNSBY |

### Memorandum Ruling

Before the Court is Defendant's motion for summary judgment. Record Document 42. Plaintiffs, Akeem Henderson and Jennifer Alexander, opposed the motion and Defendant replied. Record Documents 50 and 52. For the reasons stated herein, Defendant's motion [Record Document 42] is **DENIED**.

### Background

This case centers around the treatment four-year old asthmatic, A.H., received at Willis-Knighton South & Center for Women's Health ("WKS") on Saturday, February 10, 2018. Prior to that day, A.H. had presented to the WKS emergency department over thirty times and was admitted to the hospital several times. Record Documents 50-2, 50-3, 50-4, and 50-6 at 1. The Thursday before A.H. presented to the WKS emergency department on February 10, 2018, she visited a Quick Care Clinic where she was diagnosed with an upper respiratory infection and strep throat. Record Document 42-4 at 2, 9.

At approximately 2:00 a.m. on February 10, 2018, A.H. arrived at the WKS emergency department. Record Documents 50-2 at 11 and 50-6 at 1. According to A.H.'s medical records, her treatment proceeded as follows:

1

| | |
|---|---|
| 2:04 a.m. | David Easterling, M.D. ("Dr. Easterling") ordered that A.H. be given a "DuoNeb 1 unit dose Inhalation." Record Documents 42-4 at 1-2 and 50-2 at 13. |
| 2:11 a.m. | A nurse, Susan Rainer, RN ("Nurse Rainer"), completed a triage assessment. Record Document 50-2 at 15-16. A.H. was sitting in a tripod position, had labored breathing, was wheezing, and her home breathing treatment had not helped. *Id.* at 15. A.H.'s pulse was 156 beats per minute, her respiration rate was thirty-six, and her pulse oximetry level on room air was ninety-one percent. *Id.* |
| 2:32 a.m. | Nurse Rainer noted A.H.'s response to the DuoNeb treatment as "[t]olerated well," "[n]o adverse reaction," and "[r]espiratory status improved." Record Document 50-2 at 16. |
| 2:33 a.m. | Dr. Easterling examined A.H. and determined that she no longer had signs of respiratory distress, was breathing normally without the use of accessory muscles, and had "wheezing, that is mild." Record Document 50-2 at 11-12. |
| 2:46 a.m. | A.H. was taken to Radiology for a chest x-ray. Record Document 50-2 at 16. |
| 3:16 a.m. | Nurse Rainer administered an Albuterol inhalation to A.H. Record Document 50-2 at 16. |
| 3:23 a.m. | Nurse Rainer recorded A.H.'s vitals. Her pulse was 145 beats per minute, her respiration rate was thirty-four, and her pulse oximetry level was ninety-nine percent. Record Document 50-2 at 15. The chart does not state that this rate was measured on room air. *Id.* |
| 3:44 a.m. | A nurse administered Decadron-Dexamethasone Sodium Phosphate to A.H. Record Document 50-2 at 16. |
| 3:50 a.m. | Dr. Easterling reviewed A.H.'s vital signs, nurse notes, lab results, and radiologic study. Record Document 50-2 at 12. He spoke with A.H.'s family regarding her condition, "any diagnostic results supporting the discharge/admit diagnosis," and the need for outpatient follow up care. *Id.* Dr. Easterling noted that A.H.'s condition had "returned to base line" and her symptoms resolved after treatment. *Id.* |
| 3:52 a.m. | Dr. Easterling ordered that A.H. be discharged. Record Document 50-2 at 16. |

2

3:55 a.m.   Nurse Rainer recorded A.H.'s response to the Albuterol treatment as "[t]olerated well," "[n]o adverse reaction," and "[r]espiratory status improved." Record Document 50-2 at 16.

3:59 a.m.   A.H. was discharged from WKS. Record Document 50-2 at 16.

4:00 a.m.   Nurse Rainer noted that A.H. tolerated the Decadron treatment well with no adverse reaction. Record Document 50-2 at 16.

According to A.H.'s mother, who was present with A.H. throughout her entire visit to WKS that morning, Dr. Easterling physically examined A.H. approximately thirty minutes after she arrived at WKS and did not see her again before discharge. Record Document 50-6 at 1. She further states that A.H. was still "wheezing and breathing more rapid than normal" when discharged. *Id.*

After discharge, A.H. went to her grandmother's house until approximately 7:00 a.m. when her grandmother discovered her unresponsive and called emergency services. Record Document 50-6 at 2. A.H. was taken by ambulance to Willis-Knighton Bossier Health Center and later transferred to WKS where doctors treated her for respiratory and cardiac arrest and brain death. Record Documents 50-2 at 10, 50-6 at 2 and 50-7 at 5. A.H. died on February 16, 2018 when doctors discontinued life support.[1] Record Documents 50-2 at 5 and 50-6 at 2.

Plaintiffs, A.H.'s parents, brought suit alleging that Defendant's treatment the morning of February 10, 2018 violated the Emergency Medical Treatment and Active

---

[1] In responding to Defendant's motion to dismiss, Plaintiffs devote several pages of their statement of facts to discussing events that occurred after A.H. was taken to the hospital by ambulance on February 10, 2018. Record Document 50 at 10-15. Because the Court does not find these facts relevant to Plaintiffs' claim, it does not address or reproduce these facts here.

3

Labor Act ("EMTALA"). They contend that A.H. presented to WKS with an emergent medical condition, and that WKS failed to stabilize A.H. before discharging her.

## Law and Analysis

I.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. *See id.* at 322–23.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact, the nonmovant must demonstrate that there is, in fact, a genuine issue for trial by going "beyond the pleadings" and "designat[ing] specific facts" for support. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with some metaphysical doubt as to the material facts," by conclusory or unsubstantiated allegations, or by a mere "scintilla of evidence." *Id.* (internal quotation marks and citations omitted). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985) (citing *Adickes v. S. H. Kress*

& Co., 398 U.S. 144, 158–59 (1970)). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so "weak or tenuous" that it could not support a judgment in the nonmovant's favor. Armstrong v. City of Dall., 997 F.2d 62, 67 (5th Cir. 1993).

Additionally, Local Rule 56.1 requires the movant to file a statement of material facts as to which it "contends there is no genuine issue to be tried." The opposing party must then set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." W.D. La. R. 56.2. All material facts set forth in the movant's statement "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." Id.

II. EMTALA

Congress enacted EMTALA to "prevent 'patient dumping,' which is the practice of refusing to treat patients who are unable to pay." Battle ex rel. Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 557 (5th Cir. 2000) (quoting Marshall v. East Carroll Parish Hosp., 134 F.3d 319, 322 (5th Cir. 1998)). EMTALA is not the equivalent of a federal malpractice statute. Marshall, 134 F.3d at 322. As such, to comply with EMTALA a hospital must provide to all patients presenting for emergency medical care: 1) an appropriate medical screening, 2) stabilization of a known emergency medical condition, and 3) compliance with restrictions on the transfer or discharge of an individual with an unstabilized emergent medical condition. Battle, 228 F.3d at 557 (citing 42 U.S.C. § 1395dd(a)-(c)).

In this case, Defendant maintains that it provided an appropriate medical screening and does not challenge Plaintiffs' ability to demonstrate that A.H. initially presented to WKS with an emergent medical condition that it was required to stabilize. Record Document 42-2 at 5. Hence, at issue is whether A.H.'s emergent medical condition was stabilized prior to her discharge from the WKS emergency department on February 10, 2018.

    a. Plaintiffs' Stabilization Claim

Defendant first contends that Plaintiffs' failure to stabilize claim must fail because after Dr. Easterling recognized that A.H. had an emergent medical condition, he treated that condition and believed A.H. to be stable. Record Document 42-2 at 6. Defendant therefore argues that, at the time of her discharge, Dr. Easterling "did not have actual knowledge that [A.H.] was still suffering from an emergency medical condition." *Id.* Defendant also argues that it had no duty under EMTALA to re-screen A.H. prior to her discharge because EMTALA requires only that a hospital provide an initial screening when a patient presents for treatment. *Id.* According to Plaintiffs, Defendant's motion for summary judgment must be denied because it has failed to offer expert testimony to support its motion, which is a requirement for most EMTALA claims. Record Document 50 at 16. Plaintiffs argue that Dr. Easterling acquired actual knowledge that A.H. had an emergent medical condition when arriving at WKS and subsequently failed to provide the treatment necessary to ensure that her condition would not materially deteriorate upon discharge. *Id.* at 21, 25.

EMTALA defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(A). Relatedly, an emergent medical condition is "stabilized" when "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(B). EMTALA defines "transfer" to include discharging a patient. 42 U.S.C. § 1395dd(e)(4). "The Fifth Circuit has defined 'to stabilize' as '[t]reatment that medical experts agree would prevent the threatening and severe consequence of' the patient's emergency medical condition while in transit.'" *Battle*, 228 F.3d at 559 (citing *Burditt v. United States Dep't of Health & Human Servs.*, 934 F.2d 1362, 1369 (5th Cir. 1991)).

As an initial matter, Defendant's argument that "Dr. Easterling's affidavit establishes that at the time of discharge, he did not have actual knowledge that the patient was still suffering from an emergency medical condition" is immaterial. Record Document 42-2 at 6. The parties agree that A.H. had an emergent medical condition when presenting to WKS and that Dr. Easterling had actual knowledge of that condition. Record Documents 42-2 at 5, 42-4 at 2, and 50 at 18. At that point, the relevant inquiry under EMTALA is no longer whether Dr. Easterling had actual knowledge that A.H.'s emergent medical condition persisted, but whether he acted to stabilize and in fact stabilized A.H. as defined by EMTALA prior to discharging her. *See e.g.*, *Battle*, 228 F.3d 559 (explaining that a plaintiff's burden is first to prove that a hospital had actual

knowledge of the patient's emergency medical condition and, if proven, that the hospital failed to stabilize the condition prior to discharge). In other words, the relevant inquiry is whether Dr. Easterling "provide[d] such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition [was] likely to result from or occur" from discharging A.H.

The Court thus turns to whether Defendant has carried its summary judgment burden regarding whether A.H. was stable when discharged from WKS. According to Dr. Easterling, after treating A.H. with Albuterol at 3:16 a.m. and Decadron at 3:44 a.m., her condition improved—she was not in respiratory distress, she returned to her base line, she was non-distressed, well-appearing, and non-toxic. Record Document 42-4 at 3. Based on this and his "personal examination and treatment," Dr. Easterling determined that A.H. was stable and discharged her. Record Document 42-4 at 3. Similarly, Defendant presented evidence that Nurse Rainer believed A.H. to be stable when discharged. Record Document 52-1 at 2.

Plaintiffs have presented evidence sufficient to create a genuine dispute of fact as to whether A.H. received the care necessary to stabilize her, however. For example, Plaintiffs' expert witness Richard Sobel, M.D., M.P.H. ("Dr. Sobel"), explained that, based on his reading of the medical records, Dr. Easterling could not have known that A.H.'s condition was unlikely to deteriorate when he discharged her because he did not wait long enough after her final breathing treatment. According to Dr. Sobel, A.H.'s medical records show that the final pulse oximetry reading of ninety-nine percent was measured so closely to her final breathing treatment that the supplemental oxygen given during the

treatment could have artificially increased A.H.'s pulse oximetry reading beyond what A.H. was able to maintain on her own, thus making this measurement an unreliable indicator of whether A.H. would be able to maintain this level without medical intervention. Record Document 50-15 at 8-9, 16-17. Dr. Sobel also opined that Dr. Easterling discharged A.H. without observing her for long enough to know whether the steroid he administered would be an effective treatment for A.H.'s inflammation. *Id.* at 18. Plaintiffs have therefore created a genuine issue of material fact about whether the treatment WKS provided A.H. was sufficient to ensure, within a reasonable degree of medical probability, that A.H.'s condition would not materially deteriorate as a result of being discharged from the emergency department that morning.

## Conclusion

For the reasons stated herein, Defendant's motion for summary judgment [Record Document 42] is **DENIED**.

**THUS DONE AND SIGNED** this 6th day of August, 2020.

_____
ELIZABETH E. FOOTE
UNITED STATES DISTRICT JUDGE