**Richard M Sobel, MD, MPH**
**101 Passage Point**
**Peachtree City, Georgia 30269**

Hutton Banks
Attorney at Law
1038 North Ninth
Monroe, LA 71201

Re: Medical Standards/EMTALA review: ▌▌▌▌▌▌▌▌▌. Matter of Henderson v. Willis Knighton Medical Center

  I am corresponding to provide you my current expert opinion(s) regarding whether the care ▌▌▌▌▌▌▌▌▌ received as documented in the medical records of the WK South Emergency Department (the ER) on 2/10/18 was compliant with standards consistent with EMTALA. I am aware that the records you have submitted are not fully complete and that further discovery is on-going. My opinions are based on the available information. These opinions may be subject to revision based on future information received. Notwithstanding, my opinions are expressed to a reasonable degree of medical certainty.

  Thus far, I have received and reviewed:

1. The Willis Knighton Medical Center (WK) South medical records of ▌▌▌▌▌▌▌▌▌ Henderson (the patient) 4/21/14 through 2/10/18;

2. WK Bossier record following patient transfer;

3. The respective Complaint filed in the Western District of Louisiana alleging EMTALA non-compliance by WK South;

4. A "Protocol for Oxygen Administration" represented to be from the WK Hospital System;

5. The post-mortem examination of ▌▌▌▌ Henderson;

  Before proceeding, I would like to outline my professional background and foundation for providing expert opinion related to this patient's care and emergency department management. The standards I will describe respect the medical and hospital standards and consistent with the applicable Federal Regulation, EMTALA (42 U.S.C.A. § 1395dd).

  As detailed in my *Curriculum Vitae*, I received my medical degree from New York Medical College in 1980. I completed my first year of post graduate medical training in Internal Medicine/Primary Care at the University of Maryland Hospital in Baltimore, MD in 1981. This was followed by a residency in Emergency Medicine at Emory University/Grady Memorial Hospital in Atlanta, Georgia in 1984. I also received a US Public Health Service Fellowship and

1

Masters in Public Health (MPH degree) from the Johns Hopkins School of Public Health in 1982.

I have practiced as an emergency physician continuously for more than three decades. I am Board Certified by the American Board of Emergency Medicine through 2026. I have served academic appointments in various institutions. My prior teaching program appointments include the Orlando Health Care System, Residency Program in Emergency Medicine, University of Alabama, Department of Internal Medicine, Montgomery, Alabama, the University of Florida School of Medicine, Department of Anesthesia, Shands Hospital Gainesville, Florida and Emory University Department of Emergency Medicine, Emergency Medicine Residency Program, Atlanta, Georgia.

I have previously served a wide variety of medical administrative positions. They include medical director of hospital and academic emergency departments, medical contract management corporations, various hospitals and emergency medical services (EMS) organizations. I have been a member of hospital committees providing administrative oversight, utilization review and quality assurance regarding medical standards and emergency department operations. I have served as a peer reviewer for medical boards, professional review organizations, medical services management companies and hospitals.

I have had many years of prior administrative medical experience. As a medical director of several emergency departments, I have been engaged in the review process of appropriateness of medical screening, stabilization and patient transfers. I have been previously involved in the creation of policies and procedures relating to hospital compliance with medical and administrative standards consistent with EMTALA. I have reviewed many such hospital Policies and Procedures as a Medical or Regional Director for contract management organizations. I understand that compliance with the EMTALA Statute is a "Condition of Participation" for Hospitals participating in the Medicare Program of the United States.

I have participated in the training of nurses, paramedics and physicians of many specialties related to compliance with EMTALA guidelines. All practicing emergency physicians must understand the basic principles and provisions of EMTALA; is a core concept guiding daily emergency medical practice. Appropriate medical screening and stabilization of emergency medical conditions are the cornerstones of the practice of Emergency Medicine.

You have specifically asked me to opine as to whether the care and treatment of Aaliyah Henderson was consistent with medical and emergency department standards as they exist in February of 2018 consistent with the expectations for standard care by an emergency physician and/or emergency department under reasonable medical practice consistent with 42 U.S.C.A. § 1395dd (EMTALA).

My opinions regarding medical and administrative emergency department standards are not legal opinions. I will offer opinions or medical review as I would for any peer review or State or Governmental Organization designated inquiry. I will outline my opinions concerning medical and administrative standards relative to EMTALA. I have served as a professional

2

reviewer for the Georgia Health Care Foundation; the Professional Review Organization engaged to provide EMTALA reviews of care in Georgia by a Medical Review Officer which I qualify as.

I am qualified to provide you expert opinion regarding standard emergency medical practice and administrative operations of Emergency Departments/Hospitals and those related to EMTALA. Please refer to my *Curriculum Vitae* for additional details.

I will briefly outline general terms and principles regarding the related standards of medical and administrative practice which are generated by EMTALA. I have studied the EMTALA statute and the "Interpretative Guidelines", published by the Centers for Medicare and Medicaid Services, the Report to Congressional Committees regarding EMTALA. I have also reviewed posted guidance relating to professional medical reviewers ("VIII. Task 6- Professional Medical Review", Interpretive Guidelines). I have reviewed prior judicial decisions regarding EMTALA complaints and previously served as an expert.

EMTALA was enacted by Congress in 1986 as part of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985 (42 U.S.C. §1395dd). The original intent of the law was to prevent hospitals from transferring uninsured or Medicaid patients to public hospitals without, at a minimum, providing a medical screening examination to ensure they were stable for transfer. EMTALA has been further clarified and/or defined by a memorandum provided by the Center for Medicaid and State Operations/Survey and Certification Group (Ref: S&C-04-34). "The interpretive guidelines serve to interpret and clarify the responsibilities of Medicare participating hospitals in emergency cases. Simply put, the "Interpretive Guidelines" outline conditions of participation for hospitals under EMTALA, further guidance, definition and clarifications of the obligations of Hospitals under EMTALA.

According to the "Interpretive Guidelines" the integral obligations for medical evaluation and management under EMTALA are:

1. Any individual who comes to the emergency department with request for evaluation must receive a medical screening examination to determine whether an emergency medical condition exists;

2. If an emergency medical condition exists, treatment must be provided until the emergency medical condition is stabilized to the degree possible utilizing a participating Hospital's resources;

3. When medical screening has or should have predictably determined that an emergency medical condition exists, the hospital must provide stabilizing treatment within its capability and capacity;

4. If the hospital does not have adequate capability to address emergency medical condition(s), the patient may be transferred to another hospital. This in generally contingent on the transferring facility reasonably utilizing the available resources toward stabilization of the patient;

3

5. A patient may then be transferred with an unstabilized or partially stabilized emergency medical condition only when the risks are reasonably outweighed by the expected benefits and the transferring hospital has provided due efforts within its capacity.

Certain medical terminology is defined by EMTALA and/or the Interpretive Guidelines to include:

1. Emergency Medical Condition: "Emergency medical condition" (EMC) means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain, psychiatric disturbances, and/or symptoms of substance abuse) such that the absence of immediate medical attention could reasonably be expected to result in:

   a. Placement of the health of the individual (or, with respect to a pregnant woman, the health of a woman or her unborn child) in serious jeopardy;
   b. Serious impairment to any bodily functions;
   c. Serious dysfunction of any bodily organ or part; or;
   d. With respect to a pregnant woman who is having contractions. That there is inadequate time to effect a safe transfer to another hospital before delivery or that the transfer may pose a threat to the health or safety of the woman or the unborn child;

2. Medical Screening Exam: A "medical screening examination" is the process required to reach, with reasonable clinical confidence, the point at which it can be determined whether a medical emergency does or does not exist. If a hospital applies in a non-discriminatory manner (i.e., a different level of care must not exist based on payment status, race, national origin) a screening process that is reasonably calculated to determine whether an emergency medical condition exists, it has met its obligations under the Emergency Medical Treatment and Labor Act (EMTALA). Depending on the patient's presenting symptoms, the medical screening examination represents a spectrum of care ranging from a simple process involving only a brief history and physical examination to a complex process that also involves performing ancillary studies and procedures such as (but not limited to) advances and simple clinical laboratory tests, CT scans, and/or other diagnostic tests and procedures. A medical screening examination often is an extended process which may require hours to complete. The emergency department care must reflect this type of evaluation and treatment should continue until the patient is stabilized or transferred to a higher level of care if this is medically indicated;

3. Stabilization: As per the Interpretive Guidelines, "To stabilize" with respect to an emergency medical condition, is to either provide medical treatment of the condition necessary in order to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from, or occur during, the transfer of the individual from a facility. A patient will be deemed stabilized if the treating

4

physician in the emergency department/hospital has determined, within reasonable clinical confidence, that the emergency medical condition has been resolved. For patients whose emergency medical condition has not been resolved, the determination of whether they are reasonably stable for transfer may when the transferring Hospital has utilized their medically appropriate resources or services.

**Factual Summary**

███ Henderson (the patient) was a 4-year-old African-American female with a history of bronchopulmonary dysplasia (BPD) related to premature birth at 27 weeks. She suffered from "asthma" as diagnosed by her primary care provider diagnosed at 2 years old. The patient was cared for by her mother who administered home nebulized bronchodilator treatments. ███ had multiple visits to WK Bossier and South emergency departments. She was frequently treated with Rocephin, a 3rd generation cephalosporin by emergency department visits. There is no history of serious bacterial infection found documented in the available records from the WK system.

BPD and asthma were associated with multiple visits to the WK emergency departments for exacerbation of the child's bronchospasm requiring nebulized bronchodilator therapy and corticosteroids. The patient was however, neither steroid dependent nor on home oxygen. She did have several emergency admissions to WK. She was admitted for exacerbation of her respiratory disease twice within the prior 6 months of her last visits to the WK emergency department on 2/10/18.

Sharon Tran, MD, a pediatric hospitalist, comments in her discharge summary for ███'s 7/15-16/17 admission; the patient was "tachypneic with respirations in the 30's and oxygen saturation of 91%. She improved clinically and remained on room air and here respiratory distress resolved."

WK has a written policy regarding oxygen administration of supplemental oxygen to pediatric patients. According to the "O2 [oxygen] Protocol", pediatric patients with clinical signs of hypoxemia [low blood oxygen] and an oxygen saturation of 95% or less should have the administration of supplemental oxygen. If there is clinical recovery of the patient, a reassessment of the child oxygen saturation should occur within 12 hours. If the oxygen saturation is maintained at 95% or greater, it may be discontinued. The WK oxygen protocol emphasizes the importance of reassessment of the patient's clinical and oxygen saturation status; their ability to maintain their oxygenation saturation is necessary prior to discontinuance of supplemental oxygen.

On 2/10/18 at 01:54 (a.m.), Jennifer Alexander (███'s mother), arrived at the WK South ER with the patient. Aaliyah had awoken about midnight with difficulty in breathing. The patient had been admitted in July 2017 under similar circumstances and again in August. She had been seen on 12/6/17 at the WK South emergency department for a milder exacerbation of bronchospasm and discharged.

5

███ presented in a "tripod" position with frank respiratory distress. Per Susan Rainer, RN at 02:05, she was "distressed", "uncomfortable" and "anxious". The *tripod position* is a physical stance which may be the hallmark of children experiencing respiratory distress. In the tripod position, the child sits on the gurney leaning forward and supporting the upper body with hands on the knees or on the surface. The tripod position is thought to optimize the mechanics of respiration by taking advantage of the accessory muscles of the neck and upper chest to get more air into the lungs. Emergency physicians immediately recognize that a child adopting the tripod position is a likely indication of severe respiratory distress and impending respiratory failure.

The patient was designated given a triage score of "2" indicating "emergent" condition by nursing. Vital signs at 02:05 showed a rapid heart and respiratory rate of 156 and 36 respectively. Oxygen saturation measured by a pulse-oximeter device was quite low for a child at 91%.

Nurse Rainer comments "I took care of her the other day" referring to a "Quick Care visit for cough after which an antibiotic (Z-Pak) was prescribed". She continues, "gave breathing treatment at home with no relief, pt currently sitting in tripod position." At 02:04 a DuoNeb breathing treatment was ordered. At 02:11, Nurse Rainer further documents, "Respiratory effort is labored, with retractions, using tripod position. Respiratory pattern is tachypnea Airway is patent. Breath sounds with wheezes bilaterally."

02:13, David Easterling, MD is assigned as ███'s emergency physician. Dr. Easterling notes a history of breathing difficulties at midnight and a recent clinic visit. He states, "nurses notes reviewed and confirmed". His physical exam documented at 02:33 to the contrary indicates, "the patient does not display signs of respiratory distress". Only noted to be abnormal by Dr. Easterling is "wheezing, that is mild". No documentation of the patient's presentation in the *tripod position with respiratory distress* by the emergency physician even though he states nursing notes "reviewed and confirmed". To the contrary, the emergency physician reports "no use of accessory muscles" inconsistent with the patient's previously reported tripod positioning by Nurse Rainer. It is medically implausible that the patient could be found with myriad signs of respiratory distress by nursing and no findings by the emergency physician some 2 minutes later. Notwithstanding, there is simply no specific mention of the nursing finding of severe respiratory distress found in the documentation by Dr. Easterling.

Dr. Easterling does note under data interpreted, "room air observed by me at the bedside is 91%". This low reading was found at 02:05 when the patient first presented. At 02:32, Nurse Rainer notes after the breathing treatment with 100% [oxygen], "No adverse reaction; Respiratory status improved, tolerated well". There is no documentation of a physician reassessment of the patient's breath sounds after the initial exam in the child's records.

Dr. Easterling ordered an influenza test and an x-ray of the patient's chest. The influenza test was negative. The emergency physician noted the chest x-ray to show "perihilar infiltrates". Another breathing treatment with albuterol was ordered at 03:11 and administered at 03:16. There is no pre or post treatment respiratory assessment found by the emergency physician, nurse or the respiratory therapist. At 03:23, ███'s vital signs indicate a faster than normal

6

range pulse and breathing rate of 145 and 34 respectively. The pulse-oximetry was then documented to be "99%".

Typically, a breathing treatment will last for 5-10 minutes. It was administered as documented with high flow oxygen ("100%" as documented) to ▮▮▮▮ Henderson. 99% was not a room air oxygen saturation; it was not documented as a room air reading and was measured during or shortly after high flow oxygen administration. A valid room air saturation would require 20-30 minutes of "wash-out" time after high flow oxygen is discontinued as it takes some time for oxygen to dissipate from the bloodstream.

At 03:44, a steroid injection (dexamethasone 4 mg) was administered to ▮▮▮▮. At 03:59, Nurse Rainer documents no adverse reaction. It is well known that steroids require substantially more time than 15 minutes to exert a clinical effect. However, this patient will not receive the benefit of reasonable observation for steroid effect.

At 03:52, Dr. Easterling ordered the patient's discharge. There is no respiratory exam documented by the emergency physician proximate to this time. At 03:59, nurse Rainer began the discharge process. At 04:00, she notes "No adverse reaction. Tolerated well" with respect to the dexamethasone shot and closed the patient's chart.

▮▮▮▮ Henderson returned to the ER via ambulance approximately 3 hours later. According to WK South emergency department nursing notes, ▮▮▮▮ suffered a witnessed respiratory arrest at 06:51 approximately 3 hours after her discharge. The patient unfortunately arrived with CPR in progress. Fixed and dilated pupils were noted, consistent with hypoxic brain injury or death. The patient was intubated by John Horan, MD and further resuscitated. Vital signs returned with a blood pressure of 86/50 and a heart rate of 147 with assisted breathing. The patient was transferred to WK Bossier for ICU admission.

At WK Bossier, on 2/15/18, a nuclear medicine brain scan showed no flow. This and other studies were consistent with the child's brain death. Records from WK Bossier are incomplete. However, it is evident that ▮▮▮▮ Henderson suffered predictable multisystem failure. On 2/16/18, she was pronounced brain dead. The family then consented for organ procurement.

An autopsy performed on 2/19/18 revealed bronchiolitis and bronchopneumonia, an enlarged heart and the presence of "respirator brain" or anoxic brain injury. The patient had donated multiple internal organs.

**General Summary**

My opinion based on the information I have reviewed is that WK South Emergency Department did not provide reasonable medical screening and emergency stabilization for ▮▮▮▮ Henderson a child presenting with severe respiratory distress, an obvious emergency medical condition. This occurred despite staff's knowledge of her dire condition on initial presentation. She was discharged very prematurely when further medical screening and emergency stabilization was required. Within reasonable medical certainty, ▮▮▮▮ was

7

discharged with persistent status asthmaticus, an unstabilized emergency medical condition. Thus, her discharge was not compliant with emergency medical and hospital standards as promulgated by EMTALA. Furthermore, the patient's discharge occurred with the staff's knowledge that she was in severe respiratory distress less than 2 hours prior. The nurse, respiratory therapist, if one participated in care, and emergency physician at WK South did not comply with usual and customary hospital, medical and nursing standards which would have been consistent with adequate medical screening and emergency stabilization, the core principles of the EMTALA guidelines.

**Breaches of applicable standards of care and practice related to EMTALA**

Dr. Easterling and/or the staff of WK South breached the standards of care consistent with EMTALA guidelines in the following manners:

1. Failure of the emergency physician to properly obtain and/or annotate an adequate history of the patient's present illness and presentation to the WK South ER. This is an essential aspect of adequate medical screening;

2. Failure to properly perform and/or record an adequate re-examination of the child's respiratory status by the emergency physician and nursing staff. This is required for adequate medical screening and emergency stabilization of a patient with status asthmaticus;

3. Failure to recognize, consistent with WK's "Oxygen Protocol", that reasonable period of observation with favorable room air oxygen saturations in a pediatric patient is required before supplemental oxygen can be properly discontinued. Again, this is part and parcel of the medical screening and emergency stabilization process;

4. Failure to properly medically screen the patient for room air oxygen levels after high flow oxygen nebulizers. This was required to even consider the possibility of discharge of this child. ▮▮▮▮Henderson was discharged in violation of EMTALA principles with an unstabilized emergency medical condition, that is, persistent status asthmaticus;

5. Failure to properly regard the presentation of a 4-year-old child with a failure of home nebulizers treatment, chronic lung disease and multiple previous admissions to the Hospital with tripoding, other signs of respiratory distress, hypoxia, tachycardia and tachypnea as presenting with an emergency medical condition which certainly requires overnight observation or admission. This was required as part of medical screening of this patient. The emergency physician's notes do not reflect his personal recognition of the child's presenting condition. To

8

discharge a patient safely in less than 2 hours is inconsistent with EMTALA as stabilization of such a patient required many more hours, even days;

6. Failure to properly re-assess and document the patient's respiratory status. This caused or contributed to her discharge with an unstabilized emergency medical condition;

5. Failure to discharge the patient with a respiratory rate within the normal range and resolution of her fast heart rate. Failure to discharge the patient with a persistently normal room air oxygen saturation. Discharge of the patient occurred prematurely without resolution of her status asthmaticus. Thus, the patient was discharged with an unstabilized emergency medical condition, that is, persistent status asthmaticus;

5. Knowledge of discharge of the patient with an unstabilized emergency medical condition. The nurse documents the patient's condition on arrival as tripoding, in respiratory distress; these are obvious signs of impending respiratory failure. The emergency physician documents nursing notes review and acknowledges the patient's abnormal vital signs and pulse-oximetry. The discharge of this patient with such presentation is obviously reckless with less than 2 hours treatment in the emergency department without stable vital signs and room air pulse-oximetry. Stabilization of a 4-year-old child would obviously require many more hours, if not days;

6. Failure of nursing and/or respiratory therapy to question the physicians rapid and obviously premature discharge of the patient with abnormal vital signs, a lack of room air pulse-oximetry and inadequate time of observation without adequate stabilization or observation;

7. Even the administration of injectable steroids for treatment of obvious respiratory compromise due to status asthmaticus, the patient was discharged without a reasonable period of observation to verify that her condition was improved and stabilized;

8. Discharge of an unstabilized patient with the obvious risk of near term respiratory failure;

It is my opinion, to a reasonable degree of medical certainty, that the above described care was inconsistent with the above described principles of 42 U.S.C.A. § 1395dd (EMTALA). Furthermore, this care provided on 2/10/18, caused and or contributed to ▬▬▬ Henderson's death within reasonable medical probability. Had such care been consistent with EMTALA more likely than not ▬▬▬ Henderson would have survived and returned to her baseline medical status.

My opinions are based on the available information and expressed to a reasonable degree of medical certainty. They are subject to revision based upon future discovery.

9

Respectfully submitted,

Richard M Sobel, MD, MPH