UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| AKEEM HENDERSON and JENNIFER ALEXANDER, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE SUCCESSION OF A. H.<br>(Plaintiffs)<br>VERSUS<br><br>WILLIS-KNIGHTON MEDICAL CENTER d/b/a WILLIS KNIGHTON SOUTH HOSPITAL<br>(Defendant) | CIVIL ACTION NO. 5:19-CV-00163<br><br>JUDGE ELIZABETH E. FOOTE<br><br>MAGISTRATE JUDGE MARK L. HORNSBY |

## PLAINTIFFS' OPPOSITION TO WILLIS-KNIGHTON'S MOTION IN LIMINE

Respectfully Submitted:

SEDRIC E. BANKS LBN 2730
S. HUTTON BANKS LBN 37377
1038 North Ninth St.
Monroe, Louisiana 71201
318-388-1655 telephone
318-816-5026 facsimile
sedbanks@aol.com
*Attorneys for Akeem Henderson and Jennifer Alexander*

# TABLE OF CONTENTS

TABLE OF CONTENTS      i

INDEX OF AUTHROITIES      ii

REQUEST FOR ORAL ARGUMENT      1

I.     Introduction      2

II.     Statement of Facts      2

IV.     Discussion      10

     (1) RE: Plaintiffs should be prohibited from introducing any evidence, testimony, argument, or suggestion that Willis-Knighton nurses, staff, healthcare providers or any other employee sexually assaulted A.H.. or that hospital and SANE Nurse reports of suspected sexual were a "cover up" for an EMTALA violation.      10

     (2) RE: Plaintiffs should be prohibited from introducing any evidence of or making any reference to any inapplicable inpatient oxygen protocol, any oxygen protocol not in effect at the time of treatment at issue, or A.H.'s oxygen saturation levels from prior admissions to Willis-Knighton facilities.      13

     (3) RE: Any evidence or testimony that the Willis-Knighton medical records were improperly "altered" should be excluded at trial.      17

     (4) RE: Plaintiffs should be prohibited from introducing any evidence, argument or testimony that A.H. did not receive a proper screening under the requirements of EMTALA.      20

     (5) RE: Plaintiffs should not make any reference to, or introduce any evidence, testimony or argument regarding medical malpractice in this case.      22

V.     Conclusion      22

CERTIFICATE OF SERVICE      23

## INDEX OF AUTHORITIES

| **FEDERAL RULES** | **PAGE** |
|---|---|
| Federal Rule of Evidence 404 | 4, 12, 13 |
| Federal Rule of Civil Procedure 26 | 20 |

**STATUTES / CODAL PROVISIONS**

| | |
|---|---|
| 42 U.S.C.A. §1395dd | 20, 21 |

**JURISPRUDENCE**

| | |
|---|---|
| *Battle ex. rel. Battle v. Memorial Hosp. at Gulfport,* 228 F.3d 544 (5th Cir. 2000). | 20, 21 |
| *Burditt v. United States Dep't of Health & Human Servs.,* 934 F.2d 1362 at 1369 (5th Cir. 1991). | 20 |
| *Cervantes v. Tenet Hospital Limited,* (W.D. Tex. 03/26/19) 372 F.Supp.3d 486. | 22 |
| *Contogouris v. Pacific West Resources, LLC,* (5th Cir. 12/17/13) 551 Fed. Appx. 727. | 4 |
| *Guzman v. Memorial Hermann Hosp. System,* (5th Cir. 2011) 409 Fed. Appx. 769. | 14 |
| *Hassan v. City of Shreveport,*(W.D. La 06/18/18) 2018 WL 3028951. | 12 |
| *Marshall on Behalf of Marshall v. East Carroll Parish Hosp. Service Dist.,* (5th Cir. 02/09/98) 134 F.3d 319. | 20, 21 |
| *Power v. Arlington Hospital Ass.,* 42 F.3d 851 (4th Cir. 1994). | 22 |
| *Smithson v. Tenet Health System Hospitals, Inc.,* (E.D. La. 07/30/08) 2008 WL 2977361. | 20 |
| *U.S. v. Beechum,* 582 F.2d 898 (5th Cir. 1978). | 4 |
| *U.S. v. Stephens,* (5th Cir. 06/10/09) 571F.3d 401. | 4 |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

AKEEM HENDERSON and JENNIFER
ALEXANDER, INDIVIDUALLY AND
AS ADMINISTRATRIX OF THE
SUCCESSION OF A. H.

VERSUS

WILLIS-KNIGHTON MEDICAL
CENTER d/b/a WILLIS KNIGHTON
SOUTH HOSPITAL

CIVIL ACTION NO. 5:19-CV-00163

JUDGE ELIZABETH E. FOOTE

MAGISTRATE JUDGE
MARK L. HORNSBY

## PLAINTIFFS' MEMORANDUM OF LAW OPPOSING
## WILLIS-KNIGHTON'S MOTION IN LIMINE

### PLAINTIFFS REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully request oral argument of defendant's instant motion seeking a ruling that (1) only the defendant-hospital can offer testimony to explain how, when, where and why A.H. was sexually assaulted and who perpetrated the assault; (2) plaintiffs should be precluded from referencing Willis-Knighton's standing Oxygen Protocol which had been applied by Willis-Knighton's Emergency Medicine physician, David Easterling, M.D., as an "Emergency Department Order" in Willis-Knighton's Emergency Department for a A.H. as an emergency room patient on a prior visits to Willis-Knighton's ER but not in this instance and plaintiffs should be precluded from referencing A.H.'s prior admissions to Willis-Knighton and her corresponding oxygen saturation levels which Willis-Knighton's expert, Jacquelyn White, M.D. relied upon in rendering her expert opinion regarding disparate treatment; (3) plaintiffs should be precluded from pointing out the records Willis-Knighton provided to plaintiffs pre-lawsuit are different than the records produced post-lawsuit; and (4) plaintiffs should be

precluded from referencing medical malpractice in this case which must determine whether Willis-Knighton provided medical treatment and care sufficient to ensure within a reasonable degree of medical certainty that no material deterioration of A.H.'s condition would occur after she was discharged.

## INTRODUCTION

Plaintiffs Akeem Henderson and Jennifer Alexander are the natural parents of A.H.  In their petition filed February 8, 2019, plaintiffs allege Willis-Knighton Medical Center d/b/a Willis-Knighton South Hospital (Willis-Knighton) violated the Emergency Medical Treatment and Labor Act ("EMTALA"), on February 10, 2018 when the hospital acquired actual knowledge A.H. presented with an emergency medical condition and failed to stabilize the child prior to discharging her. Approximately three (3) hours after she was discharged, A.H. suffered respiratory and cardiac arrest and returned brain dead to Willis Knighton via ambulance. She never recovered.

Defendant timely Answered the Complaint and named former Shreveport Police Department Detective Jeff Allday as a material witness in this case. Defendant moved for summary judgment citing the existence of a S.A.N.E. (Sexual Assault Nurse Exam) report generated in connection with Willis-Knighton's claim to Shreveport Police that A.H. had been "raped" by a family member. The Court denied the hospital's motion for summary judgment.

## STATEMENT OF FACTS

A.H. was a four-year old autistic African-American female with a history of bronchopulmonary dysplasia ("BPD") related to premature birth. She had been diagnosed with asthma at two (2) years old and, because of these conditions, routinely visited Willis-Knighton's

Emergency Department when her prescribed bronchodilator treatments administered at home failed to provide relief. A.H. had no private health insurance and was a Medicaid beneficiary.

Prior to February 10, 2018, A.H. visited Willis-Knighton Emergency Departments on thirty-two (32) occasions due to her chronic pulmonary issues.[1] Seven (7) of those visits resulted in either her admission to the hospital, or transfer to a hospital that could provide a higher level of care.[2] Without exception, Willis-Knighton admitted A.H. each and every time she presented with an oxygen saturation below 95% on room air (abbreviated in the medical records as "R/A").[3] Said another way, prior to February 10, 2018, Willis-Knighton never discharged A.H., when her room air oxygen saturation was below 95% on presentation. Not once.[4]

On February 10, 2018, A.H. presented to Willis-Knighton ED at 2:05 a.m. in "tripod" position with an oxygen saturation of 91% on room air, pulse of 156 and respiratory rate of 36. Willis-Knighton triaged A.H.'s condition as "emergent". Willis-Knighton noted A.H. suffered from difficulty breathing, asthma exacerbation, and was tripoding. Also, noted was the fact prescribed bronchodilator treatments administered at home after midnight, including Albuterol,

---

[1] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South "WKS" Medical Records (780-792)(794-808)(809-822)(823-836)(837-947)(948-1013)(1014-1026)(1027-1037)(1038-1052)(1053-1067)(1068-1078) See Record DOC # 50 - Exhibit 1-B: WKS Medical Records (1179-1190)(1191-1203)(1204-1214)(1215-1227)(1228-1238)(1239-1252)(1253-1358)(1359-1372)(1373-1509)  See Record Doc # 50 - Exhibit:1-C: WKS Medical Records (1510-1525)(1526-1538)(1539-1643)(1644-1657)(1658-1672)(1674-1684)(1685-1695)(1696-1705)(1706-1716)(1717-1735)(1736-1746)(1747-1758).

[2] See Record Doc # 50 - Exhibit 1-C: Willis-Knighton South Medical Records BN p. 1539 – 1643 for her 11.2.15 hospital admission; BN 1510-1525 for her 12.31.15 transfer to a facility with a higher level of care; See Record Doc # 50 - Exhibits 1-B and 1-C: BN 1373 – 1509 for her 3.10.16 hospital admission; Doc # 50 - Exhibit 1-B BN 1253 – 1358 for her 5.1.16 hospital admission; Doc # 50 Exhibits 1-A and 1-B BN 1068 – 1178 for her 11.4.16 hospital admission; Exhibit 1-A BN 948 – 1013 for her 07.14.17  hospital admission; and Exhibit 1-A BN 837 – 947 for her 08.28.17 hospital admission.

*Plaintiffs' expert, Richard Sobel, M.D. noted discrepancies in the medical records Willis-Knighton provided plaintiffs versus the medical records upon which he was questioned during his deposition. (Record Doc # 50 - Exhibit 12: Dr. Sobel Depo p. 143-145) Plaintiffs cannot explain how the defendant's arrived at 37emergency room visits.

[3] Blood/oxygen saturation or "oxygen saturation" or sometimes "02 Sat" refers to the percentage of oxygen-saturated hemoglobin relative to total hemoglobin in the blood and is typically measured by a pulse oximeter.

[4] Compare Footnote 1 – (total ER visits) with Footnote 2 - (admissions to the hosp. when her 02 Sat. less than 95%).

provided no relief. Willis-Knighton ordered DuoNeb, Albuterol breathing treatments and concluded its emergent treatment at 3:44 a.m. with a steroid injection. Hospital records refer to the steroid injection as "stabilization" medication. The clinical effect of the steroid occurs approximately 6-8 hours after injection. The hospital discharging the four-year old at 3:52 a.m, less than two hours after she arrived and eight (8) minutes after the last "emergent" treatment i.e. steroid shot. A.H. was examined by a physician approximately 20 minutes after she arrived ED, but never saw another doctor prior to discharge.

After administering oxygen and Albuterol on February 10, 2018, Willis-Knighton never observed, monitored, and documented A.H.'s room air blood/oxygen saturation prior to discharging her. Instead, A.H. was given a steroid shot at 3:44 and ordered discharged at 3:52.

In moving for summary judgment, Willis-Knighton cited a S.A.N.E. (Sexual Assault Nurse Examiner) Report which is also referenced in the affidavit of David Easterling, MD.[5] According to Willis-Knighton's dispositive motion, the existence of a S.A.N.E. report somehow absolves the hospital of liability for illegally "dumping" A.H. In truth, A.H.'s medical records show trauma to the child's vagina, occurring days apart, was most likely caused by hospital personnel, and not within the three hours the child was in between ED visits. As shown more particularly below, medical records, together with the S.A.N.E. Report prove Willis-Knighton's

---

[5] Defendant's motion for summary judgment supporting memorandum cite the S.A.N.E. report. Defendant has also listed then-detective, Jeff Allday as a witness. Plaintiffs concede this evidence is relevant to the instant EMTALA proceeding and do not object. Specifically, plaintiffs reserve the right to present all evidence relating to this matter, or "offer proof" of crimes, wrongs and bad acts probadtive of intent, motive, opportunity, knowledge, identity, absence of mistake, and/or lack of accident relating to Willis-Knighton's violation of EMTALA. Willis-Knighton's attempted cover-up is intrinsic to its EMTALA violation, or in the alternative, is admissible under Rule 404(b). See *U.S. v. Stephens,* (5th Cir. 06/10/09) 571F.3d 401 at 410; See also *U.S. v. Beechum,* 582 F.2d 898 (5th Cir. 1978) and for civil application See *Contogouris v. Pacific West Resources, LLC,* (5th Cir. 12/17/13) 551 Fed. Appx. 727.

report of suspected aggravated rape is nothing more than an abhorrent attempt to silence

plaintiffs, "manufacture" evidence absolving the hospital and cover-up its EMTALA violation.[6]

After being ordered discharged by Willis-Knighton South at approximately 4:00 a.m. the

child was taken by her mother to her grandmother's, as the mother was preparing to go to work.

Less than three hours after arriving at her grandmother's, the child suffered respiratory distress.

911 was called and A.H. was transported from her grandmother's to Willis-Knighton Bossier by

an Emergency Medical Services ("EMS") team. At Willis-Knighton Bossier, Nurse Jennifer

Jaeger inserted a size 8 catheter into the unconscious four-year old at 7:47 a.m.[7] Nurse Jaeger did

not notice any trauma to the child's vagina, and instead, reported the child tolerated the

procedure well.[8]

After the catheter was inserted, Dr. James Horan, an emergency medicine physician at

Willis-Knighton Bossier, telephoned Dr. Minh Tran, PICU physician at Willis-Knighton South

from which the child was discharged approximately four hours, earlier.[9] Fifteen minutes after

arriving Willis-Knighton Bossier brain dead, the child was transported back to Willis-Knighton

South by Bossier Fire Department's EMS team.[10] Per Dr. Horan's request, a nurse from Willis-

---

[6] As "offer of proof" and In responding to Willis-Knighton's reference to the S.A.N.E. report, plaintiffs attached to Doc #50  Exhibit 1-A; 1-B; and 1-C: WK South Medical Records; Exhibit 4: the emergency room records of Willis-Knighton Bossier which, for whatever reason, were not included in A.H.'s medical records certified by Willis-Knighton's Health Systems as the medical records of A.H.; Exhibit 5: the S.A.N.E. report; Exhibit 6: the Autopsy Report; Exhibit 7: The Autopsy Investigation; Exhibit: 8 the Bossier Fire Dept. EMS "runsheet" which Willis-Knighton's expert Jacquelyn White, M.D. requested from Willis-Knighton as referenced on pages 57 and 67 of her deposition (Exhibit 9) , but which Willis-Knighton declined to provide its expert; Exhibit 9: Excerpts from the deposition of Jacquelyn White, M.D.; Exhibit 10: Catheter age/size chart attached to Dr. White's deposition as "White 1"; and Doc # 50 Exhibit 11: the Shreveport Police Department's incident report where, prior to the S.A.N.E. examination, Willis-Knighton reported to the SPD that A.H. had been "raped".
[7] See Record Doc # 50 - Exhibit 4: Willis-Knighton Bossier Medical Record p. 2 of Nurse's Notes.
[8] See Record Doc # 50 - Exhibit 4: Willis-Knighton Bossier Medical Records p. 2 of Nurse's Notes
[9] See Record Doc # 50 - Exhibit 4: Willis-Knighton Bossier Medical Records p. 2 of Physician Documentation.
[10] See Record Doc # 50 -  Exhibit 4: Willis-Knighton Bossier Physician Documentation p. 1, 5 and Exhibit 8: Bossier City Fire Dept. EMS "runsheet" p. 3.

Knighton Bossier accompanied the child in the ambulance.[11] When A.H. was placed in the ambulance for transport from Willis-Knighton Bossier to Willis-Knighton South, the EMS team performed a Genitourinary Exam which documented no abnormalities.[12] A Genitourinary Exam had also been performed by Willis-Knighton South on the child's first visit to the ER that morning which was also negative for trauma, bleeding and/or swelling.[13] So, by 8:26 a.m. on February 10, A.H. underwent two (2) separate Genitourinary Exams and both reported no abnormal findings.

When the child arrived at Willis-Knighton South at 8:46 a.m. for the second time that morning, accompanied by a nurse from Willis-Knighton Bossier, she had a size 6 catheter in place[14] i.e. different than the size 8 catheter originally inserted by Nurse Jaeger at Willis-Knighton Bossier.

At 9:31 a.m., approximately forty-five (45) minutes after the child arrived at Willis-Knighton South, Dr. Horan, at Willis-Knighton Bossier, noted a "Special Discussion" in A.H.'s Willis-Knighton Bossier medical records suggesting that, while he had not personally witnessed such, an unidentified nurse had supposedly told him there was blood in child's vagina before the first Foley catheter was inserted by Nurse Jaeger at 7:47 a.m.[15] No such notation of blood and/or vaginal insult is found in nurses notes.

Approximately ten minutes later, but before the S.A.N.E. nurse's arrival on the scene, a Willis-Knighton South official contacted the Shreveport Police Department to report suspected

---

[11] See Record Doc # 50 - Exhibit 8: Bossier City Fire Dept. EMS "runsheet" p. 3.
[12] See Record Doc # 50 - Exhibit 8: Bossier City Fire Dept. EMS "runsheet" p. 2.
[13] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South Medical Records p. 762.
[14] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South Medical Records p. 756.
[15] See Record Doc # 50 - Exhibit 4: Willis-Knighton Bossier Medical Records page 2 of Physician Documentation. Compare with Doc # 50 - Exhibit 8: Bossier Fire Dept. "runsheet" p. 3.

aggravated rape.[16] Oddly, the hospital official reporting "suspected aggravated rape", knew not only the municipal address of the supposed incident (i.e. the grandmother's home), but also the name and physical description of the supposed "perpetrator."[17] The matter was referred to then-Detective, Jeff Allday, who Willis-Knighton has listed as a witness in this case.[18]

After Willis-Knighton reported to the Shreveport Police Department that A.H. had been "raped", the S.A.N.E. nurse, Olivia Jones, examined the child and found she could not say the child had been sexually assaulted, much less raped.[19] Nurse Jones observed one laceration at the 6:00 o'clock position of child's vagina with two adjacent abrasions, one on either side.[20] Willis-Knighton's expert, Dr. Jacquelyn White, explained those injuries could have "absolutely" been caused by catheter insertion.[21]

Willis-Knighton South then inserted size 12 Foley catheter in the comatose child and inflated it with 5cc saline.[22] Dr. White explained size 12 is too "large" for a four-year old.[23] The size 12 catheter remained in place while hospital personnel contacted former detective Jeff Allday to re-examine the child at the hospital.[24]

On February 13, three (3) days *after* Willis-Knighton reported to the Shreveport Police Department that the four-year old was raped by a family member, Willis-Knighton documented a "Large area of swelling noted to [A.H.'s] public mound region and labia."[25] Dr. White testified

---

[16] See Record Doc # 50 - Exhibit 11: Shreveport Police Department Incident Report p.1.
[17] See Record Doc # 50 - Exhibit 11: Shreveport Police Department Incident Report p. 1.
[18] See attached Exhibit 1: Willis-Knighton's Supplemental Rule 26 Disclosures and attached Exhibit 2: Willis-Knighton's supplemental discovery responses and witness list.
[19] See Record Doc # 50 - Exhibit 5: S.A.N.E. Report p. 8.
[20] See Record Doc # 50 - Exhibit 5: S.A.N.E. Report p. 6.
[21] See Record Doc # 50 - Exhibit 9: Deposition of Jacquelyn White, M.D. p. 108.
[22] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South Medical Records BN p. 366, 508
[23] See Record Doc # 50 - Exhibit 9: Deposition of Jacquelyn White, M.D. p. 104. Compare with Doc # 50 - Exhibit 10: which is a catheter size/age chart attached as "White 4" to Dr. White's deposition.
[24] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South Medical Records BN p. 751, 368
[25] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South Medical Records BN p. 752.

that visual evidence of trauma to a four-year old's vagina would become apparent anywhere from a few minutes to a few hours after the trauma occurred.[26] A.H. had never left the care of Willis-Knighton during the three (3) days preceding the trauma to her public mound. The "new" trauma was not reported to the Shreveport Police Department. No S.A.N.E. nurse was asked to examine A.H. in connection with her pubic mound swelling.

On February 14, Willis-Knighton discontinued the size 12 Foley catheter inflated with 5 cc in favor of a size 10 Foley catheter inflated with 3 cc, a forty percent (40%) reduction.[27]

Willis-Knighton again contacted former detective Allday on February 15 to re-examine the comatose child at the hospital.[28]

A.H. was declared brain dead consistent with global hypoxic-ischemic encephalopathy[29] and remained on life support. On February 16, her parents decided to discontinue life support and donate their child's organs.

An autopsy was performed February 19, 2018, which revealed not one, but two lacerations: a small laceration at the 12:00 o'clock position of the hymen and a "tiny tear" to A.H.'s posterior fourchette.[30] The Autopsy Investigation Case Narrative specifically references "catheter insertion" in finding the cause of A.H. death to be natural due to bronchiolitis and pneumonia.[31] Critically, the swelling to A.H.'s pubic mound noted on February 13 and the laceration at the 12:00 o'clock position of the hymen noted in the Autopsy Report were **not**

---

[26] See Record Doc # 50 - Exhibit 9: Deposition of Jacquelyn White, M.D. p. 109.
[27] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South Medical Records BN p. 520.
*A.H.'s medical records relating the S.A.N.E. report, varying catheter sizes and public mound swelling were not produced to the family in response to their initial request for records pre-lawsuit. Plaintiffs became aware of those records after Dr. Sobel's deposition where Dr. Sobel observed the records upon which he was being questioned were different than the records plaintiffs had provided him.
[28] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South Medical Records BN p. 751.
[29] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South Medical Records BN p. 173, 458.
[30] See Record Doc # 50 - Exhibit 6: Autopsy Report p. 1, 2.
[31] See Record Doc # 50 - Exhibit 7: Autopsy Investigation p. 8; Record Doc # 50 - Exhibit 6: Autopsy Report p. 1.

*observed* by the S.A.N.E. nurse who examined A.H. on February 10. Those injuries occurred **after** February 10, while the hospital had complete control and custody over the four-year old and while Willis-Knighton repeatedly contacted former detective Allday to re-examine A.H.

Law enforcement declined any charges in connection with the hospital's reported "rape".

After burying their child, plaintiffs requested A.H.'s medical records from Willis-Knighton. Willis-Knighton provided plaintiffs with 363 pages of records which were furnished plaintiffs' expert, Dr. Richard Sobel. This lawsuit was filed February 8, 2019. Willis-Knighton deposed plaintiffs' expert, Dr. Richard Sobel, on November 26, 2019. Plaintiffs' counsel participated by telephone. Hours before Dr. Sobel's deposition began, Willis-Knighton had 1,758 pages of medical records delivered to the office of plaintiffs' counsel. By design, there was no time to review 1,758 pages prior to Dr. Sobel's deposition. During his deposition, counsel for defendant furnished medical records for Dr. Sobel to review. Dr. Sobel recognized that he had not been provided with the records upon which he was being questioned. Plaintiffs timely objected on the record of the deposition. Moreover, Dr. Sobel recognized that in addition to the 1,395 pages of medical records which were not provided to plaintiffs, other records, which should have been identical, did not match.

Interestingly, the records "missing" from those given to plaintiffs and produced during Dr. Sobel's deposition show the hospital's involvement with the injury to A.H.'s vagina, i.e. different size catheters were used at different times; the catheter inserted at Willis-Knighton Bossier was not the same size catheter observed at Willis-Knighton South; public mound swelling occurred several days after the child had already been in the custody of the hospital; and Willis-Knighton repeatedly contacted Detective Allday which conspicuously correlated with a

40% reduction in the catheter size used for A.H. In short, Willis-Knighton withheld those records from plaintiffs until after prescription had tolled on any tort claim.

Meanwhile, plaintiffs executed HIPPA authorizations granting Willis-Knighton total and unfettered access to all of A.H.'s medical records. Plaintiffs used the same standard, blanket HIPPA authorizations to obtain A.H.'s EMS run sheets, the S.A.N.E. Report, A.H.'s Autopsy, and the Coroner's Investigation records, all of which Willis-Knighton refused to obtain and provide its expert, even though the expert had specifically requested some of those records by name, to-wit:[32]

NEED EMS run sheet

## DISCUSSION

**(1) RE: Plaintiffs should be prohibited from introducing any evidence, testimony, argument, or suggestion that Willis-Knighton nurses, staff, healthcare providers or any other employee sexually assaulted A.H.. or that hospital and SANE Nurse reports of suspected sexual were a "cover up" for an EMTALA violation.**

Willis-Knighton argues the sexual assault of A.H. is probative of causation, but plaintiffs should not be allowed to even suggest that Willis-Knighton caused the sexual assault. Such is hardly fair. Moreover, there is no legal support for such ruling, as explained below.

After Willis-Knighton discharged a four-year-old child in violation of EMTALA and she returned to Willis-Knighton in cardiac arrest, hospital agents conspired to fabricate an incredibly false narrative that the child was "raped" by a family member in the four hours in between hospital visits. Willis-Knighton claims the aggravated rape "caused" A.h. respiratory distress. Willis-Knighton motion in limine seeks a ruling that this is the only narrative which may be

---

[32] See Record Doc # 57 - Daubert Exhibit 3 – Notes of Jaquelyn White, M.D. p. 3.

presented to the jury. Willis Knighton's argument "cherry picks" certain facts, and totally ignores other facts.

Indeed, Willis-Knighton officials falsely reported to police that A.H. was raped by a family member; cited the S.A.N.E. Report in its dispositive motion; supported its dispositive motion with an affidavit of Dr. David Easterling which references the S.A.N.E. Report; secreted plaintiffs medical records pre-lawsuit, and named a Shreveport detective as a material witness in this case. Characterizing sexual assault as "relevant in terms of causation" in its supporting memorandum, Willis-Knighton seeks a ruling that only the hospital can explain to the jury when, where, how, and why A.H. was sexually assaulted. According to Willis-Knighton, it would be "unfair" to allow plaintiffs to present evidence showing the assault occurred during the child's stay at the hospital, since that issue is beyond the pleadings, and accusations of sexual assault are "completely unsubstantiated by the record." Thus, the hospital seeks to sway the jury with a one-sided argument which ignores facts and circumstances discrediting its argument.

Willis-Knighton seeks to deny the jury of information contained in A.H.'s medical records, the S.A.N.E. Report, the Autopsy Investigation and EMS run sheets. Together, such evidence shows: (a) A.H. had not been sexually assaulted prior to being transported from Willis-Knighton Bossier to Willis-Knighton South for the second time; (b) the catheter inserted at Willis-Knighton Bossier was not the catheter observed at Willis-Knighton South upon A.H.'s arrival; (c) Whereas Willis-Knighton South reported the child was "raped" to the SPD, the S.A.N.E. Nurse could not say the child was assaulted; (d) A.H.'s pubic mound swelling and a second laceration to her vagina occurred between the S.A.N.E. exam on February 10 and the Autopsy on February 19, 2018, while A.H. was in total care of the defendant; (e) Willis-Knighton contacted the SPD to re-examine the child after decreasing the catheter size used on

the 4 year old by 40%; and (d) the Coroner's Investigation noted "catheter insertion" in finding A.H.'s cause of death due to broncholilitis and pneumonia, but was totally silent as to any mention, let alone, findings of rape.

The totality of records and testimony show any and all trauma to the child's vagina occurred while the child was in total care, custody and control of the hospital, and those injuries were, more likely than not, caused by hospital personnel for the specific purpose of covering up its EMTALA violation and silencing plaintiffs.

As noted above, medical records exposing the truth of vaginal injury were withheld by Willis-Knighton and secreted from plaintiffs until prescription tolled. Willis-Knighton refused to obtain the EMS run sheets specifically requested by its expert because those records show the child received a Genitourinary ("GU") exam at Willis-Knighton Bossier which revealed no abnormalities at 8:26 a.m. This fact alone shows A.H. was assaulted after she had arrived at Willis-Knighton Bossier. This fact, also, exposes the true purpose behind Willis-Knighton's instant motion in limine is to prevent the jury from hearing evidence which contradicts the hospital's argument.

This Court is no stranger to allegedly fabricated rape charges. See *Hassan v. City of Shreveport,*(W.D. La 06/18/18) 2018 WL 3028951 where this Court admitted evidence probative of whether charges of rape had been fabricated for impeachment purposes. Here, evidence of crimes, wrongs and/or bad acts, including fabricated rape charges, and the circumstances surrounding same, are admissible under Rule 404(a) of the Federal Rules of Evidence to impeach Willis-Knighton's version of how, when, where, and why A.H. was sexually assaulted which the defendant has already put at issue. Oddly, such information was fair game for Willis-Knighton to include in its dispositive motion, but off-limits, now, that its motion has been denied.

Moreover, Willis-Knighton's fabricated "rape" allegations and the circumstances surrounding same constitute crimes, wrongs, and/or acts which are admissible under Federal Rule of Evidence 404 (b) to show Willis-Knighton had "knowledge" it violated EMTALA, as well as, the hospital's opportunity, motive and plan designed and implemented to falsely blame A.H.'s family for causing the injuries arising as a result of EMTALA violation.

Defendants are not prejudiced by plaintiffs exposing the hospital's scheme to falsely accuse A.H.'s family members of causing injury, when the true cause of injury is the hospital's EMTALA violation. Such is particularly true where the hospital cited the S.A.N.E. Report in its dispositive motion, named Detective Allday as a material witness, and acknowledged the sexual assault of A.H. is relevant in terms of causation.

**(2) RE: Plaintiffs should be prohibited from introducing any evidence of or making any reference to any inapplicable inpatient oxygen protocol, any oxygen protocol not in effect at the time of treatment at issue, or A.H.'s oxygen saturation levels from prior admissions to Willis-Knighton facilities.**

At the time A.H. presented with a room-air oxygen saturation of 91% on room air, Willis-Knighton had in effect a standing Oxygen Protocol relating to pediatric patients exhibiting clinical signs of hypoxemia. Medical records confirm Willis-Knighton's Oxygen Protocol[33] was consistently ordered and applied for A.H. when presenting to the ER. Willis-Knighton produced its Oxygen Protocol in this lawsuit in response to plaintiffs' written discovery requests.[34] According to the protocol, clinical signs of hypoxemia include tachycardia, tachypnea, and oxygen saturation of less than 95% on room air in pediatric patients. If a pediatric patient exhibits an oxygen saturation level of less than 95% on room, oxygen is to be administered per the protocol. Once oxygen is administered, the protocol then requires Willis-Knighton providers

---

[33] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South Medical Records BN 1069 – 1073.
[34] See Record Doc # 50 - Exhibit 2: Willis-Knighton Discovery Response to RFP #1(a).

to "place patient on room air and observe saturation" and discontinue oxygen only "if the patient is able to maintain an oxygen saturation of 92% [95% for pediatric patients] or greater on room air with no clinical signs or symptoms of hypoxemia."[35]

A hospital's substantive failure to follow its own screening procedures or policies is probative of disparate treatment, and therefore a violation of EMTALA, *Smithson v. Tenet Health Sys. Hosp., Inc.,* (E.D. La. 06/30/08) 2008 WL 2977361 and *Guzman v. Memorial Hermann Hosp. System,* (5th Cir. 2011) 409 Fed. Appx. 769.

Willis-Knighton seeks an order excluding reference to its Oxygen Protocol and any of A.H.'s prior visits to Willis-Knighton. This is because A.H. received disparate treatment on the night in question when compared with her prior visits when she was not illegally dumped by the hospital in violation of EMTALA. A.H.'s medical records show that on November 4, 2016 when she presented with basically the same symptoms as the night in question, Willis-Knighton's Emergency Medicine Physician, Dr. David Easterling, issued an Emergency Department Order to apply Willis-Knighton's Oxygen Protocol to A.H., while she was an emergency room patient in Willis-Knighton's Emergency Department, to-wit:[36]

---

[35] See Record Doc # 50 - Exhibit 2:  Willis-Knighton Discovery Response to RFP #1(a).
[36] See Record Doc # 50 – Exhibit 1-B p. 1095 (Excerpted and emphasis supplied) re-attached here as Exhibit 3.

**WK** WILLIS-KNIGHTON HEALTH SYSTEM

**EMERGENCY DEPARTMENT TEMPORARY ORDERS**   Henderson

Date/Time __11/4/16__   1755   Level of service: ☐ Inpatient admission (expected to stay 2 midnights) ☑ Observation

1. Attending M.D. ___Craig___   Level of care: ☑ Routine ☐ Telemetry ☐ Step-Down
   ☐ Critical Care ☐ PICU
2. Diagnosis: _Bronchiolitis c̄ Hypoxia_
3. Allergies (including Food): ___NKDF___
4. Condition: ☑ Good ☐ Fair ☐ Poor
5. Vitals:   Floor routine with BP every _____ ; Weigh on admission and ☐ daily
   ☐ Urinary catheter/HOUDINI protocol; I & O every _____ hr; ☐ Neurological checks every _____ hr for _____ hr
6. NPO/Diet: _Regular_
7. Activity: _Ad lib_ / Bed rest with bathroom privileges / Up with assistance / Complete bed rest
8. Lab/X-Ray: ☐ Bedside glucose _____ , do not confirm: call MD if greater than 350 mg/dL or less than 70 mg/dL
   ☐ EKG & Troponin every 6 hours times 2 – reason for exam: _____

9. MEDS: ☐ Oxygen via Nasal Cannula 2L/min ☑ Oxygen protocol ☐ Other_____

10. SALINE LOCK / IV FLUIDS: ___NS @ 50 cc/hr___

11. OTHER: _____

12. CONSULT   Dr _____

13. Complete care is turned over to Dr ___Craig___ on patient's admission to the hospital.
    Notify him/her STAT or at _____ of admission/arrival and STAT for any problems or concerns.

Spoke to: _____
Physician Signature                    Printed Name or Dictation #

_noted by J Griffith, RN 11-4-16 @ 2000_

PO2675_1
Revised 01/07/2015
Committee Approved 03/13/2015
Page 1 of 1                    PO0005

HENDERSON, AALIYAH L
10/01/13    3Y 01M
Easterling, David R    11/04/16
K32957086

Obviously, the same ER physician who discharged A.H. on the night in question had previously

issued an Emergency Department Order for Willis-Knighton's Oxygen Protocol applied for A.H.

while she was an emergency room patient in Willis-Knighton's Emergency Department.

The hospital's assertion that Willis-Knighton's Oxygen Protocol "only applies to

inpatients" is belied by its own ER records and is not supported by any fact of record, only legal

argument by its counsel. Plaintiffs' expert, Dr. Richard Sobel, pointed out that the protocol is not restricted to inpatients.[37] Defendant's argument is without merit.

Moreover, plaintiffs anticipate proving A.H. received disparate treatment on the night in question by comparing such to her prior hospital visits to Willis-Knighton. Prior to February 10, 2018, A.H. visited Willis-Knighton Emergency Departments on thirty-two (32) occasions due to her chronic pulmonary issues.[38] Seven (7) of those visits resulted in either her admission to the hospital, or transfer to a hospital that could provide a higher level of care.[39] Without exception, Willis-Knighton admitted A.H. each and every time she presented with an oxygen saturation below 95% on room air (abbreviated in the medical records as "R/A").[40] Said another way, prior to February 10, 2018, Willis-Knighton never discharged A.H., when her room air oxygen saturation was below 95% on presentation. Not once.[41] On February 10, 2018, A.H. presented with a blood oxygen saturation level below 95% and was discharged. She went into respiratory arrest approximately three hours later. Plaintiffs simply do not understand the argument they

---

[37] See Record Doc # 50 – Exhibit 12 Deposition of Dr. Sobel p. 87 re-attached here as Exhibit 5: Sobel Depo. p. 87.

[38] See Record Doc # 50 - Exhibit 1-A: Willis-Knighton South "WKS" Medical Records (780-792)(794-808)(809-822)(823-836)(837-947)(948-1013)(1014-1026)(1027-1037)(1038-1052)(1053-1067)(1068-1078) See Record Doc # 50 - Exhibits 1-B: WKS Medical Records (1179-1190)(1191-1203)(1204-1214)(1215-1227)(1228-1238)(1239-1252)(1253-1358)(1359-1372)(1373-1509)  Exhibit:1-C: WKS Medical Records (1510-1525)(1526-1538)(1539-1643)(1644-1657)(1658-1672)(1674-1684)(1685-1695)(1696-1705)(1706-1716)(1717-1735)(1736-1746)(1747-1758).

[39] See Record Doc # 50 - Exhibits 1-C: Willis-Knighton South Medical Records BN p. 1539 – 1643 for her 11.2.15 hospital admission; BN 1510-1525 for her 12.31.15 transfer to a facility with a higher level of care; Exhibits 1-B and 1-C: BN 1373 – 1509 for her 3.10.16 hospital admission; Exhibit 1-B BN 1253 – 1358 for her 5.1.16 hospital admission; Exhibit 1-A and 1-B BN 1068 – 1178 for her 11.4.16 hospital admission; Exhibit 1-A BN 948 – 1013 for her 07.14.17  hospital admission; and Exhibit 1-A BN 837 – 947 for her 08.28.17 hospital admission.
*Plaintiffs' expert, Richard Sobel, M.D. noted discrepancies in the medical records Willis-Knighton provided plaintiffs versus the medical records upon which he was questioned during his deposition. (Exhibit 12: Dr. Sobel Depo p. 143-145) Plaintiffs cannot explain how the defendant's arrived at 37emergency room visits.

[40] Blood/oxygen saturation or "oxygen saturation" or sometimes "02 Sat" refers to the percentage of oxygen-saturated hemoglobin relative to total hemoglobin in the blood and is typically measured by a pulse oximeter.

[41] Compare Footnote 1 – (total ER visits) with Footnote 2 - (admissions to the hosp. when her 02 Sat. less than 95%).

should be precluded from referencing prior visits of the exact same patient to the exact same hospital to prove disparate treatment.

What is more, both plaintiffs expert, Richard Sobel, M.D.; M.P.H. and Willis-Knighton's expert, Jacquelyn White, M.D., reviewed A.H.'s prior ER visits and admissions in rendering their respective reports.[42] In her *Daubert* testimony Dr. White acknowledged,[43]

```
14        Dr. White, is that appropriate to look at the prior
15    visits?
16    A    Absolutely.
17    Q    Thank you.
```

Now, Willis-Knighton seeks to exclude those facts and testimony. The instant motion should be denied where plaintiffs are entitled to prove A.H. was dumped on the night in question instead of being treated as she had been on her last 32 visits to Willis-Knighton's ER.

**(3) RE: Any evidence or testimony that the Willis-Knighton medical records were improperly "altered" should be excluded at trial.**

After burying their child, plaintiffs requested A.H.'s medical records from Willis-Knighton. Willis-Knighton provided plaintiffs with 363 pages of records.[44] These records were furnished plaintiffs' expert, Dr. Richard Sobel. While this lawsuit was filed February 8, 2019, Willis-Knighton deposed plaintiffs' expert, Dr. Richard Sobel, on November 26, 2019. Plaintiffs' counsel participated by telephone. The day of Dr. Sobel's deposition Willis-Knighton had 1,758 pages of medical records delivered to the office of plaintiffs' counsel.[45] During his deposition, Dr. Sobel recognized that he had not been provided with the records upon which he was being

---

[42] See Record Doc # 60 Daubert Hearing Transcript at p. 21, 22, 62, 75, 76.
[43] See Record Doc # 60 Daubert Hearing Transcript at p. 21.
[44] See attached Exhibit 4: WK medical records produced to plaintiffs pre-lawsuit. Compare with Doc # 50 Exhibit 1-A; 1-B; and 1-C produced for the first time at Dr. Sobel's deposition.
[45] See Record Doc # 50 – Exhibit 1-A; 1-B; 1-C – Medical records produced at Dr. Sobel's deposition.

questioned. Plaintiffs timely objected on the record of the deposition.[46] Dr. Sobel recognized that

in addition to the 1,395 pages which were not provided to plaintiffs, other records, which should

have been identical, did not match.[47]

 For instance the following is an excerpt from the original records produced to plaintiffs.

This is an excerpt from A.H.'s original visit to Willis-Knighton on February 10, 2018, to-wit:[48]

**Historical:**
- **Allergies:** Codeine; FISH PRODUCT DERIVATIVES;
- **Home Meds:**
  1. Albuterol Inhl as needed
  2. *dulera 2 puffs am and 2 puffs pm*
  3. Singulair PO nightly
- **PMHx:** Asthma; Autism
- **PSHx:** None
**Historical:**

 In the records originally produced to plaintiffs prior to February of 2019, a Willis-

Knighton healthcare provider had thought it significant enough to bold and underline A.H.'s

home medications which had failed to afford the child any relief prior to her visit to the ER.

However, in the "new" records produced by Willis-Knighton at Dr. Sobel's deposition in

November of 2019, A.H.'s home medications were de-emphasized in what should be the exact

same note for the exact same time, excerpted from the exact same record to-wit:[49]

**Historical:**
- **Allergies:** Codeine; FISH PRODUCT DERIVATIVES;
- **Home Meds:**
  1. Albuterol Inhl as needed
  2. dulera 2 puffs am and 2 puffs pm
  3. Singulair PO nightly
- **PMHx:** Asthma; Autism
- **PSHx:** None
**Historical:**

---

[46] See attached Exhibit 5: Deposition of Dr. Sobel p. 149, 150, 151, 153.
[47] See attached Exhibit 5: Deposition of Dr. Sobel p. 132.
[48] See attached Exhibit 4: Medical Records produced to plaintiffs pre-lawsuit BN p. 287.
[49] See Record Doc # 50 – Exhibit 1-A – Medical Records produced at Dr. Sobel's Deposition p. 766 re-attached here as Exhibit 6.

De-emphasizing the home medications which were not working (the reason A.H. was at Willis-Knighton's Emergency Department) has a tendency to make it less likely A.H. had been stabilized at the time of discharge. The jury should be allowed to see that the record was altered in a way that benefited Willis-Knighton and is probative of the hospital's liability under EMTALA. Additionally, the "new" records show "corrections" made to the original record, of which plaintiffs were not aware prior to discovering the "new" records at Dr. Sobel's deposition, to-wit:[50]

| Corrections: | | |
|---|---|---|
| 02:20 ~~02:05~~ ~~Pulse 156bpm; Resp 36bpm; Pulse Ox 91% RA; 13.14 kg; Height 3 ft. 2 in.; BMI: 19.4; 100% breathing treatment;~~ | ~~sr11~~ | sr11 |
| 02:22 ~~02:14~~ ~~Respiratory: Respiratory effort is labored, with retractions, grunting, using tripod position; Respiratory pattern is tachypnea Airway is patent Breath sounds with wheezes bilaterally.~~ | ~~sr11~~ | sr11 |

The version of medical records originally provided plaintiffs do not have a "corrections" section which show *ex post facto* material and/or temporal alterations of A.H.'s medical records concerning "breathing treatment", "tripod position", "wheezes", and tachypnea. Dr. Sobel described these "corrections" as "fairly significant".[51]

What is more, the "missing" records produced during Dr. Sobel's deposition show the hospital's involvement with the injury to A.H.'s vagina, i.e. that different size catheters were used at different times, that the catheter inserted at Willis-Knighton Bossier was not the catheter observed at Willis-Knighton South, that public mound swelling occurred several days after the child had already been in the custody of the hospital, that Willis-Knighton repeatedly contacted Detective Allday which conspicuously correlated with a 40% reduction in the catheter size used for A.H., ect. The defendant withheld those records from plaintiffs until prescription had tolled.

---

[50] See Record Doc # 50 – Exhibit 1-A: Medical Records produced at Dr. Sobel's Deposition p. 765, 768.
[51] See attached Exhibit 5: Deposition of Dr. Sobel p. 145.

Willis-Knighton supplemented its discovery responses and Rule 26 disclosures to name witnesses Trish Koopman and Tim Culpepper as best able to explain the "audit trails"[52] which Willis-Knighton produced but plaintiffs do not understand.[53] Now, Willis-Knighton claims its nurse, Susan Rainer, not its electronic medical record ("EMR") I.T. personnel, is best able to explain Willis-Knighton's audit trail. In its supplemental disclosures, Willis-Knighton admitted nurse Rainer does not have knowledge of the EMR systems or audit trail unlike Ms. Koopman and Mr. Culpepper.[54]

**(4) RE: Plaintiffs should be prohibited from introducing any evidence, argument or testimony that A.H. did not receive a proper screening under the requirements of EMTALA.**

Plaintiffs concede Willis-Knighton's initial screening was sufficient for the hospital to acquire actual knowledge A.H. presented with an emergency medical condition. As a matter of law, a hospital has an affirmative duty to stabilize emergency medical conditions of which it acquires actual knowledge. *Battle ex rel. Battle v. Memorial Hosp. at Gulfport,* (5th Cir. 09/20/00) 228 F.3d 544 at 559 citing *Burditt v. United States Dep't of Health & Human Servs.,* 934 F.2d 1362 at 1369 (5th Cir. 1991). A hospital's duty to stabilize under EMTALA requires the hospital "…to provide such medical treatment of the emergency medical condition as may be necessary to assure, within a reasonable degree of medical probability, that no material deterioration of the condition is likely to result…"42 U.S.C.A. § 1395dd; *Smithson v. Tenet Health System Hospitals, Inc.*, U.S.D.C. 07/30/08 2008 WL 2977361; citing *Battle ex rel. Battle,* (5th Cir. 09/20/00) 228 F.3d 544 at 558-559 and *Marshall on Behalf of Marshall v. East Carroll*

---

[52] See attached Exhibit 1: Willis-Knighton supplemental Rule 26 disclosures p. 1, 2, 3 and attached Exhibit 2: Willis-Knighton's supplemental discovery responses and witness list p. 1 and 2.
[53] See attached Exhibit 7: Willis-Knighton's "audit trail".
[54] See attached Exhibit 1: Willis-Knighton supplemental Rule 26 disclosures p. 1, 2, and 3and attached Exhibit 2: Willis-Knighton supplemental discovery responses and witness list p. 1 and 2.

*Parish Hosp. Service Dist.* (5th Cir. 02/09/98) 134 F.3d 319 at 325. Part and parcel of the hospital's stabilization requirement is "to provide for such ***further medical examination*** and such treatment as may be required to stabilize the medical condition." See 42 U.S.C.A. § 1395dd(e)(1)(A); *Battle ex rel. Battle,* (5th Cir. 09/20/00) 228 F.3d 544 at 558-559 and *Marshall on Behalf of Marshall v. E. Carroll Par. Hosp. Ser. Dist.* (5th Cir. 02/09/98) 134 F.3d 319 at 325. (Emphasis supplied) Dr. Sobel recognizes "further medical examination" basically amounts to "screening" in the stabilization process.

Moreover, Dr. Sobel explains some of Willis-Knighton's EMTALA violations qualify as failure to stabilize, failure to provide further medical examination, and failure to screen. For instance, Dr. Sobel opines, "Dr. Easterling and/or Willis-Knighton South breached the standards of care consistent with EMTALA in the following manners:

> 3. Failure to recognize, consistent with WK's "Oxygen Protocol",
> that reasonable period of observation with favorable room air
> oxygen saturation in pediatric patient is required before
> supplemental oxygen can be properly discontinued. Again, this is
> part and parcel of the medical screening and emergency
> stabilization process.

Plaintiffs anticipate Willis-Knighton may attempt to characterize its failure to observe A.H.'s room air oxygen saturation as strictly a "screening" claim rather than a "stabilization" claim when, in reality, Willis-Knighton violated numerous EMTALA provisions, including the hospital's duty to provide for such "further medical examination" in the stabilization process. Rather than striking fragments of Dr. Sobel's report, plaintiffs propose Dr. Sobel be allowed to explain to the jury what effect, if any, "missing" medical records not furnished prior to his deposition may have on opinions in his report, if any. Such is a particularly appropriate remedy where Dr. Sobel did not have the benefit of 1,395 pages of A.H.'s medical records secreted from

plaintiffs and "corrections" in the altered "new" records prior to rendering his report. It is noted that in his expert report, Dr. Sobel reserved the right to amend and supplement his report after conspicuously he recognized the version of A.H.'s medical records provided plaintiffs were "incomplete".[55]

**(5) RE: Plaintiffs should not make any reference to, or introduce any evidence, testimony or argument regarding medical malpractice in this case.**

The same concern described above is also present here. Although a defendant's conduct may sometimes qualify as both malpractice and EMTALA violation, the causes of action remain distinct. See *Cervantes v. Tenet Hospital Limited,* (W.D. Tex. 03/26/19) 372 F.Supp.3d 486 at 494 citing *Power v. Arlington Hospital Ass.,* 42 F.3d 851 st 859 (4th Cir. 1994). While it is true plaintiffs have not sought recovery under a malpractice theory of liability, the misconduct of Willis-Knighton, and its agent for the purposes of EMTALA, Dr. David Easterling's, can be arguably construed as both malpractice and patient dumping. Willis-Knighton will likely argue that the misconduct in this case is "malpractice" not a violation of EMTALA. Such argument is intended to confuse the jury, if not, likely to do so.

Instead of confusing the jury on how they should find a violation of EMTALA where malpractice has not been alleged, plaintiffs propose the jury should simply be instructed on the elements of EMTALA which plaintiffs must prove in order to recover under the federal statute. Either EMTALA was breached or it was not. Malpractice is a non-issue, and should not be for the jury to consider in this case.

---

[55] See Record Doc # 50 – Exhibit 14: Expert Report of Dr. Sobel p. 1.

## CONCLUSION

For the law and reasons set forth above, defendant's motion should

Respectfully Submitted:

S. HUTTON BANKS LBN 37377
SEDRIC E. BANKS LBN 2730
1038 North Ninth St.
Monroe, Louisiana 71201
318-388-1655 telephone
318-816-5026 facsimile
bankssh@hotmail.com

*Attorneys for Akeem Henderson and
Jennifer Alexander*

## CERTIFICATE OF SERVICE

I hereby certify on this 1st day of September, 2020, a copy of the above and foregoing was served on all counsel of record via the CM/ECF/PACER system.

S. HUTTON BANKS